IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


ROY HARNESS,
KAMAL KARRIEM,
and GABRIELLE JONES,

        Plaintiffs

v.                      Civil Action No.  3:17-CV-791-DPJ-FKB

DELBERT HOSEMANN, Secretary of State
of Mississippi,

        Defendant


COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.    This is a challenge to certain portions of Section 241 of the Mississippi Constitution of 1890 that list specific crimes that were set forth in 1890 as crimes that forever disqualify a citizen from voting. That 1890 list of crimes is the last remaining vestige of the infamous plan by the framers of that Constitution to rob African-Americans of the right to vote that they attained after slavery was abolished in the aftermath of the Civil War.

2.    A number of methods of African-American voter suppression were adopted by the framers of the 1890 Constitution, including literacy tests and poll taxes. One of those tools was contained in Section 241. That section provided --- and still provides today --- that "[e]very inhabitant of this state, except idiots and

insane persons, who is a citizen of the United States of America" and who meets the age requirement (previously 21 and now 18) and residency requirement and is duly registered "is declared to be a qualified elector" except for those who have been convicted of certain specific criminal offenses.  The offenses set forth in 1890 were those that the drafters believed were committed disproportionately by African-Americans.   As stated by the Mississippi Supreme Court six years later, the 1890 convention "swept the circle of expedience to obstruct the franchise by the negro race" by targeting "the offenses to which its weaker members were prone." *Ratliff v. Beale,* 20 So. 863, 868 (1896).

3.     The disqualifying crimes adopted as part of Section 241 in 1890 that are still in effect today are "bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement [and] bigamy."  Burglary was in the original list but was removed in 1950 by constitutional amendment.  Murder and rape were added by constitutional amendment in 1968.  This lawsuit seeks to nullify and strike only those crimes in the original list.  It does not challenge the use of murder and rape as disqualifying crimes.

4.     In 1998, the United States Court of Appeals for the Fifth Circuit held that the 1950 and 1968 amendments constituted a "re-enactment" of the original list in § 241 by which "a majority of the voters had to approve the entire provision," and that this "re-enactment" removed the discriminatory taint of the

original version.   The Court also stated that the plaintiff in that case, a prisoner representing himself, had offered no evidence that the 1950 and 1968 amendments were themselves tainted by unconstitutional discrimination.   Accordingly, that Court held that the plaintiff had not proven § 241 to be unconstitutional.   *Cotton v. Fordice,* 157 F.3d 388, 391-392 (5th Cir. 1998).   Because the plaintiffs here will present allegations and evidence that were not presented by the *pro se* plaintiff in that case on issues that were not briefed by the parties --- including the fact that the 1950 and 1968 amendments were not "re-enactments" of the original list, that the voters were not called upon to approve or reject the original list, and that the amendments did not remove the discriminatory taint of the original version --- the outcome of this case is not governed by that court decision.

*Jurisdiction and Venue*

5.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), and 42 U.S.C. § 1983.   Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.

6.     Venue is proper under 28 U.S.C. § 1391(b)(1)-(2) as relevant acts and omissions occurred, and the defendant resides, within the Southern District of Mississippi.

*Parties*

7.      Plaintiff Roy Harness was convicted of forgery in 1986 and has completed his sentence.  Earlier this year, at the age of 62, Mr. Harness completed his baccalaureate degree in Social Work from Jackson State University and was awarded a scholarship to pursue his Master's degree.  Plaintiff Kamal Karriem, a former city council member in Columbus, was convicted of embezzlement in 2005 and has completed his sentence.  Mr. Karriem is a pastor and is one of the owners and operators of his family's restaurant.  Plaintiff Gabrielle Jones was convicted of forgery in 2009 and receiving stolen property in 2013.  She has completed her sentences.

8.      Defendant Delbert Hosemann is the Secretary of State of Mississippi. As such, he discharges a number of responsibilities related to voter registration and determining who is qualified to register and vote.  For example, pursuant to Miss. Code § 23-15-165, the Secretary of State maintains a statewide centralized voter registration database  and insures that the registrar and election commissioners of each county receive regular reports of death, change of address, and convictions for disenfranchising crimes that apply to registered voters in each county.  The Secretary of State regularly receives a list of criminal convictions and coordinates with the counties to insure that no one convicted of one of the disfranchising crimes is allowed to register and vote.  The Secretary of State trains local election

officials and assists them in carrying out their responsibilities.  He is sued in his official capacity.

