

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

DENNIS HOPKINS; HERMAN PARKER
JR.; WALTER WAYNE KUHN JR.;
BYRON DEMOND COLEMAN; JON
O'NEAL; and EARNEST WILLHITE,
individually and on behalf of a class of all
others similarly situated,

    Plaintiffs,

      v.

SECRETARY OF STATE DELBERT
HOSEMANN, in his official capacity,

    Defendant.

Civil Action No. 3:18 Cv 188 -CWR -LRA

## CLASS ACTION COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF



**EXHIBIT**

A

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

JURISDICTION & VENUE .................................................................................4

PARTIES .................................................................................................................4

GENERAL ALLEGATIONS ...............................................................................7

I.   Mississippi's criminal disenfranchisement scheme was designed to selectively and permanently strip black citizens of their right to vote. .......................................7

    A.   The lifetime voting ban was carefully crafted to disenfranchise black voters....................................................................................................8

    B.   The lifetime voting ban was enacted to punish Mississippi citizens convicted of certain crimes. ...................................................................9

    C.   The suffrage bill provision empowered the legislature with unfettered discretion to decide whose voting rights to restore................................10

II.   The fundamental structure of Mississippi's criminal disenfranchisement scheme has not changed since 1890..........................................................................11

III.   A disenfranchised citizen who registers to vote or votes may face criminal penalties. ........................................................................................................14

IV.   A disenfranchised citizen has no realistic opportunity to regain the right to vote by suffrage bill. ..............................................................................................15

    A.   The complex, multi-step process for regaining the right to vote by suffrage bill is discretionary at every level. ........................................16

    B.   The fourteen successful suffrage bills of the past five years illustrate the inherent arbitrariness of the process. ...............................................20

V.   Mississippi's lifetime voting ban impacts tens of thousands of citizens who have paid their debts to society. ..............................................................................22

VI.   Mississippi's lifetime voting ban is an outlier nationwide. ..............................23

VII.   Section 2 of the Fourteenth Amendment does not permit states to permanently deny citizens the right to vote based on a criminal conviction. .........................33

CLASS ACTION ALLEGATIONS ....................................................................35

CAUSES OF ACTION ....................................................................................................38

    FIRST CAUSE OF ACTION ...............................................................................38

    SECOND CAUSE OF ACTION ..........................................................................39

    THIRD CAUSE OF ACTION ..............................................................................40

    FOURTH CAUSE OF ACTION ..........................................................................41

    FIFTH CAUSE OF ACTION ...............................................................................42

PRAYER FOR RELIEF .................................................................................................43

## PRELIMINARY STATEMENT

1.      The right to vote is the cornerstone of citizenship in a democratic society. This lawsuit challenges the arcane criminal disenfranchisement scheme crafted more than 125 years ago by delegates to the 1890 Mississippi Constitutional Convention. The scheme, created in the wake of Reconstruction, was harsh, punitive and unforgiving. It remains one of the most extreme and unjust in the nation. Born out of racial animus and still disproportionately impacting black Mississippians, the scheme impermissibly denies the right to vote to tens of thousands of citizens across the state. Under Section 241 of the Mississippi Constitution, individuals who are convicted in Mississippi state courts of numerous common crimes lose the right to vote for the rest of their lives, with effectively no avenue to seek restoration. Once so marked, Plaintiffs, like those here, can never again be full and functioning members of the civic community even after they have completed their sentences. Years, or even decades, of crime-free exemplary life does not excuse the historic conviction. Such a scheme has no place in 21st century America.

2.      Nearly all other states restore voting rights to disenfranchised citizens after they have completed their sentences, if not sooner. But in Mississippi, a disenfranchised citizen may only regain his or her right to vote at the behest of the Governor, or through the rarity of an arbitrary suffrage bill passed by the Mississippi Legislature pursuant to Section 253 of the Mississippi Constitution. The suffrage bill provision establishes no objective criteria for the restoration of voting rights. Instead, Mississippi legislators have complete discretion to determine whether or not to allow a disenfranchised citizen to vote again. In the last five years, only fourteen Mississippians have obtained the restoration of their voting rights by successful suffrage bill.

3.      Section 241's lifetime disenfranchisement provision, effectively a lifetime voting ban, violates the Eighth Amendment's prohibition on cruel and unusual punishment, as measured

under modern standards of fairness and decency. Section 241 also violates the Fourteenth Amendment, which only permits states to temporarily "abridge" an individual's right to vote based on his or her "participation in rebellion, or other crime."

4.     Section 253, the suffrage bill provision, is also unconstitutional. This provision violates the Equal Protection Clause of the Fourteenth Amendment because: (i) it permits state officials to arbitrarily restore voting rights to some Mississippi citizens and not others; and (ii) it was enacted in 1890 with discriminatory intent, has not since been amended, and continues to disproportionately affect black citizens. The suffrage bill provision also violates the First Amendment by impermissibly vesting government officials with unbridled discretion to determine who may engage in political expression and political association, both fundamental First Amendment freedoms implicated by the right to vote.

5.     Plaintiffs Dennis Hopkins, Herman Parker Jr., Walter Wayne Kuhn Jr., Byron Demond Coleman, Jon O'Neal, and Earnest Willhite (collectively, the "named Plaintiffs") are among the tens of thousands of Mississippi citizens who have paid their debts to society, yet continue to serve an extraordinarily unjust sentence of lifetime disenfranchisement. Each named Plaintiff lacks access to a fair and objective process for the restoration of voting rights. The named Plaintiffs seek to represent a class consisting of similarly situated Mississippi citizens (the "Class" or "Class members") who (a) have been convicted of a crime the Secretary of State treats as disenfranchising under Section 241 of the Mississippi Constitution and/or Miss. Code § 23-15-11 (a "disenfranchising offense"), and (b) have completed their sentences, including any term of incarceration, supervised release, parole and/or probation (their "sentences").

2

6.      The defendant in this action is Secretary of State Delbert Hosemann (the "Secretary of State"), who is "designated as Mississippi's chief election officer" for purposes of the National Voter Registration Act of 1993.[1]

7.      Plaintiffs, on behalf of themselves and the Class members, seek relief for the Secretary of State's violations of their rights, privileges, and immunities secured by 42 U.S.C. § 1983 ("Section 1983") and the First, Eighth, and Fourteenth Amendments of the United States Constitution.

8.      The named Plaintiffs seek to represent a certified class for the purpose of obtaining injunctive and declaratory relief only. They seek a class-wide judgment declaring that (a) Mississippi's lifetime voting ban violates the Eighth Amendment's prohibition on cruel and unusual punishment, as well as the Fourteenth Amendment; and (b) Mississippi's inherently arbitrary and racially discriminatory suffrage bill provision violates both the Equal Protection Clause of the Fourteenth Amendment and the First Amendment.

9.      The named Plaintiffs also seek a class-wide injunction (a) requiring the Secretary of State to reinstate to the voter registration rolls, and automatically restore voting rights to, all Mississippi citizens who have completed their sentences; and (b) enjoining the Secretary of State from denying any Mississippi citizen the right to register to vote and cast a ballot in Mississippi on the basis of his or her conviction of a disenfranchising offense if that citizen has completed his or her sentence.

10.     Plaintiffs also seek an award of attorneys' fees and costs and such other relief as this Court deems equitable and just.

---

[1]     Miss. Code Ann. § 23-15-211.1 (2018).

3

### JURISDICTION & VENUE

11.     This action is brought pursuant to 42 U.S.C. § 1983.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

13.     This court has personal jurisdiction over the Secretary of State, who is an elected official in Mississippi. The Secretary of State works and resides in the State of Mississippi.

14.     This Court is authorized to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

15.     This Court is authorized to award attorneys' fees under 42 U.S.C. § 1988(b).

16.     Venue is properly set within the United States District Court for the Southern District of Mississippi pursuant to 28 U.S.C. § 1391.

### PARTIES

#### *Plaintiffs*

17.     Plaintiff Dennis Hopkins is a white 43-year old citizen of the United States who lives in Marshall County, Mississippi. Mr. Hopkins owns his own towing business, and his wife is a schoolteacher and school bus driver. Together, they are raising eight children, and they have been foster and adoptive parents. Mr. Hopkins is also a grandfather. He has devoted his life to working with children. He founded a local peewee football team, and he coaches softball and baseball. Despite the many contributions he has made to his community, Mr. Hopkins is not eligible to vote in Mississippi. In 1998, he was convicted of grand larceny, a disenfranchising offense under Mississippi state law. He has not been convicted of any crimes since completing his sentence over sixteen years ago. Mr. Hopkins is devastated by his inability to vote. He says, "The government is telling us—you don't vote, so you don't matter . . . I haven't gotten in

4

trouble for 20 years, but I still can't cast my vote for my children's future. I feel like a branded man."

