**EXHIBIT 2**

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| ROY HARNESS, et al.,<br><br>　　　Plaintiffs,<br><br>　　　　v.<br><br>DELBERT HOSEMANN, SECRETARY OF STATE OF MISSISSIPPI, in his official capacity,<br><br>　　　Defendant. | Civil Action No. 3:17-cv-791-DPJ-FKB<br>*Consolidated with*<br>Civil Action No. 3:18-cv-188-DPJ-FKB |
| DENNIS HOPKINS, et al.,<br><br>　　　Plaintiffs,<br><br>　　　　v.<br><br>DELBERT HOSEMANN, SECRETARY OF STATE OF MISSISSIPPI, in his official capacity,<br><br>　　　Defendant. | |

## REPORT OF DOROTHY O. PRATT, Ph.D.

August 1, 2018

# TABLE OF CONTENTS

Page

I.      INTRODUCTION AND QUALIFICATIONS ................................................................1

II.     ASSIGNMENT ...........................................................................................................2

III.    SUMMARY OF MY OPINIONS ................................................................................2

IV.     SUMMARY OF SOURCES AND RESEARCH METHODOLOGY .............................4

V.      EXPLANATION OF MY OPINIONS ........................................................................6

        A.      The Events Leading up to the Convention ........................................................6

        B.      The Delegates to the Convention ......................................................................8

        C.      The Purpose of the Convention ......................................................................10

        D.      Circumventing the Obstacles Posed by the Fifteenth Amendment .....................12

        E.      The Proposed Repeal of the Fifteenth Amendment ...........................................14

        F.      The Work of the Franchise Committee .............................................................15

        G.      The Understanding Clause ..............................................................................19

        H.      The Suffrage Restoration Provision ................................................................24

                1.      The Convention Debates on the Suffrage Restoration Provision.............26
                2.      The Suffrage Restoration Process Was Designed to Be Onerous. ...........30
                3.      Suffrage Restoration Was Not a Gubernatorial Pardon Power.................31

        I.      The Adoption of the 1890 Constitution ...........................................................33

        J.      The Impact of the 1890 Constitution ...............................................................35

        K.      The First Use of the Suffrage Restoration Provision .........................................36

VI.     CONCLUSION ..........................................................................................................38

## I.    INTRODUCTION AND QUALIFICATIONS

1.      I have been retained as an expert by counsel for Plaintiffs in *Hopkins v. Hosemann*, captioned above. I have prepared this report according to Federal Rule of Civil Procedure 26(a)(2)(B).

2.      From August 2007 until my retirement in August 2016, I was an Associate Research Professor in the Department of History at the University of South Carolina. Before that I served at the University of Notre Dame both as an Assistant Dean in the College of Arts and Letters and as an Associate Professional Specialist in the Department of History. I earned both my Ph.D. and M.A. in History from the University of Notre Dame. In addition, I received an M.A. in Anthropology from Brigham Young University. I grew up in Jackson, Mississippi, and I come from a long line of Mississippians. A number of my family members and close friends still reside in Mississippi.

3.      One of my main research interests is the divisions between insider/outsider groups. My work in this area led to the publication of two monographs: *Sowing the Wind: The Mississippi Constitutional Convention of 1890* (University Press of Mississippi 2017) and *Shipshewana: An Indiana Amish Community* (Indiana University Press 2004). Both books investigate the creation of cultural boundaries and the construction of "fencing" to keep social and political divisions distinct. I have also researched and written a number of shorter publications and papers relating to other types of insider/outsider groups, including in the areas of gender division, racial and class specifications, and religious questions.

4.      My teaching interests are primarily focused on nineteenth-century American history. I have taught courses on the Civil War (for which I received the Kaneb Undergraduate Teaching Award at Notre Dame), the Jacksonian Era, the Gilded Age and Progressive Era,

1

History of the American West, History of the American South, and the Survey of American History. A copy of my curriculum vitae is attached as Appendix A to this report.

5.      I have not previously testified as an expert witness.

## II.      ASSIGNMENT

6.      I have been asked by Simpson Thacher & Bartlett LLP and the Southern Poverty Law Center, counsel for Plaintiffs in *Hopkins v. Hosemann*, to offer my opinions concerning the purpose of the franchise-related provisions of Mississippi's 1890 Constitution (the "1890 Constitution"), with a particular focus on the intent, design, and scope of Section 253 (the "Suffrage Restoration Provision"), which permits the Mississippi Legislature to restore voting rights to individuals disfranchised by reason of the criminal offenses enumerated in Section 241.

7.      I am being compensated for my work at the rate of $100 an hour. This remuneration is not contingent on my opinions and does not influence my conclusions in any way.

## III.     SUMMARY OF MY OPINIONS

8.      Based on my review of the history of the 1890 Constitution, including the debates that took place during Mississippi's 1890 Constitutional Convention (the "Convention"), I have reached the following opinions:

     a.      The delegates to the Convention (the "delegates") fully intended to disfranchise African Americans. Specifically, the delegates aimed to deny enough African Americans access to the ballot box to ensure white political control within the state.

     b.      While many of the delegates bluntly stated their intention to disfranchise African Americans, they disguised this purpose in the words of the 1890 Constitution. Every significant franchise-related section of the 1890

Constitution was designed and worded to disfranchise African Americans without specifically referring to race.

c.    The delegates recognized that no single race-neutral restriction, standing alone, would accomplish their goal of white political control. For this reason, the Franchise Committee specified several requirements to qualify for the elective franchise, including a literacy test and a criminal disfranchisement provision; these requirements were designed to intertwine and interlock to create an effective barrier to African American political participation within the state.

d.    A key challenge posed by the seemingly race-neutral qualifiers the delegates selected, particularly the literacy test and criminal disfranchisement provisions, was the risk that these provisos could disfranchise some white men in addition to African Americans. To protect the white men who might be ensnared by these requirements, the delegates established remedies for the loss of the elective franchise: for illiteracy the antidote was the constitutional interpretation test, or "Understanding Clause," and for disfranchisement due to criminal conviction the antidote was the Suffrage Restoration Provision. Both the Understanding Clause and the Suffrage Restoration Provision were designed as safety nets for white men.

e.    The Understanding Clause and the Suffrage Restoration Provision were both intentionally vague. Neither the Understanding Clause nor the Suffrage Restoration Provision had any specific standards for application. Election officials who applied the Understanding Clause and legislators who introduced or voted on private bills for the restoration of suffrage (lost under the criminal disfranchisement provision) had unrestricted latitude.

3

f.      The process established in the Suffrage Restoration Provision was designed to be onerous; the members of the Franchise Committee never planned for it to be easily implemented. Ostensibly, the Suffrage Restoration Provision was available to help anyone disfranchised because of a criminal offense. In reality, the members of the Franchise Committee intended readmission to the elective franchise to be reserved for white men who could negotiate the system.

g.      The Suffrage Restoration Provision was never intended to be a gubernatorial pardon. The delegates voted down every attempt to connect the Suffrage Restoration Provision to the governor's pardon power, and specifically kept the Suffrage Restoration Provision out of the purview of the executive branch.

## IV.     SUMMARY OF SOURCES AND RESEARCH METHODOLOGY

9.      The opinions in this report are based largely on the nine years I spent researching my monograph, *Sowing the Wind*, as well as the extensive literature on the Convention, the 1890 Constitution, and the aftermath.

10.     I have relied on the *Journal of the Proceedings of the Constitutional Convention of 1890* (Jackson, Mississippi: E.L. Martin, printer to the Convention, 1890) (the "*Proceedings*"), which is the official publication of the minutes of the Convention. Despite the volume's large size, the content of the *Proceedings* is sparse. The *Proceedings* does not include the speeches of the delegates in support of or in opposition to bills or amendments.

11.     As a matter of procedure, the committees of the Convention did not keep official minutes, even when the delegates met as a Committee of the Whole. The minutes that were kept were primarily transcripts of motions on the floor. When reporting on votes, the *Proceedings* did not always report the wording of the original text of the provision at issue, but only the phrases

4

that might need amendment. Therefore, a complete picture of the Convention does not emerge from the minutes as published in the *Proceedings*.

12.    For this reason, I have also relied on reports from the *Clarion-Ledger*, which historians and others have recognized as the paper of record for the Convention. The *Clarion-Ledger* (published in Jackson, Mississippi, where the Convention met) sent reporters daily to the Convention to write columns for the paper; no other paper did this throughout the meeting of the Convention.[1] Certain delegates even provided the *Clarion-Ledger* with advance copies of their speeches, which the paper then published verbatim. During debates in the United States Senate in December of 1890, Mississippi's senior Senator James Z. George acknowledged that the *Clarion-Ledger* was "considered" "reputable" and therefore accurately reported the Convention deliberations.[2]

13.    Where appropriate, I have also have relied on other Mississippi newspapers, including the *Daily Commercial Herald* of Vicksburg. In addition, I have considered editorials from the newspapers of Memphis and New Orleans that help to reveal the viewpoints of interested outsiders concerning the arguments presented at the Convention.

14.    I have also relied upon judicial decisions as well as articles written by the delegates to elucidate their opinions and biases. Several of these articles are included in the *Journal of the Mississippi Historical Society*, volume 6 (1902), when the state historical society

---

[1] *Proceedings*, 23, which stated, "*The Clarion-Ledger* is issuing a daily paper containing the proceedings in full of this Convention." See also "*Daily Clarion-Ledger*, For the Constitutional Convention, Only $1.00," *Daily Clarion-Ledger*, August 15, 1890, p. 2, "*The Daily Clarion-Ledger* will give a faithful and comprehensive report of [the Convention's] deliberations."

[2] *Congressional Record Containing the Proceedings and Debates of the Fifty-First Congress, Second Session*, vol. 22 (Washington, DC: Government Printing Office, 1891) ("*Congressional Record*"), 731.

gathered and published information on this topic. Finally, I have also considered the works of other major scholars of the 1890 Constitution.

15.     A list of the materials I considered in preparing this report is attached as Appendix B.

## V.     EXPLANATION OF MY OPINIONS

16.     As described in detail below, the purpose of the Convention was to create a new constitution that would disfranchise most African Americans within the state, in a manner that would not draw scrutiny under the Fifteenth Amendment. Many of the provisions adopted by the delegates had previously been used in other states, including those in the North.[3] What other states had not done, however, was to intertwine the voter eligibility requirements in a way that would result in sweeping, lifelong disfranchisement of African Americans while minimizing the disfranchisement of white men.

### A.     THE EVENTS LEADING UP TO THE CONVENTION

17.     In 1875, old confederates wrestled control of the state away from those who had supported Reconstruction. This process, called the "Mississippi Plan" across the South, relied on intimidation and fraud to gain control of the ballot box and the voting process within each state.[4] Through the late 1870s and early 1880s, the continued use of these tactics ensured that the

---

[3] Speech by Senator J. Z. George, defending the new Mississippi Constitution. See Appendix to the *Congressional Record*, 51st Cong., 2nd sess., vol. 22, pp. 52-53 (December 31, 1890).

[4] "Two Good Speeches, Delivered by Judge Chrisman and Hon. W. A. Boyd," *Clarion-Ledger*, September 11, 1890, p. 1, in which J. B. Chrisman, a delegate of Lincoln County, stated, "Sir, it is no secret that there has not been a full vote and a fair count in Mississippi since 1875—that we have been preserving our ascendancy of the white people by revolutionary methods. In plain words, we have been stuffing ballot-boxes, committing perjury and here and there in the State carrying the elections by fraud and violence until the whole machinery for elections was about to rot down."

participation of African Americans at the polls remained low enough that white men maintained political control of the state.[5]

18.     By the late 1880s, however, African American political power was resurging. Of the 254 delegates to the state Republican Convention in 1889, all but 60 delegates were African American.[6] Economically, African Americans began to join the Colored Farmers' Alliance, which pressed for both political and economic reforms.[7] This new confidence was met a violent reaction, with a particularly vicious example occurring in LeFlore County in September 1889.[8] Somewhere between 20 and 100 African American farmers were killed that day.

19.     Mississippi's senior senator, former Confederate Army colonel James Z. George, was among those who argued that the best way to respond to these various political changes was by crafting a new state constitution.[9] In October of 1889, Senator George publicly called for a convention to redesign the state's constitution.[10] His speech played upon the fears of the white population by predicting that the census of 1900 would show African Americans in the state

---

[5] Nationally, voting participation was falling, and in Mississippi, as in some other states at the time, the numbers of actual voters are suspect because of the acknowledged voter fraud and intimidation. What matters is that enough African American voters, for whatever reason, failed to vote or have their votes counted, so that the white population could maintain control. See, for example, "Hon. W.S. Eskridge, His Speech in Opposition to the Committee Report," *Daily Clarion-Ledger*, September 16, 1890, p. 1: "It is true that of late years the negro has taken but little interest in elections, he has in a great measure ceased to be an active factor in politics."

[6] "Republican Convention," *Clarion-Ledger*, September 26, 1889, p. 1.

[7] "Meeting of the Colored State Alliance," *Daily Commercial Herald* (Vicksburg), August 15, 1889, p. 2, reporting that the Colored Farmers' Alliance "is represented to be strong and steadily growing."

[8] "The LeFlore Troubles," *Clarion-Ledger*, September 5, 1889, p. 4.

[9] Senator George was instrumental in overturning the Reconstruction government in the state. He is widely credited as a key architect of the 1890 Constitution's disfranchisement provisions.

[10] "Senator J. Z. George, He Addresses a Large Audience at His Old Home," *Clarion-Ledger*, October 24, 1889, p. 1.

outnumbering whites by two to one.[11] He emphasized the new threats to Mississippi's control of African American voting and the pressing need to redress those dangers through the "unity of the whites," which he described as "essential to safety." Senator George asserted that the convention's "first duty" would be to "devise such measures, consistent with the constitution of the United States," which would ensure "a home government, under the control of the white people of the State."[12]

20.      In February of 1890, the Mississippi Legislature, with the acquiescence of the governor, passed an act calling for "a Convention to revise and amend the present Constitution of the State, or to enact a new Constitution."[13] Elections for delegates to the constitutional convention ensued with short notice.[14]

## B.      THE DELEGATES TO THE CONVENTION

21.      There were 134 delegates elected to the Convention, most representing Mississippi's various counties.[15] There were also a number of notable men, including Senator George, who were elected as at-large delegates.[16] Although a majority of the state's residents

---

[11] Ibid., which reported that Senator George said, "It is estimated by thoughtful statisticians that the new census will show that the black population of Mississippi will exceed that of the whites nearly one-half million. Considering our mild climate, our fertile soil, and its adaptation to the production of cotton, it is almost certain that in 1900, a very short period, the black population will outnumber the whites by two to one."

