IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ROY HARNESS, ET AL.                                    PLAINTIFFS

v.                              CIVIL ACTION NO. 3:17cv791-DPJ-FKB

DELBERT HOSEMANN, SECRETARY OF
STATE OF MISSISSIPPI                                    DEFENDANT

*consolidated with*

DENNIS HOPKINS, ET AL.                                    PLAINTIFFS

v.

SECRETARY OF STATE DELBERT
HOSEMANN, in his official capacity                        DEFENDANT

---

**MEMORANDUM OF AUTHORITIES SUPPORTING SECRETARY
HOSEMANN'S MOTION FOR SUMMARY JUDGMENT
AS TO THE *HOPKINS* PLAINTIFFS' LAWSUIT**

---

## INTRODUCTION

Since statehood, in one form or another, Mississippi law has always prescribed felon disenfranchisement—before and after the United States Constitution expressly authorized the policy. Presently, Mississippi law provides that felonies classified as murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement, bigamy, and voter fraud are disqualifying. MISS. CONST. art. 12, § 241; MISS. CODE ANN. §§ 23-15-11, 23-15-19. But Mississippi law also provides a discretionary mechanism for felons to re-gain the ballot through a suffrage bill passed by the State Legislature. MISS. CONST. art. 12, § 253.

The named Hopkins plaintiffs include six Mississippi residents who have sued Secretary of State Delbert Hosemann. [Dkt. 20-1 at pp. 4-7].[1] Each claims he is currently disqualified as an elector under state law on account of a felony conviction. [*Id.*]. And each challenges as unconstitutional Mississippi law that disenfranchises certain felons (Section 241 and related statutes), and Mississippi law that allows disenfranchised felons to re-gain the ballot through a suffrage bill (Section 253).  Neither type of challenge may go forward.

To be sure, plaintiffs want a declaration and injunction against Secretary Hosemann barring him from enforcing Mississippi's disenfranchising and re-enfranchising laws. But the Secretary does not enforce those laws. And the Secretary has nothing to with the passage of a suffrage bill by the Mississippi Legislature per Section 253. So, plaintiffs lack Article III standing, and the Eleventh Amendment also bars their claims.

In any event, though, the challenges do not have any legal merit. Starting first with Section 241, the U.S. Constitution expressly approves of the right of a State to disenfranchise felons—including permanently. As the Supreme Court has put it, "the exclusion of felons from the vote has an affirmative sanction in [Section] 2 of the Fourteenth Amendment[.]" ***Richardson v. Ramirez***, 418 U.S. 24, 54, 72 (1974).

Plainly put, plaintiffs cannot surmount the wall of precedent built on ***Richardson***, and they reach only a dead end with their non-racial, equal protection challenge to Section 241. *See, e.g.*, ***Hand v. Scott***, 888 F.3d 1206, 1213 (11th Cir. 2018) ("Indeed, the district court acknowledged that '[i]t is well-settled that a state can disenfranchise convicted felons under

---

[1] The Hopkins plaintiffs' lawsuit was consolidated with the earlier-filed felon disenfranchisement suit filed by the Harness plaintiffs against Secretary Hosemann. [3:17-cv-00791, Dkt. 34]. This memorandum, and the motion it supports, addresses only the Hopkins plaintiffs' claims. The Secretary will separately move for summary judgment as to the Harness case. Further, all of the citations to docket entries in this memorandum are to the lead case, No. 3:17-cv-00791.

Section Two of the Fourteenth Amendment.' And it correctly explained that a state may do so 'permanently.'"); *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998).

Equally unavailing is the Eighth Amendment challenge to Section 241. It is axiomatic that one part of the Constitution cannot prohibit what another expressly contemplates. To accept the theory urged here, though, the Court would have to conclude that the same Constitution that permits felon disenfranchisement under the Fourteenth Amendment prohibits it under the Eighth. What's more, because felon disenfranchisement is not considered "punishment," the Eighth Amendment is not implicated at all here. *Simmons v. Galvin*, 575 F.3d 24, 43 (1st Cir. 2009); *El-Amin v. McDonnell*, 3:12-CV-00538-JAG, 2013 WL 1193357, at *5–6 (E.D. Va. Mar. 22, 2013) (citing *Green v. Bd. of Elections*, 380 F.2d 445, 450 (2d Cir. 1967), *cert. denied,* 389 U.S. 1048 (1968)); *Trop v. Dulles,* 356 U.S. 86, 97 (1958)).

Next up is the three-part constitutional challenge to Section 253. It also fails. First, plaintiffs' equal protection claim based on the so-called "arbitrary restoration of the right to vote" misses the mark.  For instance, fifty years ago, a convicted felon by the name of Rufus Beacham challenged Florida's law entrusting the State's highest-ranking executive officers with discretion to restore the civil rights, including voting rights, of convicted felons.

Beacham sought to enjoin the "purely discretionary manner" of the re-enfranchisement decisions.  *Beacham v. Braterman*, 300 F. Supp. 182, 183 (S.D. Fla. 1969). A three-judge panel of the district court unanimously rejected Beacham's plea. The case did not end there. In a direct appeal, Beacham asked the Supreme Court to decide whether Florida's discretionary vote restoration procedure "violate[s] the Constitution in that there are no ascertainable standards governing the recovery of the fundamental right to vote?" Jurisdictional Statement Question C, *Beacham v. Braterman*, 396 U.S. 12 (1969) (No. 404), 1969 WL 136703, at *3. The Supreme

Court resolved that issue by summarily affirming the lower court's judgment. ***Beacham v. Braterman***, 396 U.S. 12 (1969).

No doubt, Section 253 is not the same as a gubernatorial pardon or executive clemency. But it is similar in the sense that it is a mechanism for convicted felons to re-gain the ballot. Notably, too, Section 253 does not detract from the executive pardon power. *See* MISS. CONST. art. 5, § 124; ***In re Hooker***, 87 So. 3d 401, 423 (Miss. 2012). In other words, Section 253 provides an added option available to felons for re-enfranchisement—even though States may disenfranchise convicted felons permanently. *See* ***Richardson***, 418 U.S. at 54; ***Johnson v. Governor of Fla***., 405 F.3d 1214, 1217 (11th Cir. 2005) (en banc).

Next, in Count 4, plaintiffs attempt to repackage their challenge to Section 253 as one brought under the guise of the First Amendment. But this does not improve the argument.  The First Amendment "afford[s] no greater protection for voting rights claims than that already provided by the Fourteenth[.]" ***Burton v. City of Belle Glade***, 178 F.3d 1175, 1188 n.9 (11th Cir. 1999). And no First Amendment challenge to disenfranchisement laws has been successful in any circuit court—let alone the Fifth Circuit or the Supreme Court. ***Thompson v. Alabama***, 293 F. Supp. 3d 1313, 1327 (M.D. Ala. 2017).

Third, and lastly, Count 5 of the complaint injects a racial discrimination claim into the mix. But it falls flat under the test set forth by the Supreme Court in ***Hunter v. Underwood***, 471 U.S. 222 (1985). Plaintiffs contend that Section 253 must have been enacted with a discriminatory intent because it was enacted in 1890 in Mississippi. But, aside from the year it originally was adopted, plaintiffs offer little else showing racial motivation. Still more, plaintiffs present no evidence of disproportionate impact or discriminatory application.

In short, the Hopkins plaintiffs' lawsuit amounts only to a plea to change settled law. It is not an effort to state a cognizable claim under the law as it presently exists. Grant of the instant motion for summary judgment, therefore, is warranted.

## FACTS

***Felon disenfranchisement***. There is no dispute that the Fourteenth Amendment expressly authorizes felon disenfranchisement. *See* U.S. CONST. amend. XIV, § 2. When it was ratified, "29 States had provisions in their constitutions which prohibited, or authorized the legislature to prohibit, exercise of the franchise by persons convicted of felonies or infamous crimes." ***Richardson***, 418 U.S. at 48. Today, approximately thirteen States disenfranchise felons beyond the term of their prison sentence.[2] And all but two States (Maine and Vermont) disenfranchise felons during their prison sentence.[3]

Felon disenfranchisement is based on the philosophy of republican government and theory of social compact. In the words of Judge Friendly, "[a] man who breaks the laws he has authorized his agent to make for his own governance could fairly have been thought to have abandoned the right to participate in further administering the [social] compact." ***Green***, 380 F.2d at 451.

