*Harness v. Hosemann*
Robert Luckett, PhD
May 21, 2018

**OPINIONS**

1. The 1890 constitutional convention in Mississippi adopted various tools of black disfranchisement such as poll taxes and literacy tests, and it added, in Section 241 of the Constitution, a list of disqualifying crimes designed to further restrict African American access to the right to vote, specifically "bribery, burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery, embezzlement or bigamy."

2. In 1950 and 1968, when the list of disqualifying crimes in Section 241 was amended, neither the resolutions in the legislature nor the voters' ballots gave those voting the option to re-enact or repeal the remaining disqualifying crimes from the original list.

3. In 1950 and 1968, the changes to the disqualifying crimes in the proposed amendments were not the subject of public discussion in the press.

4. Both the 1950 and 1968 amendments occurred during times in Mississippi of general white resistance to the civil rights movement and of ongoing racial discrimination by the state legislature.

**REPORT**

On Tuesday, August 12, 1890, white leaders in the state of Mississippi convened a constitutional convention to reinvent a system of laws that had governed the state since 1868. For over 20 years, a bi-racial coalition had ruled, and African Americans, who made up the majority of the population, played a sizable role. In the immediate aftermath of emancipation, black Mississippians debunked the racist myths about the righteousness of slavery and the proper condition of African Americans. Rather than cower in the face of freedom, black men and women reestablished and affirmed families that had been torn apart by the domestic slave trade. They built community institutions like churches, schools, and fraternal organizations. They began businesses and established farms, and, most controversially in the eyes of white southerners, they capitalized on the opportunities afforded by the Thirteenth, Fourteenth, and Fifteenth Amendments to claim American citizenship, including the right to vote.

During Reconstruction throughout the South, black men served on all levels of national, state, and local governments. A former slave, James Hill, had been Secretary of State in Mississippi. John R. Lynch, who had been born a slave in Louisiana, was elected to the U.S. House of Representatives from Mississippi's 6th district, and, in the 1870s and early-1880s, Hiram Revels and Blanche K. Bruce served in the U.S. Senate from Mississippi, two of four African Americans to serve in that body until Barack Obama's election in 2005. Black voting was essential to maintaining a precarious position in southern society, and white men recognized that in order to "redeem" their social, economic, and political power they had to control the franchise. With that in mind during this era of Redemption, white Mississippians set out to reassert control through the fraudulent and often violent use of tools like sharecropping, convict-lease, segregation, and lynching. Yet, the disfranchisement of black voters guaranteed the long-term stability of white power. Without the ability to vote, to run for office, to serve on a jury, and to elect representatives, African Americans could not do anything about the rise of Jim Crow in Mississippi, and, soon, the rest of the white South followed the example of what came to be known as the "Mississippi Plan."

Thus, when 134 delegates elected Solomon S. Calhoon as the President of the 1890 constitutional convention in Jackson, he declared that their purpose was "to effect one object": black disfranchisement. In his brief remarks, Calhoon made sure to address the "fact…that there exists here in this State two distinct and opposite types of mankind," one white and the other black. In his mind, emancipation and the rise of black political participation in the state after the Civil War had "always meant economic and moral ruin" and had "failed," whereas white "rule has always meant prosperity and happiness, and prosperity and happiness to all races." Calhoon was so convinced about the righteousness of these racial distinctions that he declared them "to be

a law of God."[1] A watershed for racist ideology and laws, this moment initiated a dark chapter in the history of American democracy.

The 1890 constitutional convention in Mississippi adopted some of the more infamous tools of black disfranchisement such as poll taxes and literacy tests, but it also added, in Section 241 of the Constitution, a set of disqualifying crimes to further restrict African American access to the right to vote, specifically "bribery, burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery, embezzlement or bigamy." In her monograph about the convention, historian Dorothy Pratt notes that the disqualifying crimes were "perceived at the time to be mainly African American problems, particularly bigamy."[2] All these disfranchising devices were crafted so that they did not openly violate the dictates of the 15th Amendment, which said the right to vote cannot be restricted based on "race, color, or previous condition of servitude." While literacy tests and poll taxes have subsequently been nullified by federal law, the list of disqualifying crimes mostly remains intact to restrict access to the ballot.

