IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ROY HARNESS, et al.,

       Plaintiffs

v.                             Civil Action No. 3:17cv791-DPJ-FKB

DELBERT HOSEMANN, Secretary of State
of Mississippi,

       Defendant

*consolidated with*

DENNIS HOPKINS, et al,

v.                             Civil Action No. 3:18cv188-CWR-LRA

DELBERT HOSEMANN, Secretary of State
of Mississippi,

       Defendant

## <u>MEMORANDUM OF HARNESS PLAINTIFFS IN<br>SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>

*Introduction*

1.     This is a challenge to certain portions of Section 241 of the Mississippi

Constitution of 1890 that list specific crimes that were set forth in 1890 as crimes

that forever disqualify a citizen from voting.  That 1890 list of crimes is the last

remaining vestige of the infamous plan by the framers of that Constitution to rob

African-Americans of the right to vote that they attained after slavery was abolished in the aftermath of the Civil War.

2.     A number of methods of African-American voter suppression were adopted by the framers of the 1890 Constitution, including literacy tests and poll taxes.  One of those tools was contained in Section 241.  That section provided --- and still provides today --- that "[e]very inhabitant of this state, except idiots and insane persons, who is a citizen of the United States of America" and who meets the age requirement (previously 21 and now 18) and residency requirement and is duly registered "is declared to be a qualified elector" except for those who have been convicted of certain specific criminal offenses.  The offenses set forth in 1890 were those that the drafters believed were committed disproportionately by African-Americans.   As stated by the Mississippi Supreme Court six years later, the 1890 convention "swept the circle of expedience to obstruct the franchise by the negro race" by targeting "the offenses to which its weaker members were prone." *Ratliff v. Beale,* 20 So. 863, 868 (1896).

3.     The disqualifying crimes adopted as part of Section 241 in 1890 that are still in effect today are "bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement [and] bigamy."  Burglary was in the original list but was removed in 1950 by constitutional amendment.  Murder and rape were added by constitutional amendment in 1968.  This lawsuit seeks to nullify

and strike only those crimes in the original list. It does not challenge the use of murder and rape as disqualifying crimes.

4. In *Hunter v. Underwood*, 471 U.S. 222 (1985), the Supreme Court struck down as unconstitutional a portion of Section 182 of the Alabama Constitution, enacted at the 1901 Alabama Constitution, that disfranchised people convicted of crimes "involving moral turpitude." According to the Supreme Court, "the Alabama Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks," the "crimes selected for inclusion in § 182 were believed by the delegates to be more frequently committed by blacks," and the "evidence . . . demonstrates conclusively that § 182 was enacted with the intent of disenfranchising blacks." *Id.* at 227, 229.

5. In 1998, thirteen years after *Hunter,* the United States Court of Appeals for the Fifth Circuit held that "Although § 241 [of the Mississippi Constitution] was facially neutral and technically in compliance with the Fourteenth Amendment, the state was motivated by a desire to discriminate against blacks" when the provision was enacted in 1890. *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998). Accordingly, said the Fifth Circuit, "we would be bound by *Hunter*" but for the Fifth Circuit's conclusion that the 1950 and 1968 amendments constituted a "re-enactment" of the original list in § 241 by which "a majority of the voters had to approve the entire provision," and that this "re-enactment" removed the

discriminatory taint of the original version.  Accordingly, that Court held that the plaintiff had not proven § 241 to be unconstitutional.  *Id.* at 391-392.

6.     The legislative resolutions and the actual ballots from the 1950 and 1968 amendments --- which were not placed in evidence by the pro se plaintiff in *Cotton* but which are submitted with this motion --- demonstrate that the voters were asked only to vote up or down on the amendments but were not asked to decide between approving or rejecting the original list.[1] Thus, contrary to the Fifth Circuit panel's assumption based on the incomplete record in that case, the 1950 and 1968 amendments were not "re-enactments" of the original list and the outcome of this case is therefore not governed by *Cotton's* reasoning.  Instead, it is governed by *Hunter.*  As explained in the remainder of this memorandum, Section 241, like Section 182 in Alabama, was "enacted with the intent of disenfranchising blacks." *Hunter,* 471 U.S. at 229.  Like the crimes in the challenged provision in *Hunter*, the crimes in Mississippi's 1890 list "were believed by the delegates to be more frequently committed by blacks." *Id.*[2]  The outcome here should be the same as in *Hunter.*  That list must be stricken from the Mississippi Constitution and the

