UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ROY HARNESS, ET AL.                                          PLAINTIFFS

V.                                    CIVIL ACTION NO. 3:17-CV-791-DPJ-FKB

DELBERT HOSEMANN, SECRETARY OF STATE
OF MISSISSIPPI                                               DEFENDANT

CONSOLIDATED WITH

DENNIS HOPKINS, ET AL.                                       PLAINTIFFS

V.                                    CIVIL ACTION NO. 3:18-CV-188-DPJ-FKB

DELBERT HOSEMANN, SECRETARY OF STATE
OF MISSISSIPPI                                               DEFENDANT

ORDER

Plaintiffs seek an order restoring the voting rights of convicted felons in Mississippi.  The

parties have all moved for summary judgment, contending that there are no disputed facts.  [63,

65, 66, 74].  As discussed more fully below, both the United States Supreme Court and the Fifth

Circuit Court of Appeals have rejected Plaintiffs' pivotal legal arguments as to article XII,

section 241 of the Mississippi Constitution.  While those courts may be free to reassess their

prior rulings, the precedent is binding at the district-court level.  For that and other reasons,

Plaintiffs' motions [65, 74] are denied and Defendant's motions [63, 66] are granted as to

disenfranchisement under section 241.  As to section 253, which restores the right to vote, the

Court finds the relevant motions [65, 66] should be denied.

I.    Facts and Procedural History

        Two groups of convicted felons filed separate suits seeking to regain the right to vote.
The lead plaintiffs in those cases were Roy Harness and Dennis Hopkins.  The Court
consolidated the cases on June 28, 2018, and then certified a class action on February 26, 2019.

        Plaintiffs challenge two sections of article XII of the Mississippi Constitution—sections
241 and 253.  Section 241 provides that individuals who have been "convicted of murder, rape,
bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery,
embezzlement[,] or bigamy" are ineligible to vote.  And section 253 allows the legislature to
restore an individual's suffrage by "a two-thirds vote of both houses, of all members elected."

        The Harness Plaintiffs focus their complaint on section 241, arguing that it violates the
Fourteenth and Fifteenth Amendments because the disenfranchising crimes that remain from the
section's 1890 version were adopted to suppress black voters.  Harness Am. Compl. [19] at 19–
20.  They seek declaratory relief enjoining Secretary of State Delbert Hosemann from taking any
steps that would prevent voting by Mississippians convicted of bribery, theft, arson, obtaining
money or goods under false pretense, perjury, forgery, embezzlement, and bigamy.  *Id.* at 21.[1]

        The Hopkins Plaintiffs challenge both sections 241 and 253 and take a different
approach.  They say lifetime disenfranchisement (section 241) violates the Eighth Amendment's
prohibition against cruel and unusual punishment and exceeds § 2 of the Fourteenth Amendment,
which allows states to merely "abridge" a felon's voting rights.  Hopkins Compl. [1] at 4–5 (filed
in 3:18-CV-188-DPJ-FKB).  As to section 253 (the restoration provision), the Hopkins Plaintiffs

---

[1] The Harness Plaintiffs do not challenge disqualification based on murder and rape convictions.
*Id.* at 2.

argue that it violates both the First Amendment, by hampering political expression, and the Equal Protection Clause, because it is arbitrary and was enacted with discriminatory intent.  *Id.*

II.      Summary Judgment Standard

Each party seeks summary judgment.  That relief is warranted under Federal Rule of Civil Procedure 56(a) when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little*, 37 F.3d at 1075; *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993).

III.    Article III Standing and Eleventh Amendment Immunity

    In his motions for summary judgment, Hosemann first raises concerns over Article III

standing and Eleventh Amendment immunity.  Under both approaches, Hosemann questions his

connection to sections 241 and 253.  As to section 241, he insists that local election officials

have the duty and authority to register, refuse, and purge voters.  And as to section 253, he

maintains that only the legislature can act to restore voting rights. [2]

        A.    Legal Standards

    To establish an Article III case or controversy, Plaintiffs must show:  (1) they have

suffered an "injury in fact," (2) there is a "causal connection between the injury and the conduct

complained of," and (3) "the injury will be 'redressed by a favorable decision.'"  *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quoting *Simon v. E. Ky. Welfare Rights*

*Org.*, 426 U.S. 26, 38 (1976)).  "The party invoking federal jurisdiction bears the burden of

establishing these elements."  *Id.* at 561.  Hosemann concedes that Plaintiffs meet the first

element but says they cannot establish a causal connection or redressability.  *See Rivera v.*

*Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002) (noting that a failure to establish any one

element deprives the court of jurisdiction).

    In addition, Hosemann asserts Eleventh Amendment immunity and argues that the *Ex*

*parte Young* exception is inapplicable.  209 U.S. 123 (1908).  Under *Ex parte Young*, a state

officer can be sued in federal court despite the Eleventh Amendment, if that officer has "'some

connection with the enforcement of the act' in question or [is] 'specially charged with the duty to

---

[2] While Article III standing and Eleventh Amendment immunity are distinct concepts, there is
significant overlap.  *See* Hopkins Resp. Mem. [78] at 20–21 (citing *Air Evac EMS, Inc. v. Tex.,*
*Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017)); *see also* Def.'s
Rebuttal [86] at 5 (stating "plaintiff's [s]ection 241 claims against the Secretary fail under Article
III and/or the Eleventh Amendment").

4

enforce the statute' and [is] threatening to exercise that duty." *Okpalobi v. Foster*, 244 F.3d 405, 414–15 (5th Cir. 2001) (quoting *Ex parte Young*, 209 U.S. at 157, 158).  With these standards in mind, the Court considers sections 241 and 253 separately.

B.      Section 241

Hosemann says he does not enforce section 241, does not investigate or prosecute violations of election laws, does not supervise local election officials, lacks the authority to prohibit felons from registering to vote, and has no duty to remove felons from the voter rolls. Def.'s Mem. [64] at 6.  But Plaintiffs argue that Hosemann's responsibilities under state law—particularly the administration of the computerized Statewide Elections Management System ("SEMS")—and his designation as the state's chief election officer under the National Voter Registration Act of 1993 ("NVRA") provide enough basis for Article III standing and trigger the *Ex parte Young* exception to Eleventh Amendment immunity.

