# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 24, 2022

Lyle W. Cayce
Clerk

No. 19-60632

Roy Harness; Kamal Karriem,

*Plaintiffs—Appellants*,

*versus*

Michael Watson, Secretary of State of Mississippi,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:17-CV-791

Before Richman, *Chief Judge*, and Jones, Smith, Stewart, Dennis, Elrod, Southwick, Haynes, Graves, Higginson, Costa, Willett, Ho, Duncan, Engelhardt, Oldham, and Wilson, *Circuit Judges*.

Per Curiam:

The issue before the en banc court is whether the current version of Miss. Const. art. 12, § 241 violates the Equal Protection Clause of the United States Constitution. This provision was upheld in *Cotton v. Fordice*, 157 F.3d 388 (5th Cir. 1998), which was binding on the district court and the panel decision here, but the court voted to reconsider *Cotton* en banc. Having done so, and with the benefit of considerable additional briefing on behalf of

plaintiffs, we continue to find that *Cotton*'s result is consistent with the seminal Supreme Court decision in *Hunter v. Underwood*, 471 U.S. 222, 105 S. Ct. 1916 (1985). The district court's judgment is AFFIRMED.

## BACKGROUND

### I.    Mississippi Constitution art. 12, § 241

A historical review of the challenged constitutional provision's evolution is necessary to further discussion. In its current form, the Mississippi Constitution denies the vote to any person "convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy." Miss. Const. art. 12, § 241. State statutes incorporate the Section 241 list by reference.[1] Miss. Code §§ 23-15-11, 23-15-19.

The original version of Section 241 was adopted as part of the Mississippi Constitution of 1890. It is uncontroverted that the state constitutional convention was steeped in racism and that "the state was motivated by a desire to discriminate against blacks" when the 1890 Constitution was adopted. *Cotton*, 157 F.3d at 391. Shortly afterward, the state Supreme Court even emphasized this point. *See Ratliff v. Beale*, 20 So. 865, 868 (Miss. 1896) (acknowledging the "consistent, controlling[,] directing purpose governing the [1890] convention[:] . . . to obstruct the exercise of the franchise by the negro race"). One device that the convention exploited to deny the franchise to blacks was the alteration of a pre-existing felon disenfranchisement law.[2] Accordingly, Section 241 was reconfigured

---

[1] Mississippi law provides a procedure for disenfranchised felons' voting rights to be restored. Miss. Const. art. 5, § 124, art. 12, § 253; Miss. Code §§ 47-7-31, 47-7-41. These provisions were not argued by the parties or considered by this court.

[2] It is uncontested that a state may disenfranchise convicted felons. Section 2 of the Fourteenth Amendment of the United States Constitution allows states to revoke

in the 1890 Constitution to eliminate voter disenfranchisement for crimes thought to be "white crimes" and by adding crimes thought to be "black crimes." If Section 241 had never been amended, the provision would violate the Equal Protection Clause pursuant to *Hunter*. 471 U.S. at 227–28, 105 S. Ct. at 1920. Critically, however, it has been amended.

Since its invidious inception, Section 241 has been reenacted twice according to the state's procedures for enacting constitutional amendments. Those procedures require, first, that the legislature propose an amendment, and second, that the people ratify it. Only upon an affirmative popular ratification vote does the amendment take effect. Miss. Const. art. 3, §§ 5, 6; art. 15, § 273. The 1950 amendment removed "burglary" from Section 241's list of disenfranchising crimes.[3] In 1968, several significant changes

---

voting privileges to anyone engaged in "rebellion, or other crime." *See Richardson v. Ramirez*, 418 U.S. 24, 54, 94 S. Ct. 2655, 2671 (1974) ("[T]he exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment.").

[3] The 1950 amendment went to the voters in its entirety, rewriting Section 241 as follows:

> Every inhabitant of this state, except idiots, insane persons and Indians not taxed, who is a citizen of the United States of America, twenty-one years old and upwards, who has resided in this state for two years, and one year in the election district, or in the incorporated city or town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, and who has paid on or before the first day of February of the year in which he shall offer to vote, all poll taxes which may have been legally required of him, and which he has had an opportunity of paying according to law, for the two preceding years, and who shall produce to the officers holding the election satisfactory evidence that he has paid such taxes, is declared to be a qualified elector, but any minister of the gospel in charge of an organized church, or his wife legally residing with him, shall be entitled to vote after six months residence in the election district, incorporated city or town, if otherwise qualified.

were made to Section 241, including the addition of "rape" and "murder" as crimes resulting in denial of the franchise.[4]

A multi-stage process led to the ratification of both successive versions of Section 241. The deliberative process behind the amendments was consequential. First, each house of the state legislature agreed to the proposed amendments by a two-thirds majority. Next, the entirety of Section 241 as amended was published two weeks before the popular elections. Then the amendments were presented to the public for a majority vote. The ballots presented the voters with two options—to vote "For Amendment" or "Against Amendment"—and the ballots printed out the entire provision as amended. The ballots did not disclose Section 241's then-existing language, and thus from the face of the ballot alone, the voters would not know what Section 241 would entail if they voted "Against Amendment."

The version of Section 241 enacted in 1968 is most relevant because it remains operative today.[5] In 1965, a federal Civil Rights Commission had

---

The amendment was enacted by a 66,077 to 14,362 vote. 1952 Miss. Off. & Stat. Reg. 466.

[4] The 1968 amendments went to the voters in its entirety, rewriting Section 241 as follows:

> Every inhabitant of this State, except idiots and insane persons, who is a citizen of the United States of America, twenty-one (21) years old and upwards, who has resided in this State for one (1) year, and for one (1) year in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city or town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector.

The amendments were enacted by a 136,846 to 59,888 vote. 1968-72 Miss. Off. & Stat. Reg. 356-57.

[5] As a result, we need not address the motivation behind the 1950 amendment.

issued a detailed report condemning Mississippi's widespread racist voting practices and denouncing remnants of the 1890 convention's racist drafting. Specifically, the Commission criticized the various methods the convention used to "accomplish the same result" that "an express denial of the franchise" to black Americans would have accomplished.[6]   Among these devices were residency provisions and poll tax requirements.[7]   Additionally, the Commission took issue with the fact that the "disfranchising crimes were those to which Negroes were thought to be particularly prone" and that the "more serious felonies of murder, rape, or assault were not included."[8]

The Mississippi legislature responded to these objections in what became the constitutional amendment revising Section 241.   In 1968, the Mississippi legislature introduced House Concurrent Resolution No. 5 ("H.C.R. No. 5"), which, among other changes, modified the residency requirements, deleted the poll tax requirements, and added the supposed "non-black" crimes of "murder" and "rape" to the disenfranchising crimes in Section 241.   One of the explicit purposes of H.R. No. 5 was "to delete certain improper parts of the section."   These changes were approved by popular vote, as required by the state constitution, and resulted in the reenactment of Section 241 as it stands today.[9]

---

[6] Voting in Mississippi, A Report of the United States Commission for Civil Rights, at 3–4 (1965).

[7] *Id.* at 4–6.   The Commission stated that "[t]he requirement of long residency, two years in the State and one year in the election district, was aimed at the supposed 'disposition of young Negroes . . . to change their homes and precincts every year.'" *Id.* at 6.

[8] *Id.*

[9] For the sake of completeness, a further amendment of Section 241 was approved by popular vote in 1972, lowering the voting age from 21 to 18 and reenacting the provision again in its entirety.

No. 19-60632

Post-reenactment information is also instructive. In 1984, Mississippi's election scheme was scrutinized by a multi-racial Election Law Reform Task Force, led by Democrat Secretary of State Dick Molpus. The Task Force held public hearings throughout the state and met with voting rights lawyers from the U.S. Department of Justice. The Task Force included members of the legislature, executive branch officials, circuit clerks, local election commissioners, and members of the public. Over the course of seven months, the Task Force accepted public comments and deliberated over the state's election laws. The Task Force contemplated, *inter alia*, whether to amend Section 241 by expanding the list of disenfranchising felonies. For example, the Task Force's meeting with the U.S. Department of Justice involved "much discussion concerning the broadening of disenfranchising crimes to include all felonies." Ultimately, however, the members resolved to leave the law "as is."

In response to the Task Force's work, both chambers of the 1985 Mississippi legislature formed committees that also studied these issues and considered the Task Force recommendations. One joint committee memorandum recommended expanding Section 241 to include all felony convictions except for tax evasion and manslaughter. A senate bill was introduced to that effect. Ultimately, the Mississippi legislature followed the recommendation of the Task Force and declined to expand the Section 241 list of disenfranchising crimes. Instead, the state's election statutes were amended by, among other things, adding two direct references to the Section 241 list of disenfranchising crimes. The amended statutes took effect after being precleared by the U.S. Department of Justice.[10]

---

[10] 1986 Miss. Laws, ch. 492. A recent change added voter fraud to the list of disenfranchising crimes. 2021 Miss. Laws, ch. 517.

No. 19-60632

## II.    Current Proceedings

Plaintiffs-Appellants, Roy Harness and Kamal Karriem, are black men in Mississippi who were convicted, respectively, of forgery and embezzlement. Both are disenfranchised under current Mississippi law because of their convictions. They filed suit against the Mississippi Secretary of State under the Fourteenth and Fifteenth Amendments seeking declaratory and injunctive relief to restore the voting rights of convicted felons in Mississippi. They contend that the crimes that "remain" in Section 241 from the 1890 Constitution are still tainted by the racial animus with which they were originally enacted. Plaintiffs do not challenge murder and rape in Section 241, which were not part of the 1890 list but were added in 1968.

The district court's thorough and carefully reasoned opinion granted the Secretary's motion for summary judgment. The court acknowledged the precedential effect of this court's holding in *Cotton* that the 1950 and 1968 amendments to Section 241 cleansed the current provision of its previous discriminatory taint. The district court went further to explain that the additional public and legislative deliberations in 1984–86 "show[] the state would have passed section 241 as is without racial motivation." Plaintiffs appealed, and a panel of this court affirmed on similar grounds. *See Harness v. Hosemann*, 988 F.3d 818, 821–23 (5th Cir.), *reh'g en banc granted, opinion vacated*, 2 F.4th 501 (5th Cir. 2021). This court granted plaintiffs' subsequent request for rehearing en banc.

### STANDARD OF REVIEW

A grant of summary judgment is reviewed *de novo* on appeal. *Petro Harvester Operating Co., L.L.C. v. Keith*, 954 F.3d 686, 691 (5th Cir. 2020). All "evidence and inferences from the summary judgment record are viewed in the light most favorable to the nonmovant." *Tradewinds Env't Restoration,*

*Inc. v. St. Tammany Park, LLC*, 578 F.3d 255, 258 (5th Cir. 2009) (quoting *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460, 465 (5th Cir. 2005)). Summary judgment is appropriate "when the pleadings and evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted).

## DISCUSSION

Plaintiffs, along with the principal dissent, principally argue that, because Section 241 was originally enacted with racial animus in 1890, it cannot survive scrutiny under the Equal Protection Clause. "Because this case is indistinguishable from *Hunter*," they contend, "the eight originally-listed crimes in Section 241 must be invalidated as unconstitutional." Further, they assert that *Cotton* was erroneously decided because, when voting on the subsequent reenactments of Section 241, Mississippi voters were never given the opportunity to vote up or down on each specifically listed crime in Section 241. And in any event, they assert, ongoing pervasive racial discrimination in both 1950 and 1968 "render[ed] implausible" the intentional removal of discriminatory intent from Section 241.

After careful consideration of the record and applicable precedents, we reconfirm that Section 241 in its current form does not violate the Equal Protection Clause. Plaintiffs failed to meet their burden of showing that the current version of Section 241 was motivated by discriminatory intent. In addition, Mississippi has conclusively shown that any taint associated with Section 241 has been cured.

## I.

All of plaintiffs' and the principal dissent's claims derive from *Hunter,* in which the Supreme Court held unconstitutional a provision of the 1901 Alabama Constitution that was adopted in part to disenfranchise blacks

convicted of certain misdemeanor offenses.  471 U.S. at 227, 105 S. Ct. at 1919.  The Supreme Court affirmed that the *Arlington Heights* standard should be applied to laws, like felon disenfranchisement provisions, that are facially neutral but have racially disproportionate effects.[11]  According to this standard, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S. Ct. 555, 563 (1977).[12] *Arlington Heights* adopted a two-stage process, which *Hunter* followed.  The first stage ("*Hunter* step one") places the burden on plaintiffs to prove by an evidentiary preponderance that racial discrimination was a substantial or motivating factor in enacting the challenged provision.  *Hunter*, 471 U.S. at 227–28, 105 S. Ct. at 1920.  If the plaintiffs were to succeed on that point, at the second stage ("*Hunter* step two"), the burden shifts to the state to demonstrate that the provision would have been enacted without an impermissible purpose.  *Id.* at 228, 105 S. Ct. at 1920 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977)).

---

[11] The parties present different theories regarding whether and at what point in the analysis *Hunter* requires evidence of unconstitutional effects as well as motive. *Cf. Cotton*, 157 F.3d at 392 n.9.  The Supreme Court noted that the existence of ongoing unconstitutional effects had not been challenged by the state of Alabama. *Hunter*, 471 U.S. at 227, 105 S. Ct. at 1919–20.  We need not reach these questions because plaintiffs fail to make the threshold showing of discriminatory intent.

[12] Pursuant to *Arlington Heights,* evidence of discriminatory intent may include: (i) whether "a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action," (ii) consideration of the "historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes," and (iii) "the legislative or administrative history," which "may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  429 U.S. at 265–68, 97 S. Ct. at 564–65.

The *Hunter* Court acknowledged that proving the motivation for official actions may be a "problematic undertaking." *Id.* However, the plaintiffs had satisfied *Hunter*'s first step with a wealth of historical evidence that the "zeal for white supremacy ran rampant at the convention," including specifically the drafting of the disenfranchisement provision. *Id.* at 229, 105 S. Ct. at 1921. Moreover, the Court concluded, the disenfranchisement provision "certainly would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation." *Id.* at 231, 105 S. Ct. at 1922.

The Court also rejected the state's position that the provision had been shorn of its original unconstitutional motive by events in the ensuing eighty years, specifically the judicial pruning of criminal miscegenation and a few others considered blatantly racist. *Id.* at 233, 105 S. Ct. at 1922. But the Court added a provocative qualification to this point:

> *Without deciding whether § 182 would be valid if enacted today without any impermissible motivation,* we simply observe that its original enactment was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect.

*Id.* (emphasis added). The *Hunter* Court thus left open the question whether later reenactments would have rendered the provision valid. *See also Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018).

Three circuit courts, including this one, have answered the Court's hypothetical in the affirmative. *Cotton*, 157 F.3d 388; *Johnson v. Governor of Fla.*, 405 F.3d 1214 (11th Cir. 2005) (en banc); *Hayden v. Paterson*, 594 F.3d 150 (2d Cir. 2010). Their considered exposition of *Hunter* presents a further basis for our conclusions.

In *Cotton*, this court confronted whether the 1950 and 1968 reenactments of Section 241 sufficiently demonstrated that Section 241 in its

current form was enacted for race-neutral reasons. *Cotton*, 157 F.3d at 391–92. As this court noted, "*Hunter* . . . left open the possibility that by amendment, a facially neutral provision like § 241 might overcome its odious origin." *Id.* at 391. It then concluded "[t]hat is what has happened here." *Id.* Emphasizing the "deliberative process" that resulted in the amendments, the court determined that "each amendment superseded the previous provision." *Id.* It also noted that the plaintiff had not offered any proof of discriminatory intent regarding the current version of Section 241, but rather he relied "exclusively on the Mississippi Supreme Court's now-irrelevant admission in *Ratliff*" that the 1890 convention enacted Section 241 with impermissible motives. *Id.* at 392. The panel ultimately held that, "[b]ecause the motives of Mississippi's legislature and voters when § 241 was re-enacted are not impugned, . . . *Hunter* does not condemn § 241." *Id.*

The two other circuit courts called on to address *Hunter*'s unanswered hypothetical have adopted the *Cotton* approach. In *Johnson*, the Eleventh Circuit's en banc court considered, *inter alia,* an 1868 voter disenfranchisement provision in the Florida Constitution that was revised as part of a new constitution in 1968. 405 F.3d at 1218–19. The 1868 provision included some enumerated misdemeanors, but the 1968 version only included felonies. *Id.* at 1221. Applying *Hunter*, the court assumed without deciding that there was discriminatory intent behind the 1868 version of the law, but concluded that any racist taint had been eliminated by the subsequent reenactment in 1968. *Id.* at 1223–24. The court emphasized that the *Hunter* Court "did not hold that intervening *legislative* changes to the policy would have been legally insufficient to remove an earlier discriminatory intent." *Id.* at 1223 n.20. It considered determinative the multistep constitutional revision process, which included approval by the voters as the last step. *Id.* at 1224. The court concluded that "[t]he state has met its burden as a matter of law by substantively reenacting the law for race-

neutral reasons." *Id.* The *Johnson* court cited and relied on *Cotton* throughout its opinion. *Id.* ("Thus, as in *Cotton v. Fordice*, Florida's 1968 re-enactment eliminated any taint from the allegedly discriminatory 1868 provision . . . .").