*Section 241 and the 1890 Convention*

9.      As adopted in 1890, § 241 read as follows:

> Every male inhabitant of this State, except idiots, insane persons and Indians not taxed, who is a citizen of the United States, twenty-one years old and upwards, who has resided in this State two years, and one year in the election district, or in the incorporated city or town, in which he offers to vote, and who is duly registered as provided in this article, *and who has never been convicted of bribery, burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery, embezzlement or bigamy*, and who has paid, on or before the first day of February of the year in which he shall offer to vote, all taxes which may have been legally required of him, and which he has had an opportunity of paying according to law, for the two preceding years, and who shall produce to the officers holding the election satisfactory evidence that he has paid said taxes, is declared to be a qualified elector; but any minister of the gospel in charge of an organized church shall be entitled to vote after six months residence in the election district, if otherwise qualified.

(Emphasis added).

10.     As mentioned previously, this otherwise quirky collection of crimes was  listed in Section 241 because the 1890 framers believed them to be disproportionately committed by African-Americans and they chose to "obstruct the franchise by the negro race" by targeting "the offenses to which its weaker members were prone." *Ratliff v. Beale,* 20 So. at 868.

11.     There were other provisions of the 1890 Constitution that also were designed to prevent African-Americans from voting.  For example, Section 243

required payment of a poll tax.   This poll tax requirement was later invalidated in *United States v. Mississippi,* No. 3791 (S.D. Miss. Mar. 31, 1966), which was based on *Harper v. Virginia Board of Elections,* 383 U.S. 663 (1966), and was formally repealed in 1974.   Section 244 imposed a literacy and understanding clause.  That provision was nullified by the federal Voting Rights Act of 1965 and was formally repealed in 1975.

12.     Section 241's list of disenfranchising crimes was an integral part of the overall effort to prevent African-Americans in Mississippi from voting: "Devices used by Mississippi to inhibit black voters include poll taxes, literacy tests, residency requirements, "good moral character" tests, *a disenfranchising crimes provision*, and white primaries." *Mississippi State Chapter, Operation PUSH v. Mabus,* 932 F.2d 400, 402 (5th Cir. 1991) (emphasis added).

*The 1950 and 1968 Amendments to Section 241*

13.     In 1950, the Mississippi legislature passed a resolution to amend Section 241 for multiple purposes, including the removal of burglary from the list of disqualifying crimes.   The first paragraph of the resolution stated:   "A concurrent resolution to amend Section 241 of the Mississippi Constitution of 1890 so as to provide the qualifications of electors, and amending by providing that the wife of a minister of the gospel legally residing with him shall be qualified to vote after a residence of six months in the election district, or incorporated city or town,

if otherwise qualified."   The resolution then stated that the Legislature resolved "[t]hat the following amendment to the Constitution of the State of Mississippi be submitted to the qualified voters of the State for ratification or rejection . . . viz: Amend section 241 of the constitution of the State of Mississippi, so that it shall read as follows . . . .:"   The text of the proposed Section 241 was then listed without the crime of burglary included.  Miss. Laws 1950 Ch. 569, H. Con. R. 10. The November 1950 ballot contained the exact same language as the resolution and was followed by two options from which the voter could select.   "For Amendment" or "Against Amendment."   At no point did the legislative resolution or the ballot state that the amendment would affect the list of disqualifying crimes or that it would remove burglary from the list.  While burglary was not included in the list, neither the resolution nor the ballot explained that it previously was on the list.  More importantly, neither the resolution nor the ballot gave legislators and voters the option of choosing whether to retain or repeal the remainder of the original 1890 list of disqualifying crimes.

14.   In 1968, the Mississippi legislature passed a resolution to amend Section 241 for multiple purposes, including the addition of murder and rape as disqualifying crimes.  The first paragraph of the resolution stated:  "A concurrent resolution to amend Section 241, Mississippi Constitution of 1890, to provide for one-year residency within the State and County and a six-month residency within

the election precinct to be a qualified elector; to delete certain improper parts of the Section; and for related purposes."   The resolution then stated that the Legislature resolved "[t]hat the following amendment to the Constitution of the State of Mississippi be submitted to the qualified voters of the State for ratification or rejection . . . viz: Amend section 241 of the constitution of the State of Mississippi, so that it will read as follows: . . . . "  The text of the proposed Section 241 was then listed with the crimes murder and rape included.   The resolution also instructed the Secretary of State to place the resolution on the ballot.  Miss. Laws 1968 Ch. 614, H. Con. R. 5.   The June 1968 ballot contained the exact same language as the resolution and was followed by two options from which the voter could select.  "For the Amendment" or "Against the Amendment."  At no point did the legislative resolution or the ballot state that the amendment would affect the list of disqualifying crimes or that it would add murder and rape to the list.  While murder and rape were included in the list, neither the resolution nor the ballot explained that they were not previously on the list.  More importantly, neither the resolution nor the ballot gave legislators and voters the option of choosing whether to retain or repeal the other crimes on the list which were part of the original 1890 provision.