18.     Plaintiff Herman Parker Jr. is a black 44-year-old citizen of the United States who resides in Warren County, Mississippi. He is married with two children. He has been working at the Vicksburg Housing Authority for over a decade. Although Mr. Parker is an upstanding and hardworking citizen, he does not have the right to vote in Mississippi. In 1993, when Mr. Parker was just 19 years old, he was convicted of grand larceny, a disenfranchising offense under Mississippi state law. Mr. Parker completed his sentence in 1998. In 2012, more than 14 years after he had completed his sentence, then-Representative George Flaggs Jr. sponsored a suffrage bill on Mr. Parker's behalf. The House Judiciary B Committee approved Mr. Parker's suffrage bill, and the members of the House of Representatives voted in favor of restoring Mr. Parker's voting rights. But when Mr. Parker's suffrage bill was referred to the Senate Judiciary B Committee, it died in committee. Mr. Parker remains disenfranchised to this day. He says, "I'm a husband and father of two beautiful children, and I'm proud to work for the City of Vicksburg, where I was born and raised . . . I'm not that 19 year-old boy anymore—I'm a man and deserve a voice in government because of who I am today."

19.     Plaintiff Walter Wayne Kuhn Jr. is a white 47-year-old citizen of the United States who lives in Hinds County, Mississippi. He is a veteran of the United States Army. Mr. Kuhn lost the right to vote just months after his 18th birthday. In 1989, he was convicted of grand larceny, a disenfranchising offense under Mississippi state law. He completed his sentence in 1992. Today, Mr. Kuhn works in home improvement for Strength Roofing and Siding, a company based in Mississippi. He is an active member of his church, and he leads a weekly class called "Celebrate Recovery" that is regularly attended by dozens of men who are attempting to

overcome drug addiction. Mr. Kuhn's record was expunged in December of 2017, but he still

feels like a second-class citizen because he cannot vote.[2] He believes that taking away people's

right to vote for life makes it harder for them to reintegrate into society. In his classes, he says,

"You can turn your life around by just doing the next right thing because God forgives, even if

Mississippi doesn't."

     20.    Plaintiff Byron Demond Coleman is a black 54-year-old citizen of the United

States who lives in Hinds County, Mississippi. He worked as a delivery driver until he suffered a

major stroke. Mr. Coleman lost his right to vote more than two decades ago. In 1997, he was

convicted of receiving stolen property, a disenfranchising offense under Mississippi state law, for

purchasing several refurbished appliances. He completed his sentence in 1998. Mr. Coleman

desperately wishes to have the right to vote. He says, "I remember when Dr. King and Medgar

Evers died, and I know what they died for . . . I am the right person to vote in Mississippi for

what's best for my children and grandchildren."

     21.    Plaintiff Jon O'Neal is a white 37-year-old citizen of the United States who

presently resides in Forrest County, Mississippi. He currently attends classes at the Christian

Men and Women's Job Corps. In 2011, Mr. O'Neal was convicted of second degree arson of a

non-dwelling, a disenfranchising offense under Mississippi state law. He completed his sentence

in 2015, and has not been convicted of any crimes since. Mr. O'Neal has always been passionate

about politics. Before his conviction, he voted regularly. His inability to vote has destroyed his

identity. Mr. O'Neal explains, "Politics was a big part of my life and now it's just gone. I was

very political and now I'm nothing."

---

[2]   Neither Section 241 of the Mississippi Constitution nor Mississippi Code § 23-15-11, which
sets forth Mississippi's voter eligibility requirements, provides that an individual whose
record has been expunged for a disenfranchising offense regains the right to vote.

22.     Plaintiff Earnest Willhite is a white 36-year-old United States citizen who presently resides in Hinds County, Mississippi. He is a car mechanic. In 2012, Mr. Willhite was convicted of grand larceny, a disenfranchising offense under Mississippi law. He completed his sentence in January 2018. Mr. Willhite has become very religious since his conviction, and he believes he has turned his life around. He wants to regain his right to vote in order to help elect people who reflect his values.

### *Defendant*

23.     Defendant Secretary of State Delbert Hosemann is responsible for maintaining the Statewide Election Management System, which is the "official record of registered voters in every county of the state."[3] In his capacity as Mississippi's "chief election officer,"[4] the Secretary of State establishes and implements rules and procedures pursuant to which the state's election commissioners and registrars deny voter registration applications from individuals convicted of disenfranchising offenses, and purge the names of disenfranchised citizens from the voter registration rolls.

### GENERAL ALLEGATIONS

I.      **Mississippi's criminal disenfranchisement scheme was designed to selectively and permanently strip black citizens of their right to vote.**

24.     In 1890, the Mississippi Legislature embarked on an ambitious effort to craft a new constitution to achieve "an alteration of the whole basis of franchise" in the state.[5] The

---

[3]   Miss. Code Ann. § 23-15-165 (2018).

[4]   Miss. Code Ann. § 23-15-211.1 (2018).

[5]   *Convention Speeches,* The Clarion Ledger (Sept. 18, 1890) (transcribing statements made by Mr. Edward Mayes).

7

purpose of the 1890 Constitutional Convention was to concentrate political control in the hands of Mississippi's white voters.

25.     The delegates to the 1890 Constitutional Convention worked to draft provisions to restrict the number of black voters without running afoul of the Fifteenth Amendment's prohibition on racially discriminatory voting restrictions. To this end, the 1890 Constitution incorporated a variety of provisions that indirectly limited black citizens' access to the ballot, including a literacy test and a poll tax.

26.     Mississippi's 1890 Constitution was extraordinarily successful at disenfranchising black citizens. In 1867, 67% of otherwise eligible black citizens were registered to vote in Mississippi.[6] Within two years of the enactment of the 1890 Constitution, this number had plummeted to less than 6%.[7]

**A.      The lifetime voting ban was carefully crafted to disenfranchise black voters.**

27.     One of the hallmark features of the 1890 Constitution was the lifetime voting ban included in Section 241, which established Mississippi's voter eligibility requirements.[8] The

---

[6]   U.S. Comm'n on Civil Rights, *Voting in Mississippi* 8 (1965).

[7]   *Id.* at 5.

[8]   Section 241 provided in its entirety as follows:

Every male inhabitant of this State, except idiots, insane persons and Indians not taxed, who is a citizen of the United States, twenty-one years old and upwards, who has resided in this State two years, and one year in the election district, or in the incorporated city or town, in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of bribery, burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery, embezzlement or bigamy, and who has paid, on or before the first day of February of the year in which he shall offer to vote, all taxes which may have been legally required of him, and he has had an opportunity of paying according to law, for the two preceding years, and who shall produce to the officers holding the election satisfactory evidence that he has paid said taxes, is declared to be a qualified elector; but any minister of the gospel in charge of an organized church shall be entitled to vote after six months residence in the election district, if otherwise qualified.

8

lifetime voting ban stated that a Mississippi citizen was eligible to vote only if he had "*never been convicted* of bribery, burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery, embezzlement or bigamy."[9] A Mississippi citizen convicted of any of the enumerated crimes lost his right to vote forever.

28.     In *Ratliff v. Beale*, 20 So. 865 (Miss. 1896), the Mississippi Supreme Court recognized that the delegates to the 1890 Constitutional Convention intentionally chose disenfranchising offenses that they believed to be disproportionately committed by black individuals.[10]

29.     The delegates enacted the lifetime voting ban to selectively and permanently disenfranchise black voters.

**B.     The lifetime voting ban was enacted to punish Mississippi citizens convicted of certain crimes.**

30.     The lifetime voting ban was enacted as a punitive measure. One of the conditions of Mississippi's readmission to full statehood in 1870 was that Mississippi could include criminal disenfranchisement provisions in its state constitution only as a form of "punishment." The Act to admit the State of Mississippi to Representation in the Congress of the United States (the "Readmission Act") provided in relevant part as follows:

---

The Mississippi Constitution of 1868, Mississippi History Now, § 2, available at http://mshistorynow.mdah.state.ms.us/articles/98/index.php?s=extra&id=269 (last visited Mar. 2, 2018).

[9]   Miss. Const. art. XII, § 241 (1890) (emphasis added).

[10]   *Ratliff*, 20 So. at 868 ("Restrained by the federal constitution from discriminating against the negro race, the convention discriminated against its characteristics and the offenses to which its weaker members were prone . . . Burglary, theft, arson, and obtaining money under false pretenses were declared to be disqualifications, while robbery and murder and other crimes in which violence was the principal ingredient were not.").

> [T]he State of Mississippi is readmitted to representation in
> Congress as one of the States of the Union, upon the following
> fundamental conditions: First, that the constitution of Mississippi
> shall never be so amended or changed as to deprive any citizen or
> class of citizens of the United States of the right to vote who are
> entitled to vote by the constitution herein recognized, *except as a
> punishment for such crimes as are now felonies at common law,*
> whereof they shall have been duly convicted under laws equally
> applicable to all the inhabitants of said State ...[11]

The delegates to the 1890 Constitutional Convention adopted the lifetime voting ban in order to

penalize citizens convicted of disenfranchising offenses.

### C.   The suffrage bill provision empowered the legislature with unfettered discretion to decide whose voting rights to restore.