[12] Ibid.

[13] "Laws of the State of Mississippi, Published by Authority," *Clarion-Ledger*, February 13, 1890, p. 6, publishing "An Act to provide for calling a Convention to amend the Constitution"; "State Legislature, A Summary of Yesterday's Proceedings," *Daily Clarion-Ledger*, February 6, 1890, p. 1, which notes the governor's approval of a House Bill to call a constitutional convention.

[14] "Laws of the State of Mississippi, Published by Authority," *Clarion-Ledger*, February 13, 1890, p. 6, which published "An Act to provide for calling a Convention to amend the Constitution." Section 2 directed that an election for delegates to the constitutional convention would be held on July 29, 1890.

[15] *Proceedings*, 5-7.

were African American, only <u>one</u> of the delegates—Isaiah T. Montgomery—was African American.[17] Mr. Montgomery was almost unseated during the seventh day of the Convention proceedings.[18]

22.     Mr. Montgomery and George P. Melchior, both from Bolivar County, were the only two delegates elected as Republicans.[19] The remaining delegates, though ostensibly Democrats, were not uniform in their opinion. They divided into various groups jockeying for power; among those were the old elites, the New South adherents, the Farmers' Alliance men, and the Greenback Party members. Historians have traditionally condensed these Democratic factions into two groups: the delegates from the white counties and the delegates from the black counties.[20]

23.     The white counties had a preponderance of white farmers, who were short of money, short on education, long on suspicion of elite power, and especially long on virulent racial animosity. The black counties had a larger proportion of African Americans, and a smaller percentage of white farmers. The white farmers in the black counties were relatively better off

---

[16] Ibid.

[17] "More Free Talking, Numerous Orators Prese[n]t Their Views," *Daily Clarion-Ledger*, September 16, 1890, p. 1, which notes that Mr. Montgomery was "the only colored delegate in the Convention."

[18] *Proceedings*, 67-77; see also "The Convention, Montgomery and Melchoir [sic] Seated," *Daily Commercial Herald* (Vicksburg), August 21, 1890, p. 1.

[19] "Complexion of the Convention," *Daily Clarion-Ledger*, August 8, 1890, p. 2, which notes that "Melchoir [sic] and Montgomery are the only Republican delegates, elected as such, who will occupy seats in the Convention."

[20] The delegates described themselves as falling into two broad camps, those from the white counties and those from the black counties. See, for example, "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1, in a speech of E. Mayes, a delegate for the state at large, "[I]n the course of these discussions much has been said about the white counties and the black counties; about their divergent aspirations and their conflicting interests, much about their want of unity and homogeneity."

than their counterparts in the white counties and had carved out a pragmatic approach to the power struggles in the state.[21]

24.     The delegates from the white counties and the delegates from the black counties were mistrustful of the other, particularly over money and taxation. Only racial animosity united the white voters in all the counties.[22] Even though compromises between the delegates from the white counties and those from the black counties may appear to have been based on other grounds, they were not. Underneath issues of reapportionment, secret balloting, women voting, taxation, and prohibition was that of race.

### C.     THE PURPOSE OF THE CONVENTION

25.     The Convention began in Jackson, Mississippi, on August 12, 1890.[23] On the first day of the Convention, Judge Solomon Saladin Calhoon, a delegate of Hinds County and a former Lieutenant Colonel in the Confederate Army, was elected President of the Convention.[24] Judge Calhoon began the Convention with a speech that left no doubts about the purpose of the Convention: "This ballot system must be so arranged as to effect one object" — that white

---

[21] A number of black counties permitted some fusion voting, which allowed for a split ticket between parties; the procedure was a compromise to sanction some representation by two parties among elected officials. As a result of fusion voting, some African American Republicans were able to get elected as lower-level functionaries.

[22] See, for example, "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5, reporting on E. O. Sykes, a delegate of Monroe County: "He alluded to the phenomenal condition of affairs in the State— one portion of the State largely black, and the other largely white, and urged the necessity of striking some happy medium by which the fewest of white people shall be dissatisfied. Our hope lies solely in the unity and solidity of the white race."; "Convention Speeches," *Clarion-Ledger*, September 18, 1890, p. 2, a speech of J. B. Boothe, a delegate for the state at large and a member of the Franchise Committee, discussed "the lack of complete homogeneity of interest between the counties in the white and counties in the black belt," and stated that "concessions must come from both sides" because "there is danger of negro domination near or remote."

[23] *Proceedings*, 3.

[24] Ibid., 8-9.

people would be in the ascendancy.[25] He posited that when African Americans were in control, as during Reconstruction, it had "always meant economic and moral ruin." White rule, on the other hand, resulted in "prosperity and happiness to all races."[26]

26.     Though Judge Calhoon often spoke at the Convention in circumlocution about race matters, he had not been so fastidious in the months leading up to the election for the delegates. Before the Convention began, Judge Calhoon wrote, "Negro suffrage is an evil and an evil to both races."[27] He questioned, "Why should the Negro have this dangerous power of suffrage?"[28] Judge Calhoon's platform was absolutely clear when he was elected as a delegate of Hinds County and then selected as the Convention's President.

27.     Judge Calhoon's sentiments were not unique. Throughout the Convention debates, the delegates openly acknowledged that the purpose of the Convention was to create a new constitution which would disfranchise enough African Americans to ensure a stable white majority. For example:

- "Every scheme of self-government for the negro will prove a disastrous failure . . . We are, therefore, here for the purpose of organizing a new government, by which the political power of the State shall be vested in a majority fit to govern."— Senator George, a delegate for the state at large.[29]

---

[25] Ibid., 9-11.

[26] Ibid.

[27] "Judge Calhoon's Views. Thinks the Negro Should Be Deprivee [sic] of Suffrage," *Clarion-Ledger*, March 6, 1890, p. 2, quoting "a lengthy paper of Judge S. S. Calhoon, published in the *Times-Democrat* [New Orleans], on the negro problem."

[28] Ibid.

[29] "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5; see also "The Franchise. Senator George's Grea[t] Speech," *Daily Commercial Herald* (Vicksburg), September 17, 1890, p. 1.

- "It is the manifest intention of this Convention to secure to the State of Mississippi 'white supremacy.'" — Constitutional provisions submitted by Mr. Melchior, a Republican delegate of Bolivar County.[30]

- Mississippi's government should be "for all time in the control of the white race — the only race fit to govern in this country." — T. P. Bell, a delegate of Kemper County.[31]

- To prevent an "overthrow" of the white civil government it is necessary "to secure to the white race a fixed and permanent majority." — W. S. Eskridge, a delegate of Tallahatchie County.[32]

- "[I came] to assist in making a constitution that would give the power of the State into the hands of the white people, and there it should be lodged." — General S. D. Lee, delegate of Oktibbeha County and President of Mississippi A&M College (now Mississippi State University).[33]

28.     Although the delegates were unapologetic in describing their intention to disfranchise African-Americans, they were careful to avoid any reference to race in the franchise-related provisions of the 1890 Constitution. Every significant section of the 1890 Constitution was worded to avoid challenge under the Fifteenth Amendment.

### D.   CIRCUMVENTING THE OBSTACLES POSED BY THE FIFTEENTH AMENDMENT

29.     On August 22, 1890, the Convention's Judiciary Committee addressed the question of whether any efforts at disfranchisement would run afoul of the Fifteenth

---

[30] *Proceedings*, 275.

[31] "The Convention," *Clarion-Ledger*, September 11, 1890, p. 5.

[32] "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1.

[33] "And Still They Talk. Judge Chrisman's Last Grand and Eloquent Appeal," *Daily Clarion-Ledger*, September 18, 1890, p. 1.

Amendment.[34] The Committee was chaired by Judge Wiley P. Harris, Senator George's law partner.[35]

30.     The Judiciary Committee reported that the Fifteenth Amendment could not make anyone a voter.[36] Rather, it only forbade states to take away the franchise of citizens on the basis of their race.[37] According to the Judiciary Committee, Mississippi had "just as large discretion in regulating the franchise as it had before its adoption, with the single limitation, that the regulations which it prescribes shall apply alike to both races."[38]

31.     The Judiciary Committee was of the view that if the state added race-neutral qualifiers for registering voters, it would not be in violation of the Fifteenth Amendment. For instance, "[i]f a property or educational qualification shall be thought wise, or expedient, or if the payment of taxes or a longer residence in State or county should be deemed expedient, either or all may be adopted, provided they are applied alike to both races."[39] Resting on the advice of the Judiciary Committee, the delegates proceeded with their agenda.

---

[34] *Proceedings*, 83-87; see also "Judiciary Committee. They Make the First Report to the Convention," *Daily Clarion-Ledger*, August 22, 1890, p. 1.

[35] "Judiciary Committee. They Make the First Report to the Convention," *Daily Clarion-Ledger*, August 22, 1890, p. 1.

[36] *Proceedings*, 85: "It is plain, in the opinion of the Committee, from this section of the Constitution [referring to the Fourteenth Amendment], that Congress can not confer suffrage, can not make a voter, and that we must look to the several States, and their laws and Constitutions to ascertain who are legally competent to vote."

[37] Ibid.: "The Fifteenth Amendment has but one operation and was engrafted in the Constitution for the single purpose of laying an inhibition on the State, of discriminating against the colored man, because of race or previous condition of servitude."

[38] Ibid.

[39] Ibid.

E.      THE PROPOSED REPEAL OF THE FIFTEENTH AMENDMENT

32.      On September 30, 1890, a special committee of delegates, designated as the Committee on Preamble and Resolutions, proposed that Mississippi demand a repeal of the Fifteenth Amendment.[40] Framed as a request to Congress, the language of the committee's report was formal.[41] The report declared that Mississippi and some other states had nearly equal numbers of the two races and stated that "[t]hese two races, though friendly and homogenous for all business and industrial purposes, are widely separated by race instincts and prejudices in all political and social matters." According to the committee, the two races would be forever "divided in all political contests in the main, on race lines" and were "without any well founded hope of a change."[42]

33.      The report posited that "one race or the other must have charge and control the governments" or there would be "ever recurring conflicts" between the two. The report further expressed the committee members' fundamental understanding of the issue: "the white people only are capable of conducting and maintaining the governments," for "the negro race, even if its people were educated, being wholly unequal to such great responsibility, if they should come into control of such governments."[43]

---

[40] *Proceedings*, 302-04; see also "Slowly Jogging Along. Wrestling with the Legislative Report," *Daily Clarion-Ledger*, September 30, 1890, p. 1, which reported, "[T]he Committee recommended that a proposition to repeal the 15th Amendment to the Constitution of the United States be submitted by Congress." The special committee was created on the motion of M. Dabney, a delegate of Warren County, on August 26, 1890. *Proceedings*, 113-14; "Another Brief Session, A Mass of Bills Put in the Convention Hopper," *Daily Clarion-Ledger*, August 27, 1890, p. 1.

[41] *Proceedings*, 302-04.

[42] Ibid., 303.

[43] Ibid.

34.     The report concluded that "the true and only efficient remedy . . . lies in the repeal of the XV Amendment of the Constitution of the United States." The committee felt so strongly about this issue that they added, "we will cheerfully accept as a condition to such repeal such reduction in representation the House of Representatives . . . as may be reasonable."[44] The proposal went nowhere.

## F.     THE WORK OF THE FRANCHISE COMMITTEE

35.     The delegates were divided into committees to draft different sections of the state's new constitution. The largest and most important committee was the 35-member Committee on the Elective Franchise, Apportionment and Elections (the "Franchise Committee").[45] Senator George was a member, as was Judge Harris and many other important state leaders.[46] Over eighty percent of the Franchise Committee members resided in black counties. The Franchise Committee's proposals reflected that ethos in that they sought restriction of the African American vote and were less concerned about the incidental disfranchisement of

---

[44] Ibid., 304.

[45] *Proceedings*, 19-20.

[46] Ibid., 22. Isaiah Montgomery, the lone African American delegate, was a member of the Franchise Committee. He remains an enigma, as he not only served on the Franchise Committee but also voted for the 1890 Constitution—including the disfranchisement components. In a speech during the Convention on September 15, 1890, Mr. Montgomery acknowledged that Mississippians had employed "every form of demoralization" including "bloodshed, bribery, [and] ballot-stuffing" to restrict the African American vote. He further stated that the African American race "has not yet attained the high plane of moral, intellectual and political excellence common" to the white race. Given the realities of the time, he argued that "the work of this Convention, in order to be successful, must restrict the franchise by prescribing such qualifications for voters as would reduce the negro vote considerably below the white vote of the State." He expressed his view that in order "to restore honesty and purity to the ballot box," the new constitution must ensure to the state "a safe and intelligent voting population, capable of comprehending the intricate responsibilities." "A Noble Speech. The Remarkable Address of Isaiah T. Montgomery, a Negro," *World* (New York), September 27, 1890, p. 1; part of the speech can also be found in "The Convention," *Clarion-Ledger,* September 18, 1890, p. 5.

white men.[47] Such disregard for the white county voters did not sit well with their representatives, especially for members of the Farmers' Alliance, who represented many poor white farmers.

36.    The Franchise Committee operated in secrecy, with all debates taking place behind closed doors.[48] While some delegates objected to this secrecy in principle, others felt the closed-door approach was necessary.[49] Edward Mayes, a delegate for the state at large, said the Franchise Committee's secret meetings were not only understandable but also "wise and justifiable" for the Convention's "avowed purpose was an alteration of the whole basis of franchise, and necessarily in the shape of restriction."[50]

37.    The members of the Franchise Committee realized that the way to avoid scrutiny under the Fifteenth Amendment was to create qualifiers, rather than disqualifiers, for voters that would apply equally to white and African American males. The difficulty they faced was

---

[47] See, for example, "Convention Speeches. Hon. J. H. Jones Speaks Against Female Suffrage," *Clarion-Ledger*, September 18, 1890, p. 2, reporting a speech of J. B. Boothe, a delegate for the state at large and a member of the Franchise Committee, who questioned whether all of the white county delegates would oppose provisions that disfranchised some white men, and positing that they would be willing to accept the Franchise Committee's propositions for the greater good.