***Felon Disenfranchisement and Re-enfranchisement in Mississippi***. The State's 1817 and 1832 Constitutions, and the laws enacted under them, provided for felon

---

[2] These states appear to be: Alabama, (ALA. CONST. , § 177); Arizona (ARIZ. REV. STAT. ANN. §§ 13-904, 16-101(A)(5)); Delaware (DEL. CONST. Art. V, § 2); Florida (FLA. CONST. Art. VI, § 4 and FLA. STAT. ANN. § 97.041(2)(b)); Iowa (IOWA CODE ANN. § 48A.6); Kentucky (KY. CONST. § 145); Maryland (MD. CODE ANN., Elec. § 3-102); Nebraska (NEB. CONST. Art. VI, § 2 and NEB. REV. STAT. § 32-313); Nevada (NEV. CONST. Art. II, § 1 and NEV. REV. STAT. § 293.055); Tennessee (TENN. CONST. Art. I, § 5 and TENN. CODE ANN. §§ 2-19-143, 40-20-112); Virginia (VA. CONST. Art. II, § 1 and VA. CODE ANN. § 24.2-101); Wyoming (WYO. STAT. ANN. §§ 6-10-106, 22-1- 102(xxvi); and of course Mississippi.

[3] *See infra* note 9.

disenfranchisement. [Nos. 15-21:104-131].[4] After the Civil War, the States (including Mississippi)

ratified the Fourteenth Amendment—which expressly authorizes felon disenfranchisement.

Following suit, Mississippi's Reconstruction-era government enacted the 1868 Constitution and

other felon disenfranchisement laws. [Nos. 23-27:132-160].

The 1890 Mississippi constitutional framers, like all their predecessors, addressed felon

disenfranchisement. Their Constitution Section 241 modified the State's prior laws to disqualify

persons "convicted of bribery, burglary, theft, arson, obtaining money or goods under false

pretenses, perjury, forgery, embezzlement or bigamy" from voting. [No. 34:262]. The 1890

version of Section 241's disenfranchising crimes remained on the books for six decades. [No. 37].

The 1890 Constitution also adopted a legislative method for convicted felons to re-gain the

ballot. Specifically, Article 12, § 253 provides:

> The legislature may, by a two-thirds vote of both houses, of all members elected,
> restore the right of suffrage to any person disqualified by reason of crime; but the
> reasons therefor shall be spread upon the journals, and the vote shall be by yeas
> and nays.

MISS. CONST. art. 12, § 253.

In the 1950s and 1960s, things started to change as it relates to the State's

disenfranchisement laws and its categorical list of disenfranchising crimes. [Nos. 37; 39:277-278;

43:305-306; 59:400; 62:408]. And, in the mid-1980s, Mississippi lawmakers again revisited the

issue of disenfranchisement—as well as that of re-enfranchisement. [Nos. 63-78:410-574].  In

---

[4] A full Itemization of Undisputed Material Facts supporting Secretary Hosemann's grounds for summary judgment is attached as Exhibit "A" to the Harness summary judgment motion. The Secretary expressly incorporates that exhibit, as well as those facts and all supporting documentation, into this memorandum and the motion it supports. [Dkt. 63, 63-1, 63-2].  Likewise, any citation herein to the Undisputed Material Facts refers to Exhibit "A" and its corresponding documentation attached to the Harness motion. As in the Harness memorandum, each fact is individually numbered and set forth in the Itemization, and supported by a consecutively paginated record appended to it. Citations to the Itemization and its attached record in this brief follow this format: [(itemized fact number(s)):(record page number(s))].

1984, for instance, a diverse Task Force of state officials and citizens investigated, debated, and proposed changes to the State's laws. [Nos. 63-68:410-519].

The 1985 Legislature responded to the Task Force's findings by forming study committees to further review the election laws. [No. 69:520-555]. Prior to the 1986 Regular Session, the committees reported to the full Legislature and proposed to repeal the existing election laws and replacing them with a new Election Code. [No. 71:520-555]. The legislative package proposed changing the felon disenfranchisement scheme and restoring suffrage following completion of the sentence. [Nos. 71:520-555, 543-544; 72:559-561].

Through the deliberative legislative process, legislators opted instead to conform their new Election Code's felon disenfranchisement provisions to the 1968 version of Section 241. [No. 73:563-566]. And the legislators opted to endorse Section 253—that is, to not restore suffrage automatically. [Nos. 71:520-555, 543-544; 72:559-561; 74-567]. The 1986 legislation passed both houses nearly unanimously, with only four of 174 legislators voting nay. [No. 74-567].

**Plaintiffs' Lawsuit.**  In March 2018, Dennis Hopkins, Herman Parker, Jr., Walter Wayne Kuhn Jr., Byron Demond Coleman, Jon O'Neal, and Earnest Willhite filed this lawsuit against Secretary of State Delbert Hosemann. [Dkt. 20-1 at pp. 4-7]. Plaintiffs allege they each are disqualified from voting under Mississippi law due to their respective felony convictions.[5] [*Id.*]. Plaintiffs also moved to certify a class in August 2018. [Dkt. 44].  That motion is still pending, and it is opposed by the Secretary. [Dkt. 49, 50].

Plaintiffs' complaint asserts five separate facial constitutional challenges to Sections 241 and 253 of the Mississippi Constitution. Those causes of action include:

∗   a "non-racial" Fourteenth Amendment claim targeting Section 241 and related statutes;

---

[5] The plaintiffs' felony convictions are: Hopkins (grand larceny); Parker (grand larceny); Kuhn (grand larceny); Coleman (receiving stolen property); O'Neal (arson); Willhite (grand larceny).

* an Eighth Amendment claim targeting the felony conviction disqualification provisions in Section 241, as well as related Mississippi Code Sections 23-15-11 and 23-15-19;

* an Equal Protection Clause "arbitrariness" claim focused on the Legislature's authority to pass suffrage bills under Mississippi Constitution Section 253;

* a First Amendment claim attacking Section 253; and

* a race discrimination-based equal protection claim targeting Section 253.

[*Id.* at pp. 38-43.].

## ARGUMENT

As noted, plaintiffs' five causes of action challenging Sections 241 and 253 are brought solely against Secretary Hosemann. Those claims all fail for the following reasons: (i) plaintiffs lack Article III standing; (ii) the Eleventh Amendment bars plaintiffs' claims; and (iii) the claims otherwise fail on the merits. These avenues for dismissal are addressed in turn, and each avenue alone requires dismissal of plaintiffs' suit.

### *PLAINTIFFS LACK ARTICLE III STANDING, AND THE ELEVENTH AMENDMENT BARS THE CLAIMS AGAINST SECRETARY HOSEMANN*

### I.   **Plaintiffs Lack Article III Standing**.

To establish an Article III case or controversy, plaintiffs' claims must satisfy three separate elements:

(1) the plaintiff[s] must have suffered an "injury in fact"- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

(2) there is a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant[s], and not the result of the independent action of some third party not before the court; and

(3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1991) (internal citations and quotations omitted). Plaintiffs have the burden of proof. *Id.* at 561. And they cannot simply rely on their pleadings. They must support their standing allegations "with the manner and degree of evidence required" at the summary judgment stage. *Id.*

Also significant, the Court "must evaluate each plaintiff's Article III standing *for each claim*." *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) (emphasis supplied). Thus, plaintiffs must separately establish standing for both their Sections 241 and 253 challenges. A failure to establish each the element for each claim deprives the Court of jurisdiction over the claim. *Rivera v. Wyeth-Ayerst Labs*., 283 F.3d 315, 319 (5th Cir. 2002).

Here, plaintiffs fail to satisfy the latter two prongs of the standing test. Standing, moreover, concerns the congruence or fit between the plaintiff and the defendant. "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art[icle] III." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Thus, in a suit against state officials for injunctive relief, a plaintiff does not have Article III standing with respect to those officials who are powerless to remedy the alleged injury. *Linda R.S. v. Richard D*., 410 U.S. 614, 616–18 (1973); *Okpalobi v. Foster*, 244 F.3d 405, 426-27 (5th Cir. 2001) (en banc); *id*. at 429.