The Mississippi Supreme Court confirmed the reasoning for disfranchisement in the case of *Ratliff v. Beale* in 1896. The primary issue at stake in *Ratliff* was the question of whether the poll tax was a mandatory levee on all of Mississippi's citizens, white and black, or a tax on just those people who wanted to vote. W.T. Ratliff was the white Hinds County sheriff and tax collector. He had seized items of furniture from Ambus Beale, a black man, as payment for back, unpaid poll taxes. The argument for making the poll tax mandatory and taking assets from those who failed to pay was to enable the state to raise more money to meet the economic crisis that had been set in motion by the Civil War, but some of the framers of the 1890 Constitution were worried that forcing black Mississippians to pay the poll tax might unintentionally enfranchise them.[3]

Solomon Calhoon himself, President of the 1890 constitutional convention, defended Ambus Beale and won the case, but he was motivated by the desire to keep blacks disfranchised, not to help Beale. In the defendant's brief to the Mississippi Supreme Court, Calhoon's team argued that "'if the payment of the poll tax is made compulsory, as it will be if a voter's bed and blankets may be seized for tax, it will be but a short time before the State is again cursed with a negro majority, with all the evils and perils that follow in the train of so disastrous an event.'"[4] And, the state Supreme Court agreed and recited a racist historical lesson on the necessity of both the poll tax and the disqualifying crimes.

Openly biased, the justices argued that Reconstruction had been led by "a recently enfranchised race, unfitted by educational experience for the responsibility thrust upon it," and that that era of black empowerment "was succeeded by a semimilitary, semicivil uprising, under which the white race, inferior in number, but superior in spirit, in governmental instinct, and in intelligence, was restored to power." The Court noted the primary purpose of the 1890 convention: "Within the field of permissible action under the limitations imposed by the federal constitution, the convention swept the circle of expedients to obstruct the exercise of the franchise by the negro race." The Court insisted that black disfranchisement was justified because African Americans had characteristics that "clearly distinguished it as a race from that of the whites." Per the Court, African Americans were "a patient, docile people, but careless, landless, and migratory within narrow limits, without forethought." Beyond the poll tax, the state's justices noted that the 1890 Constitution created the specific list of disfranchising crimes since African Americans were more often "given rather to furtive offenses than to the robust crimes of the whites. Restrained by the federal Constitution from discriminating against the negro race, the convention discriminated against its characteristics and the offenses to which its

4

weaker members were prone."[5] For more than a century, those crimes have stayed consistent with the exception of two amendments to the state Constitution in 1950 and 1968.

By 1950, racial discrimination and black disfranchisement had long been the rule in the state. Between 1877 and 1950, Mississippi led the nation with 654 known lynchings, or more than one lynching every six weeks for 73 years. Although black World War II veterans like Medgar Evers began to demand the rights of American citizenship and launched what became the modern civil rights movement by the 1950s, the electorate was almost all white, and the Mississippi legislature was all white in a state that was 45% African American.[6] Rather than revoke Jim Crow laws at the time, the state's political leadership sought to extend them.

At his 1948 inauguration, Governor Fielding Wright, who was still in office two years later, claimed that the proposed federal anti-lynching, anti-poll tax, and anti-segregation legislation "aimed to wreck the South and our institutions" and called on Mississippians to "bolt" the national Democratic Party if it moved forward with efforts to pass those bills. For further emphasis, the state legislature—whose members had been elected in November 1947 and served during the 1950 session—celebrated the Governor's message and declared "that Mississippians will no longer tolerate these abuses and efforts to destroy the South and her institutions, and hereby pledge our full support to the Governor in his efforts to protect and uphold the principles, traditions, and way of life of our beloved Southland."[7]

In this context, the 1950 Mississippi legislature passed a concurrent resolution to amend Section 241 of the Constitution and put it before the voters. The first paragraph of the resolution stated: "A concurrent resolution to amend section 241 of the Mississippi Constitution of 1890 so as to provide the qualifications of electors, and amending by providing that the wife of a minister of the gospel legally residing with him shall be qualified to vote after a residence of six months

in the election district, or incorporated city or town, if otherwise qualified."[8] The ballot contained this same descriptive language.