---

[1] Doc. 74-5 through 74-8 (1950 and 1968 resolutions and ballot language); doc. 74-2, pp. 5-7 (report of historian Dr. Robert Luckett); doc. 74-4, pp. 2-5 (Grace Sullivan declaration).  Dr. Luckett's resume has also been submitted.  Doc. 74-3.  All documents cited in this memorandum were filed with the Harness Plaintiffs' Motion for Summary Judgment.  Doc. 74.

[2] Doc 74-2, p. 2 (Luckett report).

Defendant must be enjoined from permanently disqualifying voters because they were convicted of crimes contained in that list.

*Parties*

7.      Plaintiff Roy Harness was convicted of forgery in 1986 and has completed his sentence.[3]  Earlier this year, at the age of 62, Mr. Harness completed his baccalaureate degree in Social Work from Jackson State University and was awarded a scholarship to pursue his Master's degree.  Plaintiff Kamal Karriem, a former city council member in Columbus, was convicted of embezzlement in 2005 and has completed his sentence.[4]  Mr. Karriem is a pastor and is one of the owners and operators of his family's restaurant.

8.      Defendant Delbert Hosemann is the Secretary of State of Mississippi. As such, he discharges a number of responsibilities related to voter registration and determining who is qualified to register and vote.  For example, pursuant to Miss. Code § 23-15-165, the Secretary of State maintains a statewide centralized voter registration database and insures that the registrar and election commissioners of each county receive regular reports of death, change of address, and convictions for disenfranchising crimes that apply to registered voters in each county.  The Secretary of State regularly receives a list of criminal convictions and coordinates with the

---

[3] Doc. 74-15, pp. 3-4; doc. 74-16.
[4] Doc. 74-15, pp. 3-4; doc 74-18.

counties to insure that no one convicted of one of the disfranchising crimes is allowed to register and vote.  The Secretary of State trains local election officials and assists them in carrying out their responsibilities.

*Section 241 and the 1890 Convention*

9.     As adopted in 1890, § 241 read as follows:

> Every male inhabitant of this State, except idiots, insane persons and Indians not taxed, who is a citizen of the United States, twenty-one years old and upwards, who has resided in this State two years, and one year in the election district, or in the incorporated city or town, in which he offers to vote, and who is duly registered as provided in this article, *and who has never been convicted of bribery, burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery, embezzlement or bigamy*, and who has paid, on or before the first day of February of the year in which he shall offer to vote, all taxes which may have been legally required of him, and which he has had an opportunity of paying according to law, for the two preceding years, and who shall produce to the officers holding the election satisfactory evidence that he has paid said taxes, is declared to be a qualified elector; but any minister of the gospel in charge of an organized church shall be entitled to vote after six months residence in the election district, if otherwise qualified.

(Emphasis added).[5]

10.     As mentioned previously, this otherwise quirky collection of crimes was listed in Section 241 because the 1890 framers believed them to be disproportionately committed by African-Americans and they chose to "obstruct the

---

[5] Doc. 74-4, pp. 1-2.

franchise by the negro race" by targeting "the offenses to which its weaker members were prone." *Ratliff v. Beale,* 20 So. at 868.[6]

11.     There were other provisions of the 1890 Constitution that also were designed to prevent African-Americans from voting.   For example, Section 243 required payment of a poll tax.   This poll tax requirement was later invalidated in *United States v. Mississippi,* No. 3791 (S.D. Miss. Mar. 31, 1966), which was based on *Harper v. Virginia Board of Elections,* 383 U.S. 663 (1966), and was formally repealed in 1974.   Section 244 imposed a literacy and understanding clause.   That provision was nullified by the federal Voting Rights Act of 1965 and was formally repealed in 1975.[7]

12.     Section 241's list of disenfranchising crimes was an integral part of the overall effort to prevent African-Americans in Mississippi from voting.[8] "Devices used by Mississippi to inhibit black voters include poll taxes, literacy tests, residency requirements, "good moral character" tests, *a disenfranchising crimes provision*, and white primaries."   *Mississippi State Chapter, Operation PUSH v. Mabus,* 932 F.2d 400, 402 (5th Cir. 1991) (emphasis added).