Under state statute, "[t]he circuit clerk of each county is authorized and directed to prepare and keep in his or her office a full and complete list . . . of persons convicted of voter fraud or of any crime listed in Section 241, Mississippi Constitution of 1890."  Miss. Code § 23-15-151.  But the statute goes on to provide that a list of persons convicted of a disenfranchising crime "shall also be entered into [SEMS] on a quarterly basis."  *Id.*  SEMS is maintained by the Secretary of State and is considered "the official record of registered voters in every county of the state."  *Id.* § 23-15-165(1).

Hosemann explains that "the Administrative Office of Courts provides data regarding criminal convictions which is filtered to only include individuals with a conviction of a disenfranchising crime before being loaded into [SEMS]."  Hosemann Resp. to Hopkins Interrogs. [63-1] at 44.  Then SEMS "provides potential match reporting regarding individuals

convicted of a disenfranchising crime and county election officials are trained to only take action upon review of a final sentencing order entered by a court." *Id.* at 49.  That training is provided by Hosemann.  *See id.* at 48 ("The Secretary of State provides training annually to county election commissioners regarding voter roll maintenance in accordance with Mississippi law and the National Voter Registration Act."); *see also* Miss. Code § 23-15-211(4) (stating Hosemann is responsible for conducting and sponsoring an "elections seminar" attended by county election commissioners).  In other words, Hosemann receives information regarding disenfranchising convictions, adds that information to SEMS, and trains county officials on the next step.

In addition, Hosemann is Mississippi's "chief election officer" for purposes of the NVRA, Miss. Code § 23-15-211.1(1), and has "the power and duty to gather sufficient information concerning voting in elections in this state," *id.* § 23-15-211.1(2); *see also* 52 U.S.C. § 20509 ("Each State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities under this chapter.").  And while this civil action is not rooted in the NVRA, several courts have held that the designation of "chief election officer" militates in favor of finding Article III standing in various election-law contexts.  *See OCA-Greater Hous. v. Texas*, 867 F.3d 604, 613–14 (5th Cir. 2017) (finding Article III standing, noting that the statute at issue applied to every election, and observing that the Texas Secretary of State was the chief election officer of the state); *Scott v. Schedler*, 771 F.3d 831, 838–39 (5th Cir. 2014) (finding Article III standing and noting the Secretary of State was the chief election officer under the NVRA); *Voting for Am., Inc. v. Andrade*, 888 F. Supp. 2d 816, 828–29, 832 (S.D. Tex. 2012) (Costa, J.) (denying Secretary's motion to dismiss for lack of standing and noting that her "argument is at odds with numerous cases in which plaintiffs have sued secretaries of state when challenging voter registration laws even though states commonly

delegate voter registration responsibilities to county officials"), *rev'd on other grounds*, 732 F.3d 382; *see also United States v. Missouri*, 535 F.3d 844, 846 n.1 (8th Cir. 2008) (finding that the Missouri Secretary of State was the proper party to be sued under the NVRA even though enforcement power was delegated to local officials); *Madera v. Detzner*, 325 F. Supp. 3d 1269, 1276 (N.D. Fla. 2018) (noting the Secretary of State was Florida's chief election officer and "[t]his statutory job description is not window dressing"). [3]

Based on these duties, Plaintiffs' injuries are sufficiently traceable to and redressable by Hosemann to establish Article III standing.  While he may not be the only step in disenfranchising a voter, he certainly plays a crucial role in the process.  *Compare K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) (finding redressability was met even though the defendant was "far from the sole participant in the application of the challenged statute"), *with Okpalobi*, 244 F.3d at 427 (finding no standing where the state officers did not have "*any duty or ability to do anything*" in connection with the law at issue (emphasis added)).

Likewise, for purposes of Eleventh Amendment immunity, Hosemann has "some connection" with enforcement of section 241, particularly in his role as chief election officer and administrator of SEMS.  *Ex parte Young*, 209 U.S. at 157; *see Mo. Prot. & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007) (denying immunity in action challenging voter disqualification as "incapacitated" and noting that while local election officials had authority to register voters, the Secretary of State was charged with providing local officials of individuals deemed incapacitated); *Libertarian Party of Ky. v. Grimes*, 164 F. Supp. 3d 945, 950 (E.D. Ky. 2016) (finding *Ex parte Young* exception applied where Secretary of State provided training to

---

[3] Hosemann also serves on the three-person State Board of Election Commissioners alongside the Governor and the Attorney General.  Miss. Code § 23-15-211(1).

7

county clerks and therefore had "some control over the perpetuation of the ballot access regime the [p]laintiffs challenge[d]").[4]

C.    Section 253

Section 253 presents a much closer question.  It provides:  "The Legislature may, by a two-thirds vote of both houses, of all members elected, restore the right of suffrage to any person disqualified by reason of crime; but the reasons therefor shall be spread upon the journals, and the vote shall be by yeas and nays."  Miss. Const. art. XII, § 253.  The Hopkins Plaintiffs ask the Court to "[i]ssue a class-wide judgment declaring that the inherently arbitrary and racially discriminatory legislative process for the restoration of voting rights established by the suffrage bill provision of the Mississippi Constitution violates the Equal Protection Clause of the Fourteenth Amendment, as well as the First Amendment."  Hopkins Compl. [1] at 47.

Hosemann says he has no connection to or role in the restoration process:  he is not a member of the legislature, he does not introduce suffrage bills, and he does not vote on such bills.  *See* Miss. Const. art. XII, § 253; *see also* Hopkins Compl. [1] at 20 (flow chart detailing restoration process); Hosemann Resp. to Hopkins Interrogs. [63-1] at 53.  He therefore denies a causal connection or redressability.