The Second Circuit employed similar reasoning to analyze a series of felon disenfranchisement provisions contained in three versions of the New York Constitution, all dated in the nineteenth century. *Hayden*, 594 F.3d at 155–56.[13] New York's constitutional provisions authorized the legislature to enact disenfranchisement laws for those convicted of "any infamous crime." *Id.* An earlier constitutional provision *required* the passage of such laws, but the provision was later revised and reenacted to be *permissive*. The most recent amendment, approved in 1894 and still in force, made the disenfranchisement laws *mandatory* again. *Id.* at 156.

The plaintiffs did not allege racist motivation behind the 1894 amendment. *Id.* at 159. Because of this, the court concluded that they failed to establish discriminatory intent, and moreover, any discriminatory taint of the earlier iterations had been cured. *Id.* at 165–67. The Second Circuit agreed with *Johnson* and *Cotton*, concluding that *Hunter* allowed the court independently to consider the intent of the 1894 amendment. *Id.* at 166–67. The Second Circuit addressed but rejected any concern that the changes made to the provision following the tainted enactments were essentially pretextual. *Id.* at 167. The court made clear that (i) no bad faith had been alleged on behalf of the 1894 delegates; (ii) the amendment was substantive in scope, in addition to being deliberative; and (iii) no allegations were made as to the discriminatory intent of the 1894 delegates. *Id.*

---

[13] The plaintiffs separately challenged a state law concerning felon disenfranchisement, but the court's discussion of that law is inapposite to the present case.

No. 19-60632

## II.

Despite the uniform approach of these authorities, and others,[14] plaintiffs here still contend that *Hunter* is dispositive because the original racist motivation behind eight of the crimes currently listed in Section 241 has not been purged. On its face, this "sins of the father" contention fails. This case is not analogous to *Hunter* because the provision has been, not only reenacted, but reenacted *twice* according to Mississippi state procedures. The qualification in *Hunter* as to subsequent enactments has been understood in multiple decisions in addition to *Cotton* to mean that the

---

[14] *See also United States v. Johnson*, 40 F.3d 436, 440 (D.C. Cir. 1994), *cert. denied*, 514 U.S. 1041, 115 S. Ct. 1412 (1995) (asserting, in the context of an Equal Protection challenge to a 1986 federal drug statute, that "the undeniable racism that animated legislative debate leading to the passage of a *1914* statute criminalizing cocaine trafficking generally, long before the crack/powder distinction was contemplated," is "of no relevance to our inquiry into the motives of the Congress that passed the 1986 Act" (citing *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20, 107 S. Ct. 1756, 1770 n. 20 (1987))). The district courts that have considered this question have also looked to the last enacting legislature's intent. *See Thompson v. Merrill*, 505 F. Supp. 3d 1239, 1255, 1261 (M.D. Ala. 2020) (looking for evidence of continuing discriminatory intent or discriminatory intent of the last enacting legislature); *United States v. Gallegos-Aparicio*, No. 19-CR-2637-GPC, 2020 WL 7318124, at *4 (S.D. Cal. Dec. 11, 2020) (holding that the defendant's claim failed because he did not establish that the reenacting Congress was motivated by discrimination); *United States v. Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at *6 (S.D. Cal. Dec. 8, 2020) ("Although Mr. Rios-Montano argues that the intent of the prior Congress remains legally operative until a future Congress makes an affirmative contrary showing, other courts that have considered the issue in the context of felon disenfranchisement provisions have rejected this approach."); *United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 2021 WL 3570229, at *5 (D.N.M. Aug. 12, 2021) ("Even if the Court did not find that Congress purged the racial animus . . . with its later enactment of the INA, . . . other courts have rejected the notion that prior congressional intent remains operative until a future Congress makes an affirmative contrary showing."); *Lynch by Lynch v. Alabama*, No. CV 08-S-450-NE, 2011 WL 13186739, at *334 (N.D. Ala. Nov. 7, 2011), *aff'd in part, vacated in part on other grounds, I.L. v. Alabama*, 739 F.3d 1273 (11th Cir. 2014) (holding that the plaintiffs had not met their burden of showing the amended provisions were reenacted with discriminatory intent, but that the plaintiffs had met this burden as to the provisions that were never amended).

decisive legal question is the intent of the legislature that enacted the most recent version of an originally tainted law.[15]

That courts must look to the most recent enactment of the challenged provision, not the original tainted version, is fortified, if not fully ratified, by the Supreme Court's decision in *Abbott v. Perez*, 138 S. Ct. 2305 (2018). *Abbott* reversed a three-judge district court decision that had wrongfully placed the burden on Texas to show that a 2013 redistricting plan had purged the discriminatory "taint" of a previous plan (that had never become effective). *Id.* at 2324. In reaching that result, the Court held that the intent of the enacting legislature (2013) was paramount. The Court was emphatic that "[t]he allocation of the burden of proof and the presumption of legislative good faith are not changed by a finding of past discrimination." *Id.* "Past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* (internal quotation marks and brackets omitted). The Court added, "we have never suggested that past discrimination flips the evidentiary burden on its head." *Id.* at 2325.

To be sure, the Court distinguished *Hunter* as involving a "very different situation" and explained that Alabama's discriminatory provision had never been changed, only "pruned." *Id.* Culminating its explanation, the Court noted that *Hunter* "specifically declined to address the question whether the then-existing version would have been valid if reenacted today." *Id.* (internal quotation marks and brackets omitted). *Hunter* was expressly different from *Abbott* because the Texas legislature, rather than simply adopting an earlier legislative redistricting plan, had largely modelled a plan

---

[15] *See Johnson,* 405 F.3d at 1223 ("[W]e are concerned here with the validity of the *1968 provision*, not the 1868 provision and the plaintiffs conceded that the 1968 provision was not enacted with discriminatory intent"); *Hayden,* 594 F.3d at 162 (plaintiffs' failure to allege "this invidious purpose motivated the enactment" of the latest constitutional provision was "fatal to plaintiffs' intentional discrimination claim").

developed by a state court during protracted litigation. *Id.* What mattered in *Abbott,* as the Court stated, was thus the intent behind that 2013 legislative act.

In sum, notwithstanding the potential impact of past discrimination on reenacted laws, *Abbott* stands for three propositions. *First*, it squarely placed the burden of proof of intentional discrimination on the law's challenger. *Second*, the most recent enactment is the one that must be evaluated under the Equal Protection Clause. *Third*, the presumption of legislative good faith persists. *Hunter* stands out because the provision at issue there had remained virtually intact for eighty years, untouched by the legislature, from the time of its patently racist enactment. But the Court noted in *Abbott* that it had no occasion to address the precise question reserved by *Hunter*. *Id.*

For these reasons, we remain confident, contrary to plaintiffs' principal assertion, that the critical issue here is not the intent behind Mississippi's 1890 Constitution, but whether the reenactment of Section 241 in 1968 was free of intentional racial discrimination.

## III.

As an alternative to asserting that *Hunter* is on all fours with this case, plaintiffs do not even allege that the 1968 amendment was enacted with discriminatory intent. They concede that they have provided no evidence that the amendment passed with invidious motives in 1968 because they do not believe it necessary. As they put it, "the determinative issue…is not whether the amendments resulted from discrimination (*there is little reason to think that they did*)" (emphasis added). They explain, "[b]ecause [plaintiffs] do not challenge murder and rape, they have no obligation to prove that the 1950 and 1968 amendments were motivated by discrimination." But this contention, standing alone, perpetuates the "sins of the fathers" discounting

of the amendment process, and flips the burden of proof and presumption of legislative good faith contrary to both *Abbott* and *Hunter*.

Instead, plaintiffs and the principal dissent approach *Hunter*'s first step by arguing that the reenactments of Section 241 cannot purge the racially discriminatory taint of the 1890 constitution's list of disenfranchising crimes. They rest on two propositions: (i) that the state constitutional amendment process did not give voters an opportunity to consider eliminating either in their entirety or individually the bulk of the crimes tainted by racial animus, instead only asking in 1950 whether to remove burglary and in 1968 whether to add rape and murder to the original list; and (ii) that the "extensive hostility of the legislature and much of the white populace to equal rights in 1950 and 1968[] render[] implausible" the assertion that the amendments were made to remove discriminatory taint. The first argument has no support in applicable law, and the second perverts the burden of proof, contrary to *Hunter* and *Abbott*.

Plaintiffs first assert that the more complete historical evidence they offer corrects *Cotton*'s erroneous conclusion that in the successive amendments of Section 241, a "majority of voters had to approve the entire provision." 157 F.3d at 391. Plaintiffs also deride *Cotton*'s reliance on the state's "deliberative process" for constitutional amendments. *Id.* As plaintiffs and the principal dissent would have it, the original discriminatory motivation for the crimes listed in 1890 persists unless the voters were asked to approve or reject every crime tainted in the original version of Section 241.

This principle, if adopted, would extend far beyond *Hunter*'s query about legislative reenactments and would in effect federalize special requirements for purging long-ago discrimination from revised or reenacted state laws. Under *Arlington Heights*, the indicia to evaluate lawmakers' discriminatory purpose are found in circumstantial evidence such as

legislative history, legislators' public comments, a "clear pattern" of otherwise inexplicable racial impacts, and a "series" of invidious actions.[16] *Hunter*, applying the *Arlington Heights* methodology, says nothing about what it takes for a state legislature to revise its laws and obviate Equal Protection challenges based on decades-old versions.[17] Plaintiffs' proposal that a state constitutional amendment must be voted on word for word to avoid any vestigial racial taint is radically prescriptive. It would require the revision of state amendment processes, supplanting those provisions with some kind of constitutional plebiscite. *Cotton*, like other courts, interpreted *Hunter* to authorize federal courts only to discern legislative intent[18] according to *Arlington Heights*'s methodology. No subsequent case law supports plaintiffs' novel, judicially crafted political theory of public consent.[19]

---

[16] *See Arlington Heights* criteria, *supra* n.12.

[17] *Hunter* rejected the sufficiency of judicial "pruning," of course, but that is distinct from prescribing an approved reenactment procedure for states to effectively purge original discriminatory taint.

[18] The term "legislative intent" is used here as shorthand for the process by which a statute *or* constitutional amendment is enacted. *Arlington Heights* canvassed indicia of "legislative intent" because an ordinance was at issue there, while in *Hunter* the Court had to determine the intent behind a state constitutional amendment. In the instant case, Mississippi's amendment process is not complete until the voters have ratified the legislature's proposed amendment. Plaintiffs here have disclaimed discriminatory intent by the legislature or voters in the 1968 amendment process.

[19] Plaintiffs and the principal dissent erroneously contend that *Abbott* expanded *Hunter*. They repeatedly reference this quotation: "[T]he [judicial] amendments [in *Hunter*] did not alter the intent with which the article, including the *parts that remained*, had been adopted." *Abbott*, 138 S. Ct. at 2325 (emphasis added). Plaintiffs claim that any part of the original provision that remains and was not individually voted on in the later amendments must fail under *Abbott*'s interpretation of *Hunter*. They read too much into this merely descriptive statement about what happened in *Hunter*. The Court would hardly adopt a major analytical change while distinguishing *Hunter*'s facts. And indeed, in the next sentence, *Abbott* reaffirms *Hunter*'s qualification, stating, "[b]ut the Court [in *Hunter*]

No. 19-60632

Not only is plaintiffs' and the principal dissent's overarching theory deficient, but it also mischaracterizes the regularity and legal effect of the state's subsequent amendments of Section 241. That the state conformed to its procedural requirements is fully explained earlier in this opinion and need not be restated. There is no dispute that the amendments were enacted in compliance with state law. As further shown above, the voters had to approve the full text of Section 241 as amended, not merely bare propositions regarding whether to delete burglary or add murder and rape. Also in 1968, the amendment significantly altered residency requirements and the poll tax, both of which had been originally infected by racial animus. The 1968 amendment process bears no hint of subterfuge to covertly maintain racial discrimination.[20] Contrary to plaintiffs' and the principal dissent's word-by-word approach, the process used in 1968 was sufficient to reenact Section 241 in its entirety. Finally, under Mississippi law, constitutional amendments "overrule[] the prior interpretation[s], which become[] for all practical purposes relegated to history" and "cease[] to exist." *State ex rel. Moore v. Molpus*, 578 So. 2d 624, 639 (Miss. 1991). Section 241 as it existed in 1890 "ceased to exist," rendering the discriminatory intent behind its original enactment irrelevant here and purging the original taint by reenactments of the whole provision.[21]

---

specifically declined to address the question whether the then-existing version would have been valid if reenacted today." *Id.* (internal quotation marks and brackets omitted).

[20] *Cf. Hayden*, 594 F.3d at 167 (expressing concern about subterfuge).

[21] At oral argument, plaintiffs' counsel asserted that Section 241 was *void ab initio* because it was invalid as enacted in 1890. *See Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 401 (5th Cir. 2008). They ask the court to conclude both that "it is as though [the legislature] had not acted at all" and also that the discriminatory taint from this legislative "nonaction" persists today. *See id.* But that is a non sequitur. No matter what happened in 1890, all plaintiffs establish is that Section 241 was *de novo* reenacted in 1968. And they have no evidence of discriminatory motive in connection with that process.

No. 19-60632

Plaintiffs' second argument about the amendment process is that *Cotton* failed to examine the "historical context" in which the 1950 and 1968 amendments were passed, that is, the state's ongoing racism throughout that period. We are not blind to the state's deplorable history of racial discrimination, or its delayed response to the end of de jure segregation, or its attempts to suppress black voter participation during that period. But the overall social and political climate in Mississippi in the 1950s and 1960s fails to carry plaintiffs' burden to prove that the 1968 amendment intentionally discriminated against black voters.

Similarly, half of the principal dissenting opinion recounts racism in Mississippi during this period, but none of this history appears in the record before the district court or this court. None of this history refers to or bears on the 1968 amendments to all of Section 241. Equally important, the dissent's attempt to create a fact issue is at odds with plaintiffs' concession that "there is little reason to think" racial discrimination motivated the amendments.

Not only does the legislative history of the 1968 amendment lack evidence of discriminatory intent in regard to the list of disenfranchising crimes, but if anything, it tends to support the opposite proposition. The legislature was trying to eliminate several objections contained in the then-recent findings of the Civil Rights Commission. Thus, the amendment of Section 241 included adding supposedly "non-black" crimes to the disenfranchising list, modifying voter residency requirements, and deleting the poll tax. All such changes had been sought by the Commission and indicate an intent to, at a minimum, avoid a challenge to the law, or to win in court if there were such a challenge.[22]

---

[22] Further, as this court has noted, the fact that an amendment seeks to alleviate constitutional concerns does not alone constitute evidence of unconstitutional motivation. *See Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n.,* 945 F.3d 206, 216 (5th Cir. 2019)

No. 19-60632

Accordingly, as a matter of law, plaintiffs have not demonstrated that Section 241 as it currently stands was motivated by discriminatory intent or that any other approach to demonstrating the provision's unconstitutionality is viable.

## IV.

Because of plaintiffs' failure to show discriminatory intent, the burden never shifted to the Secretary under *Hunter*'s second step. Pursuant to the second step, courts seek to determine whether the current provision would still have been enacted without discriminatory intent. 471 U.S. at 228, 105 S. Ct. at 1920 (citing *Mt. Healthy*, 429 U.S. at 287, 97 S. Ct. at 576). As discussed, the two later constitutional amendments had the effect of reenacting Section 241 in its entirety.[23] But even if there remained a question of discriminatory intent arising from the 1968 amendment, plaintiffs' claims would still fail because Mississippi produced additional evidence that eliminated any taint from Section 241.[24]

The 1984–86 discussions involving the public, those in the Task Force, and the Mississippi legislative committees illustrate that Section 241 in its current form reflects purposeful and race-neutral contemplation. To be sure, legislative inaction is generally unreliable when used to interpret

---

(that the drafter "sought to create a law that would survive a constitutional challenge is not evidence of a discriminatory legislative purpose").

[23] Judge Graves has disavowed in the dissent what he wrote a few years ago: "The passage of time and the actions of intervening parties cut that thread of intent in *Cotton*: two legislatures, acting eighteen years apart (with the first acting sixty years after the offending constitutional provision was enacted) approved the amendments by two-thirds majorities, and then the entire sections—not just the amendments—were subject to statewide votes in favor of full reenactment." *Veasey v. Abbott*, 888 F.3d 792, 822 (5th Cir. 2018) (Graves, J., concurring in part and dissenting in part).

[24] The dissent fails to acknowledge the impact of subsequent public deliberations concerning felon disenfranchisement.

statutes or regulations. *See Rapanos v. United States*, 547 U.S. 715, 749, 126 S. Ct. 2208, 2231 (2006). But here, the court is not tasked with interpreting Section 241. Rather, the inquiry is one of motivation: whether Section 241 would have been enacted in its current form absent racial discrimination. *Hunter*, 471 U.S. at 228, 105 S. Ct. at 1920. Later events— even if they ultimately result in legislative inaction—are not irrelevant to demonstrating intent. In this case, subsequent legislative attention to Mississippi's election laws indicates that Section 241 was carefully evaluated before the legislature opted to leave it unchanged.