15.   Accordingly, in passing the 1950 and 1968 amendments, neither two-thirds of the legislature nor a majority of the voters had to approve the entirety of

Section 241 or the list of crimes that were originally included in it.  They only had to approve the amendments by voting "for the amendment[s]."  Even then, the amendments were not explained to them.  These votes were not re-enactments of Section 241.

16.    Moreover, the amendments to the list were not the subject of discussion in the media.  While there were several articles in the daily *Clarion-Ledger* in both 1950 and 1968 about proposed constitutional amendments, the only discussion in those articles regarding amendments to Section 241 related to the proposed residency requirement for ministers' wives in 1950 and the proposed change in the general residency requirement in 1968.  There was no mention in those articles about the list of disqualifying crimes from 1890 or any changes to it.

*Cotton v. Fordice*

17.    *Cotton v. Fordice* was a challenge to Section 241 filed in 1996 by two prisoners at the Mississippi State Penitentiary at Parchman who represented themselves:  Jarvious Cotton and Keith Brown.   On March 18, 1997, the United States Magistrate Judge issued a report and recommendation stating that summary judgment should be granted for the State Defendants.  The Magistrate said that the plaintiffs' claim that the 1890 constitutional convention targeted crimes that the framers believed African-Americans were prone to commit was "purely speculation and conjecture" and that "[t]he Plaintiffs present absolutely no proof

that these facts are true." *Cotton v. Fordice,* No. 3:96cv141BN (S.D. Miss.  March 18, 1997) Report & Rec. at p. 5.   Nothing in the report and recommendation referred to the 1950 and 1968 amendments to Section 241.    The plaintiffs filed objections to the report and recommendation.  On April 7, 1997, the District Judge overruled the objections, adopted the report and recommendation, and entered summary judgment for the State Defendants in a two page order.  The order did not mention the 1950 and 1968 amendments to Section 241.

18.   The plaintiffs appealed the District Court's decision in *Cotton.* However, Jarvious Cotton's appeal was severed and dismissed because of issues relating to prior cases and whether he qualified to proceed *in formal pauperis* in the appeal.  Nevertheless, both Brown and Cotton listed their names as lay counsel for Brown in the Fifth Circuit briefing.  Neither Brown's brief or reply brief in the Fifth Circuit mentioned the 1950 or 1968 amendments to Section 241.  The State Defendants' Fifth Circuit brief did not mention them either except to say following after quoting from *Ratliff v. Beale*:   "At the time *Ratliff* was written, Section 241, read quite differently than it does today. One of the most important amendments that concerns this matter is the crimes which result in disenfranchisement upon conviction. The original 1890 version of Section 241 disenfranchised bribery, burglary, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement and bigamy. Section 241, as it reads today, also includes

murder and rape, but does not mention burglary. The present inclusion of the violent crimes of murder and rape and the deletion of burglary makes *Ratliff* inapplicable to Section 241 as it reads today. Cotton and Brown's argument that the discriminatory effect Section 241 may have had when it was enacted over one hundred years ago makes the section unconstitutional today is without merit." *Cotton v. Fordice,* No. 97-60275 (5th Cir.), Brief for Appellees at p. 10.