31.   The delegates to the 1890 Constitutional Convention were careful to establish a

discretionary mechanism for restoring voting rights to Mississippi citizens convicted of

disenfranchising offenses. The suffrage bill provision of the 1890 Constitution read then, as it

does now, as follows:

> The legislature may by a two-thirds vote of both houses, of all
> members elected, restore the right of suffrage to any person
> disqualified by reason of crime; but the reasons therefor shall be
> spread upon the journals, and the vote shall be by yeas and nays.

Miss. Const. art. XII, § 253 (1890).

32.   The delegates did not establish any objective or uniform criteria for the

Mississippi Legislature to use when deciding whether to restore a disenfranchised citizen's

voting rights. Instead, the delegates vested the legislature with unchecked authority to allow

certain citizens to regain their voting rights, while leaving other citizens disenfranchised.

33.   Like Mississippi's constitutional interpretation "tests" for voter registration, the

suffrage bill provision was standardless by design. It facilitated the continued denial of voting

---

[11]   An Act to admit [sic] the State of Mississippi to Representation in the Congress of the United
States, 16 Stat. 67, 68 (1870) (emphasis added).

rights to black citizens by allowing the state's legislators to apply any criteria they chose when deciding whether to restore an individual's voting rights. Nothing in the suffrage bill provision precluded legislators from applying different standards to different applicants.

34.     While the Mississippi Supreme Court in *Ratliff* did not specifically address the suffrage bill provision, the Court recognized that discriminatory intent permeated the 1890 Constitution in its entirety. The *Ratliff* Court stated that all of the voting-related provisions of the 1890 Constitution were racially motivated:

> He who reads the constitution of 1869 and that of 1890 will have his attention arrested by the marked difference in the number and character of the provisions upon the franchise. . . . *It is in the highest degree improbable that there was not a consistent, controlling directing purpose governing the convention by which these schemes were elaborated and fixed in the constitution.*[12]

The *Ratliff* Court explained that "[w]ithin the field of permissible action under the limitations imposed by the federal constitution, the [1890] convention swept the circle of expedients to obstruct the exercise of the franchise by the negro race."[13]

## II.     The fundamental structure of Mississippi's criminal disenfranchisement scheme has not changed since 1890.

35.     The list of disenfranchising offenses set forth in the lifetime voting ban of the 1890 Constitution has been amended twice: once in 1950 to eliminate burglary as a disenfranchising offense, and again in 1968 to add murder and rape. Aside from these changes, the lifetime voting ban in effect today is identical to the 1890 version.

36.     The present-day version states that a Mississippi citizen is eligible to vote only if he or she has *"never been convicted* of murder, rape, bribery, theft, arson, obtaining money or

---

[12]     *Ratliff*, 20 So. at 867–68 (emphasis added).

[13]     *Id.* at 867.

goods under false pretense, perjury, forgery, embezzlement or bigamy."[14] Pursuant to this

provision, Mississippi continues to punish citizens convicted of disenfranchising offenses by

prohibiting them from voting forever, even after they have completed the terms of their

sentences.

37.     While the lifetime voting ban of the 1890 Constitution has been amended, the

suffrage bill provision has survived completely unchanged. It reads word-for-word the same

today as it did in 1890. To this day, Mississippi has not enacted any legislation establishing

either objective criteria that legislators must take into account when considering the restoration

of an individual's voting rights pursuant to the suffrage bill provision, or a statutorily mandated

procedure that legislators must follow when introducing and voting on suffrage bills.

38.     Mississippi has, however, adopted a number of changes to the interpretation and

application of the lifetime voting ban. Although the Mississippi Constitution lists only ten

disenfranchising offenses, the Attorney General has opined that there are twelve additional

offenses that fall within the scope of the lifetime voting ban: armed robbery, extortion, felony

bad check, felony shoplifting, larceny, receiving stolen property, robbery, timber larceny,

unlawful taking of a motor vehicle, statutory rape, carjacking, and larceny under lease or rental

---

[14] Miss. Const. art. XII, § 241 (emphasis added). The present-day version of Section 241 provides, in its entirety, as follows:

Every inhabitant of this state, except idiots and insane persons, who is a citizen of the United States of America, eighteen (18) years old and upward, who has been a resident of this state for one (1) year, and for one (1) year in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city or town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector, except that he shall be qualified to vote for President and Vice President of the United States if he meets the requirements established by Congress therefor and is otherwise a qualified elector.

*Id.*

agreement.[15] These additional disenfranchising offenses are listed on Mississippi's voter registration application.

39.    When deciding whether any given offense is disenfranchising, the Attorney General has "looked to the elements of a particular 'modern' crime to determine if it is equivalent to one of the crimes listed in" the lifetime voting ban.[16] The Attorney General has repeatedly opined that "there could be additional crimes that are disqualifying."[17]

40.    Because of the Attorney General's expansive interpretation of the lifetime voting ban, a Mississippi citizen can permanently lose his or her voting rights for a minor offense—such as stealing wood from a neighbor's yard, or writing a single bad check.

41.    Section 244-A empowers the state legislature to impose "additional qualifications for voter registration."[18] In 2012, the legislature added voter fraud as a disenfranchising offense.[19]

42.    Miss. Code § 23-15-11 sets forth Mississippi's current voter eligibility requirements. The provision states that a Mississippi citizen may be eligible to vote only if he or

---

[15]  Miss. Att'y Gen. Op. No. 2009-00210 (2009), 2009 WL 2517257 (enumerating 22 disenfranchising offenses).

[16]  Miss. Att'y Gen. Op. No. 2011-00475 (2011), 2011 WL 6813983.

[17]  Miss. Att'y Gen. Op. No. 2009-00210 (2009), 2009 WL 2517257; *see also* Miss. Att'y Gen. Op. No. 2004-0171 (2004), 2004 WL 1171855.

[18]  Pursuant to Section 244-A of the Mississippi Constitution, the Mississippi Legislature has the "power to prescribe and enforce by appropriate legislation qualifications to be required of persons to vote and to register to vote in addition to those set forth in" the Mississippi Constitution. Miss. Const. art. XII, § 244-A. Section 244-A was enacted in August of 1965, just weeks after the Voting Rights Act was signed into law.

[19]  S.B. 2227, 2012 Leg., Reg. Sess. (Miss. 2012).

13

she "has never been convicted of vote fraud or of any crime listed in" the lifetime voting ban set forth in Section 241 of the Mississippi Constitution.[20]

43.    Miss. Code § 23-15-19 provides that "[a]ny person who has been convicted of vote fraud or of any crime listed in Section 241, Mississippi Constitution of 1890, such crimes defined as 'disenfranchising,' shall not be registered [to vote], or if registered the name of the person shall be removed from the Statewide Elections Management System by the registrar or the election commissioners of the county of his or her residence."[21]

44.    The Mississippi Attorney General has opined that "circuit clerks are authorized to remove the name of any registered voter who has been convicted of a disenfranchising crime from the voter rolls without any contact with the voter."[22]

**III.    A disenfranchised citizen who registers to vote or votes may face criminal penalties.**

45.    Because the lifetime voting ban is part of the punishment for certain offenses, a disenfranchised Mississippi citizen who registers to vote or casts a ballot can be criminally prosecuted and imprisoned.

46.    Miss. Code § 97-13-25, entitled *False registration as elector*, provides that a disenfranchised citizen who "knowingly" registers to vote "shall, on conviction, be imprisoned in the State Penitentiary for a term not to exceed five (5) years, or be fined not more than Five Thousand Dollars ($5,000), or both."

---

[20]    Section 241 does not state that the lifetime voting ban applies only to Mississippi state court convictions. However, the Mississippi Supreme Court has held that "§ 241 and the statutes that implement it do not disenfranchise those convicted of felonies under the laws of other states or under federal law." *Young v. Hosemann*, 598 F.3d 184, 191 n.2 (5th Cir. 2010) (citing *State v. McDonald*, 145 So. 508 (Miss. 1933) and *Middleton v. Evers*, 515 So. 2d 940 (Miss. 1987)).

[21]    Miss. Code Ann. § 23-15-19 (2018).

[22]    Miss. Att'y Gen. Op. No. 2011-00053 (2011), 2011 WL 1114306.

47.    Miss. Code § 97-13-35, entitled *Illegal voting behavior*, provides that a disenfranchised citizen who "shall vote at any election . . . shall, upon conviction, be imprisoned in the county jail not more than one (1) year, or be fined not more than One Thousand Dollars ($1,000.00), or both."

48.    Miss. Code § 23-15-753, entitled *Vote fraud: violations by paid assistants*, provides that a disenfranchised citizen who submits an absentee ballot "shall be guilty of the crime of 'vote fraud' and, upon conviction, shall be sentenced to pay a fine of not less than Five Hundred Dollars ($500) nor more than Five Thousand Dollars ($5,000), or by imprisonment in the county jail for no more than one (1) year, or by both fine and imprisonment, or by being sentenced to the State Penitentiary for not less than one (1) year nor more than five (5) years."