[48] "Is It a Failure?" *Daily Clarion-Ledger*, August 30, 1890, p. 2: "The Franchise Committe[e] sit[s] with closed doors and its deliberations are supposed to be secret."

[49] Compare, for example, "The Franchise, Senator George's Grea[t] Speech," *Daily Commercial Herald* (Vicksburg), September 17, 1890, p. 1, which notes that H. L. Muldrow, a delegate for the state at large, "criticised [sic] the action of the committee in holding secret sessions," according to Senator George, with "Convention Speeches," *Clarion-Ledger*, September 18, 1890, pp. 1-2, the speeches of E. Mayes and J. B. Boothe, delegates for the state at large, in which both defended the secret sessions of the Franchise Committee. Mr. Mayes was also chancellor at what is now the University of Mississippi (Ole Miss).

[50] "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1.

avoiding the disfranchisement of too many white men. Therefore, for example, they rejected the inclusion of a property test.[51]

38.     The Franchise Committee issued its first report on September 2, 1890 (the "Franchise Committee Report"), which comprised franchise provisions, re-apportionment directions, and an ordinance regarding the official and secret ballot to be used henceforth in elections (the "Election Ordinance").[52] The Franchise Committee Report proposed several voter eligibility requirements, including a poll tax, a lengthy residency requirement, a literacy test, and a targeted criminal disfranchisement provision:

Section 1 specified that elections were to be by secret ballot, printed by the government (previously voters literally cast a party ticket, printed by the party); the particulars were to be found in the Election Ordinance.

Section 2 listed the qualifications of voters: registered, males at least twenty-one years old, citizens, not Indians not taxed; residency within the state for two years and the county for one year; not convicted of certain crimes (bribery, burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery, embezzlement, or bigamy); and having paid the poll tax for the previous two years. Certain exceptions were made, including for ministers of the gospel.

Section 3 required an oath admitting to the provisions under Section 2; false testimony could result in perjury charges.

Section 4 required a poll tax for all males between the ages of twenty-one and sixty that was to be used to support the public schools; failure to pay the tax could result in seizure of personal property. An exception was made for those who were deaf, dumb, blind, or maimed.

Section 5 required qualified voters to be able to read the state constitution or "be able to understand the same when read to him; or give a reasonable interpretation thereof." This interpretation test came to be known as the Understanding Clause.

---

[51] The delegates recognized that a property test would disfranchise many white men. See "Hon. Irvin Miller. He Speaks Against an Educational or Property Qualification," *Daily Clarion-Ledger*, September 13, 1890, p. 1, which quotes I. Miller, a delegate of Leake County, who stated that a property qualification "will cause a division in the ranks of the white people of our State."

[52] *Proceedings*, 134-44.

Section 5 also required all voters to re-register after the new qualifications became effective.

**Section 6** provided the date when the Election Ordinance would be effective: January 1, 1896.[53]

39.     The members of the Franchise Committee intended to craft specifications to apply principally to African American voters, but they knew that some white men would be disfranchised in the process. The possibility of disfranchising some white men caused a notable split between the delegates from the white counties and the delegates from the black counties.

40.     Certain white-county delegates were blunt and aggressive in their reaction to any threat of disfranchising white men.[54] Irvin Miller of Leake County wanted to be sure not to disfranchise any Confederate veterans.[55] W. A. Boyd of Tippah County agreed, stating that he would not support any proposal that disfranchised any white men in his county.[56] Mr. Boyd had previously asserted that the Convention had "no power . . . to disfranchise because of poverty or illiteracy."[57] He stated that to white men, the right to vote was "an inheritance" and asked, "What right have you to take it away?"[58] In contrast, J. H. McGehee of Franklin County asked everyone

---

[53] Ibid., 134-36.

[54] See, for example, "Stuck in the 'Whole.' The Report of the Franchise Committee," *Daily Clarion-Ledger*, September 13, 1890, p. 1, which reports on a speech by J. Kennedy, a delegate of Clay County: "He would do anything for the relief of the Delta, except to sacrifice the rights of one poor white man in his county." "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5, quotes E. O. Sykes, a delegate of Monroe County, who adds: "The moral effect of one white vote is greater than that of fifty black votes."

[55] "Convention Speeches. Hon. J. H. Jones Speaks Against Female Suffrage," *Clarion-Ledger*, September 18, 1890, p. 2.

[56] Ibid.

[57] "A Property Qualification. Speech of Hon. W. A. Boyd, in Reply to Judge Chrisman," *Daily Clarion-Ledger*, September 10, 1890, p. 1.

[58] Ibid.

to compromise for a greater good:  white political control.[59] Both goals — protecting white male voters and creating a white polity — were important to the representatives from the white counties. They needed a compromise.[60]

41.    The members of the Franchise Committee sought to navigate the tricky waters of federal constitutional requirements and still disfranchise the very group that these provisions required the state not to disfranchise. In an effort to pacify everyone among the white race, the Franchise Committee created escape clauses in the form of the Understanding Clause and the Suffrage Restoration Provision. The fundamental purpose of both provisions was to mitigate the effect of the disfranchisement provisions on white males.

## G.    THE UNDERSTANDING CLAUSE

42.    A literacy requirement was a cornerstone of the Franchise Committee's disfranchisement scheme. The problem was that too many white men were also illiterate.[61] The

---

[59] "Discussion Continues. Seven Hundred Dollars per Day for Talk," *Clarion-Ledger*, September 18, 1890, p. 3.

[60] A number of delegates, including Senator George, acknowledged that Franchise Committee Report was the product of compromise. See "The Franchise. Senator George's Great Speech," *Daily Commercial Herald* (Vicksburg), September 17, 1890, p. 1:  "It is the result of a compromise of divergent and conflicting views."; "Convention Speeches," *Clarion-Ledger*, September 18, 1890, p. 2, quoting a speech of J. B. Boothe, a delegate for the state at large and a member of the Franchise Committee: "We came here from different parts of the State, representing different interests so far as the great question of suffrage is concerned . . . compromise and concession was necessary."; "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1, in a speech of E. Mayes, a delegate for the state at large: "[T]his report has been criticised [sic] as a report of compromise . . . Here it is simply a question of choice between different conditions to reach a result which we all desire and that is the future safety of our common State. It seems to me that this is particularly a subject for compromise and concession."

[61] "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5, which quotes T. S. Ford, a delegate for the state at large, who discussed the high rate of white illiteracy in his county and cautioned that the delegates should not "substitute a negro [problem] for a white problem."; see also "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1, which quotes W. B. Eskridge, a delegate of Tallahatchie County, who noted that "[o]n the basis of the census of 1880 there is eleven percent of illiteracy amongst the white race."

consequence was that the literacy requirement, in particular, exposed widening fissures between the delegates from the black and the white counties. The delegates from the white counties feared that a literacy test would disfranchise enough illiterate white males statewide to allow the black counties to maintain control of the state. To remedy this situation, the Franchise Committee, through the maneuvers of Senator George, proposed a constitutional interpretation test—which came to be known as the Understanding Clause—in Section 5 of the article on the franchise in the Franchise Committee Report.[62]

43.     The wording of Section 5 was exceptionally vague. Following the requirement that a voter must be able to read the constitution, the provision added, "[O]r he shall be able to understand the same when read to him; or give a reasonable interpretation thereof."[63] The Understanding Clause permitted a voting official to read to an illiterate person a portion of the state constitution and ask that the person demonstrate an "understanding" of the text. If the person was able to do so to the satisfaction of the voting official, that person would have access to the ballot box despite his illiteracy. Neither Section 5 nor any other provision of the Franchise Committee Report identified who should administer the test, what portion of the constitution should be read to a potential voter (or for that matter, how many portions of the text could be used), or how the determination of sufficient understanding should be made. In short, there were no standards for the Understanding Clause, which worried many people within the state.

---

[62] By many accounts, Senator George is considered to be the author of the Understanding Clause. See "The Obnoxious Section," *Clarion-Ledger*, October 9, 1890, p. 1: "This particular clause is said to be an emanation from Senator George."  In "George, Not Taylor," *Vicksburg Evening Post,* November 29, 1890, p. 2, the editors pointed out that "Senator George is the author of that famous clause. It was his pet and nursling, and but for him would not to-day be part of the organic law." Additionally, in "Give the Devil His Due," *Clarion-Ledger*, November 6, 1890, p. 5, the editors noted that "Senator George is the reputed and undoubted author of the clause which provides that illiterates who cannot read but who can understand and interpret the Constitution when read to them, shall be allowed to vote."

[63] *Proceedings*, 136.

44.     A number of the delegates felt that the Understanding Clause was plainly dishonest.[64] For example, Judge Chrisman of Lincoln County stated that the clause "looks like a farce to make a registration officer decide whether a voter rightly interprets a clause of the Constitution."[65] He observed:

> It looks as if it was intended that if the register wanted the man to vote he would read him some such clause as: Slavery except as a punishment for crime shall be forever prohibited. "Do you understand that?" "Oh, yes." But if he did not want him to vote he would read him the interstate clause or the section forbidding the legislature to pass *ex post facto* laws and demand a construction.[66]

45.     Senator George defended the Understanding Clause as a provision that "disfranchised nobody—it only enlarges the franchise."[67] He emphasized that "[n]o man loses, irrevocably, the right of suffrage" because of the literacy test.[68] Rather, "[h]e had one more chance to lift his head and exercise the highest privilege of an American freeman."[69]

---

[64] See, for example, "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1, quoting a speech of W. B. Eskridge, a delegate from Tallahatchie County: "My objection to this qualification [referring to the Understanding Clause] I will state very briefly. I fear sir, it will lead to trickery and fraud." "The Convention," *Clarion-Ledger*, September 18, 1890, p. 8, reported that L. W. Magruder, a delegate for the state at large and a member of the Franchise Committee, sought to replace the Understanding Clause with a property requirement because the Understanding Clause "was a fraud on its face—it was the serpent whose trail is on every section and clause of the scheme."; "Female Suffrage Day. Convention Turned into a Debating Society," *Daily Clarion-Ledger*, September 10, 1890, p. 1, quoted W. F. Love, a delegate of Amite County: "The clause giving to [the] manager of an election the right to judge whether or not voters understood the Constitution of the State, would lead to fraud and great dissatisfaction."

[65] "Two Good Speeches: Delivered by Judge Chrisman and Hon. W. A. Boyd," *Clarion-Ledger*, September 11, 1890, p. 1.

[66] Ibid.

[67] "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5. Judge Harris later made the same argument. See "Understanding Clause, Convention Refuses to Reconsider It," *Clarion-Ledger*, October 30, 1890, p. 5, quoting Judge Harris: "[T]he clause was simply an enlargement, and not a restriction of the suffrage."

[68] "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5.

[69] Ibid.

21

46.     But the problem with the Understanding Clause was that one of the overriding

reasons for calling the Convention was to ensure white political control through straightforward

methods.[70] The *Clarion-Ledger* reported that the Understanding Clause was "regarded by many

of the very best men of the Convention as a manifest sham."[71] The *Lexington Advertiser* said the

Understanding Clause would "incur the contempt of the honesty and intelligence of the Union

. . . Such a wicked and silly scheme can be seen through by any man of sense, and is

indefensible, morally and politically.[72] The *Monticello Press* agreed, calling it a "gigantic"

"fraud."[73]

47.     Members of the press also raised concerns that the Understanding Clause had the

potential to be used against white men.  The *Clarion-Ledger* reported that the Understanding

Clause "would be a constant menace to white supremacy."[74] Why the provision was dangerous

---

[70] See, for example, "Convention Speeches. Delivered by Messrs. Mayes and Eskridge," *Clarion-Ledger*, September 18, 1890, p. 1. W. B. Eskridge, a delegate of Tallahatchie County stated, "The people of the State are looking to us and expecting at our hands to settle the suffrage question on such a basis as will establish beyond doubt white supremacy and place the State above trickery and fraud at the ballot box."; "Expunge the Clause," *Clarion-Ledger*, October 9, 1890, p. 4, quoted W. C. McLean, a delegate of Grenada County: "[T]he people sent the delegates to the Convention to secure white supremacy, not by trick or artifice, not by fraud, stratagem or subterfuge but by brave, open, honest and honorable methods . . . [T]his section was a fraud upon its face."

[71] "The Obnoxious Section," *Clarion-Ledger*, October 9, 1890, p. 1 (quoting the *Memphis Appeal*).

[72] "Will Incur Contempt," *Clarion-Ledger*, October 9, 1890, p. 1 (quoting the *Lexington Advertiser*). Many of the small newspapers in the state are no longer extant and can only be found when quoted in another paper. The *Clarion-Ledger* editors quoted these examples as supportive of their own position.

[73] "A Gigantic Fraud," *Clarion-Ledger*, October 9, 1890, p. 1 (quoting the *Monticello Press*).

[74] "The Understanding Clause. A Growing Sentiment in Favor of Its Repeal," *Clarion-Ledger*, October 2, 1890, p. 1 (quoting the *Memphis Appeal*).

appeared obvious to the editors: "If . . . a few men unfaithful to the white race should get in power, there is no telling how much damage would result."[75]

48.     Some delegates pushed to rescind the Understanding Clause, but these efforts were met with equally vigorous opposition from the members of the Franchise Committee, including Senator George and his allies.[76] Members of the Franchise Committee from white counties saw the provision as a compromise that they needed to make. In a letter to his hometown paper the *Corinth Herald*, L. P. Reynolds, a delegate of Alcorn County and a member of the Franchise Committee, wrote:

> The intelligence clause, I think, is not objectionable as it will exclude no man with ordinary sense . . . No white man who has sense enough to go to [the] mill will be disfranchised under this clause, for all of our race have an aptitude for Republican government which will enable all our people except idiots to 'understand or give some reasonable interpretation' of some clause in the State Constitution. While I do not like this clause I found it necessary to take it in order to prevent a combination of all the black counties, for the purpose of establishing an educational and property qualification, and by doing this we also secured a white basis upon which to erect a permanent State government . . . We are relieved from all apprehension of negro rule. Our end of the States gets a large part of the new strength.[77]

49.     Many delegates from the black counties supported the provision. Judge Harris, a delegate of Hinds County and a member of the Franchise Committee, defended the

---

[75] Ibid.