A.   **The plaintiffs' individualized injuries-in-fact.**

Every federal plaintiff must always allege, and ultimately establish, an injury-in-fact that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Here, Mississippi law bars felons convicted of certain felonies from voting. Because of their respective convictions, plaintiffs allege that they cannot vote. Secretary Hosemann acknowledges plaintiffs have each alleged an individualized injury that satisfies this portion of Article III for the Sections 241 and 253 challenges.

**B.      No causal connection between plaintiffs' individualized injuries and Secretary Hosemann's conduct**.

On the second element, plaintiffs' injuries lack the requisite "causal connection" to Secretary Hosemann's conduct. *Id*. And this is true as to both Sections 241 and 253, for which plaintiffs must separately establish the requisite causal connection.

*(i)      Felon Disenfranchisement: Section 241 and related statutes.*

Plaintiffs' inability to vote due to their respective convictions may be "fairly traceable" to local officials who enforce Mississippi's felon disenfranchisement laws—but not Secretary Hosemann. *Id.* Secretary Hosemann does not enforce Section 241, or the state's other felon disenfranchisement laws. The Secretary has no investigative or prosecutorial duty with regard to any potential violation of any election laws. [No. 5:22]. He has no duty or authority to supervise local election officials in the performance of their obligations under Mississippi law. [No. 6:19-20]. And he lacks any authority or duty to prohibit convicted felons from registering, or to remove convicted felons from the voter rolls. MISS. CODE ANN. § 23-15-151; [No. 11].

Plaintiffs' pleading nevertheless suggests that, because the Secretary of State's Office serves as an information conduit and the chief election officer, the Secretary is the properly named defendant. [Dkt. 20-1 at ¶ 23]. The complaint also mentions that Secretary Hosemann maintains the statutorily-prescribed Statewide Elections Management System ("SEMS"). [*Id.*]. SEMS is a centralized and computerized information system that includes the county voter rolls, and programs local officials use to maintain them. *See* MISS. CODE ANN. § 23-15-165; [No. 8]. One of its programs filters and maintains felony conviction information uploaded from the Mississippi Administrative Office of Courts. [No. 10:16-17, 20-22].

When a local county election official logs on to SEMS to register voters or maintain their county voter rolls, SEMS can provide a potential match report showing voters who may have been

convicted of a disenfranchising crime. [No. 10:16-17, 20-22]. It is then up to the local official to gather more information and decide whether or not to take action, if necessary. [No. 10:16-17, 20-22]. Local officials are solely responsible for maintaining the voter rolls, including denying registration to disqualified felons, removing disqualified felons from the voter rolls, and otherwise. *See* MISS. CODE ANN. §§ 23-15-19, 23-15-151; [No. 7:25]. For Article III purposes, there exists no "causal connection" between Secretary Hosemann's conduct and plaintiffs' claimed voting injuries tied to their felony convictions. ***Okpalobi***, 244 F.3d at 426. That missing connection compels dismissing their claims.

  *(ii)  Felon Re-enfranchisement: Section 253.*

  Secretary Hosemann does not enforce Section 253—in fact, he has no role or connection at all to the passage of suffrage bills by the Mississippi Legislature. Plaintiffs' complaint concedes as much. For example, on page 20 of the complaint, plaintiffs provide a chart outlining how Section 253 works. Nowhere in that chart is the Secretary mentioned as having any connection to the passage of such a bill.

  This is because: the Secretary does not sponsor suffrage bills; the Secretary does not draft suffrage bills; the Secretary has no role to play when and if such a bill goes to the full Judiciary B Committee of the first chamber of the Legislature—or to the second chamber of the Legislature; the Secretary does not debate on suffrage bills; the Secretary does not vote on any suffrage bills; the Secretary cannot impact the passage or denial of a suffrage bill; and the Secretary does not sign suffrage bills. [Nos. 13:25-26; 14:32-103].

  For Article III purposes, there exists no "causal connection" between Secretary Hosemann's conduct and plaintiffs' claimed injuries tied to Mississippi's constitutional provision allowing convicted felons to re-gain the ballot through the passage of a suffrage bill by the

Mississippi Legislature. ***Okpalobi***, 244 F.3d at 426. That missing connection is dispositive and requires dismissal of all of the Section 253 claims.

### C.       Lack of redressability.

Plaintiffs not only have a causation problem. Their claims also fail Article III's third requirement. It is "merely speculative" that plaintiffs' requested relief would cure their alleged individualized injuries-in-fact. ***Lujan***, 504 U.S. at 561; *see also* ***K.P. v. LeBlanc***, 729 F.3d 427, 436 (5th Cir. 2013) (Article III standing "must exist with respect to each claim the plaintiff seeks to press and for each form of relief that is sought") (internal quotes omitted)).

*(i)       Felon Disenfranchisement: Section 241 and related statutes.*

Federal equitable relief requiring Secretary Hosemann not to "deny citizens the right to vote" based on felony convictions will not remedy their individual injuries as to their challenge to Section 241. [Dkt. 20-1 at p. 47, ¶ C]. As established, Secretary Hosemann does not enforce Section 241 or the state's other felon disenfranchisement laws. He lacks authority to register voters, to compel local election officials to register voters, or to stop local officials from prohibiting disqualified felons to register or purging felons from the voter rolls. MISS. CODE ANN. § 23-15-33(1); [Nos. 6:19-20; 7:25]. Any order entered against Secretary Hosemann implementing a re-written Section 241, "[f]or all practical purposes," would be "utterly meaningless." ***Okpalobi***, 244 F.3d at 426. Plaintiffs' failure on the redressability element requires dismissal of the claims.

*(ii)       Felon Re-enfranchisement: Section 253.*

The lack of redressability as to the Section 253 claim is obvious. Secretary Hosemann has no role at all in the introduction of suffrage bills; the sponsoring of the bills; the passage of the bills; or the enforcement of the bills. [No. 13:25-26; 14:32-103]. Thus, an order against him declaring that the "suffrage bill provision of the Mississippi Constitution violates the Equal Protection Clause of the Fourteenth Amendment, as well as the First Amendment" also "[f]or all

practical purposes," would be "utterly meaningless." *Okpalobi*, 244 F.3d at 426. Plaintiffs failure on the redressability element is yet another reason why the Section 253 claims fail immediately.

## II.     The Eleventh Amendment Bars the Claims Against Secretary Hosemann.

Even if plaintiffs somehow satisfy Article III, the Eleventh Amendment nevertheless bars their claims. Eleventh Amendment immunity prohibits claims against the State, agencies considered arms of the state, and state officials sued in their official capacities. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984). Secretary Hosemann is a state official, sued in his official capacity. He enjoys Eleventh Amendment immunity here because "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . As such, it is no different from a suit against the State itself." *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989) (internal citation omitted).

To overcome the Eleventh Amendment's bar, plaintiffs will argue their claims fit within the narrow exception in *Ex Parte Young*, 209 U.S. 123 (1908). The exception applies only when plaintiffs sue an appropriate state official, in his official capacity, for an alleged ongoing violation of federal law, and seek prospective equitable relief. *Aguilar v. Tex. Dept. of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998).

Important here, however, *Ex Parte Young* only applies in a suit challenging a state law if the defendant has "'some connection with the enforcement of the act' in question or [is] 'specifically charged with the duty to enforce the statute' and [is] threatening to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (quoting *Okpalobi*, 244 F.3d at 414-15). "The required 'connection' is not 'merely the general duty to see that the laws of the state are implemented,' but 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Id.* (quoting *Okpalobi*, 244 F.3d at 416). Plaintiffs' claims fail the "some enforcement connection" test.

Secretary Hosemann does not enforce Section 241 or the state's other felon disenfranchisement laws. The Secretary cannot register a voter, deny a voter's registration, or remove a voter from the voter rolls. MISS. CODE ANN. § 23-15-33(1); [Nos. 6:19-20; 7:25]. He cannot compel local election officials to apply, or not apply, the state's felon disenfranchisement laws when they carry out those duties. [Nos. 6:19-20; 7:25]. The same is true for Section 253. That provision concerns the machinery of the Mississippi Legislature. And Secretary Hosemann has nothing to do with the suffrage bill process. [Nos. 13:25-26; 14:32-103].

Absent more particularized duties or enforcement authority regarding the State's felon disenfranchisement/re-enfranchisement laws, *Ex Parte Young* does not reach Secretary Hosemann here as to the Section 241 claims or the Section 253 claims. *Morris*, 739 F.3d at 746; *see also* *McLaughlin v. City of Canton, Mississippi*, 947 F. Supp. 954, 965 (S.D. Miss. 1995) (Eleventh Amendment barred challenge to Section 241 against the Secretary of State).