Neither the resolution nor the actual ballot declared that burglary was being removed from the original 1890 list of disqualifying crimes. They only mentioned "the qualifications of electors" and the decreased amount of time needed for the wives of ministers to meet the residency requirement for voting. Otherwise, Section 241 was simply reproduced for voters with burglary removed and with the additional language on electors and ministers' wives. There was no notification that there was a change to the disqualifying crimes, and voters were asked to vote either "For Amendment" or "Against Amendment."[9] The amendment passed. Neither the resolution in the legislature nor the ballot gave those voting the option to re-enact or repeal the remaining disqualifying crimes from the original list.

The change to the disqualifying crimes did not appear anywhere in public discussions. In Jackson, the *Clarion-Ledger*, the state's largest newspaper and notoriously segregationist, mentioned the amendment only briefly in a handful of articles over the course of several months, and those articles referred only to the change to the residency requirements for ministers' wives.[10]

It was 1968 before the state legislature once again took steps to amend Section 241. The first paragraph of the 1968 resolution stated that it was "A concurrent resolution to amend Section 241, Mississippi Constitution of 1890 to provide for one-year residency within the State and County and a six-month residency within the election precinct to be a qualified elector; to delete certain improper parts of the Section; and for related purposes." As in 1950, the amendment changed the list of disqualifying crimes, this time to add murder and rape, but the change was not mentioned in either the resolution or on the ballot. Section 241 was reproduced

6

with murder and rape added, but nothing else alerted anyone that the change was being made. Neither the 1968 resolution in the legislature nor the ballot gave those voting the option to re-enact or repeal the original list of disqualifying crimes.[11] The amendment was submitted to the voters in the June 1968 special election and was adopted.

The amendment passed amid ongoing resistance to the civil rights movement. Despite the 1964 Civil Rights Act, public education remained starkly segregated in Mississippi until 1970. Although the Voting Rights Act had increased African American voter registration and enabled Robert Clark to be elected to the Mississippi legislature as the first African American since Reconstruction in 1967, he was the lone African American there for the next eight years. Mississippi's state and national leadership were all white, and, as the United States Supreme Court noted in 1971, "State legislatures and political party committees in Alabama and Mississippi have adopted laws or rules since the passage of the [Voting Rights Act of 1965] which have had the purpose or effect of diluting the votes of newly enfranchised Negro voters."[12] White resistance to black advancement remained the norm.

And, as in 1950, the press paid little attention to the amendment to Section 241. The few articles that discussed the amendment focused on the residency requirement and made no mention of the addition to the list of crimes. A discussion of the residency requirements is all that shows up in the *Clarion-Ledger* at the time, which did print how the new amendment was going to read and that voters would be asked to decide on the ballot if they were simply "For the Amendment" or "Against the Amendment." In reporting the results of the June 1968 election, the *Clarion-Ledger* mentioned that Charles Griffin had defeated "Negro leader Charles Evers" in a special election for the U.S. House of Representatives seat vacated by John Bell Williams, who

had been elected Governor, but nothing was said about the change to the list of disqualifying crimes.[13]

Today, the disqualifying crimes from the original list in Section 241 are the last vestiges of African American disfranchisement from the 1890 Mississippi Constitution.