13.     The evidence of discriminatory purpose surrounding the adoption of the list of disqualifying crimes in 1890 is undisputed.

_____

[6] Doc. 74-2, pp. 2-4.
[7] Doc. 74-2, p. 3, 8.
[8] *Id.*

*The 1950 and 1968 Amendments to Section 241*

14.    In 1950, the Mississippi legislature passed a resolution to amend Section 241 for multiple purposes, including the removal of burglary from the list of disqualifying crimes.  The first paragraph of the resolution stated: "A concurrent resolution to amend Section 241 of the Mississippi Constitution of 1890 so as to provide the qualifications of electors, and amending by providing that the wife of a minister of the gospel legally residing with him shall be qualified to vote after a residence of six months in the election district, or incorporated city or town, if otherwise qualified."  The resolution then stated that the Legislature resolved "[t]hat the following amendment to the Constitution of the State of Mississippi be submitted to the qualified voters of the State for ratification or rejection . . . viz: Amend section 241 of the constitution of the State of Mississippi, so that it shall read as follows . . . ."  The text of the proposed Section 241 was then listed without the crime of burglary included.  Miss. Laws 1950 Ch. 569, H. Con. R. 10.[9]

15.    The November 1950 ballot contained the exact same language as the resolution and was followed by two options from which the voter could select.  "For Amendment" or "Against Amendment."  At no point did the legislative resolution or the ballot state that the amendment would affect the list of disqualifying crimes or that it would remove burglary from the list.  While burglary was not included in

---

[9] Doc. 74-4, pp. 2-3; doc. 74-5.

the list, neither the resolution nor the ballot explained that it previously was on the list.   More importantly, neither the resolution nor the ballot gave legislators and voters the option of choosing whether to retain or repeal the remainder of the original 1890 list of disqualifying crimes.[10]

16.    In 1968, the Mississippi legislature passed a resolution to amend Section 241 for multiple purposes, including the addition of murder and rape as disqualifying crimes.   The first paragraph of the resolution stated: "A concurrent resolution to amend Section 241, Mississippi Constitution of 1890, to provide for one-year residency within the State and County and a six-month residency within the election precinct to be a qualified elector; to delete certain improper parts of the Section; and for related purposes."   The resolution then stated that the Legislature resolved "[t]hat the following amendment to the Constitution of the State of Mississippi be submitted to the qualified voters of the State for ratification or rejection . . . viz: Amend section 241 of the constitution of the State of Mississippi, so that it will read as follows: . . . . "   The text of the proposed Section 241 was then listed with the crimes murder and rape included.   The resolution also instructed the Secretary of State to place the resolution on the ballot.   Miss. Laws 1968 Ch. 614, H. Con. R. 5.[11]

---

[10] Doc. 74-4, pp. 2-3; doc. 74-5, 74-6.
[11] Doc. 74-4, pp. 8-9; doc. 74-7.

17.    The June 1968 ballot contained the exact same language as the resolution and was followed by two options from which the voter could select.  "For the Amendment" or "Against the Amendment."   At no point did the legislative resolution or the ballot state that the amendment would affect the list of disqualifying crimes or that it would add murder and rape to the list.  While murder and rape were included in the list, neither the resolution nor the ballot explained that they were not previously on the list.  More importantly, neither the resolution nor the ballot gave legislators and voters the option of choosing whether to retain or repeal the other crimes on the list which were part of the original 1890 provision.[12]

18.    Accordingly, in passing the 1950 and 1968 amendments, neither two-thirds of the legislature nor a majority of the voters had to approve the entirety of Section 241 or the list of crimes that were originally included in it.  They only had to approve the amendments by voting "for the amendment[s]."  Even then, the amendments were not explained to them.  These votes were not re-enactments of Section 241.