But as noted above, Hosemann is the state's chief election officer and maintains SEMS, which would presumably be involved in one of the final steps in returning a convicted felon to

---

[4] Hosemann relies in part on *McLaughlin v. City of Canton*, where Judge Henry T. Wingate considered criminal disenfranchisement and held that the Secretary of State was "not a proper party."  947 F. Supp. 954, 965 (S.D. Miss. 1995).  But that case was decided before Mississippi revised its election laws and designated the Secretary of State as the chief election officer.  *See* 2000 Miss. Laws 430 [77-13] (designating the Secretary of State as the chief election officer); 2004 Miss. Laws 305 [77-14] (implementing a statewide centralized voting system).

the voting rolls after he or she successfully files a section 253 petition.  Though somewhat

distinguishable, the Fifth Circuit faced a similar question in *OCA-Greater Houston*, holding:

> unlike in *Okpalobi*, where the defendants had no "enforcement connection with
> the challenged statute," the Texas Secretary of State is the chief election officer of
> the state and is instructed by statute to obtain and maintain uniformity in the
> application, operation, and interpretation of this code and of the election laws
> outside this code.  We are satisfied that OCA has met its burden under *Lujan* to
> show that its injury is fairly traceable to and redressable by the defendants.

867 F.3d at 613–14 (quoting *Okpalobi*, 244 F.3d at 427 n.5) (additional quotation marks and

footnotes omitted).  To be sure, Hosemann's role in section 253 is slight, but he does have

"'some connection with the enforcement of the act' in question."  *Morris v. Livingston*, 739 F.3d

740, 746 (5th Cir. 2014) (quoting *Okpalobi*, 244 F.3d at 414–15).  The Hopkins Plaintiffs have

minimally demonstrated standing and a basis for an *Ex parte Young* claim against Hosemann

challenging section 253.

IV.     Section 241 Merits Analysis

        While both the Harness and Hopkins Plaintiffs challenge section 241, they pursue

different theories.  As such, the Court will consider the claims separately.

        A.      Harness Plaintiffs

        Section 241 was adopted in 1890 and disenfranchised citizens found guilty of "bribery,

burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery,

embezzlement[,] [and] bigamy."  Harness Am. Compl. [19] at 5.  The section was amended in

1950 to remove burglary and again in 1968 to add rape and murder as disenfranchising crimes.

*Id.* at 2.  The Harness Plaintiffs take no issue with preventing convicted rapists and murderers

from voting.  *Id.*  But they say disenfranchisement based on the other crimes carried forward

from the 1890 version violates the Fourteenth and Fifteenth Amendments because those crimes

were selected to suppress black voters.  *Id.* at 20.

9

To begin, the United States Supreme Court has expressly held that § 2 of the Fourteenth Amendment affirmatively allows states to deny suffrage to convicted felons. *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974). That does not, however, mean states are free to deny that right for discriminatory reasons. The Supreme Court considered that issue in *Hunter v. Underwood*, where the Court set out a burden-shifting test to determine whether Alabama's felon-disenfranchisement laws violated the Equal Protection Clause. 471 U.S. 222, 227–28 (1985).

Under the *Hunter* test, a plaintiff must show that the law's original enactment was motived by race discrimination and that the law continues to have that effect. *Id.* at 233; *see also id*. at 227–28. If the plaintiff makes those showings, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without" a racially discriminatory motive. *Id.* at 228.

But *Hunter* left a caveat when it declined to decide "whether [Alabama's disenfranchisement law] would be valid if enacted today without any impermissible motivation . . . ." *Hunter*, 471 U.S. at 233. Based on that language, the Fifth Circuit has held that "substantial, race-neutral alterations in an old unconstitutional law may remove the discriminatory taint." *Veasey v. Abbott*, 888 F.3d 792, 802 (5th Cir. 2018) (citation omitted). And it has applied that rule to section 241.

In *Cotton v. Fordice*, the court observed that Mississippi twice re-enacted section 241 after original adoption:

> Section 241, as enacted in 1890, was amended in 1950, removing "burglary" from the list of disenfranchising crimes. Then, in 1968, the state broadened the provision by adding "murder" and "rape"—crimes historically excluded from the list because they were not considered "black" crimes. Amending § 241 was a deliberative process. Both houses of the state legislature had to approve the amendment by a two-thirds vote. The Mississippi Secretary of State was then required to publish a full-text version of § 241, as revised, at least two weeks before the popular election. *See* Miss. Code Ann. § 4211 (1942); H. Con. Res. 10

> (Miss. 1950); H. Con. R. 5 (Miss. 1968).  Finally, a majority of the voters had to approve the entire provision, including the revision.  Because Mississippi's procedure resulted both in 1950 and in 1968 in a re-enactment of § 241, each amendment superseded the previous provision and removed the discriminatory taint associated with the original version.

157 F.3d 388, 391 (5th Cir. 1998).  The Fifth Circuit concluded that these amendments fell

within the exception *Hunter* "left open," *id.* at 391, and therefore "*Hunter* does not condemn

§ 241," *id.* at 392.

As discussed next, the Harness Plaintiffs urge the Court to ignore *Cotton* because—

according to them—it was based on an incomplete record, was wrongly decided, and has been at

least tacitly overruled by the United States Supreme Court.

        1.       The Record Evidence

According to the Harness Plaintiffs, the *pro se* plaintiffs in *Cotton* were ill-equipped to

create a record regarding the votes in 1950 and 1968, so the Fifth Circuit failed to consider a

complete picture.  Pls.' Mem. [82] at 14.  They suggest, for instance, that the Fifth Circuit did not

see the ballot language in 1950 and 1968.  *Id.*  As a result, Plaintiffs say the court failed to

consider that neither the legislature nor the electorate were allowed to "vote[ ] on whether to

retain or remove the other crimes on the 1890 list.  Thus, the voters in 1950 and 1968 did not

have to approve the entire list of disenfranchising crimes in Section 241 and were not given the

option to do so."  *Id.* at 13.

This argument goes only so far.  True enough, the ballot language was not in the *Cotton*

appellate record.  But neither the *Cotton* plaintiffs nor the state mentioned the 1950 and 1968

votes in their appellate briefs.  *See* Pls.' Mem. [75] at 12–13.  Instead, the Fifth Circuit raised

those re-enactments *sua sponte*.  And the only way the Fifth Circuit would have been aware of

the 1950 and 1968 re-enactments is if it researched the legislative history on its own.  Indeed

*Cotton* cites that history.  *See* 157 F.3d at 391.