The Task Force recommendations and legislative process bespeak the nondiscriminatory motivations of the public and the legislature. The Task Force considered all aspects of voting in Mississippi, including the impact of any proposed revisions on minority communities. It met with the U.S. Department of Justice to discuss the conformity of its proposals with the Voting Rights Act. In this meeting, there was "much discussion concerning the broadening of disenfranchising crimes to include all felonies, and it was decided that additional review was necessary." The Task Force ultimately resolved to recommend leaving Section 241 "as is."

Later, a legislative joint committee considered the Task Force's recommendations and conducted another independent investigation.[25] The committee recommended expanding the list of disenfranchising felonies to

---

[25] In the report, the committee took issue with the fact that "some twenty-nine (29) statutes that are presently on the books, and presumably being followed, have never been submitted to the U.S. Justice Department as required by the Voting Rights Act of 1965." It then noted that "[t]he committee decided to proceed by taking the present set of laws and attempting to clarify them; to conform the statutes with judicial decisions and regulations; to repeal sections which have never been submitted or have been disapproved by the U.S. Justice Department . . . ." Notably, for instance, the committee recommended repealing the anti-single shot provision, partially because "courts . . . have declared them in violation of the 14th Amendment . . . and of Section 2 of the Voting Rights Act."

include all felonies[26] (other than manslaughter and tax-related felonies). Ultimately, the legislature opted to maintain the shorter list of disenfranchising crimes rather than expand it. In addition, the legislature amended existing state statutes, incorporating Section 241 by reference in two code provisions. These changes were precleared by the U.S. Department of Justice.

In total, the 1968 legislature, the 1968 general electorate of the state of Mississippi, the Task Force, and to some extent, the U.S. Department of Justice all considered Section 241 and approved it in its current form. It is hard to imagine a stronger showing that Section 241 would have been passed in its current form without racial motivation. *See Hunter*, 471 U.S. at 227–28, 105 S. Ct. at 1920.

## CONCLUSION

We reaffirm that the current version of Section 241 superseded the previous provisions and removed the discriminatory taint associated with the provision adopted in 1890. *Cotton*, 157 F.3d at 391–92. Plaintiffs fail to establish the 1968 reenactment of Section 241 was motivated by racism. The judgment of the district court is AFFIRMED.

---

[26] This would naturally have included the felonies listed in the current version of Section 241.

JAMES C. HO, *Circuit Judge*, concurring in part and concurring in the judgment:

Nothing in the Constitution forbids states from disqualifying felons from voting. To the contrary, Section 2 of the Fourteenth Amendment expressly contemplates that states may disenfranchise felons. It specifically provides that a state shall be apportioned fewer members of the House of Representatives if it denies the franchise to any citizens over the age of twenty-one for any reason "*except for participation in* rebellion, or other *crime*." U.S. CONST. amend. XIV, § 2 (emphasis added).

So "the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment." *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974). This conclusion derives not only from the text of Section 2, but also "the understanding of those who framed and ratified the Fourteenth Amendment." *Id.* at 48. After all, "at the time of the adoption of the Amendment, 29 States had provisions in their constitution which prohibited, or authorized the legislature to prohibit, exercise of the franchise by persons convicted of felonies." *Id.*

At the same time, States may not pick and choose which felons to disenfranchise in a manner that contravenes other provisions of the Constitution. For example, States could not disenfranchise felons based on their political party or religious beliefs. That would presumably violate the First and Fourteenth Amendments. *See Hand v. Scott*, 888 F.3d 1206, 1211–12 (11th Cir. 2018). Likewise, States could not disenfranchise felons based on their race. That would violate the Equal Protection Clause of Section 1 of the Fourteenth Amendment. *See Hunter v. Underwood*, 471 U.S. 222 (1985).

As the court today rightly observes, the history of felon disenfranchisement in the State of Mississippi is indisputably tainted by racism. But as the court also correctly concludes, the Mississippi law in effect

today does not violate the Equal Protection Clause. It certainly does not classify felons based on race. Moreover, as the court amply demonstrates, there is every indication that Mississippi would re-enact precisely the same law today for reasons wholly unmotivated by race. *See ante*, at 20–22. So under governing Supreme Court precedent, Mississippi law cannot be held unconstitutional on grounds of discriminatory intent.

I write separately to offer a separate and distinct reason why the court is right to uphold Mississippi law—namely, the absence of any discriminatory effect as well as intent. After all, Mississippi law does not disproportionately disenfranchise African-American voters at a higher rate than would a blanket felon disenfranchisement law. And Plaintiffs do not contend otherwise.

For these reasons, I agree with the court that Mississippi law is "affirmative[ly] sanction[ed]" by Section 2, *Richardson*, 418 U.S. at 54, and that accordingly we must affirm.

## I.

The 1890 Mississippi Constitution contained a felon disenfranchisement provision. Miss. Const. art. 12, § 241. As originally enacted, Section 241 did not categorically disenfranchise all felons, but instead targeted certain felonies for disenfranchisement—namely, bribery, burglary, theft, arson, obtaining money or goods under false pretenses, perjury, forgery, embezzlement, and bigamy. *Id.* In 1950, Section 241 was amended to remove burglary from the list. In 1968, murder and rape were added.

On its face, Section 241 does not disenfranchise any person based on race. But the Supreme Court has made clear that a facially neutral felon disenfranchisement law violates the Equal Protection Clause if (1) the law is motivated by a desire to discriminate on the basis of race, and (2) it continues to have that effect to this day. *See*, *e.g.*, *Hunter*, 471 U.S. at 233 (holding

Alabama felon disenfranchisement law unconstitutional because it "was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect").

So Plaintiffs must establish both discriminatory intent and effect. As *Hunter* explains, and other courts have repeatedly reaffirmed, "[a] successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect." *Greater Birmingham Ministries v. Secretary of State*, 992 F.3d 1299, 1321 (11th Cir. 2021) (collecting cases). *See also*, *e.g.*, *Hand*, 888 F.3d at 1209 ("in *Hunter*, . . . a state's method for reenfranchising a convicted felon would violate equal protection if the scheme had <u>both</u> the purpose and effect of invidious discrimination"); *Hayden v. Cty. of Nassau*, 180 F.3d 42, 48 (2nd Cir. 1999) ("[A] facially neutral statute violates equal protection if it was motivated by discriminatory animus and its application results in a discriminatory effect."). I have found no governing precedent holding a law unconstitutional based on discriminatory intent alone, in the absence of discriminatory effect. And Plaintiffs do not cite any.[1]

As a historical matter, it is undisputed that the original drafters of Section 241 cherry-picked felonies in 1890 with the deliberate, explicit, and noxious purpose of suppressing the African-American vote. *See*, *e.g.*, *Cotton v. Fordice*, 157 F.3d 388, 391 (5th Cir. 1998) ("The state defendants do not dispute that § 241 was enacted in an era when southern states discriminated

---

[1] The dissent contends that I have misconstrued *Hunter*, and that under a proper reading of that decision, "Plaintiffs do not need to establish discriminatory impact" to state a viable constitutional claim under *Hunter*. *Post*, at _ n.5. But that is contradicted by the various post-*Hunter* precedents that I discuss above. The dissent does not confront any of these authorities. Nor does it offer any authority that interprets *Hunter* as it suggests.

against blacks by disenfranchising convicts for crimes that, it was thought, were committed primarily by blacks.").[2]

But the parties disagree as to whether the amendments enacted in 1950 and 1968 served to cleanse Section 241 of its original racist intent. Our court today presents the strongest available arguments and authorities for upholding Section 241 in light of those amendments. I am particularly persuaded by the ample evidence marshaled by the court that Mississippi would enact the same law today for reasons wholly unrelated to race. *See ante*, at 20–21 ("[E]ven if there remained a question of discriminatory intent arising from the 1968 amendment, plaintiffs' claims would still fail because Mississippi produced additional evidence" that "Section 241 would have been enacted in its current form absent racial discrimination").

I write separately to address the issue expressly reserved by our court today—whether Section 241 presents "ongoing unconstitutional effects" of racial discrimination. *See ante*, at 9 n.11. I conclude that, even if one were to assume the continued taint of discriminatory intent, Plaintiffs cannot show that Section 241 is racially discriminatory in effect, as both Supreme Court and circuit precedent require. *Cf. Tex. Democratic Party v Abbott*, 961 F.3d 389, 416 (5th Cir. 2020) (Ho, J., concurring) (writing separately to explain why preliminary injunction against Texas election law is flawed "even if one were to assume that Texas law violates the Twenty-Sixth Amendment").

---

[2] The original 1890 Mississippi Constitution also required racially segregated schools, Miss. Const. art. 8, § 207, and prohibited interracial marriage, Miss. Const. art. 14, § 263. Those provisions were not repealed until 1978 and 1987, respectively, notwithstanding *Brown v. Board of Education*, 347 U.S. 483 (1954), and *Loving v. Virginia*, 388 U.S. 1 (1967).

No. 19-60632

## II.

Plaintiffs cannot satisfy the discriminatory effect element for one simple reason: Section 241 does not disproportionately disenfranchise a greater percentage of African-Americans today than would a blanket felon disenfranchisement law. Indeed, Plaintiffs acknowledged as much during oral argument. And that admission is fatal to Plaintiffs' case.

Blanket felon disenfranchisement laws are indisputably constitutional under Section 2. *See*, *e.g.*, *Richardson*, 418 U.S. at 54; *see also id.* at 72 (Marshall, J., dissenting) ("The Court construes § 2 of the Fourteenth Amendment as an express authorization for the States to disenfranchise former felons."); Laurence H. Tribe, American Constitutional Law 1094 (2nd ed. 1988) (same).

So if a blanket felon disenfranchisement law is permissible, then it's hard to see how a narrower, more selective law would be unconstitutional. After all, it's undisputed that the racial composition of the disenfranchised population is substantially the same either way. In the absence of any racial disparity between the two approaches, logic would dictate that the greater power should include the lesser power.

Moreover, the reasoning behind Plaintiffs' contrary approach is difficult to understand. Under Plaintiffs' theory, Section 241 would avoid constitutional infirmity if the State *expanded* it to cover *all* felonies. It is a peculiar theory of equal protection that teaches States to avoid liability for discriminating against people of a particular race by disenfranchising *more* individuals of that race.

## III.

Plaintiffs respond by invoking *Hunter*. But nothing in that decision supports their logic.

To begin with, *Hunter* acknowledges the "implicit authorization of § 2 to deny the vote to citizens 'for participation in rebellion, or other crime,'" as the Court recognized in *Richardson*. *Hunter*, 471 U.S. at 233 (citing *Richardson*). This is unsurprising, considering that both *Hunter* and *Richardson* were authored by then-Justice Rehnquist. More importantly, it means that blanket felon disenfranchisement laws are constitutional—and that we cannot construe *Hunter* to suggest otherwise.

In addition, it was conceded in *Hunter* that Alabama law disproportionately suppressed the African-American vote by cherry-picking offenses to exclude a greater percentage of African-Americans than would a blanket felon disenfranchisement law. And that concession was critical to proving both the discriminatory intent and disproportionate effect required to establish an equal protection violation.

To begin with, the Court found discriminatory intent because "the crimes selected for inclusion . . . were believed by the delegates to be *more frequently committed by blacks*" than other crimes. *Id.* at 227 (emphasis added). The drafters of the Alabama disenfranchisement law specifically "selected such crimes . . . that were thought to be *more commonly committed by blacks*." *Id.* at 232 (emphasis added).

Second, Alabama conceded that this cherry-picking worked—that it caused a discriminatory effect on African-American voters. As the Court noted, the racially discriminatory "impact . . . of the provision *has not been contested*." *Id.* at 227 (emphasis added). Moreover, the Court referred explicitly to the findings of the Court of Appeals. *Id.* That is notable because, according to the Court of Appeals, the State of Alabama never even bothered to suggest that its disenfranchisement law excluded African-Americans in "similarly disproportionate numbers" as the general felon population and

therefore presented no discriminatory effect.  *Underwood v. Hunter*, 730 F.2d 614, 620 n.11 (11th Cir. 1984) (emphasis added).

So the plaintiffs in *Hunter* demonstrated both discriminatory intent and effect.  This case, by contrast, presents neither element.  Mississippi vigorously maintains that its disenfranchisement law results in no racial disparity compared to the general felon population.  And Plaintiffs do not contend otherwise.

For their part, Plaintiffs theorize that we should compare the racial effects of Section 241, not to the general felon population, but to the entire population of Mississippi.  But that is not the proper comparator for determining whether Section 241 indeed has a discriminatory effect.

When a party challenges the racial composition of a jury as discriminatory in violation of the Sixth Amendment, the relevant baseline is not the general population, but the population of eligible jurors.  *See*, *e.g.*, *Berghuis v. Smith*, 559 U.S. 314, 323 (2010) ("'Absolute disparity' is determined by subtracting the percentage of African–Americans in the jury pool . . . from the percentage of African–Americans in the local, jury-eligible population.").  When a party contests the use of peremptory strikes as racially biased in violation of the Equal Protection Clause, the relevant baseline is not the general population, but the jury pool.  *See*, *e.g.*, *Seals v. Vannoy*, 1 F.4th 362, 366 (5th Cir. 2021) (examining "the number of strikes in comparison to the number of people in the jury pool who were black").  When a party objects to the racial composition of a particular workforce as the product of racism in contravention of Title VII of the 1964 Civil Rights Act, the relevant baseline is not the general population, but the universe of workers who are actually qualified to do the job in that particular labor market.  *See*, *e.g.*, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 501–02 (1989) ("[T]he relevant statistical pool for purposes of demonstrating

discriminatory exclusion must be the number of minorities qualified to undertake the particular task.").

And so too here. The relevant baseline in this case is not the general population, but the population of felons subject to disenfranchisement under Section 2 of the Fourteenth Amendment. And Plaintiffs fail to present any such racial disparity as compared to the general felon population in Mississippi.[3]

Finally, Plaintiffs suggested during oral argument that it should not matter that Section 241 causes the same racial disparities as a blanket felon disenfranchisement law would. They theorize in essence that, because racial disparities exist across the entire criminal justice system in Mississippi, Section 241 should go down with the ship.

It should go without saying that, if there is racial discrimination anywhere in the criminal justice system in Mississippi—whether within police departments, among prosecutors, or in the courtroom—we must eliminate it, root and branch. "Nothing is more corrosive to public confidence in our criminal justice system than the perception that there are two different legal standards." *Gomez v. Galman*, 18 F.4th 769, 783 (5th Cir. 2021) (Ho, J., concurring) (quotations omitted) (collecting cases alleging racism by police officers).

---

[3] The dissent claims that, at a minimum, "there is a factual dispute about discriminatory impact" that necessitates remand. *Post*, at __ n.5. But I don't see a material fact dispute here. No one denies that there's a meaningful disparity between the disenfranchised population and the entire population of Mississippi. But no one claims that there's a meaningful disparity between the disenfranchised population and the felon population of Mississippi. Where we part company is deciding which comparison is determinative: Do we compare the disenfranchised population to the general felon population—or to the citizenry at large? As explained, I say it's the former. The dissent says it's the latter. Whoever is right, it's surely a legal dispute and not a factual one.

But if there is indeed such discrimination at work here, it is entirely exogenous to Section 241. Imagine the following hypothetical: An employer holds a job fair on a particular date. A racist group of police officers, unbeknownst to the employer, blocks the roads and highways so that a particular racial group cannot attend the job fair. The police officers are plainly guilty of racial discrimination. But the employer is not—even though there is now racial disparity at the job fair.

\* \* \*

Plaintiffs no doubt present sincere concerns that Section 241 not only comes to us with a troubling provenance—it also operates today to disproportionately disenfranchise African-Americans.

But disparity alone does not prove discrimination. *See, e.g.*, *Milliken v. Bradley*, 433 U.S. 267, 280 n.14 (1977) ("[T]he Court has consistently held that the Constitution is not violated by racial imbalance . . . without more."). And in this case, there is not even a relevant disparity. Section 241 does not disenfranchise African-American voters at a greater rate than other felon disenfranchisement laws. So if there is racism in Mississippi's criminal justice system, it is upstream from Section 241. And holding Section 241 unconstitutional based on flawed metrics would not cure it.

What's more, applying the wrong numerical analysis is not just a matter of statistical imprecision. It also confounds our country's fundamental commitments.

The Constitution promises equality of treatment, not equality of outcome. It does not ask whether we have too many people of a particular race, whether in a prison, at a workplace, or on a college campus. Rather, it asks only whether the law governs every citizen in the same manner, regardless of their race. The Equal Protection Clause enshrines color-blindness, not critical race theory. *See, e.g.*, *Rollerson v. Brazos River Harbor*

No. 19-60632

*Navigation Dist.*, 6 F.4th 633, 647–50 (5th Cir. 2021) (Ho, J., concurring in part and concurring in the judgment); *Veasey v. Abbott*, 13 F.4th 362, 371–79 (5th Cir. 2021) (Ho, J., concurring).