19.    A Fifth Circuit panel affirmed the grant of summary judgment.  After citing *Ratliff,* the panel said:  "Although § 241 was facially neutral and technically in compliance with the Fourteenth Amendment, the state was motivated by a desire to discriminate against blacks."  157 F.3d at 391.  The opinion continued:  "Were this the end of the story, we would be bound by *Hunter* [*v. Underwood,* 471 U.S. 222 (1985)], which, construing an Alabama provision of similar age and intent, held it violative of equal protection. *Hunter*, however, left open the possibility that by amendment, a facially neutral provision like § 241 might overcome its odious origin. That is what has happened here."   157 F.3d at 391 (footnote omitted).  The opinion went on the state that burglary was removed in 1950, that murder and rape (which were not considered "black" crimes in 1890) were added in 1968, that the amendments were "a deliberative process," that two-thirds of each house had to approve them to put them on the ballot, that the Secretary of State was required to publish a full text version of the proposed revised provision within two weeks of

the election, and that "a majority of the voters had to approve the entire provision, including the revision." *Id.* "Because Mississippi's procedure resulted both in 1950 and 1968 in a re-enactment of § 241, each amendment superseded the previous provision and removed the discriminatory taint associated with the original version." *Id.* (footnote omitted).

20.     Neither the ballot language nor the language of the concurrent legislative resolutions were introduced into the record in *Cotton v. Fordice* or discussed in the briefs or the opinion.  As stated earlier in this Complaint, neither the ballot language nor the language of the resolutions explained that the amendments would affect the list of disqualifying crimes, much less explain how they would affect it.  More importantly, neither the resolutions nor the ballots gave legislators and voters the option of re-enacting or repealing the remainder of the original list of disqualifying crimes.

21.     Thus, as mentioned previously, in both 1950 and 1968, neither two-thirds of the legislature nor a majority of the voters had to approve the entirety of Section 241 or the list of crimes that were originally included in it.  At most, they had to approve the amendments by voting "for the amendment[s]" and even those were not explained to them.  These votes were not re-enactments of Section 241. The Fifth Circuit's determinations otherwise were wrong as a factual matter.

Those determinations were not based on a record, briefing, or argument that addressed the issue.

22.    After erroneously stating that "voters had to approve the entire revision" and that "Mississippi's procedure resulted both in 1950 and 1968 in a re-enactment of § 241," thus "remov[ing] the discriminatory taint associated with the original version," 157 F.3d at 391, the panel added the following:  "Viewed in this light, § 241 as it presently exists is unconstitutional only if the amendments were adopted out of a desire to discriminate against blacks. *See Hunter,* 471 U.S. at 228.  Brown has offered no such proof regarding the current version of § 241; he relies exclusively on the now-irrelevant admission in *Ratliff* that the original version of § 241 was adopted for the purpose of discriminating against blacks." 157 F.3d at 392.

*Discriminatory Intent*

23.    To summarize, the list of disqualifying crimes adopted in 1890 that remains in § 241 today (with the exception of burglary) was chosen by the 1890 framers with the intent to discriminate against African-Americans and prevent them from voting.  It is a vestige of the doctrine of white supremacy.  Nothing in any subsequent amendment to § 241 "re-enacted" or "approved" that list or removed the discriminatory taint of the original provision.

24.    Alternatively, even if the 1950 and 1968 amendments somehow had "re-enacted" or "approved" the original list, those amendments deliberately maintained a discriminatory provision of the 1890 constitution that has always been recognized as having been adopted for the purpose of preventing black people from voting.   Moreover, the 1950 amendment was adopted when the legislature was all-white and the electorate was almost all-white.   Although burglary was removed, the rest of the list remained intact without change.   The 1968 amendment was adopted when there was only one black member of the Mississippi legislature. The only reason he was there, and the only reason the electorate included some black voters, was the passage by the United States Congress of the Voting Rights Act of 1965.   While murder and rape were added, the 1968 amendment did not change the rest of the list.

25.    The 1950 and 1968 amendments occurred in times of extensive racial discrimination and massive resistance by all levels of Mississippi government, and by most of the white populace, to desegregation.  In 1950, Pauli Murray published her extensive survey, *States Laws on Race and Color* (1950) (Davison Douglas ed., reprint 1997), which documented Mississippi's laws requiring segregation throughout society, including in hospitals, railway, prisons, schools (including the school for the blind).   As the Fifth Circuit stated in 1963:   "[T]he State of Mississippi has a steel-hard, inflexible, undeviating official policy of segregation.