49.    Mississippi officials have enforced these criminal penalties in certain instances. For example, in May 2011, the District Attorney for Madison and Rankin Counties, Michael Guest ("DA Guest"), announced that Canton resident Terrance Watts had been *sentenced to ten years in prison* for his "illegal participation" in municipal elections for Mayor and Aldermen.[23] Terrance Watts had been convicted of forgery, a disenfranchising offense. DA Guest stated that "[t]he crime was that Mr. Watts falsely swore to an Affidavit on an Absentee Ballot that he was a duly and qualified elector of Madison County, when he knew he was not."[24]

## IV.    A disenfranchised citizen has no realistic opportunity to regain the right to vote by suffrage bill.

50.    Once a Mississippi citizen is convicted of a disenfranchising offense, he or she may only regain the right to vote at the behest of the Governor or through a successful suffrage

---

[23]  *Canton Man Receives Maximum Sentence for Voter Fraud*, Office of the District Attorney, Madison and Rankin Counties (May 17, 2011), http://www.daguest.com/canton-man-receives-maximum-sentence-for-voter-fraud/.

[24]  *Id.*

bill. Regaining the right to vote by suffrage bill is a rare event. In the past five years, only fourteen Mississippi citizens have won the restoration of their voting rights through the passage of suffrage bills.[25]

**A.    The complex, multi-step process for regaining the right to vote by suffrage bill is discretionary at every level.**

51.    Obtaining the restoration of voting rights by suffrage bill requires a series of favorable discretionary decisions by legislators. The process is fundamentally arbitrary and inherently susceptible to discrimination. There is no oversight of any kind to ensure that legislators do not exercise their discretion to vote against a proposed suffrage bill on the basis of an individual's race, religion, or political leanings. The key steps in the suffrage bill process are set forth below.

---

[25]    This number is current as of March 23, 2018.



**1.    A Mississippi legislator must agree to sponsor a suffrage bill.**

52.    To begin the process, a disenfranchised citizen must capture the interest of the state representative or senator of the district where the citizen resides to request the sponsorship of a suffrage bill—a challenge for most individuals who have been completely shut out of the political process.

17

53.     When a legislator receives a request to sponsor a suffrage bill, it is completely within his or her discretion to choose whether or not to draft and introduce such a bill on behalf of a non-constituent disenfranchised citizen. A legislator may decline to sponsor a suffrage bill on a disenfranchised citizen's behalf for any reason whatsoever—or no reason at all.

54.     Mississippi does not have any centralized system for tracking citizen requests for suffrage bill sponsorship, or legislators' responses to those requests. The Secretary of State therefore has no way of determining how many requests for suffrage bills are made; how often legislators grant those requests; and whether legislators consider factors such as race, wealth, religion, kinship status, and/or political beliefs when deciding whether to sponsor a suffrage bill.

55.     If a disenfranchised citizen is fortunate enough to win the attention and sympathy of his or her legislator, the legislator must draft a suffrage bill. A suffrage bill typically states the petitioner's name, home county, disenfranchising offense, and sentence. A suffrage bill usually states as follows: "The Legislature has been reliably informed that [the citizen] is now conducting [him- or herself] as a law-abiding and honorable citizen in a good and lawful manner."

## 2.     The suffrage bill must clear the Judiciary B Committee of the first chamber to consider it.

56.     The sponsoring legislator must obtain approval to present the suffrage bill from the House Judiciary B Committee (if the legislator is a state representative) or the Senate Judiciary B Committee (if the legislator is a senator).

57.     Before introducing the suffrage bill to the full Judiciary B Committee, the legislator may first have to obtain approval from the Suffrage Subcommittee of the Judiciary B Committee and/or the Chair of the Judiciary B Committee.

18

58.    The entire Judiciary B Committee must then approve the bill. To the extent the members apply any particular criteria in evaluating suffrage bills, such criteria are neither set forth in the Mississippi Constitution nor enumerated in any Mississippi statute or rules disseminated to the public. Committee members may decline to vote for a suffrage bill for any reason whatsoever—or no reason at all.

### 3.    Two thirds of the members of the first chamber to consider the suffrage bill must vote in favor of it.

59.    If the suffrage bill wins approval from the Judiciary B Committee, it may then be presented to the entire chamber to which the sponsoring legislator belongs. Two thirds of the legislators in that chamber must vote in favor of the suffrage bill. Legislators have complete discretion to vote in favor of or against a suffrage bill, and they do not have to provide any justification for their votes.

### 4.    The suffrage bill must clear the Judiciary B Committee of the second chamber to consider it.

60.    A suffrage bill that passes the first chamber by a two-thirds vote is then referred to the Judiciary B Committee of the second chamber. The bill may require approval from the Suffrage Subcommittee of the Judiciary B Committee and/or the Chair of the Judiciary B Committee before consideration by the full Judiciary B Committee. Members of the Judiciary B Committee of the second chamber may approve or reject the bill for any reason, or no reason at all.

61.    Numerous suffrage bills have been approved by a chamber's Judiciary B Committee and won two thirds of the votes of the members of that chamber, only to then "die" in the next chamber's Judiciary B Committee.

### 5.    Two thirds of the members of the second chamber to consider the bill must vote in favor of it.

19

62.     If the Judiciary B Committee of the second chamber approves a proposed suffrage
bill, the bill is then presented for a vote before that chamber. Legislators in the second chamber
have complete discretion to vote in favor of or against a suffrage bill, and they do not have to
disclose the basis for their decisions.

> ### 6.     The Governor must sign the suffrage bill, or permit it to become law without his signature.

63.     If the suffrage bill passes the second chamber by a two-thirds vote, the suffrage
bill is then sent to the Governor for his signature. The Governor can sign the bill, allow the bill to
become law without his signature, or veto the bill.

> ### B.     The fourteen successful suffrage bills of the past five years illustrate the inherent arbitrariness of the process.

64.     The Mississippi Legislature restored voting rights to six individuals in 2017, four
in 2015, three in 2014, and one in 2013. Not a single suffrage bill was passed in 2016.

65.     These fourteen Mississippians appear to have virtually nothing in common, as the
chart below illustrates. For example, there is no consistent number of years that have passed
since the date of each individual's conviction: one was convicted in 1978, while another was
convicted in 2010. There is also no uniformity in the severity or frequency of the offenses for
which these individuals were convicted.

66.     Because the state has established no objective criteria for the restoration of voting
rights, a suffrage bill for a particular citizen might fail one year and succeed the next—even if
nothing about that citizen has changed.

| Mississippi Citizens Who Regained Their Voting Rights Through Successful Suffrage Bills (2012-2017) | | | | | |
|---|---|---|---|---|---|
| *Year of suffrage bill* | *Sponsoring legislator* | *Initials of citizen* | *Disenfranchising offense(s) listed in suffrage bill* | *Year of conviction* | *Year of completion of sentence* |

| Year of suffrage bill | Sponsoring legislator | Initials of citizen | Disenfranchising offense(s) listed in suffrage bill | Year of conviction | Year of completion of sentence |
|---|---|---|---|---|---|
| | **Mississippi Citizens Who Regained Their Voting Rights Through Successful Suffrage Bills (2012-2017)** | | | | |
| 2013 | Representative Clara Burnett (D) | J.M.D. | Uttering forgery | 2005 | Not identified in suffrage bill or floor discussion. |
| 2014 | Representative Nolan Mettetal (R) | R.L.B. | Grand larceny | 1980 | 1988 |
| 2014 | Representative Sonya Williams-Barnes (D) | D.F.J. | Grand larceny | 1978 | 1980 |
| 2014 | Senator Dean Kirby (R) | M.T.M. | Embezzlement | 1999 | 2008 |
| 2015 | Representatives Mark Formby (R) and Hank Lott (R) | J.L.C. | Embezzlement | 1997 | 2011 |
| 2015 | Representative Reecy L. Dickson (D) | O.R. | Uttering forgery Burglary of a vehicle | 2004 | 2010 |
| 2015 | Representative David W. Myers (D) | M.S.W. | Shoplifting | 1999 | 2003 |
| 2015 | Representative Lester Carpenter (R) | T.W. | Burglary Larceny Sale of diazepam | 1991 | Not identified in suffrage bill or floor discussion. |
| 2017 | Senator Willie Simmons (D) | W.A. | Uttering forgery Conspiracy | 2007 | 2012 |
| 2017 | Representative John G. Faulkner (D) | R.E.B. | Robbery | 1999 | 2002 |
| 2017 | Senator Angela Turner-Ford (D) | C.L. | Grand larceny | 1997 | 2001 |
| 2017 | Representative | T.W.L. | Bribery | 2010 | 2015 |

21

| Mississippi Citizens Who Regained Their Voting Rights Through Successful Suffrage Bills (2012-2017) | | | | | |
|---|---|---|---|---|---|
| Year of suffrage bill | Sponsoring legislator | Initials of citizen | Disenfranchising offense(s) listed in suffrage bill | Year of conviction | Year of completion of sentence |
| | Karl Gibbs (D) | | | | |
| 2017 | Representative Nick Bain (D) | T.F.L. | Larceny | 2005 | Not identified in suffrage bill or floor discussion. |
| 2017 | Representative Sonya Williams-Barnes (D) | S.H.S. | Receiving stolen property Grand larceny | 1998 and 1999 | 2014 |

## V.    Mississippi's lifetime voting ban impacts tens of thousands of citizens who have paid their debts to society.

67.    Mississippi does not maintain records on the total number of the state's

disenfranchised citizens, the number of disenfranchised citizens who have completed their

sentences, or the racial breakdown of the state's disenfranchised population. Based on the data

that is available, however, it is clear that the state's lifetime voting ban affects tens of thousands

of Mississippi citizens who have paid their debts to society. Between 1994 and 2017, more than

47,000 Mississippi citizens were convicted of disenfranchising offenses. Approximately 60% of

these individuals—over 28,000 Mississippians—have completed their sentences.