[76] For example, "Understanding Clause, It Is Made the Special Order for Wednesday. 68 Votes Needed to Rescind It," *Daily Clarion-Ledger*, October 25, 1890, p. 1, reported that H. L. Muldrow, a delegate for the state at large, "made an earnest appeal for reconsideration" of the Understanding Clause, "and called attention to the universal protest from the press and [the] people."; see also "The Understanding Clause," *Daily Clarion-Ledger*, October 25, 1890, p. 2: "It is evident that some members of the Convention have decided to make a desperate fight to retain the section as adopted, 'understanding clause' and all."

[77] Reprinted in "Don't Like it But Takes It," *Clarion-Ledger*, October 9, 1890, p. 1.

Understanding Clause as "a chief prop of the whole structure."[78] He pointed out that all of the provisions on the franchise were interrelated.[79]

50.     On October 29, 1890, the delegates voted to retain the Understanding Clause; it passed with the support of sixty-seven votes, only one vote shy of rejecting the provision.[80]

## H.     THE SUFFRAGE RESTORATION PROVISION

51.     As part of their multipronged approach to restricting the number of African American voters, the Franchise Committee structured the criminal disfranchisement provision (enacted as Section 241 of the 1890 Constitution) to narrow the African American franchise base. While many states forbade voting by persons convicted of any felony, the Franchise Committee limited Mississippi's criminal disfranchisement provision to a carefully selected list of crimes that aimed to ensnare more African Americans than whites.  The list notably omitted violent crimes, such as murder and rape, and instead focused primarily on property-related offenses. The delegates believed that these particular crimes were disproportionately committed by African Americans because they held firmly to the stereotype that African Americans were always at the bottom of the state's economic ladder. In 1896, Mississippi Supreme Court Justice C. J. Cooper recognized that the delegates selected disfranchising offenses to target African American voters:

> [T]he convention swept the circle of expedients to obstruct the exercise of the franchise by the negro race. By reason of its previous condition of servitude and dependence, this race had acquired or accentuated certain peculiarities of habit, of

---

[78] "Understanding Clause, Convention Refuses to Reconsider It," *Clarion-Ledger*, October 30, 1890, p. 5 (quoting Judge Harris).

[79] Ibid. "[T]he Convention could not act on this particular clause without acting on the entire section; that each clause in that section qualified and was dependent on the others."

[80] *Proceedings*, 543; "Understanding Clause, Convention Refuses to Reconsider It," *Daily Clarion-Ledger*, October 29, 1990, p. 1.

> temperament, and of character, which clearly distinguished it as a
> race from that of the whites — a patient, docile people, but
> careless, landless, and migratory within narrow limits, without
> forethought, and its criminal members given rather to furtive
> offences than to the robust crimes of the whites. Restrained by the
> federal constitution from discriminating against the negro race, the
> convention discriminated against its characteristics and the
> offenses to which its weaker members were prone.[81]

52.     Even though the new criminal disfranchisement provision was crafted to

selectively disqualify African Americans, the delegates were aware that some white men

convicted of these same offenses would also lose their right to vote. The Franchise Committee

came forward with a proposed remedy in a supplemental report issued on September 15, 1890

(the "Supplemental Report"), while the polarizing and lengthy argument against the

Understanding Clause remained underway.[82] Section 10 of the Supplemental Report provided as

follows:

> The Legislature may by a two-thirds vote of both Houses, restore
> to the right of suffrage any person disqualified by reason of
> crime.[83]

The records of the Convention on the origins of the Supplemental Report are meager. Given the

timing and the context of the Supplemental Report, however, it is clear that the provisions of the

Supplemental Report, including Section 10, reflected compromises within the Franchise

Committee.

53.     Section 10, which was ultimately enacted as Section 253 of the 1890 Constitution,

empowered the state legislature to restore the franchise to those convicted of disfranchising

---

[81] *Ratliff v. Beale*, 20 So. 865, 868 (Miss. 1896).

[82] *Proceedings*, 193-95.

[83] Ibid., 195.

offenses provided that both legislative houses approved of the restoration by a two-thirds vote. The Suffrage Restoration Provision established only a limited remedy for certain people affected by the criminal disfranchisement provision. Just as the Understanding Clause served as a safety net for illiterate white males who would otherwise be disfranchised by the proposed literacy test, the Suffrage Restoration Provision ensured that whites caught up in the criminal justice system had a possible remedy and could redeem their franchise.

54.     Like the Understanding Clause, the Suffrage Restoration Provision included no standards of any kind. There were no specified parameters for legislators' deliberations, nor any requirement that legislators act in a race-neutral manner. The Suffrage Restoration Provision allowed the legislators complete discretion to determine whose voting rights to restore. The delegates expected that the legislators would use this discretion to permit only those convicted of disfranchising crimes who had influence and money to regain access to the franchise. For Mississippi of the 1890s, and under a new constitution that by its nature excluded African American representatives, the only ones with influence and money were white men.

### 1.     The Convention Debates on the Suffrage Restoration Provision

55.     On September 24, 1890, the Convention considered Section 10 of the Supplemental Report.[84] Senator George "expressed the hope that the section would stand" and explained that "[t]here would be many instances where the exercise of this power by the Legislature would be of the most beneficent character."[85] He argued that if someone had

---

[84] *Proceedings,* 267-69; "The Great Question. Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1.

[85] "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1.

straightened out his life then he should deserve a reprieve from the strictures prohibiting the franchise to those convicted of certain crimes.[86] Senator George further argued:

> Where a man hasn't got sufficient intelligence to vote, there is always the incentive and encouragement to become qualified; and so, where disqualified for crime, he should be encouraged to reform and become a good citizen.[87]

56.     Support for then-Section 10 came not only from Senator George, but also from Franchise Committee members from the white counties.[88] The other white county delegates were divided over the Suffrage Restoration Provision, just as they were about the Understanding Clause. These delegates wanted some sort of promise of franchise security for poor white farmers, but both of these provisions were entirely too vague and uncertain. The white county delegates knew that nothing in the Suffrage Restoration Provision *guaranteed* that a disfranchised person could regain his right to vote; instead the provision presented a set of difficult hurdles that the person may not be able to overcome.

57.     Given the concern of protecting poor white farmers, the delegates declined to adopt proposed amendments to then-Section 10 to establish merit-based or race-neutral standards for the restoration of suffrage. One delegate wanted to provide an option for restoration to those over forty-five years of age and of good moral character; this amendment was subsequently

---

[86] Ibid. See also "The Convention. Rapid Progress Being Made Towards the Completion of the Constitution," *Daily Commercial Herald* (Vicksburg), September 25, 1890, p. 1, which reported: "Mr. George advocated strongly the section as it stands, saying that when a man is guilty of crime, and afterwards reforms and becomes a good citizen, it will be a hardship to have the brand of infamy for ever fixed upon him."

[87] "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1.

[88] Ibid., reporting that L. P. Reynolds, a delegate of Alcorn County, and D. T. Guyton, a delegate of Attala County, both supported Section 10.

withdrawn.[89] Another wanted to confine eligibility to individuals who committed crimes as juveniles.[90] A third wanted to prohibit restoration of the elective franchise to those convicted of "infamous" crimes.[91] One delegate suggested that the trial judge and the prosecuting attorney must provide recommendations in support of the applicant's restoration petition.[92] These proposals were all tabled.[93]

58.    In contrast to the tabled amendments, a few proposals to amend Section 10 were affirmatively voted down.[94] Among those were ones to tie the restoration power of the legislature to the governor in some way.[95] A proposal to strike the section entirely, and a proposal to allow the legislature to restore suffrage lost for any reason (not just "by reason of crime"), were both also rejected.[96]

---

[89] "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1. It appears that the amendment was proposed by T. S. Ward, a delegate of Madison County.

[90] *Proceedings*, 267. W. C. Richards, a delegate of Lowndes County, proposed the amendment.

[91] Ibid., 267-68. R. H. Thompson, a floater delegate of Lincoln and Jefferson Counties, proposed the amendment.

[92] Ibid., 267. E. Henderson, a delegate of Harrison County, proposed the amendment.

[93] Ibid., 267-69; "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1.

[94] *Proceedings*, 267-69; "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1.

[95] *Proceedings*, 267-69; "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1

[96] T. S. Ward, a delegate of Madison County, moved to strike out Section 10. Ward's motion was lost by a vote of 62-41. See "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1; see also *Proceedings*, 267, which does not give the vote count. J. E. Gore, a delegate of Webster County, moved to strike the phrase "by reason of crime." *Proceedings*, 267, reports that the motion was lost. According to "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1, however, Gore's motion was tabled.

59.     One of the delegates successfully moved to add the following language: "The reasons therefor[e] shall be spread upon the Journal, and the vote shall be by yeas and nays, and in determining the vote the whole number of members elected shall be considered."[97] The purpose of the publication notice in the legislative journals was to prevent fraud (all too often perceived as a problem in state government) and secrecy in the restoration of voting rights. Publication under the Suffrage Restoration Provision was required only *after* the vote, unlike the governor's pardon provision (enacted as Section 124 of the 1890 Constitution) which required notice *before* a vote. Moreover, notice under the Suffrage Restoration Provision was to be published in-house, within the journals of the legislature; it was not required to be published in the papers (as specified in the pardon provision).[98] The amendment made it clear that consideration of restoration of suffrage was to be within the legislature and not through public opinion and the press.

60.     Following the debates on then-Section 10, W. S. Featherston, a delegate of Marshall County, moved the adoption of the provision, as amended, which carried.[99] The

---

[97] *Proceedings*, 268; "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1; "The Convention, Rapid Progress Being Made Towards the Completion of the Constitution," *Daily Commercial Herald* (Vicksburg) September 25, 1890, p. 1. According to the *Proceedings*, this amendment was proposed by R. H. Thompson, a floater delegate of Lincoln and Jefferson Counties. But both the *Daily Clarion-Ledger* and the *Daily Commercial Herald* (Vicksburg) reported that the amendment was proposed by W. F. Love, a delegate of Amite County.

[98] Compare 1890 Const., art. V, § 124: "[I]n cases of felony after conviction no pardon shall be granted until the applicant therefor shall have published for thirty days, in some newspaper in the county where the crime was committed . . . his petition for pardon, setting forth therein the reasons why such pardon should be granted" with 1890 Const., art. XII, § 253: "The legislature may . . . restore the right of suffrage to any person disqualified by reason of crime; but the reasons therefore shall be spread upon the journals, and the vote shall be by yeas and nays." *Proceedings*, 655, 677. See also "Swamp Land Matters . . . Petitions for Pardon Must Be Published," *Clarion-Ledger*, October 2, 1890, pp. 2-3.

[99] *Proceedings*, 269.

measure then became part of the draft constitution. Immediately after debating then-Section 10, the delegates resumed consideration of the Understanding Clause.[100]

61.     During the confusion of the last days of the Convention, as delegates rushed to finish the constitution, amendments to numerous sections were offered — including last-ditch efforts to repeal the Understanding Clause. On October 24, 1890, delegates revisited then-Section 10.[101] M. McClurg, a delegate of Carroll County, moved to require both a roll-call vote and approval by two-thirds of those elected to both houses.[102] This amendment was adopted.[103]

62.     The final version of the Suffrage Restoration Provision, enacted as Section 253 of Article XII (Franchise) of the 1890 Constitution, read as follows:

> The legislature may by a two-thirds vote of both houses, of all members elected, restore the right of suffrage to any person disqualified by reason of crime; but the reasons therefor shall be spread upon the Journals, and the vote shall be by yeas and nays.[104]

### 2.     The Suffrage Restoration Process Was Designed to Be Onerous.

63.     The Franchise Committee did not design the suffrage restoration process to be easy. Regaining the franchise pursuant to the Suffrage Restoration Provision required a private legislative action; this meant that the petitioner would need a network of influence even to be

---

[100] Ibid., 269-70.

[101] Ibid., 490-92. See also "Understanding Clause, It Is Made the Special Order for Wednesday," *Daily Clarion-Ledger*, October 25, 1890, p. 1.

[102] *Proceedings*, 490. See also "Understanding Clause, It Is Made the Special Order for Wednesday," *Daily Clarion-Ledger*, October 25, 1890, p. 1.

[103] *Proceedings*, 490-91.

[104] Ibid., 677.

considered for restoration. To get the local representative interested required connections or resources.

64.　The Suffrage Restoration Provision also required a two-thirds vote in both houses "of all members elected" in order for a petitioner to regain his voting rights.[105] This presented an unusually high hurdle; numerous other legislative provisions of the 1890 Constitution required only a majority, including Section 54 (enactment of a statute requires a majority of those present), Section 62 (amendment to a bill adopted in one house requires a vote by a majority in the other house), and Section 64 (appropriation of funds requires a majority of "all the members elected").[106] Section 72 provided that the legislature could even override a governor's veto with a two-thirds vote of each house, rather than a two-thirds vote of "all members elected" specified in the Suffrage Restoration Provision.[107] The requirement of a two-thirds vote "of all members elected" in both houses of the legislature strongly suggests that the Suffrage Restoration Provision was designed to benefit individuals of significance in the community, who would have access to influence or money to purchase it.

### 3.　Suffrage Restoration Was Not a Gubernatorial Pardon Power.

65.　It is clear that the Suffrage Restoration Provision was never intended to be in any way related to the governor's pardon power. L. P. Reynolds, a member of the Franchise

---

[105] *Proceedings*, 677.

[106] 1890 Constitution art. IV, § 54, states, "A majority of each house shall constitute a quorum to do business . . . "; § 62, states, "No amendment to bills by one house shall be concurred in by the other, except by a vote of a majority thereof . . . "; § 64, states, "No bill passed after the adoption of this Constitution to make appropriations of money . . . shall . . . be passed except by the votes of a majority of all the members elected to each house of the Legislature."; *Proceedings*, 645-46.

[107] 1890 Constitution art. IV, § 72, provides that in the event that the governor does not sign a bill, the legislature may reconsider the bill; "[i]f, after such reconsideration, two-thirds of that house shall agree to pass the bill, it shall be sent, with the objections, to the other house, by which, likewise, it shall be reconsidered, and if approved by two-thirds of that house, it shall become a law"; *Proceedings*, 647.