### PLAINTIFFS' CLAIMS FAIL ON THE MERITS

Even if plaintiffs could overcome Article III and the Eleventh Amendment, the Secretary still deserves summary judgment as to the Sections 241 and 253 claims.

## I.     Plaintiffs' Constitutional Challenges to Article 12, Section 241 of the Mississippi Constitution All Fail.

### A.     Plaintiffs' non-racial, equal protection challenge to Section 241 fails from the start.

Plaintiffs claim that Section 241 violates the Fourteenth Amendment.[6]  But the challenge to Section 241 brought on equal protection grounds is not one based on any racial intent or motivation. Instead, plaintiffs reason that Section 241 is unconstitutional because the Fourteenth Amendment "only permits states to *temporarily* 'abridge' an individual's right to vote based on

---

[6] The nonracial, equal protection challenge to Section 241 is Count II in plaintiffs' complaint. Defendant Hosemann analyzes Count II before Court I so as to better examine the Supreme Court's jurisprudence addressing the Fourteenth Amendment's application to felon disenfranchisement laws.

his or her 'participation in rebellion, or other crime.'" [Dkt. 20-1 at ¶ 3]. (emphasis supplied). So, plaintiffs' theory on equal protection is this: Because Section 241 contemplates permanent disenfranchisement for certain felonies, that provision collides with the Fourteenth Amendment, which supposedly permits only "temporar[y]" disenfranchisement. [*See id.*].

Such a theory, though, is not novel. It has been urged before. And it has been rejected by the Supreme Court because it falls out of step with the express language of § 2 of the Fourteenth Amendment. In addressing that provision, the Supreme Court's decision in ***Richardson*** made clear that a state's decision to permanently disenfranchise convicted felons does not, in itself, constitute an Equal Protection Clause violation. 418 U.S. at 53-55. And the history surrounding the adoption of § 2 is treated in considerable detail in ***Richardson***. *See* 418 U.S. at 43-52.

That case involved a nonracial, equal protection challenge by three ex-felons, whose terms of imprisonment and parole had expired, to provisions of the California Constitution and implementing statutes that permanently disenfranchised persons convicted of an "infamous crime." ***Id.*** at 26-27. The Supreme Court of California upheld this challenge, ***id.*** at 34-35, and the Supreme Court reversed that ruling, ***id.*** at 56.

In doing so, the Court concluded "that those who framed and adopted the Fourteenth Amendment could not have intended to prohibit outright in § 1 of that Amendment that [ (i.e., felon disenfranchisement) ] which was expressly exempted from the lesser sanction of reduced representation imposed by § 2 of the Amendment." ***Richardson***, 418 U.S. at 43, 55. The Court thus held that California could constitutionally "exclude from the franchise convicted felons who have completed their sentences and paroles." ***Id.*** at 56.

***Richardson*** has never been overruled, and no other court has retreated from it. In fact, the opposite. "Several courts [in addition to ***Richardson***] have recognized the propriety of excluding felons from the franchise." ***Johnson***, 405 F.3d at 1225; ***Hayden v. Pataki,*** 449 F.3d

305, 316–17 (2d Cir. 2006); *Green,* 380 F.2d at 450–52; *Cotton*, 157 F.3d 388.  ***Richardson*** thus forecloses the instant cause of action—a point implicitly recognized by plaintiffs. [Dkt. 20-1 at ¶ 104, n. 69] (noting the claim is asserted for "for preservation purposes").  At the end of the day, then, plaintiffs' challenge falls apart under ***Richardson*** and its progeny. Dismissal is required.

### B.   Plaintiffs' claim that felony disenfranchisement under Mississippi law violates the Eighth Amendment is a non-starter.

The Hopkins plaintiffs also maintain that "Section 241's lifetime disenfranchisement provision, effectively a lifetime voting ban, violates the Eight Amendment[.]" [Dkt. 20-1 at ¶ 3]. According to these plaintiffs, felon disenfranchisement is a form of criminal punishment that cannot be imposed for any felony because of the Eighth Amendment's prohibition on cruel and unusual punishment. Not so. In fact, such a theory fails for at least three immediate reasons.

<u>One</u>: The Eighth Amendment claim initially suffers from the same flaw as plaintiffs' First Amendment claim (discussed *infra*).  That is, to accept the argument at all, "the Court would have to conclude that the same Constitution that recognizes felon disenfranchisement under § 2 of the Fourteenth Amendment also prohibits disenfranchisement under other amendments," such as the Eighth Amendment. ***Farrakhan v. Locke***, 987 F. Supp. 1304, 1314 (E.D. Wash. 1997) *rev'd in part on other grounds*, 338 F.3d 1009 (9th Cir. 2003). This is both a legally and practically flawed rationale.

Indeed, to reach such an untenable result, the Court would have to undertake at least two illogical assumptions: (i) that the Constitution is internally inconsistent—*i.e.*, that the Fourteenth Amendment expressly allows what the Eighth Amendment otherwise prohibits; and (ii) that the Supreme Court's declaration of the facial validity of disenfranchisement laws in ***Richardson*** was based only on the fortuity that the plaintiffs therein did not make arguments under different sections of the Constitution.

Worse still, the Court would have to make those assumptions despite the Supreme Court having "strongly suggested in dicta that exclusion of convicted felons from the franchise violates *no* constitutional provision." ***Richardson****, 418 U.S. at 53 (emphasis supplied). Accordingly, because it is flawed to suggest that the Eighth Amendment prohibits what the Supreme Court already has said the Fourteenth Amendment permits, the instant Eighth Amendment claim may be dispensed with quickly.

Two: The Eighth Amendment claim additionally is precluded because felon disenfranchisement is not "punishment." *See, e.g.*, ***Simmons***, 575 F.3d at 43 ("The Supreme Court has stated that felon disenfranchisement provisions are considered regulatory rather than punitive."). Because disenfranchisement is not punishment, it necessarily cannot be cruel and unusual punishment.

In fact, in ***Trop v. Dulles***, 356 U.S. 86 (1958), the plurality opinion used felon disenfranchisement as an example of a restriction that is not punitive and would not violate the Ex Post Facto Clause:

> [A] statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose. . . . *The point may be illustrated by the situation of an ordinary felon.* A person who commits a bank robbery, for instance, loses his right to liberty and often his right to vote. If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal. *But because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise.*

***Id.*** at 96–97 (emphasis supplied).

Because only a punitive measure can violate the Eighth Amendment, the challenge to Section 241 under the Eighth Amendment fails from the start. *See, e.g.,* ***Smith v. Doe***, 538 U.S. 84, 92 (2003); *see also* ***United States v. Salerno***, 481 U.S. 739 (1987) (holding preventative

detention under the Bail Reform Act was permissible because it was regulatory and preventative, rather than punitive); *Green*, 380 F.2d at 450; *Farrakhan*, 987 F. Supp. at 1314; *Kronlund v. Honstein*, 327 F. Supp. 71, 74 (N.D. Ga. 1971) (three-judge court).

Further, no court has ever held that felon disenfranchisement laws run afoul of the Eighth Amendment—despite more than a century of litigation over the issue. *See* Robin Miller, *Validity, Construction, and Application of State Criminal Disenfranchisement Provisions*, 4 A.L.R. 6th 31 § 2 (2006). As the Court in *El-Amin v. McDonnell*, No. 3:12-CV-00538-JAG, 2013 WL 1193357, at \*5–6 (E.D. Va. Mar. 22, 2013) put it when addressing a similar claim: "Over the years, various plaintiffs have raised this argument, but to this Court's knowledge it has never won the day. In keeping with this long line of decisions, the Court dismisses El–Amin's Eighth Amendment claim as well." *Id.* at \*5-6.

To examine the issue further, though, the Supreme Court has identified several guideposts to evaluate whether a particular law is punitive. *See Smith*, 538 U.S. at 92 (applying a two-step "intent-effects" test to analyze whether a state statute violated the *Ex Post Facto* Clause); *United States v. Under Seal*, 709 F.3d 257, 263 (4th Cir. 2013) (applying the *Smith v. Doe* framework to determine whether a statute imposed punishment proscribed by the Eighth Amendment). Those guideposts are analyzed in turn.