*Robert Luckett* (signature)

**EXPERIENCE**
I have not previously testified as an expert witness.

**FEES**
$50/hour with a tentative cap of $5,000

---

[1] *Journal of the Proceedings in the Constitutional Convention of the State of Mississippi: Begun at the City of Jackson on August 12, 1890, and Concluded November 1, 1890.* Jackson: E.L. Martin, 1890. https://hdl.handle.net/2027/uiug.30112059675287, pp.1, 5-7, 10.
[2] *The Mississippi Constitution of 1890 as Originally Adopted*. Article 12 – Franchise, Section 241. http://mshistorynow.mdah.state.ms.us/articles/103/index.php?s=extra&id=270; Dorothy Overstreet Pratt. *Sowing the Wind: The Mississippi Constitutional Convention of 1890*. Jackson: University Press of Mississippi, 2018, p.79.
[3] Supreme Court of Mississippi. *W.T. Ratliff, Sherriff, v. Ambus Beale*. November 30, 1896. 74 Miss. 247, 20 So. 865; Pratt, *Sowing the Wind*, p.174.
[4] Pratt, *Sowing the Wind*, pp.174-175.
[5] Supreme Court of Mississippi, *Ratliff v. Beale*, 20 So. at 868.
[6] Equal Justice Initiative. *Lynching in America: Confronting the Legacy of Racial Terror*. 3rd Edition. https://lynchinginamerica.eji.org/report/; U.S. Department of Commerce. "Table 14: Race by Sex, for the State, Urban and Rural, 1950, and for the State, 1880-1940." *Census of Population – 1950 – Volume 2, Part 24: Characteristics of the Population: Mississippi*. Washington, D.C.: U.S. Government Printing Office, 1952, p.24-22.
[7] Fielding L. Wright. *Inaugural Address*. Subject Files. Mississippi Department of Archives and History (MDAH); *General Laws of the State of Mississippi,* Chapter 536. House Concurrent Resolution No. 15. January 22, 1948.
[8] *General Laws of the State of Mississippi*. Chapter 568. House Concurrent Resolution No. 10. January 26, 1950. p.959.
[9] *General Laws of the State of Mississippi.* House Concurrent Resolution No. 10, 1950, pp.959-960; State of Mississippi. *Sample Official Ballot*. General Election. November 7, 1950.
[10] "Senate to Prevent Flophouse Condition at State Hospital." *Clarion-Ledger*. February 10, 1950. p.10. www.newspapers.com/image/183276245; "Solons Leave Six Questions to Be Decided: People to Vote on Issues Left by '50 Session." *Clarion-Ledger*. April 19, 1950. p.1. www.newspapers.com/image/183271607; "Nov. 7 Elections Will Center on 3 Amendments: Congressman, Judges Also to Be Picked; Sample Ballot Out." *Clarion-Ledger*. October 22, 1950. p.1. www.newspapers.com/image/183275013; Charles M. Hills. "Affairs of State." *Clarion-Ledger*. October 26, 1950. p.10. www.newspapers.com/image/183275248; "Election." November 5, 1950. p.18. *Clarion-Ledger*. www.newspapers.com/image/183268331.

8

[11] *General Laws of the State of Mississippi*. Chapter 614. House Concurrent Resolution No. 5. March 25, 1968. pp.1074-1075; State of Mississippi. *Sample Official Ballot*. Special Election. June 4, 1968.
[12] *Perkins v. Matthews,* 400 U.S. 379, 389 (1971) (citation omitted).
[13] Kenneth Fairly. "House to Debate Annual Sessions." *Clarion-Ledger*. March 26, 1968. pp.1, 14. www.newspapers.com/image/180678829; James Bonney. "House Reaffirms Residency Decision." *Clarion-Ledger*. February 8, 1968. p.23. www.newspapers.com/image/180955838; "Senate." *Clarion-Ledger*. February 8, 1968. p.23. www.newspapers.com/image/180955838; "State Voting Requirements to Be Changed." *Clarion-Ledger*. June 1, 1968. p.15. www.newspapers.com/image/180585499; "Congressman, Bond Amendments before Voters." *Clarion-Ledger*. June 2, 1968. p.2. www.newspapers.com/image/180586107; "Annual Sessions Okayed by State." *Clarion-Ledger*. June 6, 1968. p.55. www.newspapers.com/180609219.