19.    Moreover, the amendments to the list were not the subject of discussion in the media.  While there were several articles in the daily *Clarion-Ledger* in both 1950 and 1968 about proposed constitutional amendments, the only discussion in those articles regarding amendments to Section 241 related to the proposed

---

[12] Doc. 74-4, pp. 4-5; Doc. 74-8.

residency requirement for ministers' wives in 1950 and the proposed change in the

general residency requirement in 1968.  There was no mention in those articles about

the list of disqualifying crimes from 1890 or any changes to it.[13]

20.    The foregoing facts about the 1950 and 1968 amendments are

undisputed.

### Cotton v. Fordice

21.    *Cotton v. Fordice* was a challenge to Section 241 filed in 1996 by two

prisoners at the Mississippi State Penitentiary at Parchman who represented

themselves:  Jarvious Cotton and Keith Brown.   On March 18, 1997, the United

States Magistrate Judge issued a report and recommendation stating that summary

judgment should be granted for the State Defendants.  The Magistrate said that the

plaintiffs' claim that the 1890 constitutional convention targeted crimes that the

framers believed African-Americans were prone to commit was "purely speculation

and conjecture" and that "[t]he Plaintiffs present absolutely no proof that these facts

are true." *Cotton v. Fordice,* No. 3:96cv141BN (S.D. Miss.  March 18, 1997) Report

& Rec. at p. 5.  Nothing in the report and recommendation referred to the 1950 and

1968 amendments to Section 241.[14]   The plaintiffs filed objections to the report and

recommendation.  On April 7, 1997, the District Judge overruled the objections,

---

[13] Doc. 74-2, pp. 6-8.
[14] Doc.  74-9 (Magistrate's R&R).

adopted the report and recommendation, and entered summary judgment for the State Defendants in a two-page order. The order did not mention the 1950 and 1968 amendments to Section 241.[15]

22. The plaintiffs appealed the District Court's decision in *Cotton*. However, Jarvious Cotton's appeal was severed and dismissed because of issues relating to prior cases and whether he qualified to proceed *in formal pauperis* in the appeal. Nevertheless, both Brown and Cotton listed their names as lay counsel for Brown in the Fifth Circuit briefing. Neither Brown's brief or reply brief in the Fifth Circuit mentioned the 1950 or 1968 amendments to Section 241. The State Defendants' Fifth Circuit brief did not mention them either except to say following after quoting from *Ratliff v. Beale*: "At the time *Ratliff* was written, Section 241, read quite differently than it does today. One of the most important amendments that concerns this matter is the crimes which result in disenfranchisement upon conviction. The original 1890 version of Section 241 disenfranchised bribery, burglary, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement and bigamy. Section 241, as it reads today, also includes murder and rape, but does not mention burglary. The present inclusion of the violent crimes of murder and rape and the deletion of burglary makes *Ratliff* inapplicable to Section 241 as it reads today. Cotton and Brown's argument that the discriminatory

---

[15] Doc. 74-10 (District Court order).

effect Section 241 may have had when it was enacted over one hundred years ago makes the section unconstitutional today is without merit." *Cotton v. Fordice,* No. 97-60275 (5th Cir.), Brief for Appellees at p. 10.[16]

23.    A Fifth Circuit panel affirmed the grant of summary judgment.  After citing *Ratliff,* the panel said: "Although § 241 was facially neutral and technically in compliance with the Fourteenth Amendment, the state was motivated by a desire to discriminate against blacks."  157 F.3d at 391.  The opinion continued: "Were this the end of the story, we would be bound by *Hunter* [*v. Underwood,* 471 U.S. 222 (1985)], which, construing an Alabama provision of similar age and intent, held it violative of equal protection. *Hunter*, however, left open the possibility that by amendment, a facially neutral provision like § 241 might overcome its odious origin. That is what has happened here."   157 F.3d at 391 (footnote omitted).  The opinion went on the state that burglary was removed in 1950, that murder and rape (which were not considered "black" crimes in 1890) were added in 1968, that the amendments were "a deliberative process," that two-thirds of each house had to approve them to put them on the ballot, that the Secretary of State was required to publish a full text version of the proposed revised provision within two weeks of the election, and that "a majority of the voters had to approve the entire provision,

---

[16] Doc. 74-11 (Fifth Circuit briefs); Doc. 74-4, pp. 5-6 (Sullivan declaration describing her review of the Fifth Circuit briefs).

including the revision." *Id.* "Because Mississippi's procedure resulted both in 1950 and 1968 in a re-enactment of § 241, each amendment superseded the previous provision and removed the discriminatory taint associated with the original version." *Id.* (footnote omitted).