Substantively, the Fifth Circuit's description of what happened in those years shows that

it read the ballot language Plaintiffs now cite.  In 1950, the ballot removing burglary from the

disenfranchising offenses read as follows:

> Section 241.  Every inhabitant of this state, except idiots, insane persons and Indians not taxed, who is a citizen of the United States of America, twenty-one years old and upwards, who has resided in this state for two years, and one year in the election district, or in the incorporated city or town in which he offers vote, and who is duly registered as provided in this article, and who has never been convicted of bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, and who has paid on or before the first day of February of the year in which he shall offer to vote, all poll taxes which may have been legally required of him, and which he has had an opportunity of paying according to law, for the two preceding years, and who shall produce to the officers holding the election satisfactory evidence that he has paid such taxes, is declared to be a qualified elector; but any minster of the gospel in charge of an organized church, or his wife legally residing with him, shall be entitled to vote after six months' residence in the election district, incorporated city or town, if otherwise qualified.
>
> Adopted by the House of Representatives, January 26, 1950.
>
> Adopted by the Senate, February 10, 1950.
>
> For Amendment …………………………………………………………..(  )
>
> Against Amendment …………………………………………………………...(  )

1950 Ballot [74-6] at 1.  Similarly, the 1968 ballot that added rape and murder read, in relevant

part, as follow:

> Section 241.  Every inhabitant of this State, except idiots and insane persons, who is a citizen of the United States of America, twenty-one (21) years old and upwards, who has resided in this State for one (1) year, and for one (1) year in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city of town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector."

ADOPTED BY HOUSE OF REPRESENTATIVES:  March 25, 1968.

ADOPTED BY SENATE:  March 25, 1968.

For Amendment …………………………………………………………..(  )

Against Amendment …………………………………………………...(  )

1968 Ballot [74-8] at 1.

This language mirrors the Fifth Circuit's description of the ballots.  As quoted more fully above, the court recognized that "a majority of the voters had to approve *the entire provision, including the revision*."  *Cotton*, 157 F.3d at 391 (emphasis added).  There is simply no hint that the court mistakenly believed voters did anything other than vote up or down on "the entire provision."  *Id.*  Nor does it appear that the court thought voters were asked to "vote[ ] on whether to retain or remove the other crimes on the 1890 list."  Pls.' Mem. [82] at 13.  Finally, the fact that the ballot language did not allow individual votes on the original crimes does not diminish *Cotton*'s conclusion that the final ballot language resulted from "a deliberative process."  *Cotton*, 157 F.3d at 391.

That does not, however, end the analysis because *Cotton* itself contains another caveat. While the Fifth Circuit found that the 1950 and 1968 amendments removed the racial taint from the 1890 enactment, it noted that the section would remain unconstitutional "if the [1950 and 1968] amendments were adopted out of a desire to discriminate against blacks."  *Id.* at 392.  On this issue, Plaintiffs again say they have created a better record.  Although they offer no direct proof of intent, they circumstantially note the racial demographics in 1950 and 1968; Mississippi's sad history of racial strife, especially around those dates; and other unconstitutional legislation passed in or around those years.  Pls.' Mem. [82] at 16–17.

Although the Fifth Circuit did not mention this well-known history in *Cotton*, the court was persuaded by the fact that both amendments made changes that cut against stereotypical notions about which disqualifying crimes would hinder black votes. *Cotton*, 157 F.3d at 391. The court found those facts sufficient to hold—as a matter of law—that the current version of section 241 comports with equal protection. *Id.* at 392.

The Fifth Circuit has not abandoned that holding. Just last year, the court cited *Cotton* in *Veasey v. Abbott*, a case upholding a Texas voting law. 888 F.3d 792, 802 (5th Cir. 2018). Though he dissented, Judge James E. Graves, Jr., explored *Cotton* in greater depth than the majority opinion, explaining why the 1950 and 1968 votes severed the original racist intent. *Id.* at 821 (Graves, J., dissenting). As he noted, the changes resulted from a "deliberative process"; the votes occurred "sixty and seventy-eight years, respectively, after [section 241] was first enacted"; and the amendments cut against notions of what were "commonly considered to be 'black' crimes." *Id.*

While it is somewhat unusual for an appellate court to raise a factual issue *sua sponte* and then decide it as a matter of law, that is what happened in *Cotton*. The Court will not assume the Fifth Circuit failed to fully consider its holding. As a result, the Harness Plaintiffs are left arguing that *Cotton* got it wrong. But even if it did, "[i]t has been long established that a legally indistinguishable decision of [the Fifth Circuit] must be followed by . . . district courts unless overruled *en banc* or by the United States Supreme Court." *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121 n.8 (5th Cir. 1992).

2.     Whether *Cotton* Was Overruled

The Fifth Circuit has not overruled *Cotton*, but the Harness Plaintiffs say the Supreme Court abrogated the decision in *Abbott v. Perez*, 138 S. Ct. 2305 (2018). *See* Pl.'s Mem. [75] at

14

15. Succinctly stated, they believe the events in 1950 and 1968 failed to remove the discriminatory intent that existed in 1890 because the votes merely amended section 241 and did not re-enact it.  *Id.*

In *Perez*, the plaintiffs argued that *Hunter* placed the burden on Texas to prove its interim redistricting plan was not discriminatory.  The Supreme Court rejected that argument noting that *Hunter* "addressed a very different situation."  *Perez*, 138 S. Ct. at 2325.  But in doing so, the Court offered the following synopsis of *Hunter*:

> *Hunter* involved an equal protection challenge to an article of the Alabama Constitution adopted in 1901 at a constitutional convention avowedly dedicated to the establishment of white supremacy.  The article disenfranchised anyone convicted of any crime on a long list that included many minor offenses.  The court below found that the article had been adopted with discriminatory intent, and this Court accepted that conclusion.  The article was never repealed, but over the years, the list of disqualifying offenses had been pruned, and the State argued that what remained was facially constitutional.  This Court rejected that argument because the *amendments* did not alter the intent with which the article, including the parts that remained, had been adopted.  *But the Court specifically declined to address the question whether the then-existing version would have been valid if "[re]enacted today.*"

*Id.* (internal citations omitted) (emphasis added).