I agree that we should affirm.

No. 19-60632

Jennifer Walker Elrod, *Circuit Judge*, dissenting:

As the majority acknowledges and the dissenters explain, it is undisputed that the enactment of § 241 was "steeped in racism." *Ante* at 2. Only six years after its enactment, the Supreme Court of Mississippi explained the motive and selection criteria for § 241's nine disenfranchising crimes. "Restrained by the federal constitution from discriminating against the negro race, the convention discriminated against its characteristics and the offenses to which its weaker members were prone." *Ratliff v. Beale*, 20 So. 865, 868 (Miss. 1896). While recognizing its invidious origins, the majority concludes that subsequent amendments to § 241 have cured the racial animus and legitimated—for equal protection purposes—the remaining crimes originally listed in the Mississippi Constitution of 1890.

I am not so sure. If Mississippi had subsequently reenacted § 241 in the absence of discriminatory intent, § 241 would pose no equal protection problem. But as Judge Graves's dissenting opinion points out, the Mississippi electorate has never been asked to either remove or approve of eight of the nine original crimes. When burglary was removed in 1950, and when rape and murder were added in 1968, Mississippians were given only an "up or down" option to approve § 241 as amended—not to approve § 241 as it then existed. *Post* at 45–48 (Graves, J., dissenting). Because Mississippians were never given the option to remove the racially tainted list, as I understand *Hunter v. Underwood*—which binds us—I am not satisfied that the relevant parts of § 241 have been 'reenacted.' *See* 471 U.S. 222, 233 (1985). Having failed to reenact it, the State is stuck with its discriminatory intent.

Under *Hunter*, the burden then shifts to the State to show that § 241 would have been enacted in the absence of the illicit intent. 471 U.S. at 228. Even assuming that (1) the relevant time period for this inquiry is not 1890,

and (2) the State does not conclusively fail to carry its burden as of 1890, I agree with Judge Graves's dissenting opinion that—at the very least—there are fact issues on this question that preclude summary judgment.

That being said, separate and apart from questions of intent, I agree with Judge Ho's concurring opinion that the plaintiffs must further show that § 241 continues to have a discriminatory effect. *Ante* at 25 (Ho, J., concurring in part and concurring in the judgment) (citing, *e.g.*, *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) ("A successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect.")); *Hunter*, 471 U.S. at 233 ("[The] original enactment [of § 182] was motivated by a desire to discriminate against blacks on account of race and the section continues to this day to have that effect."). Because the district court may address intent and effect in either order, the absence of an ongoing discriminatory effect may alone be dispositive in this case. But as Judge Graves's dissenting opinion notes, the district court did not analyze the parties' conflicting arguments or evidence about discriminatory effect. *Post* at 44 n.5 (Graves, J., dissenting). For this reason, I would remand for the district court to address whether plaintiffs have demonstrated § 241's discriminatory effect in the first instance. *Montano v. Texas*, 867 F.3d 540, 546 (5th Cir. 2017) ("[W]e are a court of review, not first view." (quotation omitted)).

No. 19-60632

HAYNES, *Circuit Judge*, dissenting:

I agree with the conclusion reached in Judge Graves's dissenting opinion as to what the decision in this case should be. In my view, the bottom line as to the relevant issues is that § 241 was enacted with discriminatory intent (which no one disputes), that it continues to have discriminatory impact, and that the provision was not "reenacted" via amendment in 1950 or 1968. At no point did the Mississippi electorate have the option of striking the entirety of § 241's disenfranchisement provision. This court's decision in *Cotton v. Fordice*, 157 F.3d 388 (5th Cir. 1998), was wrong to conclude that § 241's subsequent amendments were enacted through a "deliberative process" capable of cleansing the discriminatory taint of 1890. *See id.* at 392. Because I disagree with the majority opinion's judgment to the contrary, I respectfully dissent.

No. 19-60632

James E. Graves, Jr., *Circuit Judge*, joined by Stewart, Dennis, Higginson, and Costa, *Circuit Judges*, dissenting:

> "There is no use to equivocate or lie about the matter . . . Mississippi's constitutional convention of 1890 was held for no other purpose than to eliminate the nigger from politics . . . . In Mississippi we have in our constitution legislated against the racial peculiarities of the Negro . . . . When that device fails, we will resort to something else."[1]

This is the intent behind the law the en banc court upholds today. In 1890, Mississippi held a constitutional convention with the express aim of enshrining white supremacy. The 1890 Convention was a backlash against Reconstruction-era efforts to remedy centuries of chattel slavery and violence against Black people. The Convention was successful. The new constitution erased racial progress in Mississippi primarily through disenfranchising Black voters, formally beginning the Jim Crow era of the American South. Today the en banc majority upholds a provision enacted in 1890 that was expressly aimed at preventing Black Mississippians from voting. And it does so by concluding that a virtually all-white electorate and legislature, otherwise engaged in massive and violent resistance to the Civil Rights Movement, "cleansed" that provision in 1968. Handed an opportunity to right a 130-year-old wrong, the majority instead upholds it. I respectfully dissent.

---

[1] Statement in 1890 of James K. Vardaman. Statements like these would win Vardaman a seat as Mississippi' state representative, 1890-96; Speaker of Mississippi's House of Representatives, 1894-96; Mississippi's Governor, 1904-08; and Mississippi's U.S. Senator, 1913-19. Neil R. McMillen, Dark Journey: Black Mississippians in the Age of Jim Crow 43 (1990).

## I.

### A.

The Reconstruction Act of 1867 allowed Black Mississippians to vote for the first time in the State's history. United States Commission on Civil Rights, Voting in Mississippi 1 (1965). In 1867 Blacks made up a majority of the state's population. Their voter participation skyrocketed, producing several Black elected officials, including a Black United States Senator. *Id.* at 2. Mississippi is currently home to the highest percentage of Black Americans of any state in the Union. And yet, Mississippi has not elected a Black person to statewide office since, unsurprisingly, 1890.

No one disputes that the chief aim of Mississippi's 1890 Convention was white supremacy. Nor could anyone do so in good faith, as the delegates themselves readily declared their intentions: "Our chief duty when we meet in Convention is to devise such measures . . . as will enable us to maintain a home government, under the control of the white people of the State." McMillen, *supra*, at 41. "The plan," said U.S. Senator James Zacariah George, "is to invest permanently the powers of government in the hands of the people who ought to have them—the white people." *Id.* The Convention's President similarly avowed its blatantly racist purpose: "Let's tell the truth if it bursts the bottom of the Universe. We came here to exclude the Negro. Nothing short of this will answer." *Id.* (statement of Solomon Saladin "S.S." Calhoun) (cleaned up)). Of course, all of the 1890 Convention's 134 delegates were white Democrats, save just one African-American Republican. A white Republican named Marsh Cook had campaigned for a seat vowing to protect the rights of Black Freedmen. But a few weeks before the convention, his bullet-riddled corpse was found on a

rural road in Jasper County. "*Another White Man Murdered in Mississippi*," Cleveland Gazette, Aug. 2, 1890, at 2.

The Convention's intent was plain. Its primary method? Disenfranchisement.[2] According to a unanimous Mississippi Supreme Court in 1896, the 1890 Convention's purpose was "to obstruct the exercise of the franchise by the Negro race." *Ratliff v. Beale*, 20 So. 865, 868 (Miss. 1896). One of the key provisions enacted in 1890, and at the heart of this case, disenfranchised voters who committed certain crimes. Miss. Const. art. XII, § 241 (1890). The crimes the legislature settled on were those thought to be more likely committed by Black people, a "patient, docile people . . . given rather to furtive offenses than to the robust crimes of the

---

[2] Of course, the 1890 Convention enacted several other racist provisions:

- "The marriage of a white person with a negro or mulatto, or person who shall have one-eighth or more of negro blood, shall be unlawful and void." Miss. Const. art. XIV, § 263 (1890).

- "Separate schools shall be maintained for children of the white and colored races." Miss. Const. art. VIII, § 207 (1890).

- "[The legislature] may provide for the commutation of the sentence of convicts for good behavior, and for the constant separation of the sexes, and for the separation of the white and black convicts as far as practicable." Miss. Const. art. VIII, § 225 (1890).

- As opposed to previous state constitutions' extending the right to bear arms to "all persons," Miss. Const. art. I, § 15 (1868), the 1890 constitution gave that right only to "every citizen," enabling the legislature to "regulate or forbid carrying concealed weapons," Miss. Const. art. VIII, § 12 (1890). These provisions, of course, were intended to prevent Black Mississippians from arming. *See Ward v. Colom*, 253 So. 3d 265, 279 (Miss. 2018) (King, J., dissenting) (explaining that these alterations were "craftily designed to obstruct or deny certain rights to African Americans" (quoting Westley F. Busbee, Jr., Mississippi: A History 178 (2d ed. 2015)); Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 Kan. J. L. & Pub. Pol'y 17 (1994)).

whites." *Ratliff*, 20 So. 865 at 868 (listing "[b]urglary, theft, arson, and obtaining money under false pretenses" as the furtive offenses to which Blacks were thought to be "prone," as opposed to "robbery and murder and other crimes in which violence was the principal ingredient," which were viewed as "crimes of the whites"); *see also* MCMILLEN, *supra*, at 43. When enacted in 1890, § 241 listed nine disenfranchising offenses: bribery, burglary, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement, and bigamy. MISS. CONST. art. XII, § 241 (1890).

Section 241 has been amended only twice since 1890. In 1950, voters approved an amendment to remove burglary. In 1968, voters approved an amendment to add rape and murder. In both instances, voters voted yes or no on removing burglary or adding rape and murder, respectively. As for the other eight crimes listed in § 241, however, Mississippi voters have not spoken on them since 1890. So those eight crimes, that the 1890 Convention listed with express racist intent, remain on the books entirely unchanged and continue to disenfranchise Mississippians today.

## B.

Plaintiffs are two Black Mississippians who are disenfranchised by § 241. Roy Harness was convicted of forgery in 1986. He has since completed his sentence. In 2018, he completed his baccalaureate degree in social work from Jackson State University and was awarded a scholarship towards a master's degree—all at the age of 62. Due to his 1986 conviction and the operation of § 241, however, Harness is unable to vote. Kamal Karriem was convicted of embezzlement in 2005 and has also completed his sentence. Karreim is a former city council member, a pastor, and business owner. Like Harness, Karreim is unable to vote because embezzlement is a disenfranchising offense under § 241.

Plaintiffs sued Mississippi and raised equal protection claims under the Fourteenth and Fifteenth Amendments.

## II.

A law prohibiting the right to vote is unconstitutional if "its original enactment was motivated by a desire to discriminate against blacks on account of race[.]" *Hunter v. Underwood*, 471 U.S. 222, 233 (1985). "Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Id.* at 228 (citing *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977)). The original discriminatory taint on the law may be "cleansed" by striking down the inseverable, tainted portions of the law. Amendment, however, cleanses a discriminatory law *only* when it "alter[s] the *intent* with which the article, including the parts that remained, had been adopted." *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) (emphasis added).

The case on point here is *Hunter v. Underwood*, 471 U.S. 222 (1985). *Hunter* involved an Alabama constitutional provision modeled after Mississippi's § 241. The Alabama law disenfranchised voters for committing crimes "thought to be more commonly committed by blacks," defined as "any crime involving moral turpitude." *Id.* at 223, 232. Just as with § 241, there were ample contemporaneous statements by Alabama legislators showing the provision's racist purpose. Like § 241, the Alabama provision had been "pruned" over the years. *Perez*, 138 S. Ct. at 2325 (discussing *Hunter*).

A unanimous Supreme Court held the law was unconstitutional despite the law's revisions. *Hunter*, 471 U.S. at 228–32. The Court rejected Alabama's argument that the law was legitimized by subsequent changes over the intervening 80 years. *See id.* at 232–33. Specifically, even though judicial

decisions had "struck down" some of the more "blatantly discriminatory" inclusions in the list of crimes, such as "assault and battery on the wife and miscegenation," and left only offenses that "are acceptable [race-neutral] bases for denying the franchise," the Court determined the provision violated equal protection. *Id*. at 233. The Court noted only that the law's "original enactment was motivated by a desire to discriminate against blacks on account of race and the section continue[d] . . . to have that effect." *Id*.

In this case, we must apply *Hunter* to the eight remaining crimes in § 241. So we must decide whether anything has happened since 1890 that has "alter[ed] the intent with which the article, *including the parts that remain[]*, [was] adopted." *Perez*, 138 S. Ct. at 2325 (emphasis added).

This court first addressed this issue 24 years ago in *Cotton v. Fordice*, 157 F.3d 388 (5th Cir. 1998). In *Cotton*, the court discussed the similarities between § 241 and the Alabama law in *Hunter*:

> The state defendants do not dispute that § 241 was enacted in an era when southern states discriminated against blacks by disenfranchising convicts for crimes that, it was thought, were committed primarily by blacks . . . . Mississippi's complicity in this practice was recognized by its Supreme Court six years after the original adoption of § 241 . . . . Although § 241 was facially neutral and technically in compliance with the Fourteenth Amendment, the state was motivated by a desire to discriminate against blacks.

*Id.* at 391 (citations omitted). Despite these similarities, the court upheld § 241 based on the conclusion that amendments in 1950 and 1968 "removed the discriminatory taint associated with the original version." *Id.*

*Cotton* rests on the conclusion that Mississippi "reenact[ed]" § 241 each time it amended it. *Id.* at 390. Because the amendment process required approval by both houses of the legislature, the Secretary of State, and voters,

the court determined "§ 241 as it presently exists is unconstitutional only if the *amendments* were adopted out of a desire to discriminate against blacks." *Id.* at 392 (emphasis added). The pro se plaintiff in *Cotton*, however, failed to meet this burden of establishing discriminatory intent behind the amendments. *See id.*

Plaintiffs argue that the crimes that were originally enacted in 1890, and that remain in § 241 today, were selected with discriminatory intent and therefore are unconstitutional. Mississippi moved for summary judgment and relied on *Cotton* to argue that any discriminatory taint was removed when § 241 was amended in 1950 and 1968. Bound by *Cotton*, the district court granted summary judgment to the State and a panel of this court affirmed. *Harness v. Hosemann*, 988 F.3d 818, 823 (5th Cir. 2021), *reh'g granted and vacated*, 2 F.4th 501 (2021).

### III.

*Cotton* was wrongly decided. And the en banc majority compounds that mistake by reaffirming it today.

In my view, the discriminatory intent behind the eight crimes that were first placed in § 241 in 1890 remains today. That is because since 1890, Mississippi voters have not touched them in any meaningful way so as to alter the intent. Contrary to *Cotton*, the 1968 amendment did not reenact § 241.[3]

---

[3] *Cotton* is wrong because it concluded the 1950 and 1968 amendments were reenactments, but its errors do not end there. Jarvious Cotton and Keith Brown, the two plaintiffs in *Cotton*, proceeded pro se before our court, without the benefit of *any* detailed factual record on the amendment processes that resulted in the current version of § 241. *See* Gabriel J. Chin, *Rehabilitating Unconstitutional Statutes: An Analysis of* Cotton v. Fordice, 157 F.3d 388 (5th Cir. 1998), 71 U. CIN. L. REV. 421, 422-23 (2002) (observing that the court "neither appointed counsel nor sought the views of an *amicus curiae* who could have made an adversary presentation on this important issue"). For example, there is no evidence that the court in *Cotton* considered whether the 1950 and 1968 amendments were enacted by legislators "with awareness of [the law's] initial unconstitutionality." *Id.*

No. 19-60632

So it is sufficient in this case to look at the intent in 1890, and in doing so Plaintiffs have met their burden to establish discriminatory intent. And when the burden shifts to the State under *Hunter*, there is no evidence that in 1890, § 241 would have been enacted, or the original eight crimes selected, absent the consideration of race. Section 241 is therefore unconstitutional because it violates the Equal Protection Clause.

The majority, however, concludes § 241 was "reenacted" in 1968 and only the intent at that time matters.[4] Even if we engage with this faulty "reenactment" theory, a cursory look at Mississippi's well-known history establishes a factual dispute on whether the legislature and electorate acted with discriminatory intent in 1968. This same history sufficiently creates a factual dispute on whether § 241 would have been enacted absent the consideration of race when the inquiry is expanded to 1968 and after.

---

at 439 ("[T]here is no suggestion in the court's opinion in *Cotton* that the unfortunate origins of section 241 were specifically identified at any point in 1950 and 1968.").