The policy is stated in its laws.  It is rooted in custom." *United States v. City of Jackson,* 318 F.2d 1, 5 (5th Cir. 1963).  As late as 1973, the "Mississippi highway patrol has never in its history employed a member of the Negro race as a sworn officer." *Morrow v. Crisler,* 479 F.2d 960, 961-961 (5th Cir. 1973).  The Supreme Court noted in 1971 that "State legislatures and political party committees in Alabama and Mississippi have adopted laws or rules since the passage of the [Voting Rights Act of 1965] which have had the purpose or effect of diluting the votes of newly enfranchised Negro voters." *Perkins v. Matthews,* 400 U.S. 379, 389 (1971) (citation omitted).[1]

26.   Consistent with this resistance to racial equality, the legislatures that sat in 1950 and 1968 failed to repeal the extensive structure of discriminatory legislation that existed and took steps to add to it.  For example, the 1950 legislature (which was elected in 1947 and held sessions in 1948 and 1950) passed legislation to fortify segregation in secondary education, higher education, prisons, reform schools, and 4-H clubs for young people.  It also passed a number of resolutions in defense of racial discrimination.  Soon after that legislature was elected in 1947, Governor Fielding Wright claimed in his inaugural address that proposed federal anti-lynching, anti-poll tax, and anti-segregation legislation

---

[1] This resistance to change and its relevance to the Fifth Circuit's *Cotton* holding is discussed in Gabriel J. Chin, *Rehabilitating Unconstitutional Statutes:  An Analysis of Cotton v. Fordice,* 71 U. of Cinn. L. Rev. 421, 440-452 (2002).

"aimed to wreck the South and our institutions" and called on Mississippians to "bolt" the national Democratic Party if it moved forward with efforts to pass those bills.   The Mississippi legislature then passed a resolution praising Wright's inaugural address and stating the legislators "join the Governor in the warning given to leaders of the National Democratic Party and to the nation, that Mississippians will no longer tolerate these abuses and efforts to destroy the South and her institutions, and hereby pledge our full support to the Governor in his efforts to protect and uphold the principles, traditions, and way of life of our beloved Southland."   Miss. Laws 1948 Ch. 536, H. Con. R. 15.   That legislature subsequently passed a resolution expressing vigorous "opposition to recommendations of the President's Civil Rights Committee", which had proposed a federal anti-lynching law, anti-poll tax measures, and a permanent Fair Employment Practices Commission, claiming those recommendations would lead to the "subjugation of the majority to the demands of various minority groups, and not least among these recommendations, certain ones whose effect would be to deprive the states of their rights with regard to suffrage and elections laws." Miss. Laws 1948 Ch. 541, H. Con. R. 22.

27.   Resistance to change was also the theme of the Mississippi legislature in the years after the 1964 Civil Rights Act and the 1965 Voting Rights Act. "Mississippi, which was one of the leaders of the black disfranchisement

movement in the South with the 'Mississippi Plan' of 1890, once again led the way

with the black vote dilution strategy developed and implemented in Mississippi's

massive resistance legislative session in 1966.  Before the session ended, the all-

white state legislature enacted thirteen major pieces of legislation which racially

altered Mississippi's election laws and made it more difficult for black candidates

to get elected and for the newly enfranchised black voters to gain representation of

their choice."  Frank R. Parker, *Black Votes Count* p. 36 (1990).    Many of the

legislators in the 1966 session were re-elected in 1967 and served in the session in

1968.  In many ways, they maintained the discrimination of the past.  For example,

during the 1968 session, they amended yet maintained many of the discriminatory

laws passed in 1966, including provisions allowing counties to switch from district

to at-large elections of county boards of supervisors and to switch from elected to

appointed school superintendents.  Similarly, the 1968 legislature amended a 1964

law authorizing the State to provide financial tuition assistance to students

attending private schools by increasing the amount of assistance available to each

private school student.  That law was struck down in 1969 because "[t]he statute,

as amended, encourages, facilitates, and supports the establishment of a system of

private schools operated on a racially segregated basis as an alternative available to

white students seeking to avoid desegregated public schools."  *Coffey v. State

Educational Finance Commission,* 296 F. Supp. 1389, 1393 (S.D. Miss. 1969)

(three-judge court).    That same legislature served through the 1971 session, when it passed a state legislative redistricting plan that elected 93% of the House members and 65% of the Senators from multimember and floterial districts, which are classic tools for diluting African-American voting strength.

28.    In many ways, both the 1950 and 1968 legislatures maintained the racial discrimination of the past and did so intentionally. The failure of the legislature to repeal the discriminatory 1890 disfranchising crimes list except for burglary in 1950, and the failure of the legislature to repeal any of the discriminatory list in 1968, was the result of intentional discrimination.   As mentioned previously, the 1950 electorate was almost all-white.   The 1968 electorate contained some African-Americans, but the white majority almost uniformly refused to vote for African-American candidates, and therefore could not be relied upon to support ballot measures that would lessen racial discrimination.   "[B]arriers to black electoral success [in the 1967 state and local elections] included racial bloc voting by whites, who generally refused to vote for black candidates."   Parker, *Black Votes Count* p. 76.   The 1950 and 1968 amendments did not remove the discriminatory taint from the actions of the 1890 constitutional convention.