68.    Black citizens are disproportionately impacted by Mississippi's criminal

disenfranchisement scheme. Although only 36.5% of the state's voting age population of citizens

are black, 59% of individuals convicted of disenfranchising offenses between 1994 and 2017

were black.

69.    In recent decades, black voting-age Mississippians have been disenfranchised at

over twice the rate of white voting-age Mississippians. Between 1994 and 2017, a substantially

22

higher percentage—*more than double*—of Mississippi's black voting age population was disenfranchised as compared with the state's white voting age population.[26]

70.     The majority of Mississippi's disenfranchised citizens who have completed their sentences are also black. Of the individuals who have completed all aspects of their sentences for convictions between 1994 and 2017, approximately 58% are black and 37% are white. These statistics demonstrate that black citizens are disproportionately affected by the lack of a fair and objective process for the restoration of their voting rights.



VI.     **Mississippi's lifetime voting ban is an outlier nationwide.**

---

[26]   Between 1994-2017, 3.4% of Mississippi's black voting age population became disenfranchised and 1.3% of the Mississippi's white voting age population became disenfranchised—a difference of 270%.

71.     Mississippi is one of just *four* states in the nation to punish all individuals convicted of disenfranchising offenses by stripping them of their voting rights for the rest of their lives, even after they have completed the terms of their sentences.

72.     Pursuant to the state's lifetime voting ban, Mississippi citizens convicted of certain common crimes are permanently "severed from the body politic and condemned to the lowest form of citizenship."[27] They are forever "voiceless at the ballot box" and "must sit idly by while others elect [their] civic leaders and while others choose the fiscal and governmental policies which will govern [them]."[28]

73.     In recognition of the gross and outdated injustice of this form of punishment, forty states and the District of Columbia do not impose a lifetime voting ban[29] on any individuals convicted of disqualifying crimes. Of the remaining ten states, six impose a lifetime voting ban only as a penalty for certain types of crimes. For example, Alabama punishes individuals convicted of murder, rape, treason, and crimes involving children with a lifetime prohibition on voting.[30]

---

[27]   *McLaughlin v. Canton*, 947 F. Supp. 954, 971 (S.D. Miss. 1995).

[28]   *Id.*

[29]   The term "lifetime voting ban" refers to a permanent prohibition on the right to vote even after sentence completion, without any non-discretionary pathway to obtain the restoration of that right.

[30]   Alabama's criminal disenfranchisement laws have been challenged on constitutional grounds in *Thompson v. Alabama*, No. 2:16-CV-783-WKW (M.D. Ala. 2016). Among other claims, the plaintiffs contend that Alabama's lifetime voting ban for certain disenfranchising offenses violates the Eighth Amendment's prohibition on cruel and unusual punishment. On December 26, 2017, the Middle District of Alabama denied the defendants' motion to dismiss the plaintiffs' Eighth Amendment claim. *Thompson v. Alabama*, 2017 WL 6597511 (M.D. Ala. 2017).

74.     One state—Virginia—has a lifetime voting ban in the state constitution that has been effectively circumvented by executive order. In April 2017, former Governor Terry McAuliffe individually restored voting rights to over 156,000 Virginia citizens who had completed their sentences.[31] His successor, Governor Ralph Northam, has continued former Governor McAuliffe's efforts to restore voting rights to Virginia citizens who have paid their debts to society.[32]

75.     Today, only four states—Florida,[33] Iowa, Kentucky, and Mississippi—impose a lifetime voting ban on all individuals convicted of disenfranchising offenses. These states collectively account for only 9.8% of the population of the United States.[34] The remaining *291*

---

[31]   *See* Laura Vozzella, *Va. Gov. McAuliffe Says He Has Broken U.S. Record for Restoring Voting Rights*, The Washington Post (Apr. 27, 2017), https://www.washingtonpost.com/local/virginia-politics/va-gov-mcauliffe-says-he-has-broken-us-record-for-restoring-voting-rights/2017/04/27/55b5591a-2b8b-11e7-be51-b3fc6ff7faee_story.html.

[32]   *Policy Updates and Timeline*, Commonwealth of Va., https://restore.virginia.gov/policy-updates-and-timeline (last visited Mar. 22, 2018).

[33]   Disenfranchised citizens in Florida may only regain their voting rights through a successful petition to the state's Executive Clemency Board. In *Hand v. Scott*, 2018 WL 658696 (N.D. Fla. Feb. 1, 2018), the Northern District of Florida recently held that Florida's executive process for the restoration of voting rights violates the First Amendment because Florida's Executive Clemency Board has "unfettered discretion in restoring voting rights." *Id.* at *7. The court found that "Florida's vote-restoration scheme violates two First Amendment rights: namely, free association and free expression." *Id.* at *4. In addition to reforming its discretionary voting rights restoration process, Florida may soon end its lifetime voting ban for many disenfranchised citizens. This November, Floridians will vote on a proposed amendment to the state constitution that would provide for the restoration of voting rights to individuals convicted of nearly all disenfranchising offenses upon sentence completion. *See infra* note 65.

[34]   *State Population Totals and Components of Change: 2010-2017*, United States Census Bureau, https://www.census.gov/data/datasets/2017/demo/popest/state-total.html#ds (last visited Mar. 25, 2018). Note that for the purposes of calculating the total United States population, Puerto Rico has been excluded.

*million* United States citizens live in states that restore voting rights to some, if not all,

individuals convicted of disenfranchising offenses after they have completed their sentences.[35]

## State-by-State Criminal Disenfranchisement Laws



| | |
|---|---|
| | No lifetime voting ban for individuals who have completed their sentences. |
| | Certain disenfranchising offenses are punished with a lifetime voting ban. |
| | All disenfranchising offenses are punished with a lifetime voting ban. |

---

[35]   *Id.*

| *No lifetime voting ban for individuals who have completed their sentences:* | Alaska |
| --- | --- |
| | Arkansas |
| | California |
| | Colorado |
| | Connecticut |
| | Georgia |
| | Hawaii |
| | Idaho |
| | Illinois |
| | Indiana |
| | Kansas |
| | Louisiana |
| | Maine[36] |
| | Maryland[37] |
| | Massachusetts |
| | Michigan |
| | Minnesota |
| | Missouri[38] |
| | Montana |
| | Nebraska[39] |
| | New Hampshire |
| | New Jersey[40] |
| | New Mexico |
| | New York |
| | North Carolina |
| | North Dakota |
| | Ohio |
| | Oklahoma |
| | Oregon |
| | Pennsylvania |
| | Rhode Island |
| | South Carolina |
| | South Dakota |

---

[36]   In Maine, individuals convicted of crimes never lose the right to vote, even while they are incarcerated.

[37]   In Maryland, individuals convicted of buying or selling votes permanently lose the right to vote. *See* MD. Code Ann., Election Law § 3-102(b)(3) (West 2018).

[38]   In Missouri, an individual convicted of a voting-related offense permanently loses his or her right to vote. *See* Mo. Ann. Stat. § 115.133.2(3) (West 2017).

[39]   In Nebraska, voting rights are restored two years after the completion of a sentence for a disenfranchising offense. *See* Neb. Rev. Stat. Ann. § 32-313(1) (West 2017). Individuals convicted of treason permanently lose the right to vote. *See id.*

[40]   In New Jersey, individuals convicted of election-related offenses permanently lose the right to vote. *See* N.J. Stat. Ann. 19:4-1(6–7) (West 2018).

|  | Texas |
|---|---|
|  | Utah |
|  | Vermont[41] |
|  | Virginia[42] |
|  | Washington |
|  | Washington D.C. |
|  | West Virginia |
|  | Wisconsin |
| *Certain disenfranchising offenses are punished with a lifetime voting ban:* | Alabama |
|  | Arizona |
|  | Delaware |
|  | Nevada |
|  | Tennessee |
|  | Wyoming |
| *All disenfranchising offenses are punished with a lifetime voting ban:* | Florida |
|  | Kentucky |
|  | Iowa |
|  | Mississippi |

76.     States around the country have amended their laws in recent years to restore

voting rights to disenfranchised citizens who have completed their sentences. For example:

(a)     In 2000, Delaware amended its constitution to end its lifetime voting ban

for most categories of offenders, and to permit these individuals to apply

for the restoration of their voting rights five years after the completion of

their sentences.[43]

(b)     In 2001, New Mexico repealed its lifetime voting ban.[44]

(c)     In 2003, Wyoming ended its lifetime voting ban for individuals convicted

of a first-time, non-violent offense and provided that such individuals may

---

[41]   In Vermont, individuals convicted of crimes never lose the right to vote, even while they are incarcerated.