31

Committee and a delegate of Alcorn County, specifically stated that the Committee had shifted "this feature of the pardoning power . . . from the Executive to the Legislative Department, because such should not be vested in the Executive."[108]

66.     The delegates were exceedingly suspicious of the gubernatorial pardon power because of what many viewed as historical abuses.[109] If the Franchise Committee had considered the Suffrage Restoration Provision to be part of the gubernatorial pardon power, the delegates would have placed the provision in Article V of the 1890 Constitution, which concerned the Executive branch.[110] Article V included a provision on the gubernatorial pardon power (Section 124), but the Suffrage Restoration Provision was not mentioned or referenced in Section 124.[111]

67.     During the Convention debates, attempts to link the Suffrage Restoration Provision to the governor's pardon powers were defeated.[112] In fact, one delegate made a motion that would have forbidden the use of the gubernatorial pardon in these matters, a motion which

---

[108] "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1. Reynolds did not explain the reasoning behind this statement. Notably, he supported both the Understanding Clause and the Suffrage Restoration Provision. See "The Franchise, Voting on the Amendments," *Daily Commercial Herald* (Vicksburg), September 18, 1890, page 2, which reported on Reynolds' support of the Understanding Clause; see also "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1, which reported on Reynolds' support for the Suffrage Restoration Provision.

[109] See *Proceedings*, e.g. 51-52, 104-05, 281-82, addressing gubernatorial pardons; "Swamp Land Matters . . . Petitions for Pardon Must Be Published," *Clarion-Ledger*, October 2, 1890, pp. 2-3. The administration of Governor Adelbert Ames collapsed in 1875 following the impeachment of the lieutenant governor based on the claimed abuse of the pardon power. Governor Robert Lowry, who remained in office until January 1890, also faced criticism for pardoning scores of prisoners who had been subject to abuse by the convict lease system.

[110] Similarly, if the Franchise Committee had considered the Suffrage Restoration Provision to be an extension of the legislative powers, the Committee would have placed the provision in Article IV, which addressed the Legislative branch.

[111] See 1890 Constitution art. V, § 124; *Proceedings*, 655.

[112] *Proceedings*, 267-69; "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1.

he lost.[113] Another delegate made a counter proposal which would have guaranteed that the Suffrage Restoration Provision would *not* conflict with the governor's power to pardon.[114] This motion lost as well.[115] The rejection of these motions confirms that the Suffrage Restoration Provision was not viewed as an accompaniment to the governor's pardon power, but instead as an integral component of the web of racially-targeted restrictions on the franchise.

## I.     THE ADOPTION OF THE 1890 CONSTITUTION

68.     On November 1, 1890, the 1890 Constitution was adopted by vote of the delegates, without ratification by the citizens of Mississippi.[116] Article XII of the 1890 Constitution included both the Understanding Clause and the Suffrage Restoration Provision.[117]

69.     On the last day of the Convention, Judge Calhoon, the President of the Convention, delivered a lengthy closing address in which he declared, "Our mission here has

---

[113] *Proceedings*, 268. G. G. Dillard, a delegate of Noxubee County, proposed an amendment adding the language, "but no executive pardon shall be construed to remove the disqualification."

[114] Ibid. L. W. Magruder, a delegate for the state at large and a member of the Franchise Committee, proposed adding the language, "[p]rovided, [t]hat this shall not interfere with the right of the Governor to pardon."

[115] Both amendments were rejected, according to the *Daily Clarion-Ledger* and *Daily Commercial Herald* (Vicksburg). See "The Great Question, Settled at Last by the Constitutional Convention," *Daily Clarion-Ledger*, September 24, 1890, p. 1; "The Convention, Rapid Progress Being Made Towards the Completion of the Constitution," *Daily Commercial Herald* (Vicksburg), September 25, 1890, p. 1. The *Proceedings* reported that Mr. Dillard's motion was rejected while Mr. Magruder's motion was tabled; in addition, the *Proceedings* reported slightly different wording to the newspaper accounts. *Proceedings*, 268.

[116] *Proceedings*, 637-38; "The Great Convention, Adjourned After a Long and Laborious Session. The Constitution Promulgated," *Clarion-Ledger*, November 6, 1890, p. 3. In reliance on an opinion by the Judiciary Committee, the delegates did not seek ratification of the 1890 Constitution. The Judiciary Committee reported that "ratification by a vote of the people, has no support in any principle of constitutional law, and is merely a political theory." *Proceedings*, 148-49.

[117] 1890 Const. art. XII, §§ 244, 253; *Proceedings*, 675-77.

been accomplished."[118] He again emphasized that the purpose of the Convention was to concentrate political control in the hands of white men:

> In my judgment the material interest and moral advancement of the people of both races here depend on the predominance in government of that virtue and intelligence, which for the present at least, can come only from that race which in the past has shown a capacity for the successful administration of free institutions. That race alone can now safely exercise the functions of ruling with moderation and justice and accomplish the great purpose for which governments are established.[119]

70.     Judge Calhoon justified his position by claiming that African Americans had no history or civilization: "The race up to this time has shown no science, no literature, no art, no enterprise, no progress, no invention."[120] According to Judge Calhoon, the rule of African Americans had "always meant, stagnation, the enslavement of woman [sic], the brutalization of man, animal savagery, universal ruin."[121] Although he added reference to the necessary control of corporations and evil cartels, his emphasis for the entire speech was on race matters.

71.     To the extent his closing address left any doubts concerning the purpose of the 1890 Constitution, Judge Calhoon further clarified his position during his defense of Ambus Beale, an indigent African American whose bedstead was seized by the Hinds County Sheriff for payment of delinquent poll taxes. Judge Calhoon and his team of co-counsel, including former

---

[118] *Proceedings*, 700-03; "The Farewell Address. Delivered to the Convention by Judge S. S. Calhoon," *Clarion-Ledger*, November 6, 1890, p. 5. Senator George "moved that the address of President Calhoon be spread upon the Journal and published with the proceedings of the Convention." Senator George's motion was "adopted by a unanimous vote." *Proceedings*, 703.

[119] *Proceedings*, 702-03.

[120] Ibid., 701.

[121] Ibid., 702.

governor Robert Lowry, argued that if the poll tax could be satisfied through the seizure of property, "as it will be if a voter's bed and blankets may be seized for tax, it will be but a short time before the State is again cursed with a negro majority, with all the evils and perils that follow in the train of so disastrous an event."[122] The Mississippi Supreme Court in *Ratliff v. Beale* held that the poll tax was optional, and the network of disfranchisement provisions in the 1890 Constitution stayed intact.[123]

72.    Unlike Judge Calhoon, Senator George refused to admit that the 1890 Constitution was designed to disfranchise African Americans. For example, during the Convention debates, Senator George stated, "I deny here, as I would deny in the Senate, that the educational test was intended to exclude negroes from voting."[124] In December of 1890, Senator George defended the 1890 Constitution in lengthy remarks on the floor of the United States Senate. He contended that Mississippi had a large majority of African Americans, whom he described as "unlettered, ignorant, . . . unable to read, unused, unpracticed [and] uninformed."[125] He claimed that Mississippi, in its wisdom, "saw [it] proper to call a convention to correct the evil, not of negro suffrage *per se*, but of ignorant and debased suffrage."[126]

## J.    THE IMPACT OF THE 1890 CONSTITUTION

73.    The 1890 Constitution succeeded beyond anyone's wildest imaginations at disfranchising African American voters. Isaiah Montgomery, the lone African American delegate

---

[122] *Ratliff v. Beale*, Brief in Reply for Appellee, Mississippi Supreme Court, October term 1896.

[123] *Ratliff v. Beale*, 20 So. 865, 869 (Miss. 1896). Judge Calhoon was later appointed to the Mississippi Supreme Court and served as a Justice from 1900 through 1908.

[124] "Interesting Colloquy," *Clarion-Ledger*, September 11, 1890, p. 4.

[125] Appendix to the *Congressional Record*, 51st Cong., 2nd sess., vol. 22, pp. 52-53 (December 31, 1890).

[126] Ibid.

at the Convention, had predicted that the effect of the new constitution would be the disfranchisement of 123,000 African Americans and almost 11,100 white men.[127]

74.     The actual result was even more dramatic, thanks to a provision in the 1890 Constitution (Section 244) that required all voters to re-register before the next election following January 1, 1892.[128] This provision ensured that no one voting before 1890 would be grandfathered into the voting rolls. In consequence, registration of African American voters dropped from 66.9% of the voting age population in 1867 to 5.7% in 1892.[129] By contrast, for white men, the voter registration percentages remained higher, from 55% of the voting age population in 1867 to 56.5% in 1892.[130]

## K.     THE FIRST USE OF THE SUFFRAGE RESTORATION PROVISION

75.     The first time that the Suffrage Restoration Provision was invoked illustrates well its narrow purpose and application. In 1892 a white minor, eighteen-year-old J. E. Holliday of Hinds County, pled guilty to a charge of arson, for which he had been indicted.[131] He had been suspected of robbing and burning down three houses in an adjacent county, Rankin, which had led to threats of lynching by locals.[132] While under indictment, he escaped from the county jail together with three other prisoners, all African American.[133] Upon capture, Holliday was

---

[127] "The Convention," *Clarion-Ledger*, September 18, 1890, p. 5.

[128] 1890 Constitution art. XII, § 244; *Proceedings*, 676.

[129] *Voting in Mississippi, A Report of the United States Commission for Civil Rights* (1965), 8.

[130] Ibid.

[131] "Raymond Court," *Daily State Ledger* (Jackson), July 1, 1892, p. 1; "He Plead [sic] Guilty," *Daily State Ledger* (Jackson), July 2, 1892, p. 2.

[132] "A Tough Young Criminal," *State Ledger* (Jackson), May 13, 1892, p. 3.

[133] "City and Suburban," *Daily Clarion*, November 29, 1892, p. 4.

sentenced by Judge Chrisman, a former Convention delegate, to just one day in the state penitentiary — because his offense was "so trivial."[134]

76.     After Holliday served his day-long sentence, Judge Chrisman joined in "a strong petition for the pardon of said Holliday, which petition was signed by many leading citizens who were familiar with all the facts." Expecting no immediate relief through pardon (since the pardon petition had to be published thirty days before issuing a pardon), Governor Stone, Judge Chrisman and the district attorney all "recommended that the right of suffrage be restored to said Holliday." They reportedly "believ[ed] that [Holliday's] youth and character justif[ied] this recommendation."[135]

77.     The Legislature approved the restoration of suffrage to Holliday on February 7, 1894.[136] And so a convicted arsonist, who had escaped from prison, was "restored" to suffrage *before he was eligible to vote*. The African American men with whom he escaped did not regain their suffrage. Neither does it appear that anyone else receive a restoration of the suffrage for two more years thereafter.[137]

---

[134] "Laws of the State. Some of the Most Important Acts of the Last Legislature," *Daily Clarion-Ledger,* February 24, 1894, p. 1, publishing "An Act to restore the right of suffrage to J. E. Holliday, of Hinds county," approved February 7, 1894; "Sensational Sentence. Judge Chrisman Sends a White Boy to the Penitentiary for One Day," *Clarion-Ledger*, February 23, 1893, p. 6: "Joe Holliday, a young white boy about 17 years of age, pleaded guilty to the chart of arson in the Raymond court this week, and was sentenced by Judge Chrisman to the State penitentiary for *one day* . . . The records of the State prison show no other sentence of such short duration, and Judge Chrisman is entitled to the banner."

[135] "Laws of the State. Some of the Most Important Acts of the Last Legislature," *Daily Clarion-Ledger,* February 24, 1894, p. 1, publishing "An Act to restore the right of suffrage to J. E. Holliday, of Hinds county," approved February 7, 1894.

[136] Ibid.

[137] Two of the African American men who escaped with Holliday were charged with burglary, a disfranchising offense. The third was charged with murdering his wife, which was not disfranchising under the 1890 Constitution. See "City and Suburban," *Daily Clarion*, November 29, 1892, p. 4.

## VI.    CONCLUSION

78.    As was the case with respect to the other franchise-related provisions of the 1890 Constitution, the delegates adopted the Suffrage Restoration Provision with the specific goal of minimizing the number of African American voters while maximizing the number of white voters. Both the Understanding Clause and the Suffrage Restoration Provisions were escape clauses for white men, and both were specifically designed to have no standards for application, therefore giving the most latitude for those administering the clauses to meet the objectives of the Convention: to maintain precious voting rights for white men and to disfranchise African Americans.

Dorothy O. Pratt, Ph.D.

---

In 1896, suffrage was restored to at least two more citizens. See "Laws of Mississippi. Published by Authority," *Weekly Clarion-Ledger*, March 26, 1896, p. 6, publishing "An Act to restore the right of suffrage to C.C. Crowder, a citizen of Tippah county," approved March 11, 1896; "Laws of Mississippi. (Published by Authority.)," *Weekly Clarion-Ledger*, April 9, 1896, p. 7, publishing "an Act to remove the disabilities of George Holditch of Pontotoc county and restore to him the right of suffrage," approved March 16, 1896. Both individuals were white. (Until the 1940s most newspapers in the South, and many in the North, would identify an African American by race, but not a white person. Historians are of the view that if an individual is named in a newspaper prior to the 1940s without mention of the individual's race, it is reasonable to assume that the individual was white.)