First, the Court must ask whether "the intention of the legislature was to impose punishment." *Smith*, 538 U.S. at 92. Second, if "the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" *Id.* (citation omitted). "Because we 'ordinarily defer to the legislature's stated intent,' 'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.'" *Id.* (quoting *Hudson v. U.S.*, 522 U.S. 93, 100 (1997)).

Neither Section 241 nor the related statutes were intended by the Mississippi Legislature to be "punishment." Whether a statutory scheme is civil or criminal "is first of all a question of statutory construction," based on "the statute's text and its structure." *Id.* "Other formal attributes of a legislative enactment, such as the manner of its codification or the enforcement procedures it establishes, are [also] probative of the legislature's intent." *Id.* at 94.

As noted, Section 241 of the Mississippi Constitution deals with qualifications for electors. In full, it provides as follows:

> Every inhabitant of this state, except idiots and insane persons, who is a citizen of the United States of America, eighteen (18) years old and upward, who has been a resident of this state for one (1) year, and for one (1) year in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city or town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector, except that he shall be qualified to vote for President and Vice President of the United States if he meets the requirements established by Congress therefor and is otherwise a qualified elector.

MISS. CONST. art. 12, § 241. Nothing in this text or structure indicates that it is designed to punish.

Instead, the text addresses the qualifications of voters generally, and it treats felons the same way as those who are not competent, not of age, not citizens of the United States, and not residents of Mississippi. Additionally, the related statutory provisions that are the codification of Section 241 are not in the criminal code, they are in the part of the Mississippi Code that regulates elections—Title 23. *See* MISS. CODE ANN. § 23-15-11 (qualification of electors and eligibility); § 23-15-19 (persons convicted of vote fraud or disenfranchising crimes); § 23-15-21 (noncitizens). *See* **Simmons**, 575 F.3d at 43-44 ("Even if the Supreme Court had not already described such regulation of the franchise with respect to incarcerated felons as nonpenal, we would still find Article 120 to be a civil regulatory scheme . . . Article 120 is not in the [ ] criminal code, but rather

its civil constitutional and statutory voter qualification provisions."). In short, then, the Legislature did not intend the challenged laws to punish.

Nevertheless, even a regulatory scheme that is not intended as punishment may be so restrictive and harsh as to impose punishment in fact. Here, a court considers whether the regulatory scheme: "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith*, 538 U.S. at 97. Under this test as well, disenfranchisement is non-punitive.

Historically and traditionally, felon disenfranchisement is a paradigmatic example of a restriction that is *not* punitive. Indeed, as discussed, the plurality opinion in *Trop* used felon disenfranchisement as an example of a restriction that is not punitive. 356 U.S. at 96-97. "[I]n holding that felon disenfranchisement has 'affirmative sanction' in § 2 of the Fourteenth Amendment of the U.S. Constitution, the Supreme Court noted the historical prevalence of state felon disenfranchisement laws and never characterized even California's broad disqualification of former felons as punitive." *Simmons*, 575 F.3d at 45 (citing *Richardson*).

Similarly, felon disenfranchisement imposes "no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *Smith*, 538 U.S. at 100. In fact, Mississippi's challenged constitutional section and related statutes impose no affirmative obligation at all—much less any physical restraint.

Finally, felon disenfranchisement does not promote the traditional aims of punishment— retribution and deterrence—and is instead rationally connected to a nonpunitive purpose, which is the "'most significant' factor in our determination that the statute's effects are not punitive." *Smith*, 538 U.S. at 102; *see also id.* at 87 ("Third, the Act does not promote the traditional aims of punishment. That it might deter future crimes is not dispositive . . .Moreover,

the Ninth Circuit erred in concluding that the Act's registration obligations were retributive. While the Act does differentiate between individuals convicted of aggravated or multiple offenses and those convicted of a single nonaggravated offense, these broad categories and the reporting requirement's corresponding length are reasonably related to the danger of recidivism, and this is consistent with the regulatory objective.").

Quite differently, felon disenfranchisement is based on the philosophy of republican government and theory of social compact. In **Green**, for example, the court declined to convene a three-judge court to address nonracial constitutional challenges to New York's felon disenfranchisement statute because of the insubstantiality of the claims. 380 F.2d at 452.  In doing so, Judge Henry Friendly said:

> The early exclusion of felons from the franchise by many states could well have rested on Locke's concept, so influential at the time, that by entering into society every man "authorizes the society, or which is all one, the legislature thereof, to make laws for him as the public good of the society shall require, to the execution whereof his own assistance (as to his own decrees) is due." A man who breaks the laws he has authorized his agent to make for his own governance could fairly have been thought to have abandoned the right to participate in further administering the compact. On a less theoretical plane, it can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases. This is especially so when account is taken of the heavy incidence of recidivism and the prevalence of organized crime. A contention that the equal protection clause requires New York to allow convicted mafiosi to vote for district attorneys or judges would not only be without merit but as obviously so as anything can be.

*Id.* at 451-52 (footnote and citation omitted); *see also* **Wesley v. Collins**, 791 F.2d 1255, 1261-62 (6th Cir. 1986).

All in all, then, because felon disenfranchisement does not constitute "punishment," it also does not constitute cruel and unusual punishment. And the Eighth Amendment simply is not implicated here.

<u>Three</u>: Plaintiffs' facial challenge brought under the Eighth Amendment also fails for other reasons. As noted, disenfranchisement is neither cruel nor unusual. And it has been common throughout history and remains common in the United States.  But even if the Court were to determine otherwise, that would not end the inquiry—as plaintiffs suggest.

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a narrow proportionality principle that applies to noncapital sentences." ***Ewing v. California***, 538 U.S. 11, 20 (2003) (internal citations and quotation marks omitted). The Hopkins plaintiffs would need to show that "the sentence imposed is grossly disproportionate to the offense committed." ***United States v. Johnson***, 451 F.3d 1239, 1243 (11th Cir. 2006) (internal citations and quotation marks omitted).

In other words, the offense matters for purposes of plaintiffs' facial challenge. For instance, Mississippi law currently provides that felonies classified as murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement, bigamy, and voter fraud are disqualifying. *See* MISS. CODE ANN. § 23-15-19. Punishment that might be cruel and unusual (even under plaintiffs' otherwise incorrect theory) for one felony is not necessarily cruel and unusual another one.

That is, a punishment that might be cruel and unusual for bigamy might not be for murder or rape or voter fraud—and so on. Yet the plaintiffs here wrongly conjoin all the disqualifying felony offenses, even though the plaintiffs, and their purported class members, will most certainly have committed a wide range of disenfranchising felonies, or multiple of them. This is thus yet another reason why the instant Eighth Amendment claim must be dismissed.

II.     **Plaintiffs' Constitutional Challenges to Article 12, Section 253 of the Mississippi Constitution Also Fail.**

In general, once convicted of one of the disenfranchising crimes, a person must secure a restoration of his suffrage rights through the Mississippi Legislature or a pardon from the governor to become a qualified elector.  Here, plaintiffs do not challenge the governor's pardon authority or the discretion of that executive authority. Nor do plaintiffs' challenge any other mechanism in Mississippi for restoration of suffrage.

Instead, plaintiffs focus squarely on the legislative process that provides a path for vote restoration through a suffrage bill. That focus is misguided.

A.     **Plaintiffs' nonracial, equal protection challenge to Section 253 is inapt.**

The Hopkins plaintiffs first maintain that Section 253 violates the Equal Protection Clause because it permits state officials to arbitrarily restore voting rights to some Mississippi citizens and not others. According to plaintiffs, the constitutional provision runs afoul of equal protection in that it "establishes no objective criteria for the restoration of voting rights." [Dkt. 20-1 at ¶ 2]. This challenge misses the mark entirely.

Section 253 provides that the Mississippi Legislature may restore the right of suffrage to any person disqualified by reason of a criminal conviction upon "a two-thirds vote . . . of all members elected" in both the Senate and the House.  Notably, that constitutional provision does not detract from any other discretionary mechanism for the restoration of voting rights. Instead, it provides *another option* for felons to have their voting rights restored—even though *no* vote restoration option is constitutionally required.

While Section 253 is different from executive pardons and clemency in that it involves the machinery of state legislative processes, it is similar in that it is a non-constitutionally required procedure for vote restoration. It thus "provide[s] [a] 'fail safe' in our criminal justice

system." *Herrera v. Collins*, 506 U.S. 390, 415 (1993). And it is not the power to take away a right—it is only the "power to extend mercy." *Id.* at 412.