24.     Neither the ballot language nor the language of the concurrent legislative resolutions were introduced into the record in *Cotton v. Fordice* or discussed in the briefs or the opinion.[17]  As stated earlier in this Complaint, neither the ballot language nor the language of the resolutions explained that the amendments would affect the list of disqualifying crimes, much less explain how they would affect it.  More importantly, neither the resolutions nor the ballots gave legislators and voters the option of re-enacting or repealing the remainder of the original list of disqualifying crimes.

25.     Thus, as mentioned previously, in both 1950 and 1968, neither two-thirds of the legislature nor a majority of the voters had to approve the entirety of Section 241 or the list of crimes that were originally included in it.  At most, they had to approve the amendments by voting "for the amendment[s]" and even those were not explained to them.  These votes were not re-enactments of Section 241. The Fifth Circuit's language regarding a "re-enactment" was not based on a record, briefing, or argument that addressed the issue.

---

[17] Doc. 74-4, p. 6 (Sullivan declaration, discussing her review of the record and the briefs and opinions).

26.     The foregoing facts about the record, briefs, and orders in *Cotton v. Fordice* are undisputed.

27.     This is a different case from *Cotton* because the record is different and the evidence is different.  Accordingly, the decision in *Cotton* is not controlling here. Moreover, the Supreme Court has clarified *Hunter* since *Cotton* was decided, and this clarification demonstrates that *Cotton* is not controlling.  In *Abbott v. Perez,* 138 S. Ct. 2305 (2018), the Supreme Court explained its earlier decision in *Hunter:*

> *Hunter* involved an equal protection challenge to an article of the Alabama Constitution adopted in 1901 at a convention avowedly dedicated to the establishment of white supremacy. . . . The article was never repealed, but over the years, the list of disqualifying offenses had been pruned, and the State argued that what remained was facially constitutional.  This Court rejected that argument because the amendments did not alter the intent with which the article, including the parts that remained, had been adopted.  But the Court specifically declined to address the question whether the then-existing version would have been valid if "re-enacted today."

*Abbott,* 138 S. Ct. at 2325 (citations omitted).  Thus, *Abbott* confirmed that *Hunter* drew a distinction between "amendments that did not alter the intent" and "re-enactments."  The Court in *Cotton* did not have the benefit of this clarification from *Abbott* and, more importantly, did not have the benefit of the evidence presented here that the 1950 and 1968 amendments were not re-enactments.   The 1950 and 1968 amendments left intact all of the disfranchising crimes from the original 1890 list except one, and did not alter the intent with which the 1890 list of had been adopted.  This case is controlled by *Hunter* and the outcome should be the same.

*Discriminatory Intent*

28.    To summarize, the list of disqualifying crimes adopted in 1890 that remains in § 241 today (with the exception of burglary) was chosen by the 1890 framers with the intent to discriminate against African-Americans and prevent them from voting.  It is a vestige of the doctrine of white supremacy.  Nothing in any subsequent amendment to § 241 "re-enacted" or "approved" that list or removed the discriminatory taint of the original provision.

29.    Alternatively, even if the 1950 and 1968 amendments somehow had "re-enacted" or "approved" the original list, those amendments deliberately maintained a discriminatory provision of the 1890 constitution that has always been recognized as having been adopted for the purpose of preventing black people from voting.  Moreover, the 1950 amendment was adopted when the legislature was all-white and the electorate was almost all-white.[18]  Although burglary was removed, the rest of the list remained intact without change.  The 1968 amendment was adopted when there was only one black member of the Mississippi legislature.  The only reason he was there, and the only reason the electorate included some black voters, was the passage by the United States Congress of the Voting Rights Act of

---

[18] Doc. 74-2, p. 5.

1965.[19]   While murder and rape were added, the 1968 amendment did not change the rest of the list.