From this quote, the Harness Plaintiffs say the Court "drew a distinction between" re-enactments and "'amendments that did not alter the intent.'"  Pls.' Mem. [75] at 15 (quoting *Perez*, 138 S. Ct. at 2325).  In other words, mere amendments cannot remove discriminatory taint, whereas re-enactments may.  And because Plaintiffs describe the 1950 and 1968 votes as mere amendments rather than re-enactments, *Perez* abrogates *Cotton*.  *Id.*

This argument has two flaws.  First, Mississippians voted for the "entire provision," as amended, leading the Fifth Circuit to conclude that section 241 was "re-enacted."  *Cotton*, 157 F.3d at 391–92); *see also Veasey*, 888 F.3d at 821 (Graves, J. dissenting).  Second, and more substantively, when the *Perez* Court summarized *Hunter* and described "amendments" to

15

Alabama's disenfranchisement laws, it was not attempting to distinguish between voluntary amendments and re-enactments because there were no voluntary amendments in *Hunter*. 138 S. Ct. at 2325. Instead, the so-called "amendments" occurred when the offending Alabama statutes were "struck down by the courts." *Hunter*, 471 U.S. at 233. Significantly, *Cotton* references this very distinction when declining to follow *Hunter*. As the Fifth Circuit noted, "the voters of Mississippi willingly broadened [section] 241 through the constitutional amendment process" which made those changes "fundamentally different" from the judicial pruning that occurred in *Hunter*. *Cotton*, 157 F.3d at 391 n.8 (characterizing alterations by judicial process as "'involuntary' amendments"). And because *Perez* does not "directly conflict[ ]" with *Cotton*, *Cotton* still controls at the district-court level. *Alvarez v. City of Brownsville*, 904 F.3d 382, 398 (5th Cir. 2018).

>     3.     The Election Law Reform Task Force

The history of section 241 does not stop in 1968. Even assuming Plaintiffs are correct as to the 1950 and 1968 votes, the state revisited section 241 in the mid-1980s. Starting in 1984, Secretary of State Dick Molpus, a democrat, assembled a bipartisan, biracial Election Law Reform Task Force (the "Task Force") to review and revise the state's election laws. The Task Force included members of the legislature, executive-branch officials, circuit clerks, local election commissioners, and members of the public. Def.'s Evidentiary Submissions [63-2] at 106–07 (outlining purpose); *id.* at 111–13 (listing members). And the Task Force held public hearings throughout the state, met with representatives of the United States Justice Department, and received written feedback from organizations and individuals. *Id.* at 114 (noting plans for public hearings); *id.* at 203 (noting meeting with members of the Voting Rights Section of the U.S. Department of Justice); *id.* at 115–95.

Significantly, the Task Force expressly considered criminal disenfranchisement and whether to expand the list of crimes, amend section 241, or leave the law "as is." *Id.* at 212 (Election Law Reform Task Force- Summary of Action). In the final report, "[i]t was decided that [the] present law dealing with disenfranchisement of electors for the commission of certain crimes should be left as is. There was discussion as to the need for a constitutional amendment to change the law to include as disenfranchising crimes all felonies." *Id.*

The state legislature responded to the report by forming its own committees, issuing reports, and proposing legislation. *Id.* at 216–57. Prior to the 1986 Regular Session, the House committee, in conjunction with its Senate counterpart, issued a formal report, which proposed changes to section 241 and an effectuating constitutional amendment. *Id.* at 216-51. Specifically, as to disenfranchisement, the legislative committee recommended:

> 13. Disenfranchisement of felons
>     The committee recommends that any person convicted of any felony in this state, in another state or under federal statute, excluding the crim of manslaughter and felonious violations of the Internal Revenue Code, shall not be permitted to register to vote, or to vote; and if registered the felon's name shall be removed from the registration rolls. Upon completion of his prison sentence, including any probationary period, the felon will be eligible to register to vote upon presenting to his county registrar certifiable documentation that the sentence has been discharged.

*Id.* at 239–40.

Following the report, legislators introduced 1986 Senate Bill 2234 ("S.B. 2234"), which would have included the recommended language broadening section 241 to all felonies except manslaughter and tax violations. *Id.* at 255, 257 (Proposed House Amendment to Senate Bill No. 2234). But those changes did not survive the legislative process and were cut from the bill that passed the 1986 legislative session. *Id.* at 259–62. Instead, the legislature adopted the Task Force's recommendation and opted to keep the original list of crimes from section 241 and

amend the Mississippi Code to make it consistent with section 241. *Id.* at 260; *see also* Miss. Code § 23-15-11 (identifying qualified voters as those who have "never been convicted of vote fraud *or of any crime listed in Section 241*, Mississippi Constitution of 1890" (emphasis added)). The legislation passed 118-3 in the House and 51-1 in the Senate. Def.'s Evidentiary Submission [63-2] at 263. It was then precleared by the Department of Justice under Section 5 of the Voting Rights Act.

There is no argument or evidence that either the Task Force or the legislature was tainted with racial animus or by a desire to perpetuate a racially motivated voting scheme. So, according to Hosemann, *if* the burden shifts to him under *Hunter*, he has demonstrated that section 241 "would have been enacted without" racial animus. Def.'s Mem. [64] at 11 (citing *Hunter*, 471 U.S. at 228).

The Harness Plaintiffs say Hosemann has not met that burden for two primary reasons. First, they say the Mississippi legislature merely amended the Mississippi Code "to conform the statute to the Constitution." Pls.' Mem. [82] at 22. In other words, it did not amend the offending constitutional provision, which therefore carries over the discriminatory intent. They also argue that even if the legislature considered amending section 241, there was no statewide vote. *Id.*

But as discussed already, the amendment to the Mississippi Code followed a multi-year, biracial, bipartisan review of Mississippi's election laws that expressly considered criminal disenfranchisement and whether section 241 should be amended. At the end, an overwhelming majority of the legislature decided to leave section 241 alone and instead amend the other election laws to conform with it. This is not a case like *Hunter* where the state itself did nothing to cure the defect, nor was a constitutionally infirm statute "perpetuated into the future by neutral

18

official action." *Kirksey v. Bd. of Sup'rs of Hinds Cty.*, 554 F.2d 139, 148 (5th Cir. 1977).   The

unrebutted history shows the state would have passed section 241 as is without racial motivation.

Finally, Plaintiffs cite no authority suggesting that a statewide vote—as opposed to this thorough

representative process—is necessary to remove the racist taint that attached to section 241 more

than 100 years earlier.[5]

For all the reasons stated in this section, Defendant's motion for summary judgment on

the Harness Plaintiffs' section 241 claims is granted.