And the panel missed an opportunity to dispose of the case on a nonconstitutional basis. *See id.* at 432. The panel in *Cotton* was presented with two challenges to § 241: an as-applied challenge and a facial challenge. For the as-applied challenge, the plaintiff argued his conviction for armed robbery did not fall within the word "theft" as used in § 241. The panel, however, dismissed this argument. Robbery is not mentioned in § 241, but in a series of opinions not mentioned in *Cotton*—by the parties or the court—the Attorney General of Mississippi determined robbery is not a disenfranchising offense. *See* Op. Miss. Att'y Gen., Aug. 29, 1990, 1990 WL 547896; Op. Miss. Att'y Gen., Mar. 3, 1982, 1982 WL 44073. These opinions suggest robbery does not necessarily fall within the meaning of theft under Mississippi law because the taking of property need not be successful to sustain a robbery conviction. *See Harris v. State*, 445 So. 2d 1369, 1370 (Miss. 1984) (stating the taking of property need not be completed to count as robbery).

[4] Like the majority, I focus on the 1968 amendment. *Ante*, at 5 n.5. All that needs to be said about the 1950 amendment is that, despite being enacted 80 years after the Fifteenth Amendment's ratification, virtually no Black people had the right to vote on that amendment.

Therefore, even under the majority's theory, there are fact disputes that require the reversal of summary judgment to the State.

## A.

Application of *Hunter* requires us to overrule *Cotton*'s conclusion that there is no evidence of discriminatory intent behind § 241. There is no dispute that § 241 was enacted, and the crimes therein were selected, with a discriminatory purpose. Without belaboring the racist origins of the 1890 Convention, the only conclusion here is that § 241 "was motivated by a desire to discriminate against blacks on account of race." *Hunter*, 471 U.S. at 233. That provision continues to have a discriminatory impact.[5] Racial

---

[5] Contrary to JUDGE HO's concurrence, Plaintiffs do not need to establish discriminatory impact. The test from *Hunter* was adopted from *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). That test focuses on discriminatory purpose because that is what the Equal Protection Clause prohibits. Discriminatory impact, however, is relevant as *evidence* of discriminatory purpose. As the Supreme Court stated in *Washington v. Davis*, 426 U.S. 229, 242 (1976): "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." The Court's statement in *Hunter* about continuing discriminatory impact, then, meant that only if the law were "enacted today" would evidence of impact be relevant, as the plaintiffs would have lacked the abundant historical evidence of the initial animus motivating the law. 471 U.S. at 233. But § 241 was initially enacted with discriminatory intent, and because § 241 has not been reenacted since, evidence of discriminatory impact is unnecessary.

In any event, § 241 continues to have a disparate impact on Black Mississippians. African Americans comprise some 36% of Mississippi's population yet make up over half of those disenfranchised for embezzlement. Accordingly, Black Mississippians are more likely to be disenfranchised for embezzlement than are non-Black Mississippians despite comprising a minority of the state's population. In Mississippi, 235,152 people, or almost 11% of the state's voting age population, have lost their right to vote. Mississippi has the third highest percentage of disenfranchised Black residents of any state in the nation: 130,501 Black Mississippians, or 16% of voting-age African Americans. Almost a third of all African American men in Mississippi are disenfranchised. Chris Uggen et al., *Estimates of People Denied Voting Rights Due to a Felony Conviction*, THE SENTENCING PROJECT (Oct. 30, 2020), https://www.sentencingproject.org/wp-content/uploads/2020/10/Locked-Out-2020.pdf. Of the nearly 50,000 individuals convicted of disenfranchising

discrimination was a motivating factor behind the enactment of § 241 and the eight discriminatory-chosen crimes. Under *Hunter*, the burden has shifted to the State to demonstrate that the law would have been enacted without this factor.

Despite *Hunter*'s clear application here, the majority relies on a caveat to uphold § 241 and reaffirm *Cotton*. In *Hunter*, the Court declined to decide "whether [the discriminatory provision] would be valid if *enacted* today without any impermissible motivation." *Id.* (emphasis added). The majority takes the position that a later reenactment of a facially neutral yet originally discriminatory law can overcome the odious origins. *Ante*, at 11; *see also Cotton*, 157 F.3d at 391–92. But even if "reenactment" can have this effect, that is not what happened in Mississippi in 1968.

The Session Laws through which § 241 was changed refer to "Amendment," and not to repeal, supersession, or reenactment. *See* H.R. Con. Res. 5, 1968 Reg. Sess. Ch. 614 (MISS. LAWS 1968) (titled "A concurrent resolution to amend Section 241" and stating "Be it resolved . . . That the following amendment to the Constitution of the State of Mississippi be submitted to the qualified electors[.]"). The legislature therefore saw itself amending § 241, rather than replacing or reenacting it. The legislature

---

offenses in Mississippi state courts between 1994 and 2017, almost 60% are Black and 38% are white. Similarly, of the approximately 29,000 individuals who have completed their sentences for the convictions of disenfranchising offenses between 1994 and 2017, 58% are Black while only 36% are white. African American adults in Mississippi are thus 2.7 times more likely than white adults to be disenfranchised by § 241. *Id.*; *cf. Hunter*, 471 U.S. at 227 ("Jefferson and Montgomery Counties blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer dis[en]franchisement under Section 182 for the commission of nonprison offenses." (citation omitted)).

Thus, even if JUDGE HO is correct, there is a factual dispute about discriminatory impact. And because the district court did not address this issue below, Plaintiffs are at least entitled to present impact evidence before the district court.

accordingly framed the ballot as "For *Amendment*" or "Against *Amendment*," meaning the vote presented to the electorate referred to amendment and not reenactment. Voters could only amend § 241, they could not reenact it.

The electorate was given only an up or down vote *on an amendment*. If the amendment passed, the remainder of the existing list would persist just as it would if the amendment had failed. In other words, the amendment votes *had no effect* on the undisputedly racist list of disenfranchising crimes originally enacted in 1890. The votes "for amendment" allowed murder and rape to be added to § 241. The votes "against amendment" allowed § 241 to remain unchanged—i.e., for the provision to not include murder and rape. These votes, either for or against amendment, gave no say on the other crimes listed in § 241, importantly, the crimes that were enacted in 1890. The "for amendment" votes did not influence the inclusion or exclusion of bigamy or embezzlement. The "against amendment" votes did not have the effect of revoking theft or bribery from the list. Regardless of the outcome of the vote, the eight crimes that were enacted in 1890 would remain. Because the public vote had no effect on those discriminatory-chosen crimes, the vote also had no effect on allegedly altering the intent behind those crimes. *See Perez*, 138 S. Ct. at 2325 (noting that discriminatory taint of law is not eliminated unless an amendment "*alter[s] the intent* with which the article . . . had been adopted." (emphasis added)); *Veasey v. Abbott*, 888 F.3d 792, 822 (5th Cir. 2018) (Graves, J., concurring in part and dissenting in part) ("Nothing cuts the thread of [discriminatory] intent here.").[6]

---

[6] I recognize that I have, in a previous opinion, endorsed *Cotton* as a case where the discriminatory intent of § 241 was eliminated by reenactment. *See Veasey*, 888 F.3d at 822 (Graves, J., concurring in part and dissenting in part). But it is now clear that *Cotton* is built on a faulty premise that the amendments wholly "reenacted" § 241. Instead, this case is like *Veasey* where there was "no reenactment" at all. *Id.* And the inability of the 1968

No. 19-60632

This is particularly important in this case because only the *people*, through a direct exercise of popular sovereignty, can amend a constitution, and it follows that only the people through the amendment process can cleanse a racist constitutional provision of its discriminatory purpose. *See* Miss. Const. art. XV, § 273(2); *cf.* U.S. Const. art. 5. Mississippians have not had a say on the eight crimes originally enacted in 1890 *since* 1890. Those crimes were not on the table in 1968. So there is no basis to conclude Mississippians ratified or reenacted § 241 or the eight crimes from 1890. And the Supreme Court has explained that while "[p]ast discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful," *Hunter*'s burden-shifting framework applies in cases where a law has been "pruned" but "never repealed," as long as the discriminatory law's "amendments did not alter the intent with which the [law], including the parts that remained, had been adopted." *Perez*, 138 S. Ct. at 2324-25. Because § 241 was merely "pruned" in 1968, not "repealed" or "reenacted," the burden has shifted to the State.

Consider an analogy: a city council votes to build a wall. Years later, it offers the city's voters a choice on whether to make the wall a foot shorter. The voters in this scenario can vote only on whether to change the wall; they are given no opportunity to get rid of it. Regardless of the vote's result, it expresses no information on voters' views of the wall itself, only on the (modest) change to the wall's height. So too here. The 1968 vote reflects the voters' views only on the addition or subtraction of three crimes in the original § 241 list. Those votes did not touch, in any way, the eight original crimes from 1890 that remain in § 241 to this day. *Cf. Veasey*, 888 F.3d at 822 (Graves, J., concurring in part and dissenting in part) ("The new legislation

---

votes to affect the original eight crimes shows that as a practical matter, nothing has cut the thread of discriminatory intent that originated in 1890. *Id.*

just *added new provisions* to the *discriminatory framework* of the former legislation—modifications which . . . continue to burden the franchise of poor and minority voters. The old legislation 'remain[s] on the books' and is still the law." (emphasis added)).

Although it is unclear whether reenactment can cure a discriminatory law, *see Hunter*, 471 U.S. at 233, there is no basis to conclude § 241 has been reenacted since 1890. So we need only look to the intent behind the original enactment in 1890. *See Veasey*, 888 F.3d at 822 (Graves, J., concurring in part and dissenting in part) (stating there is no need to consider "the state of mind of the reenacting body" when "[t]here was no reenactment"). *Hunter* clearly holds that "[o]nce racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." 471 U.S. at 228. And because racial discrimination was undisputedly a motivating factor behind the enactment of § 241, Plaintiffs have met their burden under *Hunter*.

## B.

But according to the majority, the explicitly racist intent behind the 1890 constitution is irrelevant. Instead, because the majority erroneously concludes the provision was reenacted in 1968, what matters is whether there was discriminatory intent behind the 1968 amendment. *See Abbott*, 138 S. Ct. at 2324 ("Whenever a challenger claims that a state law was enacted with discriminatory intent, the burden of proof lies with the challenger." (citation omitted)). The majority thus makes this case about Mississippi in the 1960s. In doing so, the majority ironically fails to acknowledge the relevant and well-known historical evidence of Mississippi in the 1960s that creates a factual dispute about whether the 1968 amendment was motivated by discriminatory intent. And while the majority contends "the overall social and political

climate in Mississippi in the 1950s and 1960s fails to carry plaintiffs' burden," *ante*, at 19, I must disagree.

Even a cursory review of Mississippi history leading up to 1968 demonstrates that life for Black Mississippians in this era was little better than it had been for their grandparents in 1890. As John Dittmer describes:

> For generations, in the treatment of its African-American citizens, Mississippi had been, as Roy Wilkins bluntly put it, "the worst state." In no other southern state was the use of terror against the black population so systematic and pervasive. Both the Citizens' Council and the Ku Klux Klan made a mockery of the law, employing economic sanctions, intimidation, and violence to maintain white supremacy. Elected officials and business leaders had either cooperated with these extremists or stood by hoping that somehow calm would return, with the racial status quo maintained. Mississippi had no racially enlightened white political leadership, no locally influential voices of moderation in the media, no white ministerial associations pleading for racial justice.

JOHN DITTMER, LOCAL PEOPLE: THE STRUGGLE FOR CIVIL RIGHTS IN MISSISSIPPI 423 (1994). So entrenched was racial apartheid in Mississippi that white South African politicians made several research trips to the state in the mid-20th Century to learn how best to keep their own Black population disempowered and impoverished in perpetuity, and Nazi intellectuals found in Mississippi a model for their Aryan ethno-state, with Adolph Hitler proclaiming that the Volga region would be "our Mississippi." *See* PRUDENCE L. CARTER, STUBBORN ROOTS: RACE, CULTURE, AND INEQUALITY IN U.S. AND SOUTH AFRICAN SCHOOLS 19 (2012); Joanna L. Grisinger, *"South Africa is the Mississippi of the world": Anti-Apartheid Activism through Domestic Civil Rights Law*, 38 LAW & HIST. REV. 843 (2019); Ira Katznelson, "What America Taught the Nazis," THE

ATLANTIC (Nov. 2017) http://tinyurl.com/mryap3kd; Alex Ross, "How American Racism Influenced Hitler," THE NEW YORKER (April 30, 2018), http://tinyurl.com/3csryjnc.

The history of the struggle for civil rights in Mississippi in the 1960s reveals three themes. First, most white Mississippians in the 1960s strongly and overtly opposed the civil rights movement that sought to place Black Mississippians as equals in the state. An examination of Mississippi society in the 1960s—specifically its endemic white supremacy and reactionary backlash to the Civil Rights Movement—makes it implausible to think the electorate acted without discriminatory intent in voting on the § 241 amendment in 1968. Second, the actions of the legislature reveal consistent racist motives behind its legislative proposals. Particularly, the legislature and state leaders often acted to keep Black Mississippians as second-class citizens, undermine desegregation demands, and dilute the Black vote. Third, the federal government's role in the civil rights struggle in Mississippi was oftentimes characterized by inaction at best, and collusion with white supremacists at worst. This relationship between Mississippi and the federal government throughout this time and in response to the Civil Rights Act, Voting Rights Act, and *Brown v. Board of Education*, show just how little Mississippi was willing to comply with federal mandates, debunking the majority's contention that Mississippi responded to a report from the Civil Rights Commission in amending § 241.

No. 19-60632

### 1.    Mississippians' Hostility to Civil Rights

*"A desert state sweltering in the heat of injustice and oppression."*[7]

As Historian Neil McMillen has noted, Mississippi in the early 1950s saw an "atmosphere of unremitting hostility to social change in any form, where law was the servant of white supremacy," and, with the law on their side, "white supremacists had little need for lawlessness." McMillen, *remarks at Freedom Summer Reviewed conference, Jackson and Tougaloo, MS*, Oct. 30-Nov. 1, 1979 (quoted in DITTMER, *supra*, at 46). But that all changed with the prospect of court-ordered desegregation, grassroots civil rights activism, and federal legislation. Around this time Mississippi "plung[ed] into a period of violent interracial conflict unmatched since the bloody years of the 1870s." DITTMER, *supra*, at 34. As Reverend George W. Lee said at a small rally for voter registration in 1955, "Pray not for your mom and pop. They've gone to heaven. Pray you can make it through this hell."[8] *Id.* at 53.

Opposition to the civil rights movements was a society-wide campaign. Whites took a keen interest in curricula at white schools, banning books deemed too friendly to civil rights. *Id.* at 60–61. In 1956, the Mississippi House passed a bill requiring the State library commission to buy books advancing white supremacy. One purchased book, promoted in schools throughout the state, was Judge Tom Brady's *Black Monday*, a diatribe against *Brown*, that featured the following passage: "You can dress a chimpanzee, housebreak him, and teach him to use a knife and fork, but it will

---

[7] Rev. Dr. Martin Luther King, Jr., "I Have a Dream," Lincoln Memorial Address on August 28, 1963.

[8] Weeks later Rev. Lee would die of gunshot wounds to the face from white segregationist vigilantes in a drive-by shooting. The local newspaper reported only that Rev. Lee died in a "bizarre" car accident. DITTMER, *supra*, at 53.

take countless generations of evolutionary development, if ever, before you can convince him that a caterpillar or cockroach is not a delicacy. Likewise the social, economic, and religious preferences of the Negro remain close to the caterpillar and the cockroach." *Id.* at 60–61. Brady was appointed to the Mississippi Supreme Court in 1963, a position he would hold until his death in 1973.

Banks rescinded credit and declined mortgages for any Black person too interested in desegregation, the IRS took a sudden interest in civil rights leaders, local mail carriers publicized the names of NAACP mail recipients, and death threats were made against civil rights workers and sympathizers. *Id.* at 48–50. Through much of the 1960s, it was not uncommon for white county registrars to call the police whenever Black people tried to register to vote, even though they almost always failed the state's subjective and impossible literacy tests. *Id.* at 132. Police chiefs would physically block Black people from registering to vote. State law required local newspapers to publish the names of Black people who tried to register to vote. *Id.* at 137. White employers fired any individual with connections to the Black suffrage movement, however tenuous, while local mayors and sheriffs shuttered Black-owned businesses or revoked Black churches' tax-exempt statuses on trumped-up violations. Municipalities voted to shut off utilities or rescind entitlement to federal benefits like food surplus programs to whole swaths of Black communities deemed too friendly to civil rights causes. When Delta towns tried to *starve* Black communities by withholding access to a federal food surplus program, volunteers from around the country sent tons of food to the Delta, much of which was seized by police as contraband or set ablaze by white supremacists. *Id.* at 144-47. Black leaders who complained of these reprisals were arrested for "public utterances designed to incite breach of the peace." *Id.* Four years after *Brown*, Clennon King, a Black man, applied for admission to Ole Miss. The State responded by having King involuntarily

committed to an asylum, because according to the State, only an insane person would presume so much. TAYLOR BRANCH, PARTING THE WATERS: AMERICA IN THE KING YEARS, 1954-63 253 (1988).