*Application of Section 241*

29.    The Mississippi Attorney General's Office has concluded that the word "theft" in Section 241 encompasses a number of crimes, including receiving stolen property, felon shoplifting, multiple types of larceny, unlawful taking of a motor vehicle, extortion, carjacking, robbery, and armed robbery.  He also has concluded that the term "false pretenses" in Section 241 includes the crime of felony bad check.  Thus, people convicted of those subsidiary crimes have also been deemed to be disfranchised and are not allowed to vote.

*Discriminatory Impact*

30.    The disqualification of people convicted of the crimes that were listed in Section 241 in 1890 and that remain in Section 241 today, and their subsidiary crimes, has a discriminatory impact.   For example, according to the 2010 census, 35% of Mississippi's population 18 and over is African-American.  Approximately 60% of the people convicted of those disqualifying crimes in the Mississippi state courts between 1994 and the present are African-American.

*Removing the 1890 Discrimination from Section 241*

31.    At present, Section 241 reads as follows:

Every inhabitant of this state, except idiots and insane persons, who is a citizen of the United States of America, eighteen (18) years old and upward, who has been a resident of this state for one (1) year, and for one (1) year in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city or town in which he offers to vote, and who is duly registered as provided in this

article, and who has never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector, except that he shall be qualified to vote for President and Vice President of the United States if he meets the requirements established by Congress therefor and is otherwise a qualified elector.

In order to remove the unconstitutional 1890 discrimination from Section 241, the words "bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy," which were in the original 1890 version, must be nullified so that they no longer have any force or effect. The Defendant, his agents, and all acting in concert withhim must be enjoined from preventing people convicted of those crimes from voting. The disqualifying crimes that remain will be murder and rape.

### *Violations*

32.   The disqualification of Mississippians from voting based on convictions for "bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy," and all subsidiary crimes that have been determined to fit within those terms for purposes of disenfranchisement, is a violation of the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

### *Relief*

33.   This Court should declare that the disqualification of Mississippians from voting based on convictions for "bribery, theft, arson, obtaining money or

goods under false pretense, perjury, forgery, embezzlement or bigamy," and all subsidiary crimes that have been determined to fit within those terms for purposes of disenfranchisement, is a violation of the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

34.     The Court should enjoin the Defendant, his agents, and all acting in concert with them from taking any steps to prevent Mississippians from registering and voting because they were convicted of "bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy," or were convicted of any of the subsidiary crimes that have been determined to fit within those terms for purposes of disfranchisement, and should further nullify and enjoin them  from giving any force and effect to the words "bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy" in Section 241 of the Mississippi Constitution.

35.     The Court should grant the Plaintiffs their costs, expenses, attorneys' fees, and such other relief to which they may be entitled.

Respectfully submitted,


_s/ Beth L. Orlansky_
BETH L. ORLANSKY, MSB# 3938
JEREMY EISLER, MSB# 5493
MISSISSIPPI CENTER FOR
JUSTICE
P.O. Box 1023
Jackson, MS 39205-1023
(601) 352-2269
borlansky@mscenterforjustice.org
jeisler@mscenterforjustice.org

DAVID M. LIPMAN
THE LIPMAN LAW FIRM
5915 Ponce de Leon Blvd.
Suite 44
Coral Gables, Florida 33146
(305) 662-2600
dmlipman@aol.com
_Application to be filed_

_s/ Robert B.  McDuff_
ROBERT B. MCDUFF, MSB 2532
767 North Congress Street
Jackson, MS 39202
(601) 969-0802
rbm@mcdufflaw.com
_Lead Counsel_

FRED L. BANKS JR, MSB# 1733
PHELPS DUNBAR
P.O. Box 16114
Jackson, MS 39236-6114
(601) 352-2300
fred.banks@phelps.com

ARMAND DERFNER
DERFNER & ALTMAN
575 King Street, Suite B
Charleston, SC  29403
(804) 723-9804
aderfner@derfneraltman.com
_PHV application to be filed_

_Counsel for Plaintiffs_