[42]   Virginia has a lifetime disenfranchisement provision in the state constitution that has been effectively circumvented by executive order. *See supra* note 32 and accompanying text.

[43]   H.B. 126, 140th Gen. Assemb., Reg. Sess. (Del. 2000).

[44]   S.B. 204, 45th Leg., Reg. Sess. (N.M. 2001).

apply for voting rights restoration five years after the completion of their sentence.[45]

(d)    In 2005, Nebraska ended its lifetime voting ban, and changed its laws to provide that individuals convicted of a felony automatically regain their voting rights two years after the completion of their sentences.[46] This legislation restored voting rights to 50,000 Nebraskans.[47]

(e)    In 2007, Maryland ended its lifetime voting ban, and provided that voting rights would be automatically reinstated for all individuals upon the completion of their sentences.[48] This led to the restoration of voting rights to 52,000 Maryland citizens.[49]

77.    In stark contrast to Mississippi's convoluted process for the restoration of voting rights, a number of states have changed their laws to provide that individuals who have completed their sentences *automatically* regain the right to vote. For example:

---

[45]   S.F. 0065, 57th Leg., Gen. Sess. (Wyo. 2003).

[46]   L.B. 53, 99th Leg., 1st Sess. (Neb. 2005).

[47]   JoAnne Young, *Committee Advances Bill to Allow Immediate Voting Rights to Felons*, Lincoln Journal Star (Mar. 1, 2017), http://journalstar.com/legislature/committee-advances-bill-to-allow-immediate-voting-rights-to-felons/article_159a8184-e27b-506f-bd4e-344dd65cccc7.html.

[48]   S.B. 488, 2007 Sen., Reg. Sess. (Md. 2007).

[49]   Julie Turkewitz, *Ex-Felons Join Voting Rolls as New Md. Law Opens Way*, Baltimore Sun (Jul. 3, 2007), http://articles.baltimoresun.com/2007-07-03/news/0707030134_1_felons-sentences-vote.

    (a)    In 1997, Texas eliminated its two-year waiting period and adopted a policy of automatically restoring voting rights to individuals upon the completion of their sentences.[50]

    (b)    In 2003, Nevada passed legislation automatically restoring voting rights to any individual convicted of a first-time, non-violent offense upon the completion of his or her sentence.[51]

    (c)    In 2013, Delaware amended its constitution again, this time to provide for the automatic restoration of voting rights to individuals convicted of certain non-violent felonies. Prior to the amendment, individuals convicted of these offenses had to wait five years after the completion of their sentences before regaining the right to vote.[52]

    (d)    In 2017, Wyoming enacted legislation automatically restoring voting rights to any individual who completed his or her sentence after January 1, 2010.[53]

78.    Many states have made other significant legislative changes to expand voting rights for individuals convicted of disenfranchising offenses. For example:

    (a)    In 2001, Connecticut restored voting rights to individuals on probation for a felony conviction. An estimated 36,000 Connecticut citizens regained the right to vote.[54]

---

[50]  H.B. 1001, 75th Leg., Reg. Sess. (Tex. 1997).

[51]  A.B. 55, 72nd Leg., Reg. Sess (Nev. 2003).

[52]  H.B. 10, 146th Gen. Assemb., Reg. Sess. (Del. 2013).

[53]  H.B. 0075, 64th Leg., 2017 Gen. Sess. (Wyo. 2017).

(b)     In 2003, Alabama enacted a bill permitting most felons to apply for a

certificate of eligibility to vote to obtain the restoration of their voting

rights after the completion of their sentences.[55]

(c)     In 2006, Rhode Island voters approved a ballot referendum to amend the

state constitution to restore voting rights to individuals on probation and

parole.[56] Pursuant to this constitutional amendment, 15,000 Rhode Island

citizens regained the right to vote.[57]

(d)     In 2009, Washington restored voting rights for citizens who have

completed the terms of their sentences but who still have outstanding

financial obligations.[58]

(e)     In 2015, California restored voting rights to individuals under community

supervision, enabling 60,000 people to regain the right to vote.[59]

---

[54]   H.B. 5042, 2001 Gen. Assemb., Jan. Sess. (Conn. 2001).

[55]   H.B. 3, 2003 Leg., Reg. Sess. (Ala. 2003).

[56]   H.B. 7938, 2006 Leg., Reg. Sess. (R.I. 2006). *See also* State of Rhode Island Board of Elections, 2006 General Election: Statewide and Federal Races Results, http://www.elections.state.ri.us/elections/results/2006/generalelection/topticket.php (showing majority approval of Question 2, "Amendment to Constitution—Restoration of Voting Rights").

[57]   Daniel Schleifer, *Unlocking the Vote: Activists and Disenfranchised Former Felons Restore Voting Rights in Rhode Island*, The Nation (Dec. 5, 2006), https://www.thenation.com/article/unlocking-vote-activists-and-disenfranchised-former-felons-restore-voting-rights-rhode-islan/.

[58]   H.B. 1517, 61st Leg., Reg. Sess. (Wash. 2009). However, a failure to make regular payments can lead to subsequent revocation of the right to vote until the citizen makes a "good faith effort to pay . . ." *Id.*

[59]   Alex Padilla, California Secretary of State, *Secretary Padilla Ends Appeal of Scott v. Bowen Case: Settlement Will Restore Voting Rights to Thousands of Californians* (August 4, 2015), http://www.sos.ca.gov/administration/news-releases-and-advisories/2015-news-releases-and-

(f)   In 2016, Maryland restored voting rights to ex-felons on probation or

parole.[60] Pursuant to this legislation, approximately 44,000 Maryland

citizens regained the right to vote.[61]

(g)   Also in 2016, Delaware restored voting rights to ex-felons who have

completed their sentences but have not yet paid all of their financial

obligations imposed in connection with their crimes.[62]

(h)   In 2017, Alabama "took an important step toward . . . restoring voting

rights to perhaps thousands of people" by establishing a definitive list of

crimes of "moral turpitude."[63] The new law limits the scope of the state's

previously-indeterminate criminal disenfranchisement law.[64]

79.   There is a nationwide legislative movement towards toward restoring voting

rights to individuals previously convicted of crimes and allowing these citizens a voice in our

democratic society. This movement stems from a strong and growing national consensus that

---

advisories/secretary-padilla-ends-appeal-scott-v-bowen-case (announcing California would
interpret the relevant statute as authorizing those under community supervision to vote).

[60]   H.B. 980, 2015 Gen. Assemb., Reg. Sess. (Md. 2016).

[61]   Matt Ford, *Restoring Voting Rights for Felons in Maryland*, The Atlantic (Feb. 9, 2016),
https://www.theatlantic.com/politics/archive/2016/02/maryland-felon-voting/462000.

[62]   S.B. 242, 148th Gen. Assemb., Reg. Sess. (Del. 2016).

[63]   The Editorial Board, *A Meaningful Move on Voting Rights in Alabama*, N.Y. Times (May 31,
2017), https://www.nytimes.com/2017/05/31/opinion/alabama-governor-felons-voting.html.

[64]   H.B. 282, 2017 Leg., Reg. Sess. (Ala. 2017).

sentencing individuals to a lifetime of second-class citizenship is a grossly unjust form of

punishment.[65]

**VII.   Section 2 of the Fourteenth Amendment does not permit states to permanently deny citizens the right to vote based on a criminal conviction.**

80.    Section 2 of the Fourteenth Amendment provides as follows:

> Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed. But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the executive and judicial officers of a state, or the members of the legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, *or in any way abridged, except for participation in rebellion, or other crime,* the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such state.

U.S. Const. amend. XIV, § 2 (emphasis added).

81.    Section 2 of the Fourteenth Amendment provides an exception to the

representation penalty for states that *temporarily* "abridge" voting rights based on "participation

in rebellion, or other crime." Congress did not permit states to *permanently* "deny" individuals

the right to vote because of their "participation in rebellion, or other crime."

82.    As drafted, the phrase "except for participation in rebellion, or other crime"

applies *only* to the phrase "or in any way abridged." There is no exception to the phrase "is

---

[65]   Florida is considering ending its lifetime voting ban. On April 20, 2017, the Supreme Court of Florida approved language for a ballot initiative to amend the state's constitution to provide for the restoration of voting rights for individuals of convicted of nearly all disenfranchising offenses after they complete the terms of their sentences. *Advisory Opinion to the Attorney General re: Voting Restoration Amendment*, 215 So. 3d. 1202 (Fla. 2017). The voting restoration amendment will be on the ballot in November 2018. If the amendment is approved by 60% of the state's voters, tens of thousands of Florida citizens may be eligible to regain their voting rights.

denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens

of the United States" for disenfranchisement based on "participation in rebellion, or other

crime."