# Appendix A

# Dorothy O. Pratt

| EMPLOYMENT | Fall 2007 to August 2016 | Research Associate Professor Department of History University of South Carolina |
|---|---|---|
| | Summer 2006 to May 2007 | Distinguished Lecturer Department of History University of South Carolina |
| | Fall 2001 to Summer 2006 | Assistant Dean of Arts and Letters Concurrent Assistant Professor of History University of Notre Dame |
| | Fall 1997 to Spring 2001 | Associate Director of Undergraduate Studies (History) and Assistant Chair University of Notre Dame |
| | Spring 1992 to Summer 1993 | Instructor, Southwestern Michigan College |
| | September 1979 to July 1984 | Consultant to Duke University Museum of Art for restoration of Pre-Columbian ceramic collection; private consulting and restoration |
| | September 1974 to December 1975 | Assistant to Dr. Leopold Pospisil, Division of Anthropology Peabody Museum, Yale University |
| | November 1971 to July 1974 | Research Assistant to Dr. J. N. L. Myres, President, Society of Antiquaries of London; retired Fellow of Christ Church College, Oxford |
| EDUCATION | Ph.D. (1997) (History) | University of Notre Dame Dissertation Advisor: Professor Walter Nugent Dissertation Title: "A Study in Cultural Persistence: the Amish in LaGrange County, Indiana, 1841-1945" |
| | M.A. (1995) (History) | University of Notre Dame |

M.A. (1985) (Anthropology)   Brigham Young University

B.A. (1971) (History)   Vanderbilt University

PUBLICATIONS
BOOKS   *Sowing the Wind:  The Mississippi Constitutional Convention of 1890*.
Jackson: University Press of Mississippi, 2017

*Shipshewana: A Successful Amish Community*.  Bloomington: Indiana
University Press, 2005

SHORTER
PUBLICATIONS   "Gendered Worlds," chapter for *The Routledge History of the
American South at Rutledge Press*, co-authored with Valinda
Littlefield. Maggi Morehouse, ed.  New York: Routledge, 2018

"Introduction to South Carolina and the Civil War: A Welcome to the
Thomas Cooper Library Digital Collection on the Civil War"
(webpage)

"Civic Life" in *Encyclopedia of American Women's History*.  Hasia
Diner, ed. New York: Facts on File, 2011

"Abraham Lincoln" in *Encyclopedia of World History*.  William
McNeill, ed.  New York: Berkshire Publishing Company, 2005

"Conscientious Objectors" in *Encyclopedia of Protestantism*.  Hans
Hillerbrad, ed.  New York: Routledge, 2003

"Bounty System" and "Impressment" in *Encyclopedia of the American
Civil War*.  David S. Heidler and Jeanne T. Heidler, eds.  Colorado
Springs: ABC CLIO, 2001

BOOK
REVIEWS   *Nicodemus: Post-Reconstruction Politics and Racial Justice in Western
Kansas* by Charlotte Hinger, in *Journal of Southern History* (August
2017): 714-15

*William Clark's World* by Peter J. Kastor, in *Journal of Louisiana
History* 55 (2014): 346-48

*The Chouteaus* by Stan Hoig, in *Journal of Louisiana History* 51
(2010): 231-32

*Domesticating the West: Re-Creation of the Nineteenth-Century American Middle Class* by Brenda K. Jackson, in *North Dakota History: Journal of the Northern Plains* 74 (2007): 53

*The Amish on the Iowa Prairie 1840 to 1910* by Steven D. Reschly, in *Mennonite Quarterly Review* (October 2001): 547-48

*Leaving Anabaptism: From Evangelical Mennonite Brethren to Fellowship Evangelical Bible Churches* by Calvin W. Redekop, in *Church History: Studies in Christianity and Culture* 69 (June 2000): 452-53

FELLOWSHIP       Hearst Fellowship, University of Notre Dame, 1996-1997

AWARDS          Two Thumbs Up Award, Office of Student Disabilities, University of South Carolina, 2009 and 2010

Merle Blue Humanities Award, Northern Indiana Historical Society, 2006

Kaneb Undergraduate Teaching Award, University of Notre Dame, 2003

Dissertation nominated by History Department for the Allan Nevins Prize for 1998

INVITED         "Secession and South Carolina," sponsored by Gardens Etc., October
LECTURES        2014; PEO SC State Convention, 2015

"Mississippi and the Fifteenth Amendment," sponsored by the Loblolly Society, Columbia, SC, 2015

"The Problems in Writing History," sponsored by Ann Pamela Cuningham DAR Chapter, 2013

"Reconstruction in South Carolina" sponsored by Seniors Meeting, Kilbourne Road Baptist Church, 2010

"The Burning of Columbia" sponsored by the Ann Pamela Cuningham DAR Chapter, 2009; University of South Carolina Chapter DAR, 2010; Seniors Meeting, Kilbourne Road Baptist Church, 2010; Columbia Book Club, 2011; "Savvy Seniors" 2011 and Colonial Dames, 2011; New Century Club and Golden Kiwanis 2012

"Lewis and Clark," Augusta Public Library, sponsored by an NEH grant, Lewis and Clark Exhibition, 2011

"Sand Creek Massacre" sponsored by the Ann Pamela Cuningham DAR Chapter, 2010

"Philip Sheridan and Native Americans in the West" sponsored by the Ann Pamela Cuningham DAR Chapter, 2009

"The Old Order Amish of Indiana" sponsored by PEO local organizations, 2006 (Indiana) and 2007 (South Carolina). Separate lecture to the Seniors Meeting, Kilburne Road Baptist Church, 2009; Seniors, Eastminster Presbyterian Church, 2013; sponsored by "The Club" (a Columbia women's book club), 2014; New Century Club 2014

Guest lecturer for the Notre Dame alumni Riverboat Trip on the Mississippi, 2005

"The Effect of Engineering Advances in the Civil War" sponsored by the Tau Beta Pi Honor Society, The College of Engineering at the University of Notre Dame, 2002

"Schuyler Colfax and Father Sorin," sponsored by the Notre Dame History Club, 2002

"Setting Lincoln Historically," sponsored by the Notre Dame American Studies Department, 2001; Northern Indiana Historical Society

PAPERS

"Isaiah Montgomery's Choices" Symposium on Isaiah Montgomery at the Old Capitol Museum, Jackson, Mississippi, 2016

"Mississippi Constitution of 1890 and the Fifteenth Amendment": at Symposium on the Fifteenth Amendment, US Grant Presidential Library, 2015

"The Conundrum of Isaiah Montgomery," Race, Labor, and Citizenship (After Slavery Project), 2010

Chair of panel on "Widowed South Carolina Nineteenth Century Plantation Managers" at the annual conference of the South Carolina History Association, 2008

Chair of panel on "South Carolina's Post-Reconstruction Congressmen" in "African-American Historical Alliance Seminar: Nineteenth Century African-American Congressmen, Legislators and Judges in South Carolina" at the University of South Carolina School of Law, 2007

Chair of panel on "Communicating the Gospel across the Cultural Divide" in "Christianity and Native Cultures Conference" at Saint Mary's College, Notre Dame, Indiana, 2002

"Defining Social Structure by Religious Ideology: The Amish in Indiana in World War I," American Society of Church History, 1997

DISSERTATION OR THESIS DIRECTOR OR READER

Luke Stempniak, Senior Honors Thesis, Department of History, University of South Carolina, Fall 2016, "Influence of Social Darwinism in the Nineteenth Century"

Elizabeth Spencer Gilchrist, Senior Honors Thesis, Department of History, University of South Carolina, Fall 2016, "Better American Speech Week"

Zachary Bolsch, Senior Thesis, Department of History, University of South Carolina, Fall 2016, "Kansas and the Railroads"

Daniel Soderstrom, Senior Thesis, Department of History, University of South Carolina, Fall 2016, "A Question of Leadership on the Lewis and Clark Expedition"

Justin White, Senior Thesis, Department of History, University of South Carolina, Fall 2016, "States' Rights as a Problem in the Confederacy"

Ryan Walker, Senior Thesis, Department of History, University of South Carolina, Spring 2015,  "America's Renaissance Man"

George Joga, Senior Thesis, Department of History, University of South Carolina, Fall 2015, "The Dominican Republic and the Roosevelt Corollary"

Jordan Portillo, "Senior Thesis, Department of History, University of South Carolina, Fall 2015, "Teddy Roosevelt Saves Football"

William Carson Tolar, Senior Thesis, Department of History, University of South Carolina, Spring 2014, "An Inspiration to all Hands: The story of the USS La Vallette and Chuck Witten"

Hilton Thomas, Senior Thesis, Department of History, University of South Carolina, Spring 2014,  "Wade Hampton"

James Strickland, Honors Thesis, Department of History, University of South Carolina, 2012, "The Social Consciousness of Theodore Roosevelt: Harvard College, the Election of 1912 and the Darwinist-Gospel Debate"

Justin Kearse, Senior Thesis, Department of History, University of South Carolina, 2010, "The Paternalist: Unveiling the Man behind Wade Hampton III"

William Kurtz, Honors Thesis, Department of History, University of Notre Dame, 2006.  "Palmerston and the Trent Crisis of the American Civil War"

Mariah Quinn, Honors Thesis, Department of History, University of Notre Dame, 2001.  "Ah, Then You Will see the Yo-Semite: Yosemite and the Wilderness Movement in Nineteenth Century America"

GRADUATE
THESIS/
DISSERTATION
READER

Christopher Rounds, PhD, Department of History, University of South Carolina, 2008.  "Ireland for Sale: The Marketing and Consumerism of the Irish American Identity Since 1880"

Ashley Paige Guinn, MA, Public History, University of South Carolina, 2007.   "Among Kith and Kin: The Irish in Antebellum Charleston, South Carolina"

Lindsay Crawford, MA, Public History, University of South Carolina, 2007.   "Martha Rutledge Kinloch Singleton of Kensington Plantation: Profile of a South Carolina Widow"

COURSES
TAUGHT

The Civil War Era; The Jacksonian Era; Survey of American History I and II; Southern History 1876 Present; Gilded Age and Progressive Era Non-Western Civilizations; Issues in the American Civil War; History of the American West; Immigration, Assimilation, and Nativism (senior seminar)

SOCIETY
MEMBERSHIPS

Organization of American Historians
American Historical Association

UNIVERSITY
SERVICE

SOUTH       Undergraduate Studies Committee, Department of History (10 years);
CAROLINA    Committee for Policies on the Appointment, Promotion and
            Recognition of Research Professors, College of Arts and Sciences

NOTRE       Committee on Collegiate Proceedings; Transfer Admissions
DAME        Committee; Committee on Academic Standing; College Council; Arts
            and Letters Representative to the University Code of Honor
            Committee; Renovare Student/Faculty Information System Oversight
            Committee; Provost Committee on Business School Gateway; Arts and
            Letters Committee for Business School Minor

COMMUNITY   Board Member: African-American Historical Alliance (2006-14);
SERVICE     Partnership board of the Nursing School, University of South Carolina
            (2006-11); Columbia Music Festival Association (2007, 2008)

            Board Member, Northern Indiana Historical Society (1999-2006);
            Member of the Executive Committee and  Chair of the Copshaholm
            Advisory Committee (2001-06);  President of Parent's Association, The
            Stanley Clark School (1994-95); DAR member, chapter regent (2011-
            13), and chaplain (2013-14); PEO Chapter president (2012-14), vice-
            president (2010-12); Columbia Garden Club member, chaplain (2012)
            and corresponding secretary (2013-15); member, Colonial Dames
            (2016-); Chair of Enrichment Committee, The Stanley Clark School
            (1993-94); Co-Chair of the Children's Symphony Series in South Bend,
            Indiana (1990); Sunday School teacher at Sunnyside Presbyterian
            Church 1985-1998); Kerygma teacher (2011-12, 2014-15)

# Appendix B

**Materials Considered by Dorothy O. Pratt, Ph.D.**

### *Books*

Ali, Omar H.  *In the Lion's Mouth: Black Populism in the New South, 1886-1900*.
Jackson, Mississippi: University Press of Mississippi, 2010.

Ames, Blanche.  *Adelbert Ames, 1835-1933*.  New York: Argosy-Antiquarian, Ltd.,
1964.

Ashworth, John.  *Slavery, Capitalism, and Politics in the Antebellum Republic, Vol. 1:
Commerce and Compromise, 1820-1850*.  Cambridge: Cambridge University
Press, 1995.

Ayers, Edward L.  *The Promise of the New South: Life after Reconstruction*.  New York:
Oxford University Press, 1992.

Barley, Numan and Hugh D. Graham.  *Southern Politics and the Second Reconstruction*.
Baltimore: The Johns Hopkins University Press, 1975.

Barry, John.  *Rising Tide: The Great Mississippi Flood of 1927 and How It Changed
America*.  New York: Simon & Schuster, 1997.

Berlin, Ira.  *Slaves Without Masters: The Free Negro in the Antebellum South*.  New
York: The New Press, 1974.

Berlin, Ira, et al.  *Slaves No More: Three Essays on Emancipation and the Civil War*.
New York: Cambridge University Press, 1992.

Bettersworth, John Knox.  *Mississippi: A History*.  Austin, Texas: Steck Company, 1959.

Blackmon, Douglas.  *Slavery by Another Name: The Re-enslavement of Black Americans
from the Civil War to World War II*.  New York: Anchor Publishers, 2009.

Bond, Bradley G.  *Political Culture in the Nineteenth Century South: Mississippi 1830-
1900*.  Baton Rouge: Louisiana State University Press, 1995.

Bond, Bradley G.  *Mississippi: A Documentary History*.  Jackson: University Press of
Mississippi, 2003.

Bowers, Claude.  *The Tragic Era: Revolution after Lincoln*.  New York: Houghton,
Mifflin and Company, 1929.

Buck, Paul H.  *The Road to Reunion: 1865-1900*.  Boston: Little, Brown and Company,
1937.

Burton, Vernon.  *The Age of Lincoln.*  New York: Hill and Wang, 2007.

Calhoun, Charles W.   *Conceiving a New Republic: The Republican Party and the Southern Question, 1869-1900.*  Lawrence, Kansas: University Press of Kansas, 2006.

Campbell, J.A.P.  *The Revised Code of the Statute Laws of the State of Mississippi.*  Jackson: J.L. Power, State Printer, 1880.

Cobb, James C.  *The Most Southern Place on Earth: The Mississippi Delta and the Roots of Regional Identity.*  New York: Oxford University Press, 1992.

   *Away Down South: A History of Southern Identity.*  New York: Oxford University Press, 2005.

Collins, Charles Wallace.  *Fourteenth Amendment and the States: A Study of the Operation of the Restraint Clauses of Section One of the Fourteenth Amendment to the Constitution of the United States.*  Boston: Little Brown and Company, 1912.

Cooper, William J., Jr., and Thomas E. Terrill, *The American South: A History.* Second edition.  New York: McGraw Hill, 1996.

Cresswell, Stephen.  *Mormons & Cowboys, Moonshiners & Klansmen: Federal Law Enforcement in the South & West, 1870-1893.*  Tuscaloosa: University of Alabama Press, 1991.

   *Multiparty Politics in Mississippi, 1877-1902.*  Jackson: University Press of Mississippi, 1995.

   *Rednecks, Redeemers, and Race: Mississippi after Reconstruction 1877-1917.*  Jackson: University Press of Mississippi, 2006.

Currie, James T.  *Enclave: Vicksburg and Her Plantations, 1863-1870.*  Jackson: University Press of Mississippi, 1980.