Because a suffrage bill per Section 253 *restores* rights that already have been lost pursuant to lawful and "elaborate procedures," it is not subject to the same requirements as processes that take rights away in the first place. *Smith v. Snow*, 722 F.2d 630, 632 (11th Cir. 1983) (per curiam). For instance, as the Eleventh Circuit has explained in the clemency context, "[t]he discretion involved at the clemency stage can never cause" the hardship that clemency removes; instead, "it serves only as an act of grace to relieve that sentence even when the sentence has been legally imposed." *Id.*

Further, in *Beacham*, a three judge district court panel held that it was not "a denial of equal protection of law" for Florida's Governor and the State Cabinet "to restore discretionarily the right to vote to some felons and not to others," even though "[n]either the Governor of Florida nor members of the State Cabinet [had] established specific standards to be applied to the consideration of [such] petitions." *Beacham*, 300 F. Supp. at 183, 184.

Plaintiff Beacham took aim at that holding in his appeal to the Supreme Court. In his statement of jurisdiction, Beacham asked the Supreme Court to decide whether Florida's discretionary pardon procedure "violate[s] the Constitution in that there are no ascertainable standards governing the recovery of the fundamental right to vote." Jurisdictional Statement Question C, *Beacham v. Braterman*, 396 U.S. 12 (1969) (No. 404), 1969 WL 136703, at *3. By summarily affirming the district court, the Supreme Court necessarily decided that question in the negative.[7] *Hand*, 888 F.3d at 1208.

_____

[7] That is, a summary affirmance by the Supreme Court prohibits lower courts "from coming to opposite conclusions on the precise issues presented and necessarily decided." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam). Of particular relevance here, "[s]ummary affirmances . . . without doubt reject the specific challenges presented in the statement of jurisdiction." *Id.*

The underlying rationale of *Beacham* is instructive as to the instant challenge to Section 253 of the Mississippi Constitution. For example, plaintiffs round out their challenge to Section 253 as follows: "The suffrage bill provision establishes no objective criteria for the restoration of voting rights. Instead, Mississippi legislators have complete discretion to determine whether or not to allow a disenfranchised citizen to vote again." [Dkt. 20-1 at ¶ 2].  But these contentions get the Hopkins plaintiffs no further than it got the litigant in *Beacham*. This is so because the upshot of that decision—as well as all others—is that a state need not employ specific standards when it assesses an application seeking restoration of voting rights.

After *Beacham*, in ***Conn. Bd. of Pardons v. Dumschat***, 452 U.S. 458, 464, 466 (1981), the Supreme Court "held that a state was entitled to vest the Board of Pardons with 'unfettered discretion' to grant pardons based on 'purely subjective evaluations . . . by those entrusted with the decision,' leaving inmates with only a 'unilateral hope' for pardon." ***Hand,*** 888 F.3d at 1209 (quoting 452 U.S. at 464-66). Similarly, the court in ***Smith*** rejected claims attacking "Georgia's purely discretionary pardon regime." ***Hand***, 888 F.3d at 1209 (discussing ***Smith***, 722 F.2d at 631-32).

As these and other cases make clear, governmental decisions are not unconstitutionally "arbitrary" merely because they are not made pursuant to specific standards or objective criteria. ***Dumschat***, 452 U.S. at 464-66. Indeed, many important governmental decisions— including (to name a few) presidential pardons, congressional declarations of war, and gubernatorial vetoes—are unmoored from any constraints, guidelines, or binding procedures.

Moreover, in pardon and clemency cases, the challenge is typically to the discretionary decision making of executive branch officials. Here, though, the challenge involves the mechanics of the state legislative process. And there *are* procedures for purposes of that process—namely,

state legislative procedures. [No. 14:32-103]. Further, the legislators who introduce, debate, vote on, and pass suffrage bills are chosen by and accountable to the electorate.

Moreover, at least thirteen other states appear to have discretionary vote-restoration procedures for all or some categories of felons, even if those felons have already completed their sentences.[8] And a veritable host of states give officials discretion to grant pardons to—and thereby restore the voting rights of—felons who seek restoration of voting rights but have not yet been released from incarceration, successfully completed probation, or otherwise satisfied criteria triggering automatic restoration of voting rights.[9] Thus, if it is facially unconstitutional for a state legislature to have discretion when deciding whether to pass a bill that would restore a felon's voting rights, then most—if not all—of the 48 states that deny the vote to some or all convicted felons have unconstitutional vote restoration systems.

Plus, so far as federal law is concerned, a state need not have *any* vote-restoration process, **Richardson**, 418 U.S. at 54, just as it need not have *any* clemency process in general. Section 2 of the Fourteenth Amendment blunts the full force of Section 1's Equal Protection

---

[8] Those States are Alabama, Arizona, Delaware, Florida, Iowa, Kentucky, Maryland, Mississippi, Nevada, New Jersey, Tennessee, Virginia, Washington, and Wyoming. *See* ALA. CODE §§ 15-22-36(a), 15-22-36.1(g), (h); ARIZ. REV. STAT. §§ 13-908, 13-911; DEL. CONST. art. V, § 2; 15 DEL. CODE §§ 6102(a)(1), 6103(b); FLA. CONST. art. IV, § 8(a); FLA. STAT. § 940.01(1); IOWA CONST. art. II, § 5; IOWA CONST. art. IV, § 16; Iowa Governor's Exec. Order 2011-70, *available at* http://publications.iowa.gov/10194/1/BranstadEO70.pdf; *Griffin v. Pate*, 884 N.W.2d 182, 194 (Iowa 2016); KY. CONST. § 145; Ky. Rev. Stat. § 196.045; Kentucky Governor's Exec. Order 2015-52, http://apps.sos.ky.gov/Executive/Journal/execjournalimages/2016-MISC-2015-0052-243103.pdf; MD. CODE ANN., Election Law, § 3-102(b)(1); MISS. CONST. art. XII, §§ 241, 253; MISS. CONST. ART. V, § 124; MISS. CODE §§ 47-7-41, 99-19-37; NEV. REV. STAT. §§ 213.155, 213.157; N.J. STAT. §§ 2C:51-3, 19:4-1; TENN. CODE ANN. §§ 40-29-202(a)(1), 40-29-204; *Carroll v. Raney*, 953 S.W.2d 657, 659 (Tenn. 1997); *Fite v. State ex rel. Snider*, 88 S.W. 941, 943 (Tenn. 1905); VA. CONST. art. II, § 1; VA. CONST. art. V, § 12; VA. CODE. § 24.2-101; *Howell v. McAuliffe*, 788 S.E.2d 706, 716-19, 722-24 (Va. 2016); WASH. STAT. ANN. §§ 9.96.010, 29A.04.079; WYO. CODE §§ 6-10-106, 7-13-105, 22-1-102(a)(xxvi), 22-3-102(a)(v).

[9] Only two states—Maine and Vermont—allow incarcerated felons to vote. Felon Voting Rights, Nat'l Conference of State Legislatures, Apr. 30, 2017, *available at* http://www.ncsl.org/research/elections-and-campaigns/felon-voting-rights.aspx (last visited October 3, 2018); *see* ME. REV. STAT. tit. 21-a, §§ 111, 112(14); VT. STAT. ANN. tit. 17, §§ 2121, 2122(a). In every other state, felons who are incarcerated presumably must apply for a discretionary pardon to obtain restoration of voting rights. *See, e.g.*, TENN. CODE ANN. § 40-29-202(a) (providing that a convicted felon "is eligible to . . . have the right of suffrage restored upon . . . "[r]eceiving a pardon," "[t]he discharge from custody," *or* "[b]eing granted a certificate of final discharge from supervision by the board of parole").

Clause with respect to the voting rights of felons. And, for that reason, "Section 2's express approval of the disenfranchisement of felons . . . grants to the states a realm of discretion in the disenfranchisement and reenfranchisement of felons which the states do not possess with respect to limiting the franchise of other citizens." *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978). In light of those principles, *Shepherd* held that a state policy providing for the "selective . . . reenfranchisement of convicted felons" satisfies equal protection if that policy bears "a rational relationship to the achieving of a legitimate state interest." *Id.* at 1114-15.