30.     The 1950 and 1968 amendments occurred in times of extensive racial discrimination and massive resistance by all levels of Mississippi government, and by most of the white populace, to desegregation.  In 1950, Pauli Murray published her extensive survey, *States Laws on Race and Color* (1950) (Davison Douglas ed., reprint 1997), which documented Mississippi's laws requiring segregation throughout society, including in hospitals, railway, prisons, schools (including the school for the blind).  As the Fifth Circuit stated in 1963:  "[T]he State of Mississippi has a steel-hard, inflexible, undeviating official policy of segregation.  The policy is stated in its laws.  It is rooted in custom."  *United States v. City of Jackson,* 318 F.2d 1, 5 (5th Cir. 1963).  As late as 1973, the "Mississippi highway patrol has never in its history employed a member of the Negro race as a sworn officer."  *Morrow v. Crisler,* 479 F.2d 960, 961-961 (5th Cir. 1973).  The Supreme Court noted in 1971 that "State legislatures and political party committees in Alabama and Mississippi have adopted laws or rules since the passage of the [Voting Rights Act of 1965] which have had the purpose or effect of diluting the votes of newly enfranchised Negro voters."  *Perkins v. Matthews,* 400 U.S. 379, 389 (1971) (citation omitted).[20]

---

[19] Doc. 74-2, p. 7.
[20] Doc. 74-2, pp. 5-7.  This resistance to change and its relevance to the Fifth Circuit's *Cotton* holding is discussed in Gabriel J. Chin, *Rehabilitating Unconstitutional Statutes:  An Analysis of Cotton v. Fordice,* 71 U. of Cinn. L. Rev. 421, 440-452 (2002).

31.    Consistent with this resistance to racial equality, the legislatures that sat in 1950 and 1968 failed to repeal the extensive structure of discriminatory legislation that existed and took steps to add to it.  For example, the 1950 legislature (which was elected in 1947 and held sessions in 1948 and 1950) passed legislation to fortify segregation in secondary education, higher education, prisons, reform schools, and 4-H clubs for young people.  It also passed a number of resolutions in defense of racial discrimination.  Soon after that legislature was elected in 1947, Governor Fielding Wright claimed in his inaugural address that proposed federal anti-lynching, anti-poll tax, and anti-segregation legislation "aimed to wreck the South and our institutions" and called on Mississippians to "bolt" the national Democratic Party if it moved forward with efforts to pass those bills.  The Mississippi legislature then passed a resolution praising Wright's inaugural address and stating the legislators "join the Governor in the warning given to leaders of the National Democratic Party and to the nation, that Mississippians will no longer tolerate these abuses and efforts to destroy the South and her institutions, and hereby pledge our full support to the Governor in his efforts to protect and uphold the principles, traditions, and way of life of our beloved Southland."   Miss. Laws 1948 Ch. 536, H. Con. R. 15.[21]  That legislature subsequently passed a resolution expressing vigorous "opposition to recommendations of the President's Civil Rights

---

[21] Doc. 74-2, p. 5.

Committee", which had proposed a federal anti-lynching law, anti-poll tax measures, and a permanent Fair Employment Practices Commission, claiming those recommendations would lead to the "subjugation of the majority to the demands of various minority groups, and not least among these recommendations, certain ones whose effect would be to deprive the states of their rights with regard to suffrage and elections laws." Miss. Laws 1948 Ch. 541, H. Con. R. 22.

32.     Resistance to change was also the theme of the Mississippi legislature in the years after the 1964 Civil Rights Act and the 1965 Voting Rights Act.[22] "Mississippi, which was one of the leaders of the black disfranchisement movement in the South with the 'Mississippi Plan' of 1890, once again led the way  with the black vote dilution strategy developed and implemented in Mississippi's massive resistance legislative session in 1966.  Before the session ended, the all-white state legislature enacted thirteen major pieces of legislation which racially altered Mississippi's election laws and made it more difficult for black candidates to get elected and for the newly enfranchised black voters to gain representation of their choice." Frank R. Parker, *Black Votes Count* p. 36 (1990).