B.      Hopkins Plaintiffs

The Hopkins Plaintiffs challenge section 241 under the Eighth and Fourteenth

Amendments.

1.      Fourteenth Amendment Equal Protection

Unlike the Harness Plaintiffs, the Hopkins Plaintiffs offer a non-racial approach to their

equal-protection claim.  According to them, section 241 cannot survive strict scrutiny under § 1

of the Fourteenth Amendment because it is "not narrowly drawn to address a compelling state

interest using the least drastic means."  Pls.' Mem. [73] at 38 (citing *Dunn v. Blumstein*, 405 U.S.

330, 337, 342–43 (1972)).

The plaintiffs in *Richardson v. Ramirez* said the same thing.  418 U.S. at 27.  There, three

convicted felons alleged that California's constitution—which "disenfranchised persons

convicted of an 'infamous crime'"—failed the strict-scrutiny test and therefore violated § 1's

---

[5] Hosemann does not directly argue that these facts implicate the *Cotton* analysis, but perhaps he should have.  *Cotton* was based on the observation in *Hunter* that the Court did not consider whether the law would be valid "if enacted today without any impermissible motivation." *Hunter*, 471 U.S. at 233.  In this case, Mississippi voted to keep section 241 as is and codified the implementing statutes to conform with it.  Thus, "[t]he passage of time and the actions of intervening parties [appears to have] cut that thread of [racist] intent."  *Veasey*, 888 F.3d at 821 (Graves, J., dissenting).

equal-protection guarantee.  *Id.*  The Supreme Court of California agreed, *id.* at 33–34, but the

United States Supreme Court reversed.  As the high Court noted, § 2 of the Fourteenth

Amendment acknowledges a state's right to exclude convicted felons from the franchise, *id.* at

55–56.

Section 2 provides a penalty when a state denies or abridges the right to vote.  Edited for

clarity, the section provides:

> Representatives shall be apportioned among the several States according to their
> respective numbers, counting the whole number of persons in each State . . . .  But
> when the right to vote at any election . . . is denied to any of the male inhabitants
> of such State . . . , or in any way abridged, *except for participation in rebellion, or
> other crime,* the basis of representation therein shall be reduced in the proportion
> which the number of such male citizens shall bear to the whole number of male
> citizens twenty-one years of age in such State.

U.S. Const. amend. XIV, § 2 (emphasis added).  The *Richardson* Court held that because § 2

"affirmative[ly] sanction[ed]" a state's right to deny the franchise based on a criminal conviction,

doing so cannot violate § 1 of that same amendment.  418 U.S. at 54.

Plaintiffs know *Richardson* is a problem and try to distinguish it by offering a different

construction of § 2.  According to them, the phrase "other crime" in § 2 modifies only the word

"abridged" and not the word "denied."  Pls.' Mem. [73] at 28.  So construed, § 2 would

recognize a state's right to *abridge* the voting rights of someone who commits a crime—i.e.,

temporarily disenfranchise that person—but not the right to permanently *deny* the franchise.  *Id.*

Thus, Plaintiffs say strict scrutiny applies to laws—like Mississippi's section 241—that *deny* the

franchise based on a criminal conviction.

Plaintiffs insist that *Richardson* is not binding because the Court never considered their

textual argument.  But even assuming the Supreme Court overlooked this alternative

construction, its holding is squarely on point.   "[T]he specific holding of the Court was that a

20

state may deny the franchise to that group of 'convicted felons who have completed their sentences and paroles.'" *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978) (quoting *Richardson*, 418 U.S. at 56).

That holding remains binding.  And as the Fifth Circuit stated in *Cotton*, "Section 2 of the Fourteenth Amendment does not prohibit states from disenfranchising convicted felons."  157 F.3d at 391 (citing *Richardson*, 418 U.S. at 24, 54).  Other circuits have reached the same conclusion.  *See Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Richardson* and stating "it is well established that Section 2 of the Fourteenth Amendment gives states the 'affirmative sanction' to exclude felons from the franchise"); *Hand v. Scott*, 888 F.3d 1206, 1209 (11th Cir. 2018) (noting the Supreme Court "has held that 'the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment'" (quoting *Richardson*, 418 U.S. at 54)); *Hayden v. Pataki*, 449 F.3d 305, 315 (2d Cir. 2006) ("The Supreme Court has ruled that, as a result of [§ 2], felon disenfranchisement provisions are presumptively constitutional."); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1225 (11th Cir. 2005) (listing cases, including *Richardson*, recognizing "the propriety of excluding felons from the franchise"); *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) ("That is, once a felon is properly disenfranchised a state is at liberty to keep him in that status indefinitely and never revisit that determination." (citing *Richardson*, 418 U.S. at 26–27)).  Based on *Richardson* and *Cotton*, the Court must reject Plaintiffs' argument.[6]

---

[6] Plaintiffs apparently anticipated this holding.  *See* Pls.' Mem. [73] at 43 (stating that if Court finds *Richardson* applicable, "Plaintiffs present these arguments to preserve the issue for appeal").

2.      Eighth Amendment Cruel and Unusual Punishment

The Hopkins Plaintiffs also say section 241 violates the Eighth Amendment's prohibition against cruel and unusual punishment.  While they offer a detailed analysis under that amendment, their argument again conflicts with § 2 of the Fourteenth Amendment.  Simply put, it would be internally inconsistent for the Eighth Amendment to prohibit criminal disenfranchisement while § 2 of the Fourteenth Amendment permits it.  As aptly stated by the district court in *Farrakhan v. Locke*,

> Plaintiffs also claim that Washington's felon disenfranchisement law violates free speech, double jeopardy and the prohibition of cruel and unusual punishment under the First, Fifth, and Eighth Amendments to the Constitution.  In order to uphold these claims against Defendants' motion to dismiss, the Court would have to conclude that under the same Constitution that recognizes felon disenfranchisement under § 2 of the Fourteenth Amendment also prohibits disenfranchisement under other amendments.  The Court is not inclined to interpret the Constitution in this internally inconsistent manner or to determine that the Supreme Court's declaration of the facial validity of felon disenfranchisement laws in *Richardson v. Ramirez* was based only on the fortuity that the plaintiffs therein did not make their arguments under different sections of the Constitution.  While discussing the precedent leading up to its decision in *Richardson*, the Court wrote that "recently we have strongly suggested in dicta that exclusion of convicted felons from the franchise violates no constitutional provision."  *Richardson*, 418 U.S. at 53, 94 S. Ct. at 2670.  This language in *Richardson* suggests that the facial validity of felon disenfranchisement may be absolute.  The Court concurs with this application to the case at hand.