When the government's tactics to stunt Black voter registration failed, "night riders went into action," engaging in a terror campaign throughout the state in which dozens of Black people, including children, were murdered by white vigilantes. DITTMER, *supra*, at 137. Such violence almost never resulted in any punishment for the perpetrators. In 1955, Emmett Till was lynched for speaking too warmly to a white woman. The defendants' attorney closed the trial expressing confidence that "every last Anglo-Saxon one of you has the courage to" acquit the two defendants. After an hour's deliberation, the jury did just that. The next year, both men would gleefully admit that they had indeed tortured and murdered the 14-year-old Till. *Id.* at 57. In 2008, a memorial sign was placed at the spot where Till's body was pulled from the Tallahatchie River. *In 2019*, local officials had to install a new bulletproof sign memorializing the lynching, as previous memorials were either stolen or shot up. Kayla Epstein, "*This Emmett Till memorial was vandalized again. And Again. And Again. Now, it's bulletproof*," THE WASH. POST (Oct. 20, 2019), http://tinyurl.com/2ncbw473.

Examples of similar violence abound during the period leading up to 1968. In 1961, Mississippi *state legislator* E.H. Hurst murdered Herbert Lee, a Black farmer, father of nine children, and member of the Amite County NAACP branch. What did Lee do to provoke the murder? He assisted in a voter registration drive that yielded only half a dozen new registrants. The Justice Department declined to offer protection to a witness to the murder, reasoning that it did not matter "what he testified [because] Hurst would be found innocent." DITTMER, *supra*, at 109. The witness was himself murdered two years later for the crime of speaking with Justice Department investigators. *Id.* at 215. So common were these acquittals that one white man

told a local newspaper in 1956: "There's open season on the Negroes now. They've got no protection, and any peckerwood who wants can go out and shoot himself one, and we'll free him." David Halberstam, "*Tallahatchie County Acquits a Peckerwood*," THE REPORTER, Apr. 19, 1956, at 25-30 (quote on 28).

This period is also characterized by blatant defiance of federal civil rights decrees. This defiance was often met with timid indifference by the Eisenhower, Kennedy, and Johnson Administrations. In 1961, the federal government banned segregation in bus terminals. A group of six activists from the Congress of Racial Equality, seeking to test this ruling, visited a bus station in McComb. They were severely beaten by a white mob. Although the police station was less than a block from the bus station, police declined to intervene. DITTMER, *supra*, at 114. Segregationist county clerks in Mississippi routinely defied injunctions from this court and from the Supreme Court throughout the 1960s. *E.g.*, JACK BASS, UNLIKELY HEROES 218-20 (1981). In July 1963, this court upheld a judgment against the Forrest County clerk and issued a civil contempt order for the clerk's continued refusal to allow Blacks to register to vote in Hattiesburg. DITTMER, *supra*, at 184. Even after the Supreme Court upheld that order in 1964, the clerk continued to refuse to register Black voters. *Id.*

Mississippi officials from top to bottom took pride in blatantly violating federal civil rights decrees. When this court ordered Ole Miss to immediately enroll James Meredith, *Meredith v. Fair*, 305 F.2d 343 (5th Cir. 1962), Mississippi Governor Ross Barnett claimed, on television, that "no school will be integrated in Mississippi while I am your governor," and demanded that all officials be prepared to suffer imprisonment for the cause of segregation: "We will not drink from the cup of this genocide." DITTMER, *supra*, at 139. Barnett's Lieutenant Governor, Paul Johnson, Jr., would later personally block Meredith from entering the Ole Miss campus,

setting off a race riot in which two people were killed and 160 U.S. Marshals injured. Barnett's and Johnson's actions were met with near-unanimous praise from Mississippi's white establishment: "the leaders of nearly every community, bankers, lawyers, businessmen and workers went on an orgy of rebellion against constituted authority and the federal government." *Id.* Johnson would be elected governor the next year, and a reservoir and some government buildings are named after Barnett to this day in Mississippi. After Meredith began attending Ole Miss, enrollment at the university plummeted. The "few students who befriended Meredith were targets of crude reprisals": one friend had a fire set in his room and several other friends returned to find their rooms "smeared with excrement." *Id.* at 142.

So staunch was Mississippi's adherence to white supremacy that the Kennedy Administration was "convinced that strong federal support for civil rights activists would bring on another civil war in Mississippi, with dire consequences for the South and the nation." *Id.* at 94. Citing "federalism," the nascent Kennedy Administration declined to intervene against rampant civil rights violations in Mississippi. *Id.* at 94.

When the federal government did intervene, it often did so only tepidly and as a last resort. In Leflore County, after years of police repeatedly and routinely beating and arresting Black people who merely walked to the county courthouse to register to vote, the Justice Department filed a daring civil rights lawsuit against the City of Greenwood in 1963. The suit was quickly withdrawn amid pressure from Mississippi's (white) congressional delegation. *Id.* at 154–55. Greenwood and Leflore County officials boasted that they had defeated the Washington bureaucrats. Rather than white Mississippians fearing federal reprisal, it was the other way around. The Kennedy Administration withdrew the suit because it "feared a race war in Greenwood" in the event it obtained an injunction to release those who were arrested. *Id.* at 156. Journalists at the time observed that white supremacists

in Greenwood "route[d] the federal government in a showdown on the most basic right of American citizenship." *Id.* at 157.

With federal civil rights legislation on the horizon, Mississippi yet again redoubled its suppression tactics in the mid-1960s. In summer of 1963, a group of NAACP activists left Greenwood by bus. At the Winona bus stop, local police arrested and tortured each activist who left the bus, for the crime of having protested in Greenwood for civil rights. *Id.* at 171; BRANCH, *supra*, at 819. When the SNCC sent a delegation to Winona to arrange bail for the jailed protestors, they too were arrested and beaten. DITTMER, *supra*, at 172. In response, the Justice Department brought a rare prosecution against several law enforcement officials involved in the arrests. A federal jury of local white men acquitted the defendants on all counts. *Id.* at 173.

That same summer, Medgar Evers was assassinated days after he helped organize the Jackson Woolworth sit-in, at which dozens of angry white supremacists assaulted a handful of activists sitting at a "whites only" counter of the Woolworth department store. Despite national attention of the sit-in and murder, and thousands of angry Black Americans threatening mass protest and boycott, the Kennedy Administration could cajole out of Jackson's mayor only the promise to hire a handful of Black employees for inconsequential city government positions. *Id.* at 167–69.

As bad as life was for Mississippi Blacks in the early 1960s, it generally worsened *after* the enactment of federal civil rights legislation in 1964 and 1965. The Klan was reborn. In February 1964, two hundred Klansmen gathered in Brookhaven to establish the White Knights as a statewide organization. They drafted a 40-page constitution laying out a four-phase plan of attack, with the final phase simply labeled "extermination." *Id.* at 217. On one May evening in 1964, crosses burned in 64 Mississippi counties. "Cross burnings announced the Klan presence in an area . . . followed by

bullets and bombs." *Id.* at 215. Klansmen abducted voter registration organizers across the state; if those organizers were lucky, they would only be stripped and whipped, invoking the same torture endured by their enslaved ancestors. For the dozens who were not so lucky, they would be found mutilated and murdered. Arrests for these crimes, much less prosecutions, were exceedingly rare, as law enforcement worked hand-in-hand with Klan vigilantes. *Id.* at 217. "Klan infiltration into law enforcement agencies was widespread, with police officers and members of the Mississippi State Highway Patrol on the Klan's secret membership rolls." *Id.* at 218. That summer saw 35 shootings, and 65 bombings—35 occurred at churches—by Klansmen. This explosion of violence coincided with Mississippi law enforcement arresting well over a thousand civil rights organizers. *Id.* at 251.

Klan violence was rampant and often proceeded under express sanction by local law enforcement. On June 21, 1964, civil rights organizers Andrew Goodman, James Chaney, and Michael Schwerner were arrested by a Neshoba County Sheriff's deputy, who turned the three over to Klansmen for execution. *Id.* at 247. FBI agents in the area waited almost 24 hours before searching for the three students, who by then were already dead. Several months earlier, Mississippi's State Sovereignty Commission had given the Neshoba County Sheriff's Department a description of Schwerner, his car, and his license plate number, even though Schwerner was not wanted for any crime. *Id.* at 251. The Schwerner family's wish that their son be buried next to James Chaney (a Black man) in Mississippi was denied; even the state's cemeteries were segregated. *Id.*

Once the Civil Rights Act of 1964 took effect, racist oppression only continued to worsen. Mississippi's powerful "Citizens' Council"—a kind of reactionary civic association of white-supremacist community leaders—called for mass defiance, urging whites to boycott any business that served

Black people. Mississippi's Governor similarly urged noncompliance, while Mississippi's all-white Democratic delegation denounced the Civil Rights Act, supported withdrawing the United States from the U.N., demanded a "purge" of the Supreme Court, and called for "separation of the races in all phases of our society." *Id.* at 273. Businesses that followed the new federal law endured reprisals from white supremacists. The Black people who patronized those businesses were beaten or pelted with trash, harassed by police for trumped-up infractions, or abducted and tortured by vigilante groups. *Id.* at 276-78. Black voting participation actually *declined* in 1964 largely due to an eruption of violence and harassment against Blacks. *Id.* at 323.

Despite the enactment of federal civil rights legislation, the Lyndon B. Johnson Administration remained unsupportive of Mississippi's civil rights workers. At the Democratic National Convention in Atlantic City in 1964, President Johnson called a sham press conference in the middle of Fannie Lou Hamer's televised testimony so as to distract from her harrowing, firsthand accounts of Mississippi's apartheid. *Id.* at 288. When Black civil rights activists tried to be seated as electors instead of Mississippi's white, unpledged electors—who would later go on to support the Republican nominee—the FBI spied on the activists. *Id.* at 292; *Intelligence Activities and the Rights of Americans, Book II: Final Report of the Select Committee to Study Governmental Operations*, U.S. Senate, 117 (1976). After the 1964 election, civil rights organizers mounted a challenge to Mississippi's all-white Congressional delegation, noting that these representatives won sham elections in which Black voters were systematically excluded.

The reign of terror against Black Mississippians continued. On August 27, 1964, Klansmen in McComb bombed the home of a Black woman who had recently tried to register to vote. The town of 12,000 had seen over a dozen such bombings in the previous two months alone. *Id.* at 303–04. Yet

when an FBI agent arrived at the scene of the explosion with McComb's chief of police, the agent accused the homeowner of planting the bomb herself—just outside the room where her toddler children were sleeping—and pressured her to take a lie detector test. When she refused, her husband was arrested for running an unlicensed mechanic operation in his garage. The next day, he was tried without a lawyer and coerced into pleading guilty. He was fined $600 and sentenced to nine months in jail. Despite the slew of bombings in the area, the FBI reduced its force in the town by more than half, and the police chief would later proudly tell the Civil Rights Commission that he had worked arm in arm with FBI agents in making arrests such as these. *Id.* at 306–07.

After the FBI withdrew from McComb, the Klan continued bombing Black-owned businesses and assaulting civil rights workers with impunity. Though local law enforcement almost certainly knew who the main Klan bombers were, it took a threat to send in over a thousand federal troops to McComb for police to finally make a handful of arrests. *Id.* at 310. But when the Klansmen-arsonists pled guilty to crimes whose maximum penalty was death, the state judge overseeing the proceedings gave the defendants suspended sentences and ordered their immediate release. When asked to justify this leniency, the judge declared that the defendants had been "unduly provoked" by Black civil rights workers who "are people of low morality and unhygienic," while the bombers hailed from "good families" and "deserve a second chance." *Id.* That same afternoon, another McComb judge ordered 13 civil rights workers jailed without bond for serving food in the local freedom house without a license. When the local newspaper decried these injustices, the newspaper's office was shot up and bombed, and a burning cross placed in front of the editor's home. *Id.* at 312. That November, several McComb businesses served Black customers—under the protection of dozens of federal agents and surrounded by news cameras. But when the FBI

and reporters left, most of the businesses resumed segregation. In 1965, only one McComb business catered to both Blacks and whites. *Id.*

In 1966 (12 years after *Brown*), a federal judge ordered Grenada to desegregate its schools. On Monday, September 12, 1966, about 150 Black students arrived at school and "entered unchallenged." *Id.* at 404. But upon leaving at the end of the day, the children were attacked by a mob of white men "with ax handles, pipes, and chains." *Id.* at 405. A reporter arrived to find "a black boy lying on the sidewalk, his ankle injured and his hands covering his bloody head. Further down the sidewalk, 'some husky young men were whipping a little Negro girl with pigtails. She was running. The men chased after her, whooping and leaping up and down like animals.'" *Id.* A 12-year-old boy named Richard Sigh was tripped by a white woman and, on the ground, was beaten by a crowd with clubs. The mob broke Sigh's leg and, later that day, his father was fired from his job. *Id.* All this happened while the local sheriff and several FBI agents looked on. In June 1967, a handful of the attackers were tried in federal court. An all-white jury acquitted each man.

This recount only skims the surface of life in Mississippi during the relevant time period. The racial climate in Mississippi leading up to 1968, the year that the legislature and electorate allegedly acted race neutral as to § 241, was characterized by a society-wide crusade to keep Black people as second-class citizens. Any step forward to improve civil rights was followed swiftly by massive public resistance. While in my view Mississippi voters have not had a say on the eight original disenfranchising crimes in § 241, a brief consideration of Mississippi history calls into question whether the electorate acted with discriminatory intent in 1968. *See Stewart v. Waller*, 404 F. Supp. 206, 214 (N.D. Miss. 1975) (considering "the realities of Mississippi political life in 1962" and "the historical context in which" legislative action occurred to determine intent). Mississippi and its citizens were as firmly committed to

Mississippi's historical apartheid as ever. It is hard to imagine an electorate so relentlessly active in its resistance to racial equality was somehow suddenly race neutral in their handling of a racially motivated provision in its constitution.

To the extent 1968 is the relevant time period for analyzing discriminatory intent, there is at least a fact dispute that requires the reversal of summary judgment for the State.

### 2.     The Mississippi Legislature and State Leaders

In Mississippi, only the people, the voters, can amend the state constitution. *See* MISS. CONST. art. XV, § 273(2) (requiring constitutional amendments to be "submitted in such manner and form that the people may vote for or against each amendment separately"). But *Cotton*, the majority, and the State rely on the "deliberative process" and actions of the Mississippi *legislature* to conclude there is no evidence of discriminatory intent behind the 1968 amendment to § 241. *See Cotton*, 157 F.3d at 391; *ante*, at 11, 17. This reliance is misplaced because the Mississippi legislature cannot amend or alter the *voters'* intent behind the eight crimes that they originally enacted with discriminatory intent. Regardless, if the legislature's and state leaders' actions matter, they are also telling. *Cf. Perez*, 138 S. Ct. at 2325 (stating historical background is an evidentiary source relevant to intent).

Responding to *Brown*, Mississippi's U.S. Senator James Eastland promised that the state "will not abide by nor obey this legislative decision of a political court. . . . We will take whatever steps are necessary to retain segregation in education. . . . We are about to embark on a great crusade to restore Americanism." DITTMER, *supra*, at 37. The state's attorney general asked every white Mississippi lawyer to sign up as a "Special Assistant Attorney General" to defend local school districts against potential lawsuits from Black students. *Id.* at 38. This would not be necessary because white

Mississippians' ensuing opposition to desegregation was so fierce, and federal pressure so lackluster, that the national NAACP "dropp[ed] Mississippi like a hot potato" from its civil rights work in 1955. *Id.* at 52. Another eight years would pass before the NAACP filed its first desegregation suit against Mississippi public schools, and then only after persistent finagling by Medgar Evers, who knew that the courts' assistance was needed to overcome a political process deliberately stacked against racial progress. *Id.* at 52.

In the mid-1950s, Mississippi's legislature began a decades-long campaign to kill the civil rights movement by any means necessary. "Books were banned, speakers censored, network television programs cut off in midsentence." DITTMER, *supra*, at 58. To ensure civil rights organizations gained no foothold in the state, the legislature created the State Sovereignty Commission, which maintained a secret police force dedicated wholly to stemming the tide of racial progress. The Commission infiltrated civil rights groups with spies, publicized the names of civil rights organizers, and demanded advance copies of articles from local newspapers relating to race. Articles deemed too progressive were killed, often to be replaced by Commission-produced propaganda. *Id.*

In 1956, the legislature passed a resolution of interposition, declaring *Brown* to be "invalid, unconstitutional, and of not lawful effect." The resolution passed 136 to 0. *Id.* at 59. Mississippi also passed a law in 1954 requiring registration applicants to provide a "reasonable interpretation of a section of the state constitution selected by the county registrar, who would judge the "reasonableness" of the answer. *Id.* at 53. This closed a loophole in the 1890 Constitution requiring that applicants only be able to read a portion of the constitution. The referendum passed by nearly five to one. With new laws such as these, Black registration actually *decreased* precipitously in the late 1950s.