83.     At the time the Fourteenth Amendment was enacted, the word "abridge" meant

"[t]o make shorter" or "[t]o lessen; to diminish."[66] In the analogous context of the Fifteenth

Amendment, Justice David Souter defined the term "abridge" as follows:

> [I]t is clear that abridgement necessarily means something more
> subtle and less drastic than the complete denial of the right to cast
> a ballot, denial being separately forbidden. Abridgement therefore
> must be a condition between complete denial, on the one hand, and
> complete enjoyment of voting power, on the other.[67]

84.     Section 2 therefore permits states to *lessen* or *shorten* an individual's voting rights

on the basis of his or her "participation in rebellion, or other crime" but does not allow states to

*deny* an individual's voting rights forever based on a criminal conviction.

85.     While Section 2's representation penalty has never been enforced, the language of

Section 2 has been misinterpreted as an affirmative sanction for the lifetime disenfranchisement

of individuals convicted of disenfranchising offenses. Section 2 does not facilitate the *permanent

denial* of the right to vote to American citizens. In fact, many of the legislators who enacted the

Fourteenth Amendment were ardently in favor of expansive voting rights for all American

citizens—even former Confederates. As Senator William Morris Stewart of Nevada stated during

the Fourteenth Amendment debates: "if this Union is ever restored, it must be done with

impartial suffrage and general amnesty . . . the theory of republican government is that the

---

[66]   Noah Webster, *An American Dictionary of the English Language* 105 (1828).

[67]   *Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 359 (1997) (Souter, J., concurring in part
       and dissenting in part) (discussing the definition of the term "abridge" in the analogous
       context of the Fifteenth Amendment).

people must be trusted . . . The principle is that a man to be free must exercise political power for himself. If he is not allowed to do this he is a slave."[68]

## CLASS ACTION ALLEGATIONS

86.    Plaintiffs seek to bring this action on their own behalf and on behalf of a class of those similarly situated pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

87.    The proposed Class is defined as: "Any current or future resident of the State of Mississippi who is a United States citizen, at least 18 years of age, not disqualified under the mental incapacitation provisions in Section 241 of the Mississippi Constitution and Miss. Code § 23-15-11, who (a) is disenfranchised under Mississippi state law by reason of a conviction for a crime that the Secretary of State treats as disenfranchising under Section 241 of the Mississippi Constitution and/or Miss. Code § 23-15-11, and (b) has completed his or her full sentence for each such conviction, including any term of incarceration, supervised release, parole and/or probation."

88.    The Class meets all of the requirements of Rule 23(a) of the Federal Rules of Civil Procedure.

89.    The members of the Class are so numerous as to render joinder impracticable. While data on the total number of disenfranchised Mississippi citizens who have completed their sentences is not available, there are over 28,000 Mississippians who have completed all aspects of their sentences for convictions of disenfranchising offenses between 1994 and 2017. Based on data from this time period, Plaintiffs estimate that 60% of the state's disenfranchised citizens have completed their sentences.

---

[68]   Cong. Globe, 39th Cong., 1st Sess. 2799–800 (May 24, 1866).

90.     The Class members share a number of common questions of law, including: (1) whether Mississippi's imposition of a lifetime voting ban on citizens who have completed their sentences for convictions of disenfranchising offenses violates the Eighth Amendment's prohibition on cruel and unusual punishment; (2) whether Section 2 of the Fourteenth Amendment only permits states to temporarily "abridge," but does not allow states to permanently "deny," the right to vote to individuals based on their "participation in rebellion, or other crime;" (3) whether the suffrage bill provision of the Mississippi Constitution permits arbitrary discrimination between Mississippi's disenfranchised citizens, in violation of the Equal Protection Clause of the Fourteenth Amendment; (4) whether the suffrage bill provision of the Mississippi Constitution violates the First Amendment by impermissibly vesting government officials with unfettered discretion to grant or deny applications for restoration of voting rights; and (5) whether the suffrage bill provision of the Mississippi Constitution was enacted with racially discriminatory intent and continues to have racially discriminatory effects today.

91.     The named Plaintiffs' claims are typical of those of the Class. Each named Plaintiff lacks access to a fair and objective process for the restoration of voting rights. Under Mississippi law, each named Plaintiff is prohibited from ever voting again unless his or her voting rights are restored by the Mississippi Legislature or the Governor. Because this action asserts facial challenges to Sections 241 and 253 of the Mississippi Constitution, as well as Sections 23-15-11 and 23-15-19 of the Mississippi Code, the named Plaintiffs and Class members all suffer the same constitutional injuries irrespective of whether their petitions for suffrage bills have been denied, are still pending, or have not yet been filed.

92.     The legal theories under which the named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the Class will rely, and

the harms suffered by the named Plaintiffs are typical of the harms suffered by the Class members.

93.     The named Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the Plaintiff Class, and will fairly and adequately protect the interests of the Class. Like other members of the proposed Class, the named Plaintiffs have permanently lost their voting rights pursuant to the criminal disenfranchisement laws at issue in this action, and cannot obtain the restoration of their voting rights through a fair and objective process.

94.     The named Plaintiffs are represented by the Southern Poverty Law Center and by the law firm Simpson Thacher & Bartlett LLP. Counsel for the Plaintiffs have the resources, expertise, and experience to prosecute this action. Counsel for the Plaintiffs know of no conflicts among members of the Class or between the attorneys and members of the Class.

95.     The Plaintiff Class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Secretary of State has acted and will continue to act on grounds generally applicable to the Class in requiring Mississippi citizens who have completed their sentences for disenfranchising offenses to obtain the restoration of their voting rights through an act of the Mississippi Legislature pursuant to the suffrage bill provision of the Mississippi Constitution, or at the behest of the Governor, before they can register to vote and cast a ballot. Final declaratory and injunctive relief is therefore appropriate with respect to the Plaintiff Class.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### *Cruel and Unusual Punishment*

**(Claims of Named Plaintiffs and Class Members Pursuant to 42 U.S.C. § 1983
Against the Secretary of State for Violations of the Eighth Amendment)**

96.     Plaintiffs repeat and re-allege the facts set forth in paragraph 1-95 above.

97.     Mississippi punishes citizens convicted of disqualifying crimes by permanently
prohibiting them from ever voting again, even after they have completed the terms of their
sentences.

98.     Mississippi's imposition of a lifetime voting ban on citizens who have completed
their sentences for disenfranchising offenses is a form of punishment that is both cruel and
unusual, as measured under modern standards of fairness and decency. There is a strong and
growing national consensus that lifetime voting bans are grossly unjust. Forty states and the
District of Columbia either do not impose or do not enforce lifetime voting bans. Six states
impose lifetime voting bans only for certain categories of offenses. Only four states—Florida,
Iowa, Kentucky, and Mississippi—punish all individuals convicted of disenfranchising offenses
by taking away their right to vote forever.

99.     Sentencing the named Plaintiffs and the Class members to lifetime
disenfranchisement violates the Eighth Amendment's prohibition on cruel and unusual
punishment. Stripping an individual of his or her right to vote forever is analogous to taking
away an individual's citizenship, because it renders that individual politically invisible and
voiceless for the rest of his or her life.

100.    At all times relevant herein, the Secretary of State has acted under color of state
law.

101.   The Secretary of State, acting under color of state law, has deprived and will continue to deprive the named Plaintiffs and other Class members of their Eighth Amendment protection against cruel and unusual punishment.

## SECOND CAUSE OF ACTION

### *Non-Racial Violation of the Fourteenth Amendment*

**(Claims of Named Plaintiffs and Class Members Pursuant to 42 U.S.C. § 1983 Against the Secretary of State for Violations of the Fourteenth Amendment)**

102.   Plaintiffs repeat and re-allege the facts set forth in paragraph 1-101 above.

103.   Section 2 of the Fourteenth Amendment permits states to temporarily *abridge* an individual's right to vote based on his or her "participation in rebellion, or other crime," but does not allow states to *deny* that individual the right to vote for the rest of his or her life.

104.   Mississippi's imposition of a lifetime voting ban on citizens who have completed their sentences constitutes an outright *denial* of the right to vote to individuals convicted of disenfranchising offenses. Lifetime voting bans are not sanctioned by Section 2 of the Fourteenth Amendment.[69]

105.   Mississippi's lifetime voting ban denies Plaintiffs access to the political franchise and equal protection of the laws in violation of the Fourteenth Amendment.

106.   At all times relevant herein, the Secretary of State has acted under color of state law.

107.   The Secretary of State, acting under color of state law, has deprived and will continue to deprive the named Plaintiffs and other Class members of their right to vote in violation of the Fourteenth Amendment.

---

[69]   To the extent that the Court determines that this claim is precluded by the Supreme Court's decision in *Richardson v. Ramirez*, 418 U.S. 24 (1974), Plaintiffs assert this claim for preservation purposes.

## THIRD CAUSE OF ACTION

### *Arbitrary Restoration of the Right to Vote*

**(Claims of Named Plaintiffs and Class Members Pursuant to 42 U.S.C. § 1983
Against the Secretary of State for Violations of the Equal Protection Clause)**

108.    Plaintiffs repeat and re-allege the facts set forth in paragraphs 1 through 107
above as if fully set forth herein.