Day, Kay Young. "Kinship in a Changing Economy: A View from the Sea Islands." In *Holding Onto the Land and the Lord: Kinship, Ritual, Land Tenure and Social Policy in the Rural South*, edited by Robert Hall and Carol B. Stack, 11-24. Athens: University of Georgia Press, 1982.

Doyle, Don.  *Faulkner's County: The Historical roots of Yoknapatowpha.*  Chapel Hill: University of North Carolina Press, 2001.

Dun and Bradstreet & Co.  *Reference Book: and Key Containing Ratings of Merchants, Manufacturers and Traders Generally*.  New York: R.G. Dun & Co., 1912.

Dunning, William Archibald.  *Reconstruction, Political and Economic, 1865-1877*. New York: Harper Brothers, 1907.

Dustin, Alfred M., ed.  *Crusade for Justice: Autobiography of Ida B. Wells*.  Chicago: University of Chicago Press, 1970.

DuToit, Brian M.  *Configurations of Cultural Continuity*.  Rotterdam, Netherlands: AA Balkema, 1976.

Eckford, Lucy Rice.  "The Personnel and Proceedings of the Mississippi Constitutional Convention of 1890" Master's Thesis, State College, Mississippi (Mississippi State), 1935.

Elkins, Stanley M.  *Slavery: A Problem in American Institutional and Intellectual Life*.  Chicago: University of Chicago Press, 1976.

Ethridge, George H. (Associate Justice of the Supreme Court of Mississippi).  *Mississippi Constitutions*.  Jackson, Mississippi: Tucker Printing Company, 1928.

Faircloth, Adam.  *Better Day Coming: Blacks and Equality 1890-2000*.  New York: Viking Press, 2001.

Farrell, Betty G., *Elite Families: Class and Power in Nineteenth Century Boston*.  Albany, New York: State University of New York, 1993.

Field, David Dudley.  *The Electoral Votes of 1876: Who Should Count Them, What Should Be Counted, and the Remedy for a Wrong Count*.  New York: D. Appleton and Company, 1876.

Finkelman, Paul. *Dred Scott v Sanford: A Brief History with Documents*.  Boston: Bedford Series, 1997.

Foner, Eric and Joshua Brown.  *Forever Free: The Story of Emancipation and Reconstruction*.  New York: Alfred A. Knopf, 2005.

Foner, Eric. *A Short History of Reconstruction, 1863-1877*.  New York: Harper & Row, Publishers, 1990.

Ford, Lacy.  *Deliver Us from Evil: The Slavery Question in the Old South* (New York: Oxford University Press, 2009.

Franklin, John Hope.  *Reconstruction: After the Civil War*.  Chicago: University of Chicago Press, 1961.

Garner, James W.  *Reconstruction in Mississippi*.  Baton Rouge: Louisiana State University Press, 1968 (reprint).

Genovese, Eugene.  *Roll Jordan Roll: The World the Slaves Made*.  New York: Pantheon Books, 1974.

Giggie, John M.  *After Redemption, Jim Crow and the Transformation of African-American Religion in the Delta 1875-1915*.  New York: Oxford University Press, 2008.

Gluckman, Max, ed.  *The Allocation of Responsibility*.  Manchester: Manchester University Press, 1972.

Goodwin, Lawrence.  *Democratic Promise: The Populist Movement in America*.  New York: Oxford University Press, 1976.

Graham, Lawrence Otis.  *Our Kind of People: Inside America's Black Upper Class*.  New York: Harper Collins, 1999

  *The Senator and The Socialite:  The True Story of America's First Black Dynasty*.  New York: Harper Collins Publishers, 2006.

Grantham, Dewey W.  *The South in Modern America: A Region at Odds*.  New York: Harper Perennial, 1995.

Greenberg, Kenneth.  *Honor & Slavery*.  Princeton: Princeton University Press, 1996.

Greenwood, Janette Thomas.  *Bittersweet Legacy: The Black and White "Better Classes" in Charlotte, 1850-1910*.  Chapel Hill: The University of North Carolina Press, 1994.

*Guide to U.S. Elections*, volume 1, sixth edition.  Washington, D.C.: CQ Press, a division of SAGE, 2010.

Hahn, Steven.  *A Nation Under Our Feet: Black Political Struggles in the Rural South from Slavery to the Great Migration*.  Cambridge: The Belknap Press of Harvard University Press, 2003.

  *The Roots of Southern Populism: Yeoman Farmers and the Transformation of the Georgia Upcountry, 1850-1890*.  New York: Oxford University Press, 2006.

Hall, Kermit L., et al, eds.  *Oxford Companion to the Supreme Court of the United States*.  New York: Oxford University Press, 1992.

Hall, Robert and Carol B. Stack (eds.). *Holding Onto the Land and the Lord: Kinship, Ritual, Land Tenure, and Social Policy in the Rural South*. Athens: University of Georgia Press, 1982.

Harris, William C. *The Day of the Carpetbagger: Republican Reconstruction in Mississippi*. Baton Rouge: Louisiana State University Press, 1979.

Hathorn, Guy B. "Suffrage, Apportionment, and Elections in the Mississippi Constitutional Convention of 1890" Master's thesis, University of Mississippi, 1942.

Herbert, H.A. *Why the Solid South*? Baltimore: R.H. Woodward &Company, 1890.

Hermann, Janet Sharp. *The Pursuit of a Dream*. New York: Oxford University Press, 1981.

Hoffstader, Richard. *Social Darwinism in American Thought* (reprint) New York: Beacon Press, 1992.

Holden, Matthew, Jr., ed. *"What Answer?" Speech in Support of the Franchise Committee Report, Mississippi Constitutional Convention, 1890*. Charlottesville, Virginia: Isaiah T. Montgomery Project, 2004.

Holmes, William F. *The White Chief: James Kimble Vardaman*. Baton Rouge: The Louisiana State Press, 1970.

Hughes, Thomas. *GTT Gone to Texas: Letters from Our Boys*. London: McMillan Press, 1884.

Jackson, Maurice Elizabeth. "Mound Bayou: A Study in Social Development." Master's thesis, University of Alabama, 1937.

Jones, Yvonne V. "Black Leadership Patterns and Political Change in the American South." *In Holding Onto the Land and the Lord: Kinship, Ritual, Land Tenure and Social Policy in the Rural South*, edited by Robert Hall and Carol B. Stack, 55-68. Athens: University of Georgia Press, 1982.

Key, V. O. *Southern Politics in State and Nation*. New York: Albert A. Knopf, 1949.

Kantrowitz, Stephen. *More than Freedom: Fighting for Black Citizenship in a White Republic 1829-1889*. New York: The Penguin Press, 2012.

Kasson, John F. *Rudeness & Civility: Manners in Nineteenth Century Urban America*. New York: Hill and Wang, 1990.

Kirwan, Albert D. *Revolt of the Rednecks: Mississippi Politics, 1876-1925*. New York: Harper Books, 1965.

Kousser,  J. Morgan and James M. McPherson. *Region, Race, and Reconstruction: Essays in Honor of C. Vann Woodward*.  New York: Oxford University Press, 1982.

Kousser, J. Morgan.  *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South*.  Chapel Hill: University of North Carolina Press, 1974.

Kornblum, Mark Lawrence.  *Why America Stopped Voting: The Decline of Participatory Democracy and the Emergence of Modern American Politics*.  New York: New York University Press, 2000.

Lemann, Nicholas.  *Redemption: The Last Battle of the Civil War*. New York: Farrar, Strauss and Giroux, 2006.

Loewen, James. W. *The Mississippi Chinese*.  Cambridge: Harvard University Press, 1971.

Lynch, James D.  *Kemper County Vindicated and a Peep at Radical Rule in Mississippi*. New York: Negro Universities Press, 1969, first published by E J Hale & Son, Publishers, New York, 1879.

Lynch, John R.  *Reminiscences of an Active Life: The Autobiography of John R. Lynch*, ed. John Hope Franklin.  Chicago: University of Chicago Press, 1970.

Martin, Gordon.  *Count Them One by One: Black Mississippians Fighting for the Right to Vote*.  Jackson, Mississippi: University Press of Mississippi, 2010.

Mayes, Edward.  *L.Q. C. Lamar: His Life, Times, and Speeches, 1825-1893*.  Nashville: Methodist Episcopal Church, 1896.

McLemore, Richard Aubrey, ed.  *A History of Mississippi*.  Hattiesburg: University and College Press of Mississippi, 1973.

McMath, Robert, Jr. *Populist Vanguard: A History of the Southern Farmers' Alliance* (Chapel Hill: University of North Carolina Press, 1975).

McMillen, Neil R.  *Dark Journey: Black Mississippians in the Age of Jim Crow*. Chicago: University of Illinois Press, 1990.

McPherson, James. *Battle Cry of Freedom*.  New York: Oxford University Press, 1988.

Meier, August.  *Negro Thought in America, 1880-1915*.  Ann Arbor, Michigan: University of Michigan Press, 1963.

Miller, Mary Carol.  *Lost Landmarks of Mississippi*.  Jackson: University Press of Mississippi, 2002.

Money, Hernando.  "Election of Senators by Direct Vote."  Washington, D.C.: Senate, Government Printing Office, April 11, 1902.

Montgomery, Isaiah T.  Autobiographical Notes, folder at Mississippi State Archives.

Morgan, W. Scott.  *History of the Wheel and Alliance and Impending Revolution*.  St. Louis: C.B. Woodward Company, 1891.

Newby, I. A.  *Plain Folk in the New South: Social Change and Cultural Persistence, 1880-1915*.  Baton Rouge: Louisiana State University Press, 1989.

Norrell, Robert.  *Up from History: The Life of Booker T. Washington*.  Cambridge: The Belknap Press of Harvard University, 2009.

Nugent, Walter.  *Structures of American Social History*.  Bloomington: Indiana University Press, 1981.

*Into the West, the Story of its People*.  New York: Alfred A. Knopf, 1997.

Oakes, James.  *The Ruling Race: A History of American Slaveholders*.  London: W.W. Norton & Company, 1998.

Onuf, Peter. *Statehood and Union*.  Bloomington: Indiana University Press, 1987.

Patterson, A. E. *The Possibilities of the American Negro: with Illustrations and Biographies of Some of the Leading Negroes in America*.  Cairo, Illinois: Cairo Standard Publishing Company, 1903.

Perman, Michael.  *Struggle for Mastery: Disfranchisement in the South 1888-1908*.  Chapel Hill: The University of North Carolina Press, 2001.

Phillips, Ulrich Bonnell.  *Life and Labor in the Old South*. Boston: Little, Brown, 1963, reprint.

*Proceedings of a Reunion of the Surviving Members of the Constitutional Convention of 1890*.  Jackson: Premier Printing Company, 1910.

Rehnquist, William H.  *Centennial Crisis: The Disputed Election of 1876*.  New York: Alfred A. Knopf, 2004.

Richardson, Heather Cox.  *The Death of Reconstruction: Race, labor, and Politics in the Post-Civil War North, 1865-1901*.  Cambridge: Harvard University Press, 2001.

Riser, R. Volney.  *Defying Disfranchisement: Black Voting Rights Activism in the Jim Crow South, 1890-1908*.  Baton Rouge: Louisiana State University, 2010.

Rowland, Dunbar.  *Courts, Judges, and Lawyers of Mississippi, 1798-1935*.  Jackson, Mississippi: Press of Hederman Brothers, 1935.

    *History of Mississippi: The Heart of the South*.  Chicago: The S.J. Publishing Company. 1925.

Rubin, Richard.  *Confederacy of Silence: A True Tale of the New Old South*.  New York: Atria Books, 2002.

Rusk, Jerrold G.  *A Statistical History of the American Electorate*.  Washington, D.C.: CQ Press, a division of the Congressional Quarterly, 2001.

Sansing, David G. and Carroll Waller.  *A History of the Mississippi Governor's Mansion*. Jackson: University Press of Mississippi.

Sewell, George Alexander.  *Mississippi Black History Makers*.  Jackson: University Press of Mississippi, 1977.

Sewell, George Alexander and Margaret L. Dwight.  *Mississippi Black History Makers*. Jackson: University Press of Mississippi, 1984.

Shepperd., Gladys B.  "The Montgomery Saga, From Slavery to Black Power," manuscript in Ben Montgomery Papers, Library of Congress.

Silver, David Mark.  "In the Eye of the Storm: Isaiah T. Montgomery and the Plight of Black Mississippians, 1847-1924." Honors Thesis submitted to the American Studies Department of Amherst College, 1993.

Sillers, Florence Warfield.  Wirt Williams edited the DAR compilation.  *History of Bolivar County, Mississippi: Its Creation, Pioneer Days and Progress in the Heart of the Mississippi Delta*. Spartanburg, South Carolina: The Reprint Company, Publishers, 1976, originally published 1948.

Simkins, Francis Butler and Robert Hilliard Woody.  *South Carolina During Reconstruction*.  Chapel Hill: The University of North Carolina Press, 1932.

Skates, John Ray.  *Mississippi: A Bicentennial History*.  New York: W.W. Norton & Company, Inc., 1979.

Smith, J. Clay.  *Emancipation: The Making of the Black Lawyer, 1844-1944*.
Philadelphia: University of Pennsylvania Press, 1993.

Smith, Timothy B.  *J. Z George: Mississippi's Great Commoner*.  Jackson: University
Press of Mississippi, 2012.

Span, Christopher.  *From Cotton Field to Schoolhouse: African-American Education in
Mississippi, 1862-1875*.  Chapel Hill: University of North Carolina Press, 2009.

Stamp, Kenneth M.  *The Era of Reconstruction, 1865-1877*.  New York: Alfred Knopf,
1966.

Summers, Mark Walgreen.  *Era of Good Stealings*.  New York: Oxford University Press,
1993.

Sutherland, William A.  *Notes on the Constitution of the United States: Showing the
Constitution and Operation of the Constitution as Determined by the Federal
Supreme Court and Containing References to Illustrative Cases from the Inferior
Federal Courts and State Courts*.  New York: Bancroft-Whitney, 1904.

Thompson, Julius E.  *Lynchings in Mississippi, a History, 1865-1965*.  Jefferson, North
Carolina: McFarland & Company, Inc., Publishers, 2007.

Waldrop, Christopher and Donald G. Nieman.  *Local Matters: Race, Crime, & Justice in
the Nineteenth Century South*.  Athens, Georgia: The University of Georgia Press,
2001.