Mississippi's system easily passes that test. The State "properly has an interest in excluding from the franchise persons who have manifested a fundamental antipathy to the criminal laws of the state or of the nation by violating those laws sufficiently important to be classed as felonies." *Id.* In determining whether to restore a felon's rights, the Court concluded, the State has a legitimate "interest in limiting the franchise to responsible voters." *Id.*; *see also Green*, 380 F.2d at 451.

Mississippi's case-by-case approach to vote restoration in Section 253 is rationally related to those interests. *Shepherd*, 575 F.2d at 1115. As the Supreme Court noted, it is not and cannot be irrational for clemency officers to make clemency decisions that are not "direct[ed]" by "specific and neutral criteria," since "[t]he very essence of the pardoning power is to treat each case individually." *Schick v. Reed*, 419 U.S. 256, 265, 268 (1974) ("[I]ndividual acts of clemency inherently call for discriminating choices because no two cases are the same.").

All told, because States may disenfranchise felons permanently, there is no right to any particular re-enfranchisement procedure(s). "If one has no right to procedures, the purpose of which is to prevent arbitrariness and curb discretion, then one clearly has no right to challenge the fact that the decision is discretionary." *Snow*, 722 F.2d at 632.

### B.      Plaintiffs' First Amendment challenge to Section 253 is unavailing.

Count 4 adds the First Amendment to the mix of challenges to Section 253. As to this claim, plaintiffs maintain that Section 253 "violates the First Amendment by impermissibly vesting government officials with unbridled discretion to determine who may engage in political expression and political association, both fundamental first amendment freedoms implicated by the right to vote." [Dkt. 20-1 at ¶ 4]. The citation to the First Amendment, however, does nothing to improve plaintiffs' constitutional challenge.

Like the Eighth Amendment claim, to recognize the fundamental right of felons to vote under the First Amendment, "the Court would have to conclude that the same Constitution that recognizes felon disenfranchisement under § 2 of the Fourteenth Amendment also prohibits disenfranchisement under [the First Amendment]." *Farrakhan*, 987 F. Supp. at 1314. But the First Amendment "afford[s] no greater protection for voting rights claims than that already provided by the Fourteenth and Fifteenth Amendments." *Burton*, 178 F.3d at 1188 n.9.

Accordingly, Plaintiffs may not circumvent settled law rejecting their claims by invoking the First Amendment. *Howard v. Gilmore*, 205 F.3d 1333 (4th Cir. 2000); *Johnson v. Bush*, 214 F. Supp. 2d 1333, 1338 (S.D. Fla. 2002), *aff'd sub nom. Johnson v. Governor of Fla.*, 405 F.3d 1214, 1235 (11th Cir. 2005) (en banc); *Farrakhan*, 987 F. Supp. at 1314. In fact, the existence of the Fourteenth Amendment, which expressly allows felon disenfranchisement, is the only reason the First Amendment applies to the States to begin with. *Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 450 (1938).

Further, courts have uniformly rejected similar attempts to circumvent Section 2 of the Fourteenth Amendment as unpersuasive bootstrapping. For example, the Ninth Circuit, in an opinion by retired Justice O'Connor, rejected a claim that requiring felons to "pay all debts owed under their criminal sentences" as a condition of re-enfranchisement amounted to an

unconstitutional poll tax. *Harvey v. Brewer*, 605 F.3d 1067, 1080 (9th Cir. 2010). The court reasoned that, "[h]aving lost their right to vote, they now have no cognizable Twenty-Fourth Amendment claim until their voting rights are restored." *Id.* The Sixth and Fourth Circuits have rejected similar poll-tax claims under the same rationale. *Johnson v. Bredesen*, 624 F.3d 742, 751 (6th Cir. 2010); *Howard*, 205 F.3d at 1333 (rejecting a challenge to the fee accompanying a civil-rights-restoration application because "it is not his right to vote upon which payment of a fee is being conditioned; rather, it is the restoration of his civil rights upon which the payment of a fee is being conditioned").

More recently, the Middle District of Alabama dismissed a First Amendment challenge at the Rule 12(b)(6) stage in a suit brought challenging that state's scheme for disenfranchisement and re-enfranchisement. The Alabama court reasoned that "courts confronted with First Amendment challenges to felon-disenfranchisement laws consistently have rejected such claims. Those courts have reasoned that the First Amendment does not guarantee the right to vote, at least partly based upon the Supreme Court's rationale in *Richardson*. This court aligns with these decisions." *Thompson*, 293 F. Supp. 3d at 1327–28 (footnote omitted).

Here, plaintiffs simply borrow their First Amendment arguments from those made in the Alabama litigation. And, like in Alabama, these arguments should be rejected. Having lost their right to vote, plaintiffs have no cognizable First Amendment interest to assert—at least not if and until their voting rights are restored. Therefore, they have no First Amendment interest on which Mississippi's "discretionary" re-enfranchisement system might be said to operate. Indeed, neither logic nor caselaw supports the proposition that the First Amendment gives back what the Fourteenth Amendment "expressly empowers" a State to take away. *See Hand*, 888 F.3d at 1207, 1209.

If it were otherwise, the Supreme Court in ***Richardson*** would have accepted rather than rejected plaintiffs' contention that "the state's abridgement of their right to vote triggered strict scrutiny." ***Shepherd***, 575 F.2d at 1113; *see* ***Richardson***, 418 U.S. at 54.  But it didn't. Thus, the addition of the First Amendment to the assortment of constitutional challenges does not carry plaintiffs where they are trying to go, and dismissal of this claim is warranted.

### C.      Plaintiffs have failed to prove a Fourteenth Amendment race discrimination claim as to Section 253.

The last attempt at challenging Section 253 also falls short. In this claim, plaintiffs contend that Section 253 violates equal protection because it was enacted with a racial intent. In ***Hunter v. Underwood***, 471 U.S. 222 (1985), the Supreme Court examined head-on an equal protection challenge to a criminal disenfranchisement provision.

In ***Hunter***, two plaintiffs, on behalf of themselves and a class of other misdemeanants, asserted an as-applied challenge to a never-modified 1901 Alabama Constitution provision that disenfranchised felons and misdemeanants "convicted of, among other offenses, 'any crime . . . involving moral turpitude.'" 471 U.S. at 223 (quoting ALA. CONST., art. VIII, § 182, alteration in original). The Supreme Court established a three-step test for analyzing race-based challenges to facially neutral disenfranchisement laws.

The plaintiffs were initially required to prove both the state constitutional provision's turn-of-the-century and present day disproportionate racial impact on misdemeanants, which they did. ***Id.*** at 227. The Court next held that challengers to a facially neutral law that produces disproportionate racial impact must prove race discrimination was a "substantial" or "motivating" factor behind the enactment using ***Village of Arlington Heights v. Metropolitan***

***Housing Development Corporation***'s evidentiary test. ***Hunter***, 471 U.S. at 228.[10] Then, if the challengers succeed, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." ***Id.***

The first two steps of ***Hunter***'s three-part test obligate plaintiffs to establish Section 253's original disenfranchising crimes caused a disproportionate racial impact in 1890 and present day. Then, they must prove racial motivation behind the enactment caused their particularized alleged constitutional injuries. They fail each step.

**Step One**. An initial shortcoming stems from ***Hunter***'s requirement to prove disproportionate impact. Proving both 1890 impact and present day impact are required. ***Hunter***, 471 U.S. at 223. Plaintiffs do neither.

For instance, in plaintiffs' complaint, they suggest that the "delegates to the 1890 Constitutional Convention were careful to establish a discretionary mechanism for restoring voting rights to Mississippi citizens convicted of disenfranchising crimes." [Dkt. 20-1 at ¶ 31]. And plaintiffs contend that the suffrage bill provision "facilitated the continued denial of voting rights to black citizens." [Id. at ¶ 33]. What plaintiffs do not do, however, is statistically prove any disproportionate impact as to Section 253 in 1890.