33.     Many of the legislators in the 1966 session were re-elected in 1967 and served in the session in 1968.  In many ways, they maintained the discrimination of the past.  For example, during the 1968 session, they amended yet maintained many

---

[22] Doc. 74-2, p. 7.

of the discriminatory laws passed in 1966, including provisions allowing counties to switch from district to at-large elections of county boards of supervisors and to switch from elected to appointed school superintendents.   Similarly, the 1968 legislature amended a 1964 law authorizing the State to provide financial tuition assistance to students attending private schools by increasing the amount of assistance available to each private school student.   That law was struck down in 1969 because "[t]he statute, as amended, encourages, facilitates, and supports the establishment of a system of private schools operated on a racially segregated basis as an alternative available to white students seeking to avoid desegregated public schools."   *Coffey v. State Educational Finance Commission,* 296 F. Supp. 1389, 1393 (S.D. Miss. 1969) (three-judge court).

34.     In many ways, both the 1950 and 1968 legislatures maintained the racial discrimination of the past and did so intentionally. The failure of the legislature to repeal the discriminatory 1890 disfranchising crimes list except for burglary in 1950, and the failure of the legislature to repeal any of the discriminatory list in 1968, was the result of intentional discrimination.   As mentioned previously, the 1950 electorate was almost all-white.   The 1968 electorate contained some African-Americans, but the white majority almost uniformly refused to vote for African-American candidates, and therefore could not be relied upon to support ballot measures that would lessen racial discrimination.   "[B]arriers to black electoral

success [in the 1967 state and local elections] included racial bloc voting by whites, who generally refused to vote for black candidates."  Parker, *Black Votes Count* p. 76.

35.    The 1950 and 1968 amendments did not remove the discriminatory taint from the actions of the 1890 constitutional convention.  The en banc Fifth Circuit's pronouncement regarding redistricting cases in *Kirksey v. Hinds County Board of Supervisors,* 554 F.2d 139, 142 (5th Cir. 1977) (en banc), *cert denied* 404 U.S. 968 (1977) is also applicable here:

> Where a plan, though itself racially neutral, carries forward intentional and purposeful discriminatory denial of access that is already in effect, it is not constitutional. Its benign nature cannot insulate the redistricting government entity from the existent taint. If a neutral plan were permitted to have this effect, minorities presently denied access to political life for unconstitutional reasons could be walled off from relief against continuation of that denial. The redistricting body would only need to adopt a racially benign plan that permitted the record of the past to continue unabated. Such a rule
> would sub silentio overrule *White v. Regester*. It would emasculate the efforts of racial minorities to break out of patterns of political discrimination.

*Id.* at 146-147.  The Court in *Kirksey* noted the decisions in *Washington v. Davis* and in *Arlington Heights* requiring proof of discriminatory intent, but reasoned that "nothing in these cases suggests that, where purposeful and intentional discrimination already exists, it can be constitutionally perpetuated into the future by neutral official action." *Id.* at 148.   In the present case, only one of the crimes contained in the 1890 list has been removed (burglary in 1950) and only two have been added (murder and rape in 1968, which are not challenged here).   Those

amendments were adopted during a time of extensive official racial discrimination. The voters had no option of either adopting or rejecting the original discriminatory list in its entirety.   Under these circumstances, the current version of Section 241 continues to carry forward the discrimination from 1890 and the continuing use of the original list violates the Constitution.[23]

### Application of Section 241

36.    The Secretary of State has deemed certain specific offenses to fall within the umbrella of the crimes described in Section 241.  People convicted of those subsidiary crimes are also disfranchised and are not allowed to vote.[24]

### Discriminatory Impact

37.    In *Hunter v. Underwood,* the Supreme Court noted that the Eleventh Circuit in that case had "implicitly found the evidence of discriminatory impact indisputable."  471 U.S. at 227.  The Supreme Court quoted the Eleventh Circuit: "The disparate effect persists today.  In Jefferson and Montgomery Counties blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement under Section 182 for the commission of nonprison offenses."  *Id., quoting Underwood v. Hunter,* 730 F.2d 614, 620 (11th Cir. 1984).  The Supreme

---

[23] In *Cotton,* the pro se plaintiffs presented no evidence regarding the climate in which the 1950 and 1968 amendments were adopted, 157 F.3d at 392, and did not cite *Kirksey* or its principles in the Fifth Circuit briefing.  *See* Doc. 74-11.  The record and briefing are different here and the en banc decision in *Kirksey* controls.