987 F. Supp. 1304, 1314 (E.D. Wash. 1997).  Summary judgment is appropriate as to the Hopkins Plaintiffs' Eight Amendment claim.[7]

---

[7] In *Graham v. Connor*, the United States Supreme Court held that claims related to search-and-seizure violations fall under the Fourth Amendment rather than the substantive-due-process provisions found in the Fourteenth Amendment.  490 U.S. 386, 395 (1989).  It did so because "the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct," whereas the Fourteenth Amendment addressed "the more generalized notion of 'substantive due process.'"  *Id.*  In a similar sense, § 2 of the Fourteenth Amendment "affirmative[ly] sanction[s]" a state's right to deny the franchise based on a criminal conviction whereas the Eight Amendment does not mention voting rights.  *Richardson*, 418 U.S. at 54.

V.      Section 253

As noted earlier, section 253 provides a legislative process by which a convicted felon

can regain the right to vote.  Under that provision, "[t]he Legislature may, by a two-thirds vote of

both houses, of all members elected, restore the right of suffrage to any person disqualified by

reason of crime."  Miss. Const. art. XII, § 253.

The Hopkins Plaintiffs make three primary arguments for invalidating section 253:  (1) it

violates the First Amendment because legislators have unfettered discretion to prevent speech;

(2) it violates equal protection because it includes no objective standards for determining who is

entitled to relief; and (3) it was adopted for racist reasons and therefore violates equal protection

as proscribed in *Hunter*.  The Court will address each argument.

A.      First Amendment

"[T]he First Amendment provides no greater protection for voting rights than is otherwise

found in the Fourteenth Amendment."  *Hand*, 888 F.3d at 1211; *see also id.* at 1212 ("Every

First Amendment challenge to a discretionary vote-restoration regime we've found has been

summarily rebuffed.").  The Court therefore dismisses the First Amendment claim.[8]

---

[8] Plaintiffs cite *Hand* to support their First Amendment claim, asserting "[t]he Eleventh Circuit
expressly recognized that 'a discretionary felon-reenfranchisement scheme that was facially or
intentionally designed to discriminate . . . might violate the First Amendment.'" Pls.' Mem. [78]
at 18 (quoting *Hand*, 888 F.3d at 1211–12).  But what Plaintiffs left out of that sentence makes
all the difference.  The court was addressing schemes "designed to discriminate *based on
viewpoint—say, for example, by barring Democrats*." *Hand*, 888 F.3d at 1211 (emphasis added
to language deleted from Plaintiffs' memorandum).  Plaintiffs' use of an ellipses is at best
suspect, and they never acknowledge that the *Hand* court rejected their argument.  While *Hand* is
not binding, it is persuasive.

23

B.       Arbitrary Re-enfranchisement

Plaintiffs are correct that section 253 provides no "objective standards."  Pls.' Mem. [73]

at 44.   Instead, the provision allows the legislature to consider petitions on a case-by-case basis,

which Plaintiffs attack on two grounds.  First, they say "the Fifth Circuit has twice instructed that

arbitrary disenfranchisement or re-enfranchisement of individuals convicted of disenfranchising

offenses violates the Equal Protection Clause."  Pls.' Mem. [73] at 43–44 (citing *Williams v.*

*Taylor*, 677 F.2d 510 (5th Cir. 1982); *Shepherd*, 575 F.2d 1110).  But neither case actually

addresses Plaintiffs' argument that standardless re-enfranchisement laws violate equal protection.

In *Shepherd v. Trevino*, the Fifth Circuit reviewed and upheld a Texas law that provided

"for the reenfranchisement of convicted state felons who satisfactorily complete the terms of

their probation without providing a similar mechanism for the reenfranchisement of successful

federal probationers."  575 F.2d at 1111.  In doing so, the court made the unremarkable

observation that re-enfranchisement laws may not discriminate based on race by, for example,

"disenfranchis[ing] all felons and then reenfranchis[ing] only those who are, say, white.  Nor can

we believe that [§] 2 would permit a state to make a completely arbitrary distinction between

groups of felons with respect to the right to vote."  *Id.* at 1114.   But *Shepherd* did not address

standardless re-enfranchisement mechanisms as Plaintiffs suggest.  *See* Pl.'s Mem. [73] at 44.

Indeed the mechanism it approved gave courts discretion when restoring voting rights.

*Shepherd*, 575 F.2d at 1115.

*Williams v. Taylor* is no better.  There, a black voter challenged his disenfranchisement

based on a prior conviction because white voters had not been disenfranchised.  677 F.2d at 514.

To begin with, *Williams* was not a re-enfranchisement case.  Nevertheless, Plaintiffs note that the

court reversed summary judgment and allowed the plaintiff the "chance to prove his claim of

24

selective and arbitrary enforcement of the disenfranchisement procedure." *Id.* at 517.  In doing so, the Fifth Circuit held that the plaintiff had no right to vote, but that he did have "the right not to be the arbitrary target of the Board's enforcement of the statute." *Id.* at 517.  As in *Shepherd*, the case asked whether the plaintiff had been treated differently, not whether the law violated equal protection for lack of objective standards.

Plaintiffs' second argument likewise misses the mark.  They say "[t]he Supreme Court has repeatedly struck down voter eligibility-related laws that are as 'completely devoid of standards and restraints' as Mississippi's suffrage restoration provision."  Pls.' Mem. [73] at 44.  But they support that statement by citing only disenfranchisement cases, and there is a substantive difference.   As the Supreme Court has noted, re-enfranchisement does not remove a protected interest but is instead a matter of clemency.  *See, e.g.*, *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981).