In *Jefferson Davis County*, officials conducted a "reregistration campaign," subjecting previously registered Black voters to the new, more restrictive laws, reducing the number of registered Black voters from 1,221 to 70. *Id.* at 71. "In Sunflower County, where only 114 of 18,949 eligible blacks were [registered to vote], the registrar simply turned away black applicants. The sheriff's office in Tallahatchie County, two-thirds black and with no Negro voters, refused to accept the poll tax payment from blacks. A black principal in Tallahatchie County who attempted to register lost his job, and a Forrest County minister with two degrees from Columbia University failed the [literacy] test twice. When pressed for an explanation, the registrar stated that the minister's membership in the NAACP made him unfit to vote." *Id.* at 53.

Mississippi officials also openly defied the Voting Rights Act of 1965, with minimal response from the federal government. In 1966, faced with the prospect of Black Mississippians newly empowered by federal statute with the right to vote, two state senators introduced legislation that would forcibly relocate Blacks out of Mississippi. *Id.* at 387. Most Mississippi counties in 1968 saw less than 25% registration rates among eligible Black voters, who feared reprisal from white vigilantes and state officials alike. STEVEN F. LAWSON, IN PURSUIT OF POWER: SOUTHERN BLACKS AND ELECTORAL POLITICS, 1965-1982, 14-15 (1985). It was not until 1967 that a Black person was elected to the state legislature for the first time since Reconstruction, in a district with a population 72% Black. DITTMER, *supra*, at 416.

Mississippi also waited until the late 1960s to abandon these overt discrimination tactics for "more subtle strategies to dilute and cancel the

black vote."[9] Frank R. Parker, Black Votes Count: Political Empowerment in Mississippi after 1965, 34-37 (1990). The legislature would enact several other measures to stifle Black Mississippians and continue to skew the political process against Black electoral power.

As is well-known, the Mississippi legislature in 1966 (a majority of whom served in 1968), enacted several laws to limit the voting power of Black Mississippians. It redrew Mississippi's five congressional districts, dividing voters in the Black majority Delta among three different districts. It also created multi-member at-large districts for state and county officers, giving the edge to white majorities. *See, e.g.*, 1968 Miss. Laws H.B. 260; H.B. 102; H.B. 1114; *Connor v. Johnson*, 279 F. Supp. 619 (S.D. Miss. 1966), *aff'd*, 386 U.S. 483 (1967); *see also Allen v. State Bd. of Elections*, 393 U.S. 544, 550 (1969); *Stewart v. Waller*, 404 F. Supp. 206, 214 (N.D. Miss. 1975) ("In view of that circumstance and with an awareness of the history of race relations in Mississippi, this court, in determining the purpose for which Sec. 21-3-7 was enacted, is not free to overlook the context giving rise to its enactment."). In at least 11 counties, school superintendents were changed to an appointment system rather than determined by elections. *See* Miss. Code Ann. § 6271 (1966); *Allen*, 393 U.S. at 550–51. The 1968 legislature also continued funding the notorious Sovereignty Commission

---

[9] Although Mississippi slowly abandoned outright suppression for subterfuge, sober observers saw through the ruse:

> . . . it would be naive to believe that the naturally foreseeable consequences of a statute commanding at-large elections for all aldermanic offices, and then only by a majority vote, would be anything other than to make more difficult the election of blacks to those offices. The legislative history, the inevitable and foreseeable effect of the statute's provisions, and the historical context in which the Act was passed permit no other conclusion.

*Stewart v. Waller*, 404 F. Supp. at 214.

suggesting it still had an interest in investigating individuals and organizations that challenged the racial status quo. *See* 1968 Miss. Laws H.B. 1195.

If 1968 is the relevant inquiry, and the Mississippi legislature's, not the people's, intent is relevant to determining discriminatory intent, then there is a factual dispute that requires reversal of the grant of summary judgment to the State.

### 3.     Mississippi's Response to Federal Oversight

The majority relies on Mississippi allegedly responding to the Civil Rights Commission's report on its voting practices to support its threadbare conclusion that the Mississippi legislature acted race neutrally in proposing the 1968 amendment. *See ante*, at 20. This reliance is misplaced because a review of the Mississippi legislature's actions during the relevant time period reveals a different picture of how Mississippi responds to "outside agitators."

True to its familiar history, Mississippi does not yield to outside pressure. At the turn of the 20th Century, Mississippi quickly retreated from Reconstruction ideals. Instead, it embraced the establishment of Jim Crow and Black disenfranchisement. At this same time, Mississippi established its dual school system, segregating schools by race. The history of this system is all too familiar and ultimately led to immense disparities in the education system. Mississippi did all it could to embody living proof that "separate" is not equal. Although *Brown v. Board of Education* appeared to put an end to school segregation in 1954, Mississippians resisted efforts to desegregate and appealed to the legislature to find ways around it.[10] *See* Charles C.

---

[10] And "[a]t a special session of the legislature called in November 1953 to deal with the educational budget, the Mississippi House passed a constitutional amendment

Bolton, The Hardest Deal of All: The Battle Over
School Integration in Mississippi, 1870–1980 65–66 (2005).

In the decade after *Brown*, Mississippi made almost no progress on the desegregation front. Mississippi's leaders largely ignored *Brown* and took no affirmative steps to dismantle its segregated school system in response. Rather, Mississippi adopted an "equalization" plan to improve Black schools in the hopes of convincing Black Mississippians that the status quo of segregated schools was best for everyone. *See id.* at 77.

Only in 1964 did the state see its first signs of desegregation. This came at a time when the state was still unwilling to cede an inch to federal oversight on desegregation. But due to an increase in desegregation lawsuits, the governor called the legislature into a special session to craft measures to blunt the impact of any forthcoming desegregation orders. *See id.* at 105. During this 1964 special session, the legislature drafted laws to separate students by sex and to award tuition grants for students to attend private schools. *See, e.g.*, *Student Grants Set In Mississippi; Legislature Votes Escape Hatch on Integration*, N.Y. Times (July 16, 1964), http://tinyurl.com/2s42u6bp. The bill to separate the sexes was premised on the continuing fear of miscegenation. *See* Miss. Legislature Report (June 1964) ("Many lawmakers say privately they feel there would be less danger from integration if white girls were not forced to go to school with Negro boys."); Bolton, *supra*, at 105. The bill on tuition grants was premised on creating a system of publicly funded yet "private" schools for white students

---

permitting the abolition of the public school system if the U.S. Supreme Court required desegregation." Dittmer, *supra*, at 36. For Mississippi whites, *Brown* served as a "wake-up call, and preserving the southern way of life soon assumed all the trappings of a holy crusade." *Id.* at 41.

only. *See id.* These proposals were explicitly intended to avoid integration. *See id.*

Then Mississippi adopted its "freedom of choice" plan to "desegregate." Despite the plan's label as a desegregation tactic, freedom of choice allowed Mississippi segregationists "to bend their devotion to racial segregation just enough to satisfy federal laws and black demands while preserving as much of their dual school system as possible." *Id.* at 117. And as the federal government began actively enforcing compliance with the *Brown* mandate and other desegregation initiatives, Mississippi intensely resisted.

In response to Title VI of the Civil Rights Act of 1964, which prohibited racial discrimination in any program that received federal funding and required school districts to submit desegregation plans, Mississippi school districts largely committed to the freedom of choice plan. *See id.* at 117. The federal government quickly realized this plan was a farce and continued to submit stringent guidelines for compliance with desegregation requirements. *See id.* at 119, 121. But even so, the federal government often gave Mississippi leaders leeway on these stringent requirements or Mississippi found ways to undermine them. *See id.* at 125, 127.

While Mississippi was "complying" with desegregation demands, its legislature was passing laws designed to suppress Black students' enrollment in white schools. In 1965, the legislature passed a law that mandated a nonresident tuition fee for school enrollment. Of the children affected by the law, 85% were Black.[11] *See* Gene Roberts, *Mississippi Law Bars Hundreds from Schools*, N.Y. TIMES (Sept. 11, 1965), http://tinyurl.com/2p8zfhkk.

---

[11] This law was repealed the following year after civil rights attorneys threatened a lawsuit over the tuition measure.

In 1966, the Civil Rights Commission issued a report on the status of desegregation in the Southern states for 1965 and 1966. *See Survey of School Desegregation in the Southern and Border States 1965–66*, A Report of the United States Commission for Civil Rights (1966). In that report, Mississippi was mentioned numerous times for being out of compliance while touting freedom of choice plans. The report stated freedom of choice did not work due, in large part, to white Mississippians' intimidation and harassment of Black Mississippians. *See id.* at 35–42. Mississippi was called out, again and again, for its opposition to desegregation displayed through violence, sometimes including Klan violence, against Black students wishing to attend white schools. And importantly, the report notes state and local leaders' refusal to intervene or punish such cruel and racist conduct. *See id.* at 35 (discussing Webster County and instances of Klan gatherings, cross burnings, and gun violence after a freedom of choice plan was adopted); *id.* at 37 (discussing the Klan threats to parents, students, and the superintendents, cross burnings, and violence in Calhoun, Madison, and Scott Counties). This report issued new guidelines to ensure compliance with desegregation initiatives, but they did little to advance the cause in Mississippi.

This court and the Supreme Court would go on to question the efficacy behind freedom of choice and whether the plan was just a paper tiger. *See United States v. Jefferson Cnty. Bd. of Educ.*, 372 F.2d 836, 888–89 (5th Cir. 1966), *on reh'g*, 380 F.2d 385 (5th Cir. 1967) ("[Freedom of choice] is better suited than any other to preserve the essentials of the dual school system while giving paper compliance with the duty to desegregate."); *Green v. Cnty. Sch. Bd. of New Kent Cnty.*, 391 U.S. 430, 440 (1968). Yet these decisions did not scare Mississippi into compliance. In fact, the state maintained its freedom of choice plan despite its ineffectiveness (and court orders saying so). So another federal court decision would direct Mississippi

to begin serious desegregation efforts. *See, e.g.*, *United States v. Hinds Cnty. Sch. Bd.*, 417 F.2d 852, 856 (5th Cir.), *supplemented*, 423 F.2d 1264 (5th Cir. 1969). In as late as 1969, in the face of criticism from a civil rights commission and the federal courts hovering over its desegregation efforts, Mississippi was in no hurry to comply.[12] "In actual operation, freedom of choice was just another effective manifestation of [Mississippi's] massive resistance." BOLTON, *supra*, at 140. The resistance was none other than racially motivated.

At the end of the decade, the Supreme Court finally said enough is enough. In *Alexander v. Holmes County Board of Education*, Mississippi was told that the time (15 years) for "all deliberate speed" was over. 396 U.S. 19 (1969). Mississippi school districts were ordered to desegregate by the end of the year. *See id.* While this decision moved integration along, it still did little to stamp out the continued presence of white supremacy, and its thrust behind Mississippi leaders' and the public's ongoing resistance to desegregation.

In 1969 in Tunica County, for instance, in the face of impending court-ordered integration, white flight ensued, school leaders directed white students to take their books home over the holiday break to use at whatever private institution they would inevitably attend, and white seniors were declared complete with their studies and graduated a semester early to avoid attending a desegregated school. *See* BOLTON, *supra*, at 167–8. White teachers who were assigned to formerly Black schools were permitted to

---

[12] Mississippi leaders pressured the new Nixon administration to delay implementation of a Fifth Circuit decision requiring integration by the fall of 1969. *See Stennis Linked to Desegregation Delay*, N.Y. TIMES (Sept. 19, 1969). The delay was approved by the courts but whatever the reason, it was clear that Mississippi's resistance to integration, and creative tactics to avoid it, was still prominent in 1969. *See Where Jim Crow is Alive and Well*, TIME (Sept. 19, 1969).

resign but were still compensated through the end of the 1969–70 school year. *See id.* at 168. Many white students attended church schools whose teachers were the same ones who had resigned from public schools and retained their salaries. *See id.* (citing Tr. of hearing in *United States v. Tunica Cnty. Sch. Bd.*, Nos. 6718, 7013 (N.D. Miss. May 21, 1970)). In 1970, many white Mississippians viewed Black people as so inferior that they placed their students in makeshift private schools or in no school at all. *See id.* The Tunica County superintendent and school board president each gave insight on their thoughts about Black people in early 1970, stating "whites did not want their children going to school with black children," and "black teachers were not qualified to teach white children," respectively. *Id.*

After *Alexander*, Mississippi leaders relied on the same old tactics to avoid desegregation. The white private school movement renewed its steam. From 1966 to 1970, the number of private schools rose from 161 to 236 schools, 61 of which arose in the year after *Alexander*. *See id.* at 173. State officials tried to aid the movement and proposed several measures to promote the private school system. The legislature revived the private school tuition grants as "loans" in 1969—a practice that a federal court declared invalid just earlier that same year. *See id.* at 175; *Coffey v. State Educ. Fin. Comm'n*, 296 F. Supp. 1389, 1392 (S.D. Miss. 1969). This measure would show up again in 1970. Bolton, *supra*, at 175. No one concealed the use of public funds to support a private *white* education. *See* Bolton, *supra*, at 173–75.

Some school districts responded to *Alexander* by adopting sex segregation plans as they did in the early 1960s. *See, e.g.*, *United States v. Carroll Cnty. Bd. of Educ.*, Civil No. GC 6541-K (N.D. Miss. 1969); Bolton, *supra*, at 180. These plans, again, were expressly adopted with race in mind—the superintendent in *Carroll County* testified the sex segregation plan was primarily designed "to keep the black teenage boys away from the white girls." *See* Bolton, *supra*, at 180.

In districts where these integration evasion tactics were not used for whatever reason, white parents just overtly protested the idea of desegregated schools. *See id.* at 181. They formed the Citizens for Local Control of Education (CLCE). *Id.* In January 1970, CLCE and its following of white parents marched in downtown Hattiesburg to oppose desegregation with Confederate flags, banners, and placards that read "Down with HEW" and "Bury the HEW in Mississippi Mud."[13] *Id.* State officials praised CLCE for its members' "personal courage" and "love of liberty and freedom." *See id.*; *see also The End of An Era*, TIME (Jan. 19, 1970).

After the initial backlash from *Alexander*, most white Mississippians and leaders accepted the decision as, "if not defeat, [then] at least the reality of binding law." *The End of An Era*, *supra*. Desegregation continued on a slow but less hostile trajectory.[14] Issues that arose thereon were those that affected other areas of the nation, too. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 22–32 (1971). Still, school segregation in Mississippi officially ended in 1970, a decade and a half after *Brown*. And Mississippi only released its grip on school segregation, an understood symptom of white racism, under duress. So insofar as Mississippi's leaders and public no longer had *de jure* school segregation, there is simply no evidence that the underlying racism was also washed away by court order.

---

[13] The U.S. Department of Health, Education, and Welfare was often referred to as "HEW."

[14] This is not to say that all race discrimination simply fizzled away. With integrated schools on the rise, Black students faced new challenges with teachers and peers labeling them as inferior, regular hostilities and punishments, and the exclusion of Black leaders or representatives on school committees and boards to assist with the new normal. *See* BOLTON, *supra*, at 193–95 (School Integration: A Pyrrhic Victory). Black teachers would also face inequality and discrimination. *See id.* at 212–15. Of course, this is generally historic evidence that Mississippians were not race neutral when it came to many aspects of life in 1970 and after. But I leave discussion of these injustices for another day.

The takeaway from this stretch of history and siphoned social issue is two-fold.[15] First, for as much as the majority relies on Mississippi's response to a report from the Civil Rights Commission, relevant historical evidence shows that Mississippi, its legislature, state leaders, and citizens, have never responded to outside criticism or court orders with any sort of speed or vigilance. There is no basis to conclude the Mississippi legislature proposed the 1968 amendment to § 241 "to eliminate several objections contained in the then-recent findings of the Civil Rights Commission."[16] *Ante*, at 20. Second, it is doubtful that the legislature, which enacted several racially-motivated policies for continuing the unconstitutional practice of segregation, and the electorate, made up of a vast majority of white voters who opposed treating Black Mississippians as equals for educational purposes and engaged in violence and harassment of Black children and parents dating well into the late 1960s, acted neutrally regarding race when voting on the § 241 amendment in 1968. Contrary to the majority's conclusion that "as a matter of law, plaintiffs have not demonstrated that Section 241 as it currently stands was motivated by discriminatory intent," *ante*, at 20, there is at least a fact dispute on whether the 1968 legislature and

---

[15] I should be clear that education and voting issues are not isolated or discrete social issues. One all-too-common example of the crossover occurred when a Black school principal, Eddie Lucas, participated in voter registration drives and worked on a campaign for the first Black supervisor in Bolivar County. In 1967, the Sovereignty Commission investigated his activities and by the end of the school year, Lucas's contract was not renewed. *See* Bolton, *supra*, at 163.

[16] The majority also relies on a statement in the legislative record to show that the Mississippi legislature acted "to delete certain improper parts of the section." *Ante*, at 5. Interestingly enough, the 1968 amendment did not *delete* anything from the list of crimes in § 241. It added rape and murder. So to the extent this statement is relevant, it says nothing about the intent behind the *addition* of crimes to the already-discriminatory list of crimes in § 241.

electorate acted with discriminatory intent, which requires reversal of the grant of summary judgment for the State.

Here is the bottom line: Mississippi defied a *constitutional amendment* for nearly a century. It resisted a landmark *Supreme Court order* for 20 years. It ignored sweeping *federal legislation* for almost a decade. And the majority today opines that Mississippi wasted no time in responding to an *advisory commission's report!* Inconceivable.

## C.

Plaintiffs have met their burden on discriminatory intent behind § 241. That is, in summary, that the 1890 enactment was indisputably enacted with discriminatory intent and if 1968 matters, Plaintiffs have sufficiently created a fact issue on discriminatory intent based on relevant historical evidence. The burden has therefore shifted to the State to prove the provision "would have resulted had the impermissible purpose not been considered." *Hunter*, 471 U.S. at 225 (citation omitted). I would conclude that the State cannot meet this burden and § 241's original eight crimes should be struck down as unconstitutional.

### 1. Section 241 would not have been enacted without the consideration of race

The State cannot meet its burden to demonstrate that § 241 would have been enacted, or the eight original crimes would have been selected, without racial discrimination as a factor. *See Hunter*, 471 U.S. at 228 (citing *Mt. Healthy*, 429 U.S. at 287). That is because in my view, the State's burden is confined to demonstrating the actual enactment of § 241 would have occurred absent the consideration of race—which occurred in 1890.

*Hunter* makes clear that the State's burden is "to demonstrate that the law would have been enacted without [an impermissible] factor." 471

U.S. at 228. This can only mean whether the law would have been enacted, at the only time that it *was* enacted. I discern no reason to conclude it may be analyzed outside of the timeframe of the original enactment. *See ante*, at 21 (stating without authority that "[l]ater events . . . are not irrelevant to demonstrating intent). And there has been no enactment since 1890.[17]

The relevant question is therefore whether the law that was actually enacted, i.e., § 241 in 1890, would have been enacted *at that time* without the consideration of racial discrimination. *See Mt. Healthy*, 429 U.S. at 287 (stating defendant had burden to show that it would have reached the same decision, to not rehire the plaintiff, absent consideration of impermissible motive); *City of South Miami v. DeSantis*, 561 F. Supp. 3d 1211, 1283–84 (S.D. Fla. 2021) (concluding evidence of legislative action before the relevant enactment was irrelevant to the defenders' burden at *Hunter* step two); *cf. N. Miss. Commc'ns, Inc. v. Jones*, 951 F.2d 652, 656–57 (5th Cir. 1992) (explaining the relevant timeframe for analyzing the defenders' burden is "at the time of the decision"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 464–54 n.17 (1985) (Marshall, J. concurring in the judgment in part and dissenting in part) ("[L]aws originally motivated by a discriminatory purpose continue to violate the Equal Protection Clause, even if they would be permissible were they *reenacted* without a discriminatory motive." (citing *Hunter*, 471 U.S. at 223) (emphasis added)). The answer is a resounding no.

---

[17] The State and majority contend the question is whether the law "would have been enacted *in its current form* absent the consideration of race." *Ante*, at 21 (emphasis added). But that is not what *Hunter* says. *Hunter* says the question is whether the law would have been enacted without consideration of the impermissible factor. 471 U.S. at 228. This language suggests the question is not whether the same law enacted for racially discriminatory reasons could, in some hypothetical universe or later period of time, i.e., 1986, be enacted absent the consideration of race. The question is whether the law that exists would have been enacted in the same way at the same time without the purpose of discrimination.

And notably, the State has not identified any nondiscriminatory reason to support its selection of the otherwise random list of crimes that result in disenfranchisement.

Section 241's "original enactment was motivated by a desire to discriminate against blacks on account of race. . . ." *Hunter*, 471 U.S. at 233. The State has failed to meet its burden to show it would have been enacted absent the consideration of race. "As such, it violates equal protection . . . ." *Id.* It follows that the eight crimes selected in 1890 and that remain in § 241 today must be struck down as unconstitutional. I would accordingly reverse the grant of summary judgment to the State and grant summary judgment in favor of Plaintiffs.

### 2.   There is, at a minimum, a triable issue on the State's burden

Notwithstanding my conclusion above, there is undoubtedly sufficient evidence to reverse the grant of summary judgment to the State and remand for factfinding. The State attempts to establish "as a matter of law" that § 241 would have been enacted without consideration of race in 1986, by relying on evidence of legislative inaction. As explained, I see no reason why evidence of action or intent outside of 1890, legislative inaction or otherwise, is relevant to understanding whether § 241 would have been enacted or "reenacted" in 1968 or 1986, *ante*, at 21, absent the consideration of race. But even if evidence of later legislative inaction is relevant to the State's burden, we must recognize that understanding motivation behind historical laws is a complex issue, particularly so in the context of which § 241 has operated— in Mississippi through a deeply rooted and concerning history.

And if we do consider the State's evidence of legislative inaction from the 1980s, that evidence still reveals nothing about the electorate or whether the people would have enacted a provision without the consideration of race.

*See supra* III.A ("[O]nly the *people*, through a direct exercise of popular sovereignty, can amend a constitution, and it follows that only the people can cleanse a racist constitutional provision of its discriminatory intent."). So when looking at the motives of the *people*, history shows there is still, at a minimum, a factual dispute as to whether a law like § 241 would be enacted without consideration of race in 1968, or as recently as this century.

The noxious motives and racist animus from 1890 have disintegrated over time, but they have not disappeared. A simple glance at Mississippi's notorious history from the last two decades confirms this. As recently as 2001, Mississippians voted overwhelmingly, in a nearly 2-1 margin, to retain the state flag that bore the Confederate emblem.

In 1894, just four years after the disenfranchisement of virtually all Black Mississippians, the Mississippi legislature adopted a flag with a canton that contained the Confederate Battle emblem. At the time, there was no ambiguity—the emblem was a means of demonstrating power, it sent the message to powerless Black Mississippians that white men are dominant. The all-white legislature, with the recommendation of the governor, adopted the intimidating symbol without much attention, and informed the public through a single sentence in a newspaper. That sentence did not describe the design or the symbolism it embodied. *See* Stephanie R. Rolph, *The History of Mississippi's State Flag*, Miss. History Now (Feb. 2013). But no doubt, the flag was rooted in upholding Confederate ideology in the end of the Reconstruction. Particularly, the governor at the time sought to repeal laws that permitted Black male voting, calling those laws "a menace to the South." *Id.* Ultimately, the flag's connection to—or rather embracement of—slavery and racial oppression could never be denied.

That flag would go on to fly above Mississippi government buildings and public places for 126 years. Over that time, the symbolism of that flag

endured. And day after day, Black Mississippians saw it at their schools, at their jobs, at their parks. It might even show up in their neighbors' front yards. Knowing what the flag meant and what it stood for, Mississippi's adherence to the flag was more than odd. It was a subtle yet overt inaction that kept Black Mississippians intimidated as long as it waved in the wind.

Efforts to change the flag would come. They would go. Lawsuits would fail. Legislative bills would dissolve.[18] Other states would change. Mississippi would not. Any effort to change the flag would be blocked or derided. Defenders would insist the flag had nothing to do with race. Others would disagree. So would history.

After Georgia shed some of its Confederate imagery in 2001, there was a possibility that Mississippi would do the same.[19] Mississippi then conducted a statewide special election to let the voters decide.[20] *See* 2001 Miss. Laws, HB No. 524. In the two months before the election, defense of the 1894 flag and its Confederate origins was rampant. Although Black and white proponents of change spoke out about the flag's undeniable connection to slavery, the Jim Crow era, and the coded emblem of racism, the voters

---

[18] Mississippi Representative Aaron Henry introduced bills to remove the Confederate emblem in 1988, 1990, 1992, and 1993. None of which made it to the House floor for a vote. *See* Constance Curry, *Aaron Henry: A Civil Rights Leader of the 20th Century*, Miss. History Now (Feb. 2011).

[19] For completeness, I also note that this change was prompted in part by the Mississippi Supreme Court's determination that there was no official state flag because lawmakers inadvertently failed to add it to the state code in 1906. *See Miss. Div. of United Sons of Confederate Veterans v. Miss. State Conf. of NAACP Branches*, 774 So. 2d 388, 391 (Miss. 2000) (concluding use of the flag was by custom only and permitting State to continue its usage).

[20] Notably, the legislature would have voted to keep the flag.

were not inclined to reconcile this troubled past. By a vote of 64.4%, Mississippi voters decided to keep the 1894 flag.[21] And so the flag stayed.

The failed referendum revealed a harsh truth: a majority of Mississippi voters decided against righting the wrongs of the 1894 Mississippi legislature. This was just 21 years ago.

Holding onto the Confederate legacy did not continue quietly. In June 2015, a white gunman with an affinity for the Confederate flag massacred nine Black church members at worship services in Charleston, South Carolina. Although many towns and counties began removing the 1894 flag in response to this tragedy, and South Carolina decided it had gone long enough waving the flag above its capitol, official change remained elusive in Mississippi. At the start of the legislative session the following January, 19 new bills related to the flag were on the agenda. By the end of the month, all were dead.

Almost five years later, in 2020, the high-profile deaths of Black Americans across the nation prompted a renewed call for change. The national conversation about racism was at its peak. And Mississippi's continued endorsement of the Confederate emblem was unsurprisingly magnified. Only after facing insurmountable pressure and recognizing the pain Confederate symbolism causes nearly half its population, did the 1894 flag get appropriately retired to a museum. Without consulting the voters, and for the first time with all deliberate speed, the Mississippi legislature voted to remove the 1894 flag and create a commission to design a new state flag. *See* 2020 MISS. LAWS, HB No. 1796.

Even after this monumental step, in which Mississippi was *forced* to reckon with its past, more than vestiges of that past remain. Since then, year

---

[21]The outcome ran along racial lines with the percentage of eligible white voters at the time being 64.8%.

after year without fail, the State recognizes and declares April as Confederate Heritage Month. Mississippi is the only state to devote an entire month towards the Confederacy—whose position was "thoroughly identified with the institution of slavery—the greatest material interest of the world." An Address: Setting Forth the Declaration of the Immediate Causes which Induce and Justify the Secession of Mississippi from the Federal Union and the Ordinance of Secession (1861). And every January, on the day the rest of the nation celebrates the life of Dr. King, Mississippi celebrates the life and work of Robert E. Lee.

My point is this: in 2001, Mississippi voters' interest in racial reconciliation was not strong enough to compel a vote to remove the most pervasive and recognizable symbol of slavery, oppression, and Jim Crow. Consideration of recent history raises profound doubt whether the *1968* Mississippi legislature or voters acted (or could have acted) neutrally regarding race, i.e., enacted § 241 or selected the original eight crimes absent the consideration of race. And even more so suggests the 1968 Mississippi legislature, responsible for its fair share of passing discriminatory laws, is in no way entitled to the presumption of good faith. *Perez*, 138 S. Ct. at 2324 (stating the good faith of the legislature must be presumed but the ultimate question is whether there is discriminatory intent). So, in my view, historical evidence alone creates a dispute on whether the 1968 amendment would have passed absent the consideration of race. This fact dispute requires the reversal of summary judgment for the State and a remand for factfinding on this issue.

## IV.

Recounting Mississippi's history forces me to relive my experiences growing up in the Jim Crow era. While I do not rely on those experiences in

deciding this case, I would be less than candid if I did not admit that I recall them. Vividly.

So, I confess that I remember in 1963 a cross was burned on my grandmother's lawn, two doors down from where I grew up.

In December of 1969, I left my all-Black high school for Christmas break. It was after the *Alexander* decision where the Supreme Court declared Mississippi could no longer delay desegregation. As a result, I returned to my "desegregated" high school in January of 1970. I was disheartened. Many of the best Black teachers at my high school had been transferred to a predominantly white school and many of the worst white teachers had been transferred to my school. Not a single white student enrolled at my school.

In 1991, I was appointed to serve as a state trial judge. Undoubtedly, my appointment was evidence of progress in the struggle for racial equality in Mississippi. But in the courtroom where I sat, the bench was flanked on one side by the United States flag and on the other side by the Mississippi flag and its Confederate emblem. My inclination was to ceremoniously remove it from the courtroom. But there were others who were working to change the flag. They assured me that change was imminent. They were wrong.

Ten years later I was appointed to serve on the Mississippi Supreme Court. There, the 1894 flag flew above the court, flanked the bench, and nestled in my chambers. And ten years later, when I began my service on this court, there again was the ever-present reminder of Mississippi's sordid history. It is a testament to the greatness of this country and state that I have been selected to serve in the judicial branch of government. But no matter where I went, the 1894 flag was already there—a haunting reminder that a wrong never righted touches us all.

I recount these events, as a native Mississippian, only to highlight the importance of making the right decision in this case.

V.

Harness and Karriem are Black Mississippians who are disenfranchised and deprived of a right that is the cornerstone of our democracy. They are deprived of that right because of § 241—a constitutional provision enacted for the purpose of discriminating against them and their ancestors on the basis of their race. Eight of the crimes selected in 1890 and that remain in § 241 today, including the two crimes that disenfranchise Plaintiffs, were selected with a discriminatory purpose. They were selected by a racist and nearly all-white legislature and approved by a racist and nearly all-white electorate to oppress Black Mississippians. Since then, Mississippi voters have not spoken on those eight crimes. They have not voted on or applied their intentions to those crimes.[22] So the discriminatory taint behind those eight crimes has lingered for over a century and still stands today. Because *Cotton* wrongly decided this issue, I would overrule it.

The burden has therefore shifted to the State to demonstrate § 241 would have been enacted in 1890 absent the consideration of race. It is undisputed that the State has not and cannot meet this burden. Section 241, and its eight original crimes from 1890, therefore violate the Equal Protection Clause. I would accordingly strike down the original eight crimes as unconstitutional and grant summary judgment to Plaintiffs.

---

[22] It is sadly ironic that although Mississippi and this court agree that § 241 was unconstitutionally adopted in 1890, they rely on votes governed by that provision—one that disproportionately disenfranchises Black Mississippians—to conclude that § 241 has been reenacted without a discriminatory purpose.

Alternatively, if 1890 no longer matters and § 241 was "reenacted" in 1968, the relevant historical evidence shows there are fact disputes on whether Mississippi's legislature and voters during the 1960s acted with discriminatory intent in amending § 241. The same historical evidence and fact disputes show the State has not met its burden at the summary judgment stage to demonstrate the same crimes would have been selected for § 241 absent the consideration of race. This allows Harness and Karriem to survive summary judgment. I would therefore, at a minimum, reverse the district court's grant of summary judgment to the State and remand for factfinding consistent with the Supreme Court's unanimous decision in *Hunter*.

It is worth noting that § 241 stands virtually alone in its endurance against courts acting as protectors of constitutional rights. Mississippi's other facially neutral but invidiously motivated laws and constitutional provisions have almost all been invalidated or superseded.[23] Each of these

---

[23] These include: (i) § 241's two-year residency requirement, *see Graham v. Waller*, 343 F. Supp. 1, 3 (S.D. Miss. 1972); (ii) §§ 241 and 243's requirement of payment of a poll tax and disenfranchisement of those who failed to pay it or prove that they paid it, *see Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966); *see also* Kirk H. Porter, A History of Suffrage in the United States 209 (Greenwood Press Reprint 1977) (1918) ("It is impossible to tell the number of Negroes who are unable to vote in spite of the fact that their tax has been paid, simply because he does not save the receipts. The white man is seldom asked to exhibit his receipt, although of course he could be."); (iii) § 249's requirement that electors be registered and swear an oath before a state election official, *see United States v. Mississippi*, 256 F. Supp. 344, 347 (S.D. Miss. 1966); (iv) § 241-A, added in 1960, which required "good moral character" of all electors, *see South Carolina v. Katzenbach*, 383 U.S. 301, 333–34 (1966); (v) § 244, which imposed literacy tests; (vi) § 245, which laid the groundwork for a dual registration system, one for white, one for African Americans, *see Miss. Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1269 (N.D. Miss. 1987); (vii) § 247, which provided that "the legislature shall enact laws to secure fairness in party primary elections," which the legislature used to enact a law allowing primary voters to challenge Black voters' eligibility (the Democratic Party's principles required support of segregation), *see United States v. Mississippi*, 229 F. Supp. 925, 989 (S.D. Miss. 1964) (three-judge court); *United States v. Mississippi*, 380 U.S. 128, 143–44 (1965); (viii) § 251's requirement of registration at least four months prior to an

provisions, like § 241, was enacted to maintain white supremacy in Mississippi. But unlike § 241, these provisions were all struck down by federal judges upholding their oath to the Constitution.

On § 241, Mississippians have simply not been given the chance to right the wrongs of its racist origins. And this court, in failing to right its own wrongs, deprives Mississippians of this opportunity by upholding an unconstitutional law enacted for the purpose of discriminating against Black Mississippians on the basis of their race.

I dissent.

---

election, *see Ferguson v. Williams*, 343 F. Supp. 654, 657 (N.D. Miss. 1972) (three-judge court) (per curiam); and (ix) § 241's misdemeanor disenfranchisement provision, *see McLaughlin v. City of Canton*, 947 F. Supp. 954, 978 (S.D. Miss. 1995).