109.    Under Mississippi law, a disenfranchised citizen who has completed the terms of
his or her sentence for a disenfranchising offense may only regain the right to vote at the behest
of the Governor or through an act of the state legislature pursuant to the suffrage bill provision of
the Mississippi Constitution. The named Plaintiffs and Class members challenge only
Mississippi's legislative process for the restoration of voting rights, not the scope or exercise of
the Governor's power to restore voting rights.

110.    Neither the suffrage bill provision of the Mississippi Constitution nor any other
Mississippi statute establishes any objective standards that individual legislators or the
Mississippi Legislature must apply when determining whether or not to restore voting rights to a
Mississippi citizen. The legislators are free to apply any criteria they wish, or no criteria at all,
when determining whether an individual may regain his or her voting rights. The state's
standardless legislative process for restoring voting rights is inherently arbitrary, and not
rationally related to any legitimate state interest.

111.    Requiring the named Plaintiffs and other Class members to obtain the passage of
a suffrage bill as a condition to regaining their right to vote violates the Equal Protection Clause
of the Fourteenth Amendment.

112.    At all times relevant herein, the Secretary of State has acted under color of state
law.

40

113.    The Secretary of State, acting under color of state law, has deprived and will continue to deprive the named Plaintiffs and other Class members of their Fourteenth Amendment right to a non-arbitrary process for the restoration of the right to vote.

## FOURTH CAUSE OF ACTION

### *Infringement of the Right to Political Expression and Political Association*

**(Claims of Named Plaintiffs and Class Members Pursuant to 42 U.S.C. § 1983 Against the Secretary of State for Violations of the First Amendment)**

114.    Plaintiffs repeat and re-allege the facts set forth in paragraph 1-113 above.

115.    The First Amendment provides as follows:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

U.S. Const. amend. 1. The First Amendment protects the right to vote because voting is both a form of political expression and a means of political association. The First Amendment also protects an individual's right to register to vote, because registration is a prerequisite to and enables the exercise of the right to vote.

116.    Under the First Amendment, government officials may not be vested with unfettered discretion to grant or deny licenses or permits to engage in any form of expression, association, or other conduct that is protected by the First Amendment.

117.    Pursuant to the suffrage bill provision, members of the Mississippi Legislature are vested with unfettered discretion to propose, reject, approve, deny, vote in favor of, or vote against a suffrage bill. There are no standards that govern the legislators' discretion, nor is there any oversight or review to ensure that legislators do not consider a disenfranchised citizen's actual or apparent race, religion, or political views in exercising their discretion. Mississippi's

41

legislative process for restoring voting rights therefore violates the First Amendment to the United States Constitution.

118.    At all times relevant herein, the Secretary of State has acted under color of state law.

119.    The Secretary of State, acting under color of state law, has deprived and will continue to deprive the named Plaintiffs and other Class members of their First Amendment rights in the access to and the exercise of fundamental First Amendment freedoms.

## FIFTH CAUSE OF ACTION

### *Intentional Racial Discrimination*

**(Claims of Named Plaintiffs and Class Members Pursuant to 42 U.S.C. § 1983
Against the Secretary of State for Violations of the Equal Protection Clause)**

120.    Plaintiffs repeat and re-allege the facts set forth in paragraphs 1 through 119 above as if fully set forth herein.

121.    The lifetime voting ban and the suffrage bill provision of the Mississippi Constitution were enacted as part of the 1890 Constitution, which was carefully crafted to concentrate political power in white voters without overtly violating the Fifteenth Amendment.

122.    The lifetime voting ban targeted crimes believed to be disproportionately committed by black Mississippians. The suffrage bill provision provided a mechanism for restoring voting rights lost pursuant to the lifetime voting ban, but in a manner designed to allow the continued denial of voting rights to black citizens. Devoid of objective standards, the suffrage bill provision enabled the legislators to cloak discrimination in discretion.

123.    The suffrage bill provision has had a disproportionate impact on the state's black citizens. While black citizens represent only 36.5% of Mississippi's voting age population of citizens, approximately 58% of Mississippi's disenfranchised citizens who have completed their

42

sentences for convictions of disenfranchising offenses between 1994 and 2017 are black. These black citizens have not regained their voting rights and they have no realistic hope of ever obtaining the restoration of their right to vote by suffrage bill.

124. The suffrage bill provision was originally enacted with racially discriminatory intent, and the provision has never been amended. Because the suffrage bill provision continues to disproportionately impact black Mississippians, it violates the Equal Protection Clause of the Fourteenth Amendment.

125. Requiring the named Plaintiffs and other Class members to obtain the passage of a suffrage bill as a condition to regaining their right to vote violates the Equal Protection Clause of the Fourteenth Amendment.

126. At all times relevant herein, the Secretary of State has acted under color of state law.

127. The Secretary of State, acting under color of state law, has deprived and will continue to deprive the named Plaintiffs and other Class members of their Fourteenth Amendment right to a non-racially discriminatory process for the restoration of the right to vote.

## PRAYER FOR RELIEF

**WHEREFORE,** the named Plaintiffs and other members of the Class they seek to represent respectfully pray that this Court:

A.    Issue an order certifying this action as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure in the manner described above herein, with the named Plaintiffs as class representatives;

B.    Issue a class-wide judgment declaring that Mississippi's imposition of a lifetime voting ban on individuals who have completed the terms of their sentences for

43

disenfranchising offenses violates the Eighth Amendment's prohibition on cruel and unusual punishment;

C.   Issue a class-wide judgment declaring that Section 2 of the Fourteenth Amendment permits states to temporarily "abridge" the right to vote of citizens based on their "participation in rebellion, or other crime," but does not allow states to permanently "deny" citizens the right to vote on this basis;

D.   Issue a class-wide judgment declaring that the inherently arbitrary and racially discriminatory legislative process for the restoration of voting rights established by the suffrage bill provision of the Mississippi Constitution violates the Equal Protection Clause of the Fourteenth Amendment, as well as the First Amendment;

E.   Enjoin the Defendant from denying any Mississippi citizen the right to register to vote and cast a ballot in the State of Mississippi on the basis of his or her conviction of a disenfranchising offense after he or she has completed the terms of his or her sentence;

F.   Enjoin the Defendant from imposing any additional prerequisites for eligibility to vote, beyond those requirements presently set forth in Section 241 of the Mississippi Constitution and Miss. Code § 23-15-11, on Mississippi citizens who have completed the terms of their sentences for a disenfranchising offense;

G.   Require the Secretary of State to reinstate to the voter registration rolls any Mississippi citizen who (i) was removed from the voter registration rolls solely on the basis of his or her conviction for a disenfranchising offense, and (ii) has completed the terms of his or her sentence for any and all disenfranchising offenses;

44

H.    Require the Secretary of State to automatically restore voting rights to any Mississippi citizen who has completed the terms of his or her sentence for any and all disenfranchising offenses;

I.    Require the Secretary of State to provide notice of eligibility to vote to any Mississippi citizen who meets Class Member criteria;

J.    Require the Defendant to revise all voter registration application forms and voter information materials, including the Mississippi Mail-In Voter Registration Application and the Secretary of State's online Voter Information Center, to make it clear that individuals convicted of disenfranchising offenses may register to vote and vote after they have completed their sentences for any and all disenfranchising offenses;

K.    Require the Defendant to train and educate all Mississippi state officials involved in voter registration, voter purging, and/or the maintenance of voter information in the Statewide Election Management System, on compliance with the terms of the Court's judgment in this action;

L.    Require the Defendant to conduct a public awareness campaign to educate Mississippi citizens on the automatic restoration of voting rights upon the completion of a sentence for a disenfranchising offense;

M.    Award all Plaintiffs, including the members of the Class, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988;

N.    Award all Plaintiffs, including the members of the Class, costs of suit pursuant to 42 U.S.C. §§ 1920 and 1988; and

45

O.    Award such other and further relief as this Court may deem appropriate and

equitable, including injunctive and declaratory relief as may be required in the

interests of justice.

Dated: March 27, 2018

SIMPSON THACHER & BARTLETT LLP
Jonathan K. Youngwood (*pro hac vice*
forthcoming)
Janet A. Gochman (*pro hac vice*
forthcoming)
Nihara K. Choudhri (*pro hac vice*
forthcoming)
Isaac Rethy (*pro hac vice* forthcoming)
Tyler A. Anger (*pro hac vice* forthcoming)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
jyoungwood@stblaw.com
jgochman@stblaw.com
nchoudhri@stblaw.com
irethy@stblaw.com
tyler.anger@stblaw.com

By: _____

SOUTHERN POVERTY LAW CENTER
Jody E. Owens, II (Miss. Bar No. 102333)
Paloma Wu (Miss. Bar No. 105464)
111 East Capitol Street, Suite 280
Jackson, MS 39201
(601) 354-3408
Jody.Owens@splcenter.org
Paloma.Wu@splcenter.org

Lisa Graybill (*pro hac vice* forthcoming)
1055 St. Charles Avenue
New Orleans, LA 70130
(504) 486-8982
Lisa.Graybill@splcenter.org

*Attorneys for Plaintiffs*

47