Washington, Booker T.  *Up From Slavery: With Related Documents*, ed. W. Fitzhugh
Brundgee.  Boston: Bedford/St. Martin's Press, 2003.

Wayne, Michael Stuart.  *Ante-Bellum Planters in the Post-Bellum South: The Natchez
District, 1860-1880*.  Dissertation for Yale University, 1979.  (no department
given.)

Wells, James B.  *The Chisolm Massacre: A Picture of "Home Rule" in Mississippi*.
Washington, D.C.: Chisholm Monument Association, 1878.

Wiebe, Robert H.  *The Search for Order: 1877-1920*.  New York: Hill and Wang, 1967.

Wharton, Vernon.  *The Negro in Mississippi: 1865-1890*.  New York: Greenwood Press,
reprint, 1984.

Wheeler, Marjorie Spruill.  *New Women of the New South: The Leaders of the Woman
Suffrage Movement in the Southern States*.  New York: Oxford University Press,
1993.

Whitfield, A.H., et al.  *The Mississippi Code of 1906 of the Public Statute Laws of the State of Mississippi*.  Nashville, Tennessee: Brandon Printing Company, 1906.

Wilentz Sean.  The Rise of American Democracy. 2009

Wells, James M.  *The Chisolm Massacre: A Picture of "Home Rule" in Mississippi*.  Washington, D.C.: Chisolm Monument Association, 1878.

Williamson, Joel.  *The Crucible of Race: Black-White Relations in the American South Since Emancipation*.  New York: Oxford University Press, 1984.

Willis, John C.  *Forgotten Time: The Yazoo-Mississippi Delta after the Civil War*.  Charlottesville: University Press of Virginia, 2000.

Winkle, John W. *The Mississippi State Constitution: A Reference Guide*.  Westport, Connecticut: Greenwood Press, 1993.

Wilson, Robert.  *Proceedings of the Reunion of the Survivors of the Constitutional Convention of 1890: on the Twentieth Anniversary of the Adoption of the Constitution.*  Jackson: Premier Printing Company, 1910.

Wood, Gordon.  *The Radicalism of the American Revolution*.  New York: Vintage Books, 1991.

Woodward, C. Vann.  *Origins of the New South: 1877-1913*.  Baton Rouge: Louisiana State University Press, 1951.

*The Strange Career of Jim Crow*. 2nd ed. New York: Oxford University Press, 1966.

### *Articles*

Anderson, Helen Craft, "A Chapter in the Yellow Fever Epidemic of 1878." *Publications of the Mississippi Historical Society* 10 (1909): 223-256**.**

Barbour, J.F., Jr.  "Note and Comment, Constitutional Law- Equal Protection of Laws, Exclusion of Negroes from Jury Service, Effect on Defendant's Right to a New Trial."  *Mississippi Law Journal* 8 (1935-1936):

Binney, Charles Chauncey.  "American Secret Ballot Decisions." *The American Law Register and Review* 41 (Feb 1893) 101-12.

Braden, W. H.  "Reconstruction in Lee County**."** *Publications of the Mississippi Historical Society* 10 (1909): 135-146.

Bowman, Robert.  "Reconstruction in Yazoo County." *Publications of the Mississippi Historical Society* 7 (1903): 115-130.

Butts, Alfred Benjamin. "Public Education." *Publications of the Mississippi Historical Society* (1919): 20-156.

Calhoon, S.S. "The Causes and Events that led to the Calling of the Constitutional Convention of 1890." *Publications of the Mississippi Historical Society* 6 (1902):105-110.

Coleman, James P.  "The Origin of the Constitution of 1890."  *The Journal of Mississippi History* XIX, no. 2 (April 1957): 69-92.

Coleman, Edward Clarke  "Reconstruction in Attala County." *Publications of the Mississippi Historical Society* 10 (1909): 147-161.

Day, Kay Young. "Kinship in a Changing Economy: A View from the Sea Islands." in *Holding onto the Land and the Lord*, 11-24, edited by Robert Hall and Carol B. Stack.   Athens: University of Georgia Press, 1982.
.
Fite, Gilbert, "Southern Agriculture since the Civil War: An Overview." *Agricultural History* 53 (1979): 3-21.

Fuller, Paul G. "E.P Thompson and American History: A Retrospective View." *The History Teacher* 28, no. 1 (1994): 31-36.

Garner, James W.  "The Senatorial Career of J.Z. George." *Publications of the Mississippi Historical Society* 7 (1903): 245-262.

Hasell, Willie D. "Republican Factionalism in Mississippi, 1882-1884," *Journal of Southern History* 7 (1941): 84-101

"Chalmers and Mahoneism in Mississippi," *Journal of Southern History* 10 (1944): 37-58.

"Bourbon Period in Mississippi Politics, 1875-1890" *Journal of Southern History* 11 (1945): 519-537.

Hardy, W.H. "Recollections of Reconstruction in East and Southeast Mississippi." *Publications of the Mississippi Historical Society* 7 (1903): 199-215.

Hill, George E. "The Secret Ballot." *Yale Law Journal* I (October 1891) 26-29.

Holmes, William F.  "The LeFlore County Massacre and the Demise of the Colored Farmers' Alliance." 34 Phylon (1973): 267-274.

"Whitecapping: Agrarian Violence in Mississippi, 1902-1906," 35 *Journal of Southern History* (May 1969): 165-185.

Jackson, Maurice Elizabeth.  "Mound Bayou: A Study in Social Development," University of Alabama Master's Thesis, 1937.

Johnson, Frank.  "The Conference of October 15[th], 1875, Between General George and Governor Ames." *Publications of the Mississippi Historical Society* 6 (1902): 65-78.

Frank.  "Suffrage and Reconstruction in Mississippi." *Publications of the Mississippi Historical Society* 6 (1902):.

Jones, J.H. "Penitentiary Reform in Mississippi." *Publications of the Mississippi Historical Society* 6 (1902):111-128.

Jones, Yvonne. "Black Leadership Patterns and Political Change in the American South." In *Holding onto the Land and the Lord*, 41-54, edited by Robert Hall and Carol B. Stack. Athens: University of Georgia Press, 1982.

Kirwan, Albert D.  "Apportionment in the Mississippi Constitution of 1890*," Journal of Southern History* 14 (May 1948): 234-246.

McFarland, Gerald W.  "The New York Mugwumps of 1884: A Profile." *Political Science Quarterly* 78 (1963): 40-58.

McNeily, J. S. "History of the Measures Submitted to the Committee on Elective Franchise, Apportionment and Elections in the Constitutional Convention of 1890." *Publications of the Mississippi Historical Society* 6 (1902):129-140.

"War and Reconstruction in Mississippi: 1863-1890." *Publications of the Mississippi Historical Society* 10 (1909) 165-535.

Muckenfuss, A. M.  "The Development of Manufacturing in Mississippi." *Publications of the Mississippi Historical Society* 10 (1909): 163-180.

Patton, William Hinkle.  "History of the Prohibition Movement in Mississippi." *Publications of the Mississippi Historical Society* 10 (1909):181-201.

Peskin, Allan.  "Who Were the Stalwarts?  Who Were their Rivals?  Republican Factions in the Gilded Age."  *Political Science Quarterly* 99 (1984): 703-716.

Revels, James G.  "Redeemers, Rednecks, and Racial Integrity."  In *A History of Mississippi*, edited by Richard Aubrey McLemore.  Hattiesburg: University and College Press of Mississippi, 1973.

Ringold, May Spencer.  "Senator James Zachariah George, Bourbon or Liberal?"
      *Journal of Mississippi History* 16 (July 1954): 164-182.

Roberts. W.B. (Senator). "After the War Between the States."  In *History of Bolivar
      County, Mississippi: Its Creation, Pioneer Days and Progress in the Heart of the
      Mississippi Delta*, edited by Florence Warfield Sillers. Spartanburg, South
      Carolina: The Reprint Company, Publishers, 1976.

Rovner, Herbert Saul "Note: The Effect of Racial Discrimination in the Indictment
      Stage." *Wyoming Law Journal* 5 (1950): 97-100.

Rusk, Jerrold G. "The Effect of the Australian Ballot Reform on Split Ticket Voting:
      1876-1908." *American Political Science* Review 64 (Dec 1970): 1220-1238.

Saller, Richard P.  "Pater Familias, Mater Familias, and the Gendered Semantics of the
      Roman Household." Classical Philology 94 (April 1999): 182-198.

Sillers, Walter.  "Reconstruction."  In *History of Bolivar County, Mississippi: Its
      Creation, Pioneer Days and Progress in the Heart of the Mississippi Delta*, edited
      by Florence Warfield Sillers. Spartanburg, South Carolina: The Reprint Company,
      Publishers, 1976.

Silver, James.  "Mississippi: The Closed Society," *Journal of Southern History* 30
      (February 1964): 3-34.

Stone, Alfred H.  "The Suppression of Lawlessness in the South," *North American
      Review*, April 1894: 500-506.

Ware, Alan.  "Anti-Party and Party Control of Political Reform in the United States: The
      Case of the Australian Ballot." *British Journal of Political Science* 30 (January
      2000): 14.

Wellborn, Fred. "The Influence of the Silver-Republican Senators, 1889-1891," *The
      Mississippi Valley Historical Review* 14 (March 1928): 462-480.

Witty, Fred M.  "Reconstruction in Carroll and Montgomery Counties."  *Publications of
      the Mississippi Historical Society* 10 (1909): 115-134.


## ***Government Documents***

"Alleged Election Outrages in Virginia and Mississippi," Speeches of Senator John
      Sherman and William Mahone, delivered in the Senate of the United States,
      January 29, 1885, Washington, D.C.

Burgess, James.  *Soil Survey of the Crystal Springs Area, Mississippi.*  Washington, D.C.:
      Government Printing Office, 1905.

"Chalmers v Manning" Speech of Hon. John H. Rogers of Arkansas, in the House of Representatives, February 15, 1884.

*Congressional Record Containing the Proceedings and Debates of the Fifty-First Congress*, Second Session, vol. 22 and Appendix A to vol. 22 (Washington, DC: Government Printing Office, 1891).

Department of the Interior, Census Office, *Abstract of the Eleventh Census: 1890*. Washington: Government Printing Office, 1894.

Department of the Interior, Census Office. *Abstract of the Twelfth Census of the United State: 1900.* (3rd edition Washington: Government Printing Office, 1904.

Department of Commerce and Labor, Bureau of the Census.  Abstract of the Thirteenth Census of the United States, 1910.  Washington, D.C.: Government Printing Office, 1913.

Department of the Interior, Census Office.  *Census Reports, Volume 1, Twelfth Census of the United States Taken in the Year 1900, Population.* Washington, D.C.: Census Office, 1902.

Department of the Interior, Census Office.  *Census Reports, Volume V, Twelfth Census of the United States Taken in the Year 1900, Agriculture*. Washington, D.C.: Census Office, 1902.

Department of the Interior, Census Office.  *Census Reports, Volume VI, Twelfth Census of the United States Taken in the Year 1900, Agriculture*. Washington, D.C.: Census Office, 1902.

Department of the Interior, Census Office.  *Census Reports, Volume VII, Twelfth Census of the United States Taken in the Year 1900, Manufacturer*. Washington, D.C.: Census Office, 1902.

Department of the Interior, Census Office.  *Census Reports, Volume VIII, Twelfth Census of the United States Taken in the Year 1900, Manufacturers*. Washington, D.C.: Census Office, 1902.

Department of the Interior, Census Office.  *Census Reports, Volume XIII, Twelfth Census of the United States Taken in the Year 1900, Occupations*. Washington, D.C.: Census Office, 1902.

*Journal of the Proceedings of the Constitutional Convention of the State of Mississippi.* Jackson, Mississippi: E.L. Martin, printer to the Convention, 1890.

Memorial Address of Hon. A. F. Fox Upon the Life and Character of Hon. James Z. George of Mississippi.  Delivered in the House of Representatives, May 25, 1898, Washington, D.C.

Memorial Address of Hon. John S. Williams Upon the Life and Character of Hon. James Z. George of Mississippi, May 25, 1898.  Delivered in the House of Representatives, Washington, D.C.

Report of the Hawaiian Commission in Senate Documents, 35 Cong., 3 Sess, no. 16 149-150.

Speech of Honorable William C. Oates of Alabama, March 24, 1884, in House of Representatives, "Mississippi Overflow: A Speech for the Constitution."

*Voting in Mississippi*, A Report of the United States Commission for Civil Rights (1965).


### *Archives*

**Mississippi Department of Archives and History**
Isaiah T. Montgomery Papers
Robert Wilson Papers
Alfred Holt Stone Collection
Jefferson Davis Papers
James Z. George Papers
L.Q.C. Lamar Papers
Blanche Bruce, Vertical File
*Ratliff v. Beale*, Briefs
Allison Wells, Vertical File
Online Electronic Resource: turpentine photographs; political broadsides
Wesson Industry Vertical File
Broadside Politics: Vertical File
Patrons of Husbandry, Grange Papers
Frank Burkitt Vertical File
Harry St John Dixon Papers
Tenth Annual Report of the Freedmen Support of

**Caroliniana/University of South Carolina**
Montgomery Family Papers

**Library of Congress**
Benjamin Montgomery Family Papers
General Edward Cary Walthall, 1831-1898 Papers
Robert Terrell Papers

Ben La Bree Chapter, no 118, United Daughters of the Confederation.  Membership Booklet.  Jackson, Mississippi. Louisville, Kentucky: Courier Journal Job Printing Company, 1897.

Wilbur, Leon. A. with Jean Fletcher.  *Mississippi State Government: The Constitution, Legislature,, and Administration*.  Department of Political Science, University of Southern Mississippi, Hattiesburg: Privately published, 1974.

**New York Public Library**
Democratic Pamphlets for 1892, Microfilm ZH9


*Newspapers*

Coverage of the events leading up to the 1890 Constitutional Convention, the Convention debates, and the aftermath of the adoption of the 1890 Constitution during the years 1889 to 1896 in the *Clarion-Ledger*, the *Daily Commercial Herald* (Vicksburg), the *State Ledger* (Jackson), the *World* (New York), the *Memphis Appeal,* and the *Times-Democrat* (New Orleans).


*Judicial Decisions*

*Ratliff v. Beale,* 20 So. 865 (Miss. 1896).

*Williams v. Mississippi*, 170 U.S. 213 (1898).