Also fatal to plaintiffs' claim is that there is *no* evidence as to any alleged present-day disproportionate impact. Nor do plaintiffs provide evidence that Section 253 is discriminatory in application—or that any present-day decisionmakers acted with a discriminatory purpose in applying Section 253 to a suffrage bill requested by one of the named plaintiffs. Instead, plaintiffs simply recite numbers about the voting age population of African-American citizens, as well as the

---

[10] ***Arlington Heights***' analysis looks to relevant evidence on these "non-exhaustive" factors: "(1) the historical background of the decision, (2) the specific sequence of events leading up to the decision, (3) departures from the normal procedural sequence, (4) substantive departures, and (5) legislative history, especially where there are contemporary statements by members of the decision-making body." ***Overton v. City of Austin***, 871 F.2d 529, 540 (5th Cir. 1989) (citing ***Arlington Heights***, 429 U.S. 252, 267-68 (1977)).

percentage of African-American citizens who are disenfranchised and who have completed their sentence. [Dkt. 20-1 at ¶ 123]. This proves nothing, though, as to the present-day impact of Section 253.

This is so because plaintiffs proffer no statistics vis-à-vis individuals who have requested suffrage bills versus those individuals who were or were not granted suffrage. *See id.* Plaintiffs also do not provide the race of any individuals who have requested and/or received (or failed to receive) suffrage bills. Thus, plaintiffs cannot show that Section 253 has a present-day impact, and they cannot tie any outcomes from the suffrage bill process to race.

Plaintiffs, in fact, don't even try to do this. For example, plaintiffs maintain: "The Mississippi Legislature restored voting rights to six individuals in 2017, four in 2015, three in 2014, and one in 2013. Not a single suffrage bill was passed in 2016. These fourteen Mississippians *appear to have virtually nothing in common*[.]" [Dkt. 20-1 at ¶¶ 64-65] (emphasis supplied). Plaintiffs also provide a chart outlining the year of the suffrage bill, the sponsoring legislator, the initials of the citizen, the disenfranchising offense(s) listed in the suffrage bill, the year of conviction, and the year of completion of sentence. [Dkt. 20-1 at ¶ 66].

But there is no evidence of race in plaintiffs' chart—let alone disproportionate impact related to race. That is, there is no proof that, proportionately, more Caucasians receive suffrage bills than African Americans.  And, most importantly, there is no evidence at all that Section 253 is administered present day in a racially discriminatory manner. That is fatal to plaintiffs' race-based, equal protection challenge to Section 253.

To put it simply, plaintiffs' burden on impact requires evidence. They cannot rest on their pleadings. And they have submitted no evidence on that point to date. That fails *Hunter*'s first step, and alone justifies dismissal of the claim.

**Step Two**.  If they somehow carry their impact burden, focusing on the intent element of their claim exposes more proof problems. Plaintiffs' "evidence" of intentional discrimination dates back to the original enactment of Section 253 in 1890. This evidence, though, improperly utilizes a "guilt by history" approach as to Section 253.

Basically, plaintiffs contend that Section 253 must have been enacted with a discriminatory intent because it was enacted in 1890 in Mississippi. [Dkt. 20-1 at ¶ 34] (claiming that 253 is discriminatory because such "intent permeated the 1890 Constitution in its entirety"). However, plaintiffs do not cite any contemporaneous evidence showing that racial discrimination actually motivated the adoption of that provision.

Instead, plaintiffs attempt to bypass their burden *to prove* discriminatory intent as to Section 253 by claiming that the lack of "objective and uniform criteria" *could be* evidence of such intent.  For example, in paragraph 51 of the complaint, plaintiffs maintain that Section 253's process is "*susceptible* to discrimination" and that there is "no oversight . . . *to ensure* that legislators do not exercise their discretion to vote against a proposed suffrage bill on the basis of an individual's race, religion, or political leanings." [Dkt. 20-1 at ¶ 51] (emphasis supplied).

But the risk of discrimination does not render a state law facially unconstitutional. Indeed, that risk exists whenever decisionmakers—executive, legislative, or judicial—are vested with discretion.  Thus, contending that a State's vote restoration process is "susceptible to discrimination" does not suffice under *Hunter*.

To the contrary, to make out any viable constitutional claims here, plaintiffs must affirmatively prove race motivated the 1890 framers to enact Section 253 and its legislative mechanism for vote restoration. They cannot. Consequently, even forgetting about the next 130 years, and only evaluating the 1890 decision to enact Section 253, plaintiffs' claims fail under *Hunter*'s second step.

**Step Three**.  Assuming plaintiffs could overcome these proof problems, summary judgment is still appropriate at the third step of *Hunter*. Whenever plaintiffs prevail on *Hunter*'s first two prongs, the burden shifts to the "law's defenders to demonstrate that the law would have been enacted" absent impermissible racial motivation. *Hunter*, 471 U.S. at 228. To the extent that last step ever comes into play here, the Secretary can satisfy his burden of demonstrating that the State would have enacted Section 253 absent a racial motive.

This is so because in a challenge to felon disenfranchisement laws with some nineteenth century-era origins, under *Hunter*'s framework, proving different state lawmakers subsequently endorsed the present scheme—without discriminatory motivation—may discharge the State's burden. *Johnson*, 405 F.3d at 1223-27. That is what happened in Mississippi.

For instance, Mississippi's current Election Code, first enacted in 1986, proves the point. The state's modern felon disenfranchisement laws include Section 241, as well as Code Sections 23-15-11 and 23-15-19, which together govern voter qualifications and prohibit certain convicted felons from registering to vote. In enacting the modern code provisions, lawmakers modified the State's felon disenfranchisement scheme, and the Legislative action was the product of a robust deliberative process. It changed and effectuated the State's present day disenfranchisement scheme—*and* it endorsed the re-enfranchisement scheme.

To be sure, in 1984, then-Secretary of State Molpus assembled a bipartisan, biracial Election Law Reform Task Force to undertake a comprehensive review of the State's election laws and propose election reform legislation. [Nos. 63:410-414; 64:415-417]. The Task Force's work included a review of the State's felon disenfranchisement laws. [Nos. 65:418-499; 66:500-506, 501; 67: 507-514, 507, 509; 68:515-519, 516]. When the Task Force completed its deliberations, it proposed legislation for the 1985 Regular Session.

The Legislature responded by forming study committees. [No. 69:520-55]. Prior to the 1986 Regular Session, the House committee issued a formal report, endorsed by its Senate counterpart. [No. 71:520-555].  The report's felon disenfranchisement findings included, among others, a proposal to expand the scope of disenfranchising crimes to all felonies, except "manslaughter and felonious violations of the Internal Revenue Code," and to restore suffrage to felons following completion of their sentence to reduce the Legislature's need to act on suffrage bills. [No. 71:520-555, 543-544].

Following the report, legislators introduced 1986 Senate Bill 2234 ("S.B. 2234"). [No. 72:559-561]. Throughout the deliberative legislative process, lawmakers debated and modified proposed S.B. 2234, culminating in a final conference report. [No. 73:563-566]. The report settled upon a revision of Code Sections 23-5-35 and 23-5-85, and reduced the scope of the code's felon disenfranchisement provisions.  [Nos. 73:563-566; 74:567]. And, notably, the 1986 Mississippi Legislature opted to keep the suffrage bill provision of Section 253. Thus, the 1986 Legislature endorsed the present scheme—and there is no allegation of any discriminatory motivation. *Johnson*, 405 F.3d at 1223-27.

In sum, then, while this case should never reach step three of *Hunter*, it also fails at that step if it does. Summary judgment in favor of Secretary Hosemann is proper for this reason too.

## CONCLUSION

Plaintiffs' array of constitutional challenges to the State's felon disenfranchisement and re-enfranchisement laws are all non-starters. The plaintiffs lack Article III standing. The Eleventh Amendment otherwise bars their claims. And, even if the Court reaches the merits, the claims fail at this stage too. There are thus several paths to dismissal of the suit, and this Court should follow one (or all) of them in granting summary to Secretary Hosemann.

Respectfully submitted,

**SECRETARY OF STATE DELBERT
HOSEMANN, in his official capacity**

**BY:   JIM HOOD, ATTORNEY GENERAL**

By:   ___/s/ *Krissy C. Nobile*_____
Justin L. Matheny (Bar No. 100754)
Krissy C. Nobile (Bar No. 103577)
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205
Telephone: (601) 359-3680
Facsimile: (601) 359-2003
*jmath@ago.state.ms.us*
*knobi@ago.state.ms.us*

*Counsel for Defendant Secretary of
State Delbert Hosemann, in his official
capacity*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document has been electronically filed via the Court's ECF system and thereby served on all counsel of record who have entered their appearance in this action to date.

THIS the 4th day of October, 2018.

_/s/ Krissy C. Nobile_____
Krissy C. Nobile (Bar No. 103577)