[24] Doc. 74-13, p. 2 (expert statistical report of Matthew A. Williams).

Court in *Hunter* did not address whether it is *necessary* to prove discriminatory impact in addition to the blatant discrimination that motivated the Alabama disfranchisement provision in 1901.  But the Court held that where intent and effect exist in combination --- where "the original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect" --- the enactment violates the Equal Protection Clause.  471 U.S. at 233.

38.     Just as the Supreme Court said the Eleventh Circuit had found the evidence of discriminatory impact "indisputable" in *Hunter,* it is also indisputable here.  The disqualification in Mississippi of people convicted of the crimes that were listed in Section 241 in 1890 and that remain in Section 241 today has a statewide discriminatory impact that exceeds the impact in *Hunter*.   Census data estimates from 2011-2015 show that 36% of Mississippi's population 18 and over is African-American.   However, approximately 59% of the people convicted of those disqualifying crimes in the Mississippi state courts between 1994 and the present are African-American.   African-American adults in Mississippi are 2.7 times more likely than white adults to be convicted of one of these disfranchising crimes.[25]

39.     The foregoing facts regarding impact are undisputed.

---

[25] Doc. 74-12, ¶¶ 1-5 (declaration of statistical expert Matthew Williams).  Mr. Williams' additional report and resume were also submitted.  Docs 74-13 and 74-14

*Violation*

40.   In light of the foregoing, the undisputed facts demonstrate that the disqualification of Mississippians from voting based on convictions for "bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy," and all subsidiary crimes that have been determined to fit within those terms for purposes of disenfranchisement, is a violation of the Equal Protection clause of the Fourteenth Amendment to the United States Constitution.

*Removing the 1890 Discrimination from Section 241*

41.   At present, Section 241 reads as follows:

> Every inhabitant of this state, except idiots and insane persons, who is a citizen of the United States of America, eighteen (18) years old and upward, who has been a resident of this state for one (1) year, and for one (1) year in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city or town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector, except that he shall be qualified to vote for President and Vice President of the United States if he meets the requirements established by Congress therefor and is otherwise a qualified elector.

In order to remove the unconstitutional 1890 discrimination from Section 241, the words "bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy," which were in the original 1890 version, must be nullified so that they no longer have any force or effect.  The Court should issue declaratory relief and the Defendant, his agents, and all acting in concert with him

should be enjoined from preventing people convicted of those crimes from voting. The disqualifying crimes that remain will be murder and rape.

*Conclusion*

For the foregoing reasons, and on the basis of the authorities cited, the Harness Plaintiffs Motion for Summary Judgment should be granted.

October 4, 2018

Respectfully submitted,

*s/ Robert B.  McDuff*

BETH L. ORLANSKY, MSB 3938
JEREMY EISLER, MSB 5493
MISSISSIPPI CENTER FOR JUSTICE
P.O. Box 1023
Jackson, MS 39205-1023
(601) 352-2269
borlansky@mscenterforjustice.org
jeisler@mscenterforjustice.org

ROBERT B. MCDUFF, MSB 2532
767 North Congress Street
Jackson, MS 39202
(601) 969-0802
rbm@mcdufflaw.com

DAVID M. LIPMAN, MSB 1272
THE LIPMAN LAW FIRM
5915 Ponce de Leon Blvd.
Suite 44
Coral Gables, Florida 33146
(305) 662-2600
dmlipman@aol.com

FRED L. BANKS JR, MSB 1733
PHELPS DUNBAR
P.O. Box 16114
Jackson, MS 39236-6114
(601) 352-2300
fred.banks@phelps.com

ARMAND DERFNER
DERFNER & ALTMAN
575 King Street, Suite B
Charleston, SC  29403
(804) 723-9804
aderfner@derfneraltman.com
*admitted pro hac vice*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Robert B. McDuff, hereby certify that on October 4, 2018 I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of such filing to all counsel of record.

s/Robert B. McDuff