In the re-enfranchisement context, *Hand* is again helpful.  There, the plaintiff disputed the lack of standards for pardon petitions on equal-protection grounds.  888 F.3d at 1208.  But the Eleventh Circuit concluded that the Supreme Court foreclosed the argument in *Beacham v. Braterman*, 300 F. Supp. 182 (S.D. Fla. 1969), *aff'd* 396 U.S. 12 (1969).  The *Hand* court also noted "[o]ther precedents confirm[ing] the broad discretion of the executive to grant and deny clemency," often with "unfettered discretion."  888 F.3d at 1209 (collecting cases).  The Hopkins Plaintiffs understandably observe that these cases deal with the executive branch—though *Shepherd* dealt with similar discretion vested in the judicial branch.  575 F.2d at 1113.  But Plaintiffs have not demonstrated that the legislative branch should be treated any differently.

Plaintiffs have also failed to satisfy their burden under the rational-basis test.  *See Shepherd*, 575 F.2d at 1115.  Plaintiffs say in their response to Hosemann's motion that the

25

Secretary of State has not shown section 253 is rationally related to a legitimate governmental interest.  Pls.' Mem. [78] at 46.  To begin with, it is not enough for Plaintiffs to say the state failed to demonstrate a rational basis when it is Plaintiffs' burden to make that showing.  *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 350 (5th Cir. 2013).  Substantively, "[a] state properly has an interest in excluding from the franchise persons who have manifested a fundamental antipathy to the criminal laws of the state or of the nation by violating those laws sufficiently important to be classed as felonies."  *Shepherd*, 575 F.2d at 1115.  And Plaintiffs offered no reply when Hosemann demonstrated that section 253 is rationally related to this legitimate governmental interest.  *See* Def.'s Mem. [80] at 38.

In sum, Plaintiffs' authority does not address standardless re-enfranchisement mechanisms under an equal-protection analysis, and they have otherwise failed to meet their burden under the rational-basis test.  Plaintiffs' cited authority does, however, address equal protection where a re-enfranchisement law is allegedly applied in a discriminatory way.  *See Shepherd*, 575 F.2d at 1115.  And that issue folds into Plaintiffs' *Hunter* argument—whether section 253 was adopted with the intent to discriminate and has that effect.  *Hunter*, 471 U.S. at 227.

C.      *Hunter* Analysis

The parties dispute whether the Hopkins Plaintiffs presented sufficient record evidence of (1) discriminatory intent in 1890 and (2) racial impact—the first two prongs of the *Hunter* burden-shifting analysis.  Unlike the section 241 analysis under *Cotton*, there is no Fifth Circuit authority dictating the result of this claim.  Moreover, both parties submit record evidence regarding Plaintiffs' required showing.  That evidence must be viewed in the light most

favorable to the non-movant on each cross motion, which produces questions of fact on whether Plaintiffs met their burden under *Hunter*.

That said, Hosemann also argues that the Task Force and legislative processes in the mid-1980s satisfy the third prong of the *Hunter* analysis as to section 253.  Unlike section 241, the legislature did not pass any laws that impacted section 253.  Re-enfranchisement was, however, considered.  Primarily, both the House and Senate committees jointly recommended eliminating section 253 and allowing convicted felons to regain the right to vote after completing their sentences and probation.  *See* Def.'s Evidentiary Submissions [63-2] at 239–41 (Election Law Reform Study Committee Recommendations).  But by the time S.B. 2234 was filed, that recommendation was absent.  *Id.* at 255 (Proposed House Amendment to Senate Bill No. 2334). The Court could not find in this record what happened to the suggested amendment or whether it was ever voted on by either chamber.

Hosemann does not suggest that these facts trigger the *Cotton* analysis.  As for *Hunter*, the Hopkins Plaintiffs say that absent re-enactment, the Court must limit its review to what happened in 1890.  Even assuming the evidence from the 1980s impacts Hosemann's final burden under *Hunter*, the record is not sufficient to hold—as a matter of law—that either party is entitled summary judgment on that factual issue.  Moreover, both parties offer conflicting evidence as to the intent in 1890.  Again, the evidence is viewed in the light most favorable to the non-movant, which precludes summary judgment as to original intent for enacting section 253.

VI.     Conclusion

        The parties presented extensive briefing.  And while not all arguments are reflected in

this Order, all arguments raised were considered.  Those not addressed would not have changed

the outcome.

        With respect to section 241, this Court is bound by the precedent set by the United States

Supreme Court in *Richardson v. Ramirez* and the Fifth Circuit Court of Appeals in *Cotton v.

Fordice*.  For that and the other stated reasons, Defendant's motion for summary judgment [63]

as to the Harness Plaintiffs is granted; the Harness Plaintiffs' summary-judgment motion [74] is

denied; and the Harness Complaint is severed and dismissed.  A separate judgment will be

entered in the severed Harness case in accordance with Federal Rule of Civil Procedure

58.  Defendant's motion for summary judgment [66] as to the Hopkins Plaintiffs is granted in

part and denied in part—granted as to section 241 and denied as to section 253; and the Hopkins

Plaintiffs' motion for summary judgment [74] is denied as to both sections 241 and 253.

        Finally, the court certifies all holdings in the still open Hopkins case for interlocutory

appeal.   The Court believes this order involves several controlling questions of law as to which

there is substantial ground for difference of opinion.  *See* 28 U.S.C. § 1292.  Moreover, an

immediate appeal from the order may materially advance the ultimate termination of the

litigation.  *Id.*  As noted, the Harness and Hopkins plaintiffs made different arguments as to

section 241, and if the Harness Plaintiffs appeal, then the Fifth Circuit should consider the

Hopkins Plaintiffs' legal-construction arguments at the same time.  Regarding section 253,

Hosemann may elect to appeal the standing holding and the holding regarding the implications of

the 1986 committee reports recommending deletion of section 253.  Likewise, plaintiffs may

wish to appeal the holding that their claim raises no recognized equal-protection rights.  Any one

of these or the other issues would materially impact the trial of this matter, and the Court also wishes to avoid piecemeal appeals.  For these reasons, all issues are certified.

Finally, the Court anticipates an appeal and therefore stays the Hopkins case until the appeal is concluded or the parties indicate that no appeal will be filed and request pre-trial conference.

**SO ORDERED AND ADJUDGED** this the 7th day of August